IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| GLOBAL HOME PRODUCTS, LLC, *et al.,*[1] | )    Case No. 06-10340 (KG) |
| | )    (Jointly Administered) |
| Debtors. | ) |
| | )    Chapter 11 |
| | )           0 6 - . 5 0 8 |
| | ) |
| | ) |

## EMERGENCY MOTION OF REGAL WARE, INC. FOR STAY PENDING APPEAL OF ORDER APPROVING MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF THE WEAREVER DEBTORS OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(B), (F) AND (M) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Regal Ware, Inc. ("Regal Ware") hereby files this Emergency Motion For Stay

Pending Appeal Of Order Approving Motion Of The Debtors For An Order (I)

Approving Sale By The WearEver Debtors Of Substantially All Of The WearEver

Debtors' Operating Assets Free And Clear Of All Liens, Claims, Encumbrances And

Other Interests Pursuant To Sections 363(B), (F) And (M) Of The Bankruptcy Code, (II)

Assuming And Assigning Certain Executory Contracts And Unexpired Leases, And (III)

Granting Related Relief (The "Motion") and respectfully shows this Court as follows:

## I. JURISDICTION

---

[1] The Debtors are the following entities: Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Debtors Acquisition Inc.; Debtors Puerto Rico, Inc.; Debtors Operating Company LLC.

The District Court has jurisdiction over this matter under 28 U.S.C. § 1334. The venue of this case and this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

## II. PRELIMINARY STATEMENT

On August 8, 2006, the Bankruptcy Court approved the sale of the Debtors' WearEver assets to SEB, SA ("SEB"). On August 14, 2006, the Bankruptcy Court entered *Order Approving Motion of Debtors for the Entry of an Order (I) Approving Sale by the Wearever Debtors of Substantially all of Wearever Debtors' Assets Free and Clear of all Liens, Claims, Enbumbrances and Other Interests, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Sale Order," Docket No. 664).[2]

As part of the Sale Order, paragraphs 18, 19, 20 and 22, among others (the "Assignment Approval Provisions"), authorize the Debtors to assume and assign the Trademark Sublicense Agreement (defined below) between Newell Operating Company ("Newell") and Mirro Operating Company ("Mirro"). Regal Ware is the licensor party to the Trademark Sublicense Agreement, in place of Newell, by virtue of the August 1, 2006 Assignment from Newell to Regal Ware.

Although Regal Ware submits that section 363(m) of the Bankruptcy Code does not apply to the distinct issue of assignment of the Trademark Sublicense Agreement, inasmuch as the sole predicate for such assignment is section 365, Regal Ware files this Motion out of an abundance of caution to preserve its right to have its appeal heard on the merits and to ensure that Regal Ware can obtain effective appellate relief.

---

[2] All pleadings, orders and other court filings with the Bankruptcy Court referenced in the Motion are located in the Appendix to the Motion, submitted herewith.

Regal Ware brings this Emergency Motion pursuant to Federal Rule of Bankruptcy Procedure[3] 8005 for a stay of the effectiveness of the Assignment Approval Provisions of the Sale Order. Regal Ware is not seeking a stay of the remainder of the Sale Order.

## III.    EMERGENCY REQUEST FOR EX PARTE ORDER

Regal Ware respectfully requests that this Court immediately enter on an ex parte basis, an emergency interim temporary stay order to apply until the scheduled hearing before this Court on Regal Ware's Stay Motion. Regal Ware makes this emergency request for an ex parte order because of the expressed threat made by the Debtors and the proposed purchaser SEB, to close the transaction immediately in an overt effort to moot Regal Ware's appellate rights before Regal Ware can even have its stay motion heard on the merits by this Court. An emergency ex parte interim order is merited in these circumstances because of the undisputable fact that the parties' Asset Purchase Agreement may be timely closed at any time through and including Friday August 18, 2006. The Debtors and SEB argued to the Bankruptcy Court that a stay even of this short duration, simply to allow Regal Ware to be heard by the District Court, may cause harm as it would inject some level of uncertainty into the sale process. However, Regal Ware respectfully submits that these are arguments made for the sole purpose of furthering the parties' mootness strategy. They cannot legitimately argue that they would suffer hardship if even the short stay Regal Ware is requesting on an ex parte basis would not delay in any way a timely closing.

---

[3] The Federal Rules of Bankruptcy Procedure will hereinafter be referred to as "Bankruptcy Rule __."

PHIL1 691776-1

## IV.    PROCEEDINGS BEFORE THE BANKRUPTCY COURT

On August 12, 2006, Regal Ware filed the instant Motion with the Bankruptcy Court (Docket No. 660).

On August 14, 2006, the Debtors, SEB and Wachovia Bank, National Association ("Wachovia") each filed objections to the Emergency Stay Motion (Docket Nos.663, 666 and 668, respectively). The Official Committee of Unsecured Creditors joined the Debtors objection to the Emergency Sale Motion [Docket No. 670].

At the August 14 hearing, Regal Ware through its counsel advised the Bankruptcy Court that Regal Ware agrees to be bound by an order of the Bankruptcy Court that would grant SEB all rights under the Trademark Sublicense Agreement, subject only to termination of such rights if after the conclusion of all appeals and ultimate finality of a determination of the assignability issues, Regal Ware prevails. Regal Ware further advised the Bankruptcy Court that even if Regal Ware does ultimately prevail, it nonetheless commits to allow SEB to retain any profits of sales of REGAL-marked goods during the intervening time. If the final outcome was adverse to Regal Ware, then the Trademark Sublicense Agreement would be deemed fully and unconditionally assigned to SEB. As Regal Ware advised the Bankruptcy Court, the purpose of this commitment was to present the Bankruptcy Court with an equitable mechanism to maintain the status quo pending appeal with respect to the use of the REGAL-marked goods.

The Bankruptcy Court expressed concern that Regal Ware's status quo proposal was not something that the Court could order without the agreement of the Debtors and SEB. Regal Ware argued that Regal Ware's express and unconditional undertaking in the nature of a covenant not to sue, which would then be approved by order of the

4

PHIL1 691776-1

Bankruptcy Court, would be indistinguishable from the license rights that the SEB sought to obtain at closing. The sole party with standing to such for infringement of the Licensed Trademarks is Regal Ware, and therefore a covenant not to by Regal Ware and court approval thereof would in Regal Ware's view place the parties in a position that is nearly indistinguishable from their desired position. Counsel to SEB and counsel to the Debtors did not articulate any specific reasons for their unwillingness to consent to Regal Ware's proposal, in terms of what particular legal rights they would not have under the Regal Ware proposal that they contend they would in an actual assignment. Counsel for SEB did state on the record that the primary reason SEB would not accept the offer is that it would make SEB unable to argue that any Regal Ware appeal is moot.

With respect to the evidence taken at the Stay Hearing, Regal Ware has ordered the official transcript on an expedited basis and has been advised it will be emailed to counsel to Regal Ware the morning of August 16, 2006. The following is a summary of the relevant testimony.

The Bankruptcy Court heard testimony from three witnesses at the August 14 Stay Hearing: Dennis Schmidt, Executive Vice President and Chief Operating Officer of Regal Ware; Ronald Stengel, Chief Restructuring Officer of the WearEver Debtors; and Scott Meyer, an executive with SEB.

Mr. Schmidt testified that SEB and its affiliated companies are direct competitors of Regal Ware in the "high-end" sector of cookware, principally with SEB's brand of All Clad products. The sole business line that Regal Ware is in at the present time is the high-end cookware business, which has historically been Regal Ware's primary business

5

PHIL1 691776-1

line. Regal Ware produces very similar high-quality stainless steel cookware. Also, the price point for a set of All Clad stainless steel cookware is at or near the entry-level price for a set of the stainless steel multi-layer cookware manufactured and sold by Regal Ware.

Mr. Schmidt testified that Regal Ware was at risk of irreparable harm if the Licensed Trademarks were assigned to SEB as proposed by the Debtors. SEB is a very well-capitalized and large business with significant manufacturing capacity. If SEB placed products into the market at the high-end range and bearing the Licensed Trademarks, there would be confusion in the market place caused by Regal Ware selling its products with its name on the box as the manufacturer, but the REGAL marks on the competing goods sold by SEB. He testified that this would create a difficult level of competition for Regal Ware. SEB also has a strong presence in retail outlets through numerous product lines. The All Clad line in particular enjoys a significant market share in the high-end retail market. Mr. Schmidt testified that Regal Ware was at risk that SEB would use the Licensed Trademarks to directly compete with Regal Ware, which would be likely to reduce Regal Ware sales and harm Regal Ware's business.

Regal Ware is currently pursuing an initiative to re-enter the retail market, at the high-end retail segment at specialty retail stores and high-end department stores, Mr. Schmidt testified. He testified that since 2004, Regal Ware has been working on a line of cookware that Regal Ware would seek to introduce at retail outlets such as Williams Sonoma. Mr. Schmidt testified that Regal Ware would expect to achieve significant gains in winning shelf space at such retailers, given Regal Ware's history with, and relationship with, retailers. However, Mr. Schmidt testified that SEB would be in a

6

PHIL1 691776-1

position to harm Regal Ware's business if SEB has rights under the Trademark Sublicense Agreement to use the Licensed Trademarks. While SEB already has the successful All Clad line of high-end cookware, SEB would likely seek to sell to high-end retailers goods bearing the Licensed Trademarks in order to keep Regal Ware goods from such retail outlets. Mr. Schmidt also testified that there would be confusion in the marketplace if SEB began to sell goods bearing the Licensed Trademarks in direct sales, since that is the primary sales tool used by Regal Ware at the present time.

Mr. Schmidt further testified that with respect to "low-end" retail sales to WalMart, where all of the Debtors' sales of goods bearing the Licensed Trademarks currently are, Regal Ware has a threat of harm of a different nature. If the WalMart sales of covered goods were to discontinue, and SEB does not sell to alternative retailers, then Regal Ware was at risk that the Licensed Trademarks will be effectively barred from use in any respect in the marketplace.

Mr. Stengel testified that he was the executive with primary responsibility for advising the Board of Directors regarding the bankruptcy case and for carrying out actions in connection with the bankruptcy case. The WearEver Debtors' 2006 annual revenue for sales of REGAL-marked goods was approximately $15.9 million, at a 24% gross margin revenue, approximately $4 million gross profit. He also testified that there was an ongoing dialogue with WalMart since inception of his engagement by the Debtors, during which WalMart has threatened to pull its business. He testified that the Debtors would suffer substantial harm if the Debtors' sales to WalMart were lost. Anchor Hocking sells approximately $50 million to WalMart, to same WalMart buyer as for the WearEver sales to WalMart. The Debtors' sales people have advised that there is

7

PHIL1 691776-1

significant risk to the Debtors of losing the WalMart business, including the Anchor Hocking business. He also testified that the Debtors would lose $2 million at closing on the proposed sale if the Trademark Sublicense Agreement was not assigned to SEB at closing, pursuant to a purchase price adjustment term in the asset purchase agreement. On cross-examination he testified that he could not specify in whether the issues relating to Regal Ware were a minor part of the alleged WalMart risk, or a significant part. He also testified on cross examination that the Debtors had not given any thought to what they would do with the Trademark Sublicense Agreement after the SEB closing, nor had the Debtors formulated any contingency plans for that possibility, despite the fact that they agreed in early July to an asset purchase agreement that expressly provided for the possibility that the Trademark Sublicense Agreement could not be legally assumed and assigned.

Mr. Meyer testified that he is the Executive Vice President of Group SEB, S.A., and President of its Tefal Division. He testified that in general, WalMart vendor contracts allow it to terminate vendors if they fail to meet the service requirements under such alleged contracts. However, SEB did not introduce any of the Debtors actual WalMart contracts, nor any of the alleged SEB contracts with WalMart. Mr. Meyer further testified that SEB contacted WalMart after the auction to advise that SEB was the winning bidder, due to SEB's concerns with WalMart. He also testified that SEB has considered the possibility that the Trademark Sublicense Agreement would not be assigned to SEB. Yet he was not aware of whether SEB ever waived its right to receive an assignment of the Trademark Sublicense Agreement. He further testified that SEB understands that immediate action is needed with WalMart after closing, as in SEB's

8

view WalMart is close to the point that it could pull some or all of the Debtors' business for 2006 and 2007. However, Mr. Meyer testified that SEB is confident it can meet all of WalMart's concerns after closing. He also testified that SEB can maintain the quality control requirements under the Trademark Sublicense Agreement. With respect to the WalMart risk, Mr. Meyer, like Mr. Stengel, did not testify as to any sense of proportion of the role played by any uncertainty as to Licensed Trademarks, versus the other problems the Debtors have had with WalMart as to other segments of the businesses being purchased by SEB.

After hearing the testimony of the witnesses and the arguments of counsel, the Bankruptcy Court denied Regal Ware's Emergency Stay Motion. In denying the Motion, the Bankruptcy Court, in summary, held that the standard for showing the likelihood of success on appeal is that the factual and legal issues are so unclear that a higher court could decide otherwise and found that Regal Ware did not meet that standard. The Court also ruled that Regal Ware did not demonstrate irreparable harm, as it did not show any economic harm. The Court further ruled that because it did not issue a written opinion as to the Sale Motion and the Court's ruling was narrowly tailored to the facts of the case, there would be no harm to the public if a stay pending appeal was not granted.

Accordingly, Regal Ware now seeks a stay pending appeal from the District Court for the reasons set forth below.

V.   FACTS

A.   The Background Of The Bankruptcy Case And The Sale Motion

On April 10, 2006, (the "Petition Date"), Global Home Products LLC and several affiliated entities (collectively the "Debtors") commenced the above-captioned

9

bankruptcy cases by filing voluntary petitions under Chapter 11 of Tile 11 of the United States Code.

On July 7, 2006, above-referenced debtors (the "Debtors") filed their *Motion of the Debtors for an Order (I) (A) Approving Sale Procedures and Overbid Protections in Connection with Sale of Substantially All of the Operating Assets Owned by the WearEver Debtors; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; (C) Approving Notice of Respective Dates, Times and Places for Auction and for Hearing on Approval of (i) Sale and (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving Forms of Notice; (II) Approving Inventory Advance Provisions and Granting Security Interests and Superpriority Claim; and (III) Granting Related Relief* (the "Bid Procedures Motion", Docket No. 511).

On July 14, 2006, the Debtors filed their *Motion Of The Debtors For An Order (I) Approving Sale By The Wearever Debtors Of Substantially All Of The Wearever Debtors Operating Assets Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant To Sections 363(B), (F) And (M) Of The Bankruptcy Code, (Ii) Assuming And Assigning Certain Executory Contracts And Unexpired Leases, And (III) Granting Related Relief* (the "Sale Motion", Docket No. 549).

Also on July 14, 2006, the Bankruptcy Court entered an order granting the Bid Procedures Motion (the "Bid Procedures Order", Docket No. 547).

On July 25, 2006, the Debtors filed a *Notice of Filing of Schedule of Executory Contracts and Unexpired Leases That May Be Assumed or Assigned Under The Agreement Or Any Competing Agreement* (the "Contract Notice", Docket No. 584).

On August 3, 2006, Regal Ware filed its *Objection of Regal Ware, Inc. to Motion of the Debtors for an Order (i) Approving Sale by the Wearever Debtors of Substantially All of the Wearever Debtors Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (ii) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (iii) Granting Related Relief,* (the "Objection," Dockeyt No. 618).

On August 7, 2006, the Debtors filed their *Reply to Objection of Regal Ware, Inc., to Motion Of The Debtors for Order (I) Approving Sale by the Various Wearever Debtors of Substantially all of the Wearever Debtors Operating Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "Debtors' Reply", Docket No. 631).

On August 7, 2006, Regal Ware filed its *Amended Supplemental Memorandum Of Regal Ware, Inc. In Support Of Objection To Assignment Of Trademark Sublicensing Agreement* (the "Supplemental Memorandum", Docket No. 641).

## B. The Trademark Sublicense Agreement and Related History

On October 29, 1999, Regal Ware and Newell Operating Company ("Newell") entered into a Trademark License Agreement (the "License Agreement"). The License

11

Agreement provided Newell with an exclusive license to use, directly and through its Affiliates, a number of REGAL, REGAL & DESIGN, and CORONET REGAL trademarks, for which Regal Ware has trademark registrations throughout the world (the "Licensed Trademarks"). Id.

The License Agreement provided Newell with the "right to sublicense others, including its Affiliates, to use the Licensed Trademarks" in the "Defined Field," which is "all non-electric cookware, bakeware and other accessories and products in International class 21."[4]   License Agreement § 1.3.

On or about April 13, 2004, Newell sublicensed the Licensed Trademarks by entering into a *Trademark Sublicense Agreement* with Mirro Operating Company, LLC ("Mirro")(the "Trademark Sublicense Agreement"), in connection with a Stock and Asset Purchase Agreement dated March 12, 2004 between Newell and Global Home Products LLC (the "Purchase Agreement").

The Trademark Sublicense Agreement provides as follows with respect to sublicensing and assignment:

> Sublicensing and Assignment. Licensee shall not have the right to sublicense others to use the Licensed Trademarks without the written consent of Licensor, which consent shall not be unreasonably withheld or delayed, except that Licensee may have Products manufactured by others for sale by Licensee and its Affiliates. Licensee may not assign or transfer this Agreement by operation of law or otherwise without the written consent of Licensor, which consent

---

[4] The United States Patent & Trademark Office identifies the class(es) assigned to a mark under the International Classification of Goods and Services (Nice Agreement) based upon the goods or services on which the mark is used. The International Classification has been the primary classification for marks in the United States since September 1, 1973, and includes International Class 21, which is broadly recited as "Housewares and Glass."

> shall not be unreasonably withheld or delayed. This
> Agreement and the rights and obligations of Licensor
> hereunder may be assigned or transferred by Licensor by
> voluntary action or involuntarily by operation of law or
> otherwise to any other person or entity. This agreement
> shall be binding upon the successors and assigns to the
> parties.

Trademark Sublicense Agreement § 1.3 (Added emphasis).

On August 1, 2006, Newell assigned all of its rights to the Trademark Sublicense

Agreement to Regal Ware under an assignment agreement (the "Assignment

Agreement"), as authorized under section 1.3 of the Trademark Sublicense Agreement.

Pursuant to the Assignment Agreement, Newell also assigned and transferred to Regal

Ware all of its rights under the License Agreement.

Pursuant to the Assignment Agreement, Regal Ware is the non-debtor party to the

Trademark Sublicense Agreement with Mirro. Newell has relinquished all rights and has

been released from all obligations respecting the Licensed Trademarks, the Trademark

Sublicense Agreement and the License Agreement.

### C.    The Relevant Provisions of the SEB Asset Purchase Agreement

Under the Asset Purchase Agreement with SEB, the deadline for closing does not

expire until Friday, August 18, 2006. This timing is an essential factor when the Court is

called upon to balance the hardships to Regal Ware and the other parties.

Section 2.5.4 of the Asset Purchase Agreement provides as follows:

> 2.5.4 Notwithstanding anything to the contrary herein, the
> Purchase Price (as adjusted, if at all, in accordance with the
> terms of this Agreement) shall be reduced by $2,000,000 at
> Closing if at such time the Sellers shall have failed to

13

satisfy the condition set forth in Section 4.2.17 of this
Agreement.

Section 4.2.17 of the Asset Purchase Agreement provides as follows:

4.2.17 The Sellers shall have obtained one of the following
prior to the Closing:

(i) an order (as part of the Approval Order, which shall not
be stayed as of the Closing) obtained after prior notice and
an opportunity to be heard by Regal Ware, Inc. ("Regal
Ware") and Newell Operating Co. ("Newell") either (xx)
authorizing the assignment of Sellers' interest in such
intellectual property licensed by Regal Ware to Newell as
is sublicensed by Newell to Mirro Operating Company
pursuant to that certain Trademark Sublicense Agreement
(the "Sublicense Agreement"), (yy) stating that the
consents of Regal Ware and Newell are not required for the
assignment of Sellers' interest in the Sublicense Agreement
(or, alternatively, if Sellers have obtained the consent of
only one of Regal Ware and Newell, an order providing
that the consent of the other is not required in order to
assign the Sellers' interest in the Sublicense Agreement),

(ii) the written consents (in a form reasonably satisfactory
to the Buyer) of Regal Ware and Newell to the assignment
of Sellers' interest in the Sublicense Agreement to Buyer,

(iii) the written consent of Newell to the assignment of
Sellers' interest in the Sublicense Agreement to Buyer and
Buyer's written agreement acknowledging that Regal
Ware's consent to the assignment of Sellers' interest under
the Sublicense Agreement is not required, or

(iv) Buyer's written agreement acknowledging that Regal
Ware's and Newell's consent to the assignment of Sellers
interest under the Sublicense Agreement is not required.

Only upon the failure of all of the events described in
clauses (i) through (iv) above to occur, at the election of
Buyer, Sellers shall reasonably cooperate with Buyer in any
commercially reasonable arrangement providing for the
disposition of all Designated Inventory (as defined in
Section 2.4 of the Lifetime Purchase Agreement) (and, in
the case of Designated Raw Materials (as defined in
Section 2.4 of the Lifetime Purchase Agreement) which

14

> shall become upon the manufacture thereof Designated
> Inventory, such additional Designated Inventory), subject
> to the Sublicense Agreement, pursuant to one or more
> "secured creditor" sales or other processes mutually
> agreeable to the parties, and the proceeds of all such sales
> and other processes, net of the actual cash costs and
> expenses of Sellers (as provided in the immediately
> following sentence) shall be for the account of the Buyer.
>
> All cash costs and expenses actually incurred by the
> Sellers in connection with any "secured creditor" sales or
> other processes described in the preceding sentence shall be
> the sole responsibility and obligation of the Buyer and the
> Buyer agrees to indemnify and hold harmless each of the
> Sellers with respect to any and all losses, liabilities,
> damages, claims, demands, causes of action, actions, costs
> and expenses (including, without limitation, all court costs
> and reasonable attorneys' fees) as Sellers (or any of them)
> may suffer or incur directly arising or resulting from
> cooperating with Buyer with respect to such "secured
> creditor" sales or other processes as contemplated herein.

The operation of sections 2.5.4 and 4.2.17 is clear if a stay is granted: the parties have

expressly agreed that in the event of a stay pending appeal, at Closing SEB will have a $2

million purchase price reduction and the Trademark Sublicense Agreement will remain

with Mirro as the licensee. There is thus a clear severability of the provisions that govern

the transfer of the Trademark Sublicense Agreement. At all relevant times, the parties to

the sale transaction have always had a Plan "A" and a Plan "B" to deal with the

possibility that the Trademark Sublicense Agreement could not be assigned.

## D.    The Sale Hearing and the Bankruptcy Court's Ruling

In its Objection, Regal Ware argued, and in its Supplemental Memorandum

further demonstrated, that the restriction on assignment contained in section 1.3 of the

Trademark Sublicense Agreement is enforceable under applicable trademark law.

Further, Regal Ware argued that it did not consent to such proposed assignment. Regal

15

Ware further argued, among other things, that it could not reasonably be expected to consent, without the benefit of any relevant information by which to evaluate whether assignment would benefit or harm Regal Ware.

The Bankruptcy Court conducted a hearing (the "Sale Hearing") on August 8, 2006 to consider the Sale Motion and Regal Ware's objection, among other objections. At the Sale Hearing, the Debtors asserted that Regal Ware's Trademark Sublicense Agreement was freely assignable and, even if was not freely assignable, Regal Ware was being unreasonable in refusing to consent to the assignment of the Trademark Sublicense Agreement to either SEB or Lifetime.

At the conclusion of the Sale Hearing, this Court ruled from the bench that the Trademark Sublicense Agreement is freely assignable, as a matter of law. The Court so held based on its reasoning that the exclusive nature of the license granted in the Trademark License Agreement made it free of any restriction on transfer, regardless of what contractual terms were in the agreement. The Court did not make any finding of fact on the ultimate issue of whether Regal Ware's consent to assignment of the Trademark Sublicense Agreement was reasonably withheld.

In support of its determination that the Trademark Sublicense Agreement is freely assignable, the Court reasoned that the cases cited by Regal Ware in its Objection are distinguishable, as they involved non-exclusive licenses or special circumstances not present in this case. The Court further reasoned that its determination was supported by the holding of In re Golden Books Family Entm't, Inc., 269 B.R. 311, 318 (Bankr. D. Del. 2001). Golden Books was a copyright case in which the court held that an exclusive

PHIL1 691776-1

licensee acquires certain property rights and may freely transfer its license rights. The Court also based its conclusion on In re Rooster, Inc., 100 F.2d 228 (Bankr. E.D. Pa 1989), in which the court held, based solely upon Pennsylvania law, that an exclusive trademark license does not constitute a personal services contract. In its references to Golden Books and Rooster, the Bankruptcy Court did not refer to the cases cited by Regal Ware in its Supplemental Memorandum.

Regal Ware respectfully submits that the Court's holding upends trademark law with respect to the nature of an exclusive trademark license, as well as the enforceability of a consent-based restriction on assignment in such a license agreement. Trademark law is governed by principles that are materially distinguishable from those that govern in copyright law. Regal Ware respectfully submits that the Bankruptcy Court's holding should be reviewed on appeal, on the merits. In that connection, the Bankruptcy Court should not permit the parties opposing Regal Ware to purposefully moot Regal Ware's appeal rights, or otherwise end-run the rights of Regal Ware.

**E.      During any Stay Pending Appeal, Regal Consents to Use of its Marks Under the Trademark Sublicense Agreement as a Means to Eliminate Hardship to the Estates or SEB**

The stay sought by Regal Ware is limited only to a stay of the assignment or other transfer of the Trademark Sublicense Agreement to SEB. For the duration of any stay pending appeal, Regal Ware consents to the full and unconditional use by the Debtors of their rights under the Trademark Sublicense Agreement. Regal Ware will demonstrate that under these circumstances, there will be no colorable claim that a stay pending appeal is likely to cause any harm. Instead, the fact is that the status quo may be maintained as long as the parties involved use good business sense.

17

If a stay is granted, then at Closing the Trademark Sublicense Agreement will remain with Mirro and will not be transferred to SEB. Otherwise, at Closing all or substantially all of the other Purchased Assets will be transferred to SEB. The WearEver Debtors and SEB will also enter into a Transition Services Agreement, which will provide a mechanism to transition the business from the WearEver Debtors to SEB or SEB affiliates. The question is whether the status quo will be maintained for the portion of the WearEver Debtors' business that involves the sale of products that bear the Licensed Trademarks covered by the Trademark Sublicense Agreement. Certainly, Regal Ware's consent ensures that the marks can be used. In terms of maintaining the supply to the retailers to whom the WearEver Debtors sell the marked goods, there are numerous ways to accomplish precisely that. Logic and good business practices dictate that the WearEver Debtors and SEB can and will take reasonable steps to maintain this portion of the WearEver Debtors' business, and thereby maintain the status quo pending the appeal.

Following a stay, one option that theoretically exists is one that is provided to the parties under section 4.2.17 of the Asset Purchase Agreement. In section 4.2.17, in the second-to-last sentence, there is a provision that allows the parties to essentially begin a liquidation of goods that bear the Licensed Trademarks, using "secured creditor sales" or the like. While this right is theoretically one that the WearEver Debtors and SEB may elect to exercise, it would be a To avoid such an unnecessarily drastic step during a stay pending appeal, Regal Ware expressly consents to the continued use of its marks under the terms of the Trademark Sublicense Agreement pending appeal.

It would be odd indeed if SEB and Mirro would take the steps to moot their own appeal rights by availing themselves of the secured creditor sales process with respect to

18

REGAL marked goods. Regal Ware understands that the WearEver Debtors sell a substantial amount of product to retailers, much of it bearing the Licensed Trademarks. The value of any such retailer relationships or agreements can and should be preserved notwithstanding any stay pending appeal. Regal Ware believes that a suitable arrangement between SEB and the WearEver Debtors to carry out this goal would be feasible and in the best interests of the estates and SEB. Such an interim arrangement would preserve the retailer relationships that are valuable to SEB, and will put the parties to the transaction in the best position to again move forward with transfer of the Trademark Sublicense Agreement in the event that Regal Ware's appeal is unsuccessful.

## VI.    ARGUMENT

### A.    The Legal Standard for a Stay Pending Appeal

Bankruptcy Rule 8005 governs the issuance of a stay pending appeal. Bankruptcy

Rule 8005 provides in relevant part:

> A motion for a stay of the judgment, order, or decree of a
> bankruptcy judge, for approval of a supersedeas bond, or
> for other relief pending appeal must ordinarily be presented
> to the bankruptcy judge in the first instance.
> Notwithstanding Rule 7062 but subject to the power of the
> district court. . ., the bankruptcy judge may suspend or
> order the continuation of other proceedings in the case
> under the Code or make any other appropriate order during
> the pendency of an appeal on such terms as will protect the
> rights of all parties in interest.

The standards for the issuance of a stay under Bankruptcy Rule 8005 are as

follows:

> (1) Appellant is likely to succeed on the merits of the
> appeal;
>
> (2) Appellant will suffer irreparable injury;
>
> (3) No substantial harm will come to Appellee; and
>
> (4) The stay will do no harm to the public interest.

In re Roth American, Inc., 90 B.R. 94, 95 (Bankr. M.D.Pa. 1988). These four factors

guide the Bankruptcy Court's inquiry of whether a stay should be permitted under

Bankruptcy Rule 8005. "However, no one aspect will necessarily determine its outcome.

Rather, proper judgment entails a delicate balancing of all elements." Id. (internal

quotation marks omitted).

20

PHIL1 691776-1

Courts are obligated to give serious consideration to motions seeking a preservation of the status quo pending appeal in the bankruptcy context. See Licensing by Paolo v. Sinatra (In re Gucci), 105 F.3d 837, 840 (2d Cir. 1997). In Gucci, parties appealing a bankruptcy court order approving a sale pursuant to Section 363 of the Bankruptcy Code requested that the District Court enter a stay pending appeal. The District Court denied the request, and the appellants sought and obtained a stay from the Second Circuit. Gucci, 105 F.3d at 838-39. Prior to the issuance of the stay by the Second Circuit, however, the sale was consummated. The Second Circuit was deeply troubled by the fact that the District Court's denial of the request for stay pending appeal effectively precluded the opportunity for meaningful appellate review:

> On this motion to dismiss an appeal involving a bankruptcy sale, we write to alert district judges to a major and perhaps unappreciated significance of their action, after denying a stay pending appeal, in denying even a one-day stay to permit a party to seek a stay pending appeal from the Court of Appeals.

Id., 105 F.3d at 838 (emphasis added). The court in Gucci made it clear that where, as here, significant and substantially irreversible actions may occur upon issuance of an order, the lower court has an affirmative responsibility to preserve issues for consideration by the appellate court. Id., 105 F.3d at 840.

This responsibility has two facets: at a minimum, allowing the appealing party the necessary days to seek a stay in the court of next resort, as well as giving serious consideration to the full merits of the requested stay pending appeal. In what should be deeply troubling to the Bankruptcy Court, SEB has made clear that it will seek to have this Court permit just what the Second Circuit decried in Gucci: to close the moment after

21

the Bankruptcy Court's ruling, should the Bankruptcy Court deny Regal Ware's stay motion. This would clearly allow a violation of the principle set forth in Gucci, and there is simply no reason for the Bankruptcy Court to permit such tactics, given that the subject transaction here need not close until Friday, August 18, 2006, several days after the Bankruptcy Court considers the present stay motion.

Regal Ware meets all of the Roth American requirements. Accordingly, given that the entry of the Sale Order could moot Regal Ware's appeal rights, the Court should grant a stay pending Regal Ware's appeal of the Court's ruling on the assignability of the Trademark Sublicense Agreement.

### B.    Regal Ware Is Likely To Succeed On The Merits Of The Appeal

Under the first prong of the test for granting a stay pending appeal the Court need only find that the appeal is not frivolous and that Regal Ware presents a strong appellate case. See In re Miraj & Sons, Inc., 201 B.R. 23, 26-27 (Bankr. D. Mass. 1996). As is demonstrated below, Regal Ware easily meets this test.

The Bankruptcy Court based its holding on two cases, In re Golden Books Family Entm't, Inc., 269 B.R. 311, 318 (Bankr. D. Del. 2001), and In re Rooster, Inc., 100 B.R. 228, 233 (Bankr. D. Pa. 1989). Both are legally distinguishable from the legal issues present in this case. Regal Ware respectfully submits that it was legal error for the Bankruptcy Court to apply those cases to the present situation.

22

## 1.    The Holding Of Golden Books Cannot Be Applied To Trademarks

Golden Books was decided solely with respect to "*exclusive copyright licenses*" under the unique provisions of the Copyright Act. The unique legal attributes of copyright licenses cannot be extrapolated to trademark licenses. Copyright licenses bear a unique statutory arrangement far different from the trademark laws. *Compare* 17 U.S.C. §§ 101, 106, 201(d) with 15 U.S.C. § 1060.

Under the Copyright Act of 1909 (the "1909 Act"), copyright licenses (whether exclusive or not) were "not transferable as a matter of law." Harris v. Emus Records Corp., 734 F.2d 1329, 1333 (9th Cir. 1984). Unlike an assignee, a licensee "had no right to resell or sublicense the rights acquired unless he had been expressly authorized so to do." 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.01[C][4] (2001).

However, the Copyright Act of 1976 redefined, and eradicated, much of the doctrine of indivisibility as it applied to exclusive copyright licenses. Most importantly, 17 U.S.C. § 101 defines the "transfer of copyright ownership" as "an assignment, mortgage, *exclusive license*, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, *but not including a nonexclusive license*." 17 U.S.C. § 101 (emphasis added).

Thus, the Copyright Act itself expressly provides that an *exclusive license* equates to a "*transfer of copyright ownership,*" but a nonexclusive license does not. If follows that, as was the case in Golden Books, whether copyright law precludes the free

assignment of licenses depends on whether a particular license is exclusive (assignable, because the exclusive licensee is actually the owner and thus the licensor retains no ownership rights) or nonexclusive (non-assignable, because the nonexclusive licensee is *not* the owner of the copyrights).

In contrast to Golden Books, trademark law contains no such statutory definition that equates an exclusive trademark license with outright ownership of the mark. Indeed, the only substantive trademark law regarding ownership relates to assignments. 15 U.S.C. § 1060. Notably, substantive trademark law **does not,** like copyright law, equate an exclusive license with a transfer of ownership. Therefore, the copyright distinction between exclusive and nonexclusive licenses simply cannot apply to trademark licenses. As such, it was legal error to do so in this case.

In this case, Regal Ware's ownership of its marks is clearly delineated, and indeed acknowledged by the Trademark Sublicense Agreement. Section 4.1 of the Trademark Sublicense Agreement explicitly provides that Mirro "acknowledges that Regal Ware is the owner of all right, title and interest in and to the Licensed Trademarks and is also the owner of the goodwill attached or which shall become attached to the Licensed Trademarks." This provision, standing alone, fact alone removes this case from the exclusive/nonexclusive distinction drawn in copyright law, that distinction reflective more of *ownership* than status as an exclusive or nonexclusive licensee. 17 U.S.C. § 101; *see also* TMT N. Am., Inc. v. Magic Touch GmbH, 124 F.3d 876, 882 (7th Cir. 1997) (in absence of assignment of trademark rights, foreign manufacturer holds all rights to trademark even after licensing use of trademark to exclusive U.S. distributor.)

24

Therefore, the Court's reliance on Golden Books, which dealt solely with exclusive copyright licenses, does not apply to the Trademark Sublicense Agreement, and the exclusive or nonexclusive nature of the sublicense is not relevant.

## 2. The Rooster Case, Upon Which The Court Also Relied, Is Inapposite In That It Failed To Apply *Federal* Trademark Law

The Bankruptcy Court relied upon Rooster for the proposition that the Trademark Sublicense Agreement could be assigned, even absent Regal Ware's consent, because the Court found the Trademark Sublicense Agreement not to be a personal services contract.

However, the issue in Rooster was not whether U.S. trademark law prevented the assignment of a trademark license. Rather, "the issue [was] **narrowly** framed by the parties: [did] the [sub-]licensing agreement constitute a contract for personal services, which applicable Pennsylvania law [held] unassignable?" *Id.* at 232 (emphasis added). Therefore, the issue in Rooster, as framed by the parties, was whether *Pennsylvania state law* would view the trademark sublicense as a personal services contract. Indeed all parties in Rooster "conced[ed] the applicability of Pennsylvania law to [the] dispute." Id. at 232, n8. The curious lack of argument relating to federal trademark law has been noted by at least one commentator. See Article: Michelle Morgan Harner, Carl E. Black and Eric R. Goodman, Debtors Beware: The Expanding Universe of Non-Assumable/Non-assignable Contracts in Bankruptcy, 13 Am. Bank. Inst. L. Rev. 187, 223 (Spring 2005).

The narrow issue in Rooster was "[i]n particular, ... whether the licensing agreement constitutes a personal services contract which cannot be assigned or sold by the debtor." *Id.* at 229. The Rooster court focused primarily on the fact that licensor's

25

strict quality control program resulted in very little personal discretion exercised by the
licensee. *Id.* at 235. This forced the court to the conclusion that the license at issue was
not a "personal services contract" and therefore could not be assumed or assigned under §
365(c)).

The bankruptcy court rejected the argument that the license in Rooster was one
for personal services on the grounds that Pincus' control over the debtor's use of the "Bill
Bass" trademark meant that the debtor's performance under the trademark license
agreement did not depend upon "any special personal relationship, knowledge, unique
skill or talent." Rooster, 100 B.R. at 233. Accordingly, the bankruptcy court determined
that the sublicense was assignable because it was not for personal services.[5]

Indeed, Rooster did not address the consent provision present in the present
license, namely that Newell (and now Regal Ware) had to consent to the assumption or
assignment of the sublicense. "The right of a licensee to sub-license to others must be
determined by whether the license clearly grants such a power. Similarly, the general rule
is that unless the license states otherwise, the licensee's right to use the licensed mark is
personal and cannot be assigned to another." Tap Publs. v. Chinese Yellow Pages, 925 F.
Supp. 212, 218 (D.N.Y. 1996).

_____

[5] Even if the sublicense here was not a personal services contract, it would still be non-
assignable. In re Pioneer Ford Sales, Inc., 729 F.2d 27, 28-29 (1st Cir. 1984). (District
Court erred out by its "belief that 11 U.S.C. § 365(c)(1)(A) refers only to traditional
personal service contracts…. The language of the section does not limit its effect to
personal service contracts. It refers generally to contracts that are not assignable under
nonbankruptcy law. State laws typically make contracts for personal services
nonassignable (where the contract itself is silent); but they make other sorts of contracts
nonassignable as well.")

26

In this case, the primary legal issue addressed by the Bankruptcy Court was whether the Trademark Sublicense Agreement had an enforceable restriction on assignment under Federal trademark law, and therefore enforceable under section 365(c)(1) of the Bankruptcy Code. "Under applicable *trademark* law, trademarks are personal and non-assignable without the consent of the licensor." In re N.C.P. Mktg. Group, Inc., 337 B.R. 230, 237 (D. Nev. 2005) (emphasis added). Therefore, trademark licenses are unassumable in bankruptcy. Id. "[T]he Third Circuit adheres to the majority view . . . that § 365(c) is applicable to any contract subject to a legal prohibition against assignment," not just personal service contracts. Id.

It is well recognized that "[w]ithout specific authorization from the trademark owner, the licensee's right to use the licensed mark is personal and cannot be sold or assigned to another. The reason is that because the trademark owner has a duty to control the quality of goods and services sold under the mark, it must have the right to pass on the abilities of new potential licensees." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:43 (June 2006). As recently recognized, since a trademark owner has an affirmative duty to supervise and control the licensee's use of its mark, "[c]ommon sense suggests that if a trademark licensee could unilaterally sub-license a mark without notifying or obtaining consent from the licensor, then a trademark licensor would lose his ability to police his mark, thereby becoming estopped from enforcing his ownership rights [and imposed duties] vis-à-vis the licensee. Such a result is illogical, undesirable, and at odds with the nature of intellectual property rights." Miller v. Glenn Miller Prods., 318 F. Supp. 2d 923, 937 (C.D. Cal. 2004).

27

PHIL1 691776-1

The same rationale applies to this case. Regal Ware has a duty to protect the public's expectation that all products sold under its marks of are like quality. A denial of Mirro's ability to assume and assign the trademark license comports with established Federal trademark common law, statutory law, and the imposed duties on trademark owners. Absent control of further sublicense and assignment, trademark owners would be relegated to mere observers of others' use of their duly owned and issued trademarks.

Other courts are in agreement that a trademark licensor can refuse consent to an assignment of a trademark license. *See* In re Pioneer Ford Sales, Inc., 729 F.2d 27, 30 (1st Cir. 1984) (refusing to approve transfer because Ford had a reasonable basis for objecting to proposed transferee); Ford Motor Co. v. Claremont Acquisition Corp., Inc., 186 B.R. 977, 991 (Bankr. C.D. Cal. 1995) (reversing order compelling assignment of GM franchise but affirming order compelling assignment of Ford franchise), *aff'd*, 113 F.3d 1029 (9th Cir. 1997); In re Van Ness Auto Plaza, Inc., 120 B.R. 545, 551 (Bankr. N.D. Cal. 1990) (upholding manufacturer's withholding of consent to transfer dealership); In re Van Ness Auto Plaza, 120 B.R. at 549-50 (finding manufacturer's withholding of consent to assignment of PORSCHE dealership reasonable in view of its new less desirable location, and the low rank of the proposed transferee in customer satisfaction index); see also In re West Elecs., Inc., 852 F.2d 79, 82-84 (3d Cir. 1988) (assumption by bankrupt contractor as debtor-in-possession was not permitted, due to contractor's changed circumstances).

For further example, in In re Luce Industries, Inc., 14 B.R. 529, 531-32 (Bankr. S.D.N.Y. 1981) a bankrupt licensee, as debtor-in-possession, proposed to assume its license to the FRUIT OF THE LOOM mark but delegate all manufacturing and sales

28

PHIL1 691776-1

responsibilities to a discount clothing jobber. Sympathizing with the potential adverse effect on the licensor, the court found that (i) the arrangement amounted to the assignment of an expressly non-assignable license and (ii) the licensor would not be "adequately assured of future performance" because the licensee would maintain no office, showroom, sales staff, or "leadership," and because the licensor would have no direct enforcement rights against the subcontractor.

A debtor does not necessarily have the power to assign a trademark license. See Article: Richard Leib, The Interrelationship of Trademark Law and Bankruptcy Law, 64 Am. Bankr. L.J. 1, 7 (1990). "While a debtor has the right under section 363(b)(1) of the Bankruptcy Code, subject to the court's approval, to sell property of the estate other than in the ordinary course of business, neither the provisions of section 541 defining 'property of the estate' nor of section 363 authorizing sale of estate property, expand the rights of the debtor in particular property beyond those conferred by applicable nonbankruptcy law." Therefore, a debtor cannot do in bankruptcy something that the debtor was contractually prevented from doing outside of bankruptcy. That is exactly what has happened in this case, the Court eliminated the consent requirement from the sublicense, effectively allowing the assignment of the sublicense when, outside of this proceeding, Mirro would not have been able to do so absent Regal Ware's consent.

Furthermore, a trademark may be assigned only with the goodwill that it symbolizes. 15 U.S.C. § 1060. Upon entering into the trademark license in this case, Mirro agreed that the good will represented by the licensed marks would build only in Regal Ware. See License Agreement § 4.1. Denial of assumption of the trademark license would comport with Federal trademark common law and statutory law.

No ownership interest was conveyed to Mirro, but instead was expressly recognized as belonging to Regal Ware, and Regal Ware's consent is still required.

## C.    Regal Ware Will Suffer Irreparable Injury If A Stay Is Not Entered

Again, as explained in more detail below, Regal Ware contends that § 363(m) does not encompass the assignment of the Trademark Sublicense Agreement. However, in order to protect its appellate rights, Regal Ware addresses the issue of irreparable harm in the event the Court finds § 363(m) applies to the assignment of the Trademark License Agreement.

The Debtors will argue that the Third Circuit has held executory contracts assigned pursuant to a sale are encompassed by § 363(m). See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490 (3rd Cir. 1997; Cinicola v. Scharffenberger, 248 F.3d 110, 124 (3rd Cir. 2001). However, Regal Ware submits that these cases are distinguishable.

In order for statutory mootness under § 363(m) to apply the following must be shown: (i) the underlying sale was not stayed pending appeal; and (ii) a reversal or modification of the approval of the sale would affect the validity of the sale. Krebs, 141 F.3d at 490. Applying this test to the facts of this case, Regal Ware would not be statutorily mooted.

Were the Sale Order to be reversed or modified, the validity of the sale would not be affected, as the assignment of the Trademark Sublicense Agreement is a severable component of the sale, which will have no effect on the transfer of the WearEver assets to SEB. Indeed, the Debtors and SEB specifically severed the assignment of the Trademark

PHIL1 691776-1

License Agreement from the rest of the sale transaction. Section 2.5.4 of the First Amendment to the Asset Purchase Agreement provides for a $2,000,000 purchase price reduction in the event the Trademark Sublicense Agreement cannot be assigned to the buyer. Further, nothing in the Asset Purchase Agreement conditions the closing of the sale on the assignment of the Trademark Sublicense Agreement. The assignment of the Trademark License Agreement, by design of the Debtors and SEB, is not inextricably linked to the sale of all the other WearEver assets. See Cinicola, 248 F.3d at 126 ("we are convinced the assumption and assignment of the physician contracts were inextricably intertwined with AHERF's sale of assets. . . .").

Thus, absent any other provision in the Asset Purchase Agreement, the sale will close, regardless of whether the Trademark Sublicense Agreement can be assigned to SEB at the closing. Accordingly, the validity of the sale will not be upset.

Because the facts of this case demonstrate a reversal or modification of the approval of the sale would not affect the validity of the sale, the assignment of the Trademark Sublicense Agreement would not be subject to § 363(m).

However, should the Court find that § 363(m) applies to the Trademark Sublicense Agreement, then a stay of the effectiveness of the Assignment Approval Provisions of the Sale Order is essential, as Regal Ware will be substantially and irreparably harmed as its appeal rights will be mooted by 11 U.S.C. § 363(m).

A denial of a stay pending appeal in this matter risks a forfeiture of Regal Ware's rights to appeal the Bankruptcy Court's ruling as to the free assignability of its trademarks, for the actual assignment of the Trademark Sublicense Agreement to SEB

31

will likely render an appeal constitutionally moot. See In re PWS Holding Corporation, 228 F.3d 224, 236 (3rd Cir. 2000) ("[c]onstitutional mootness implicates the Article III case or controversy requirement; an appeal is moot in the constitutional sense only if events have taken place that make it "impossible for the court to grant 'any effectual relief whatever.'")(citing Church of Scientology of Calif. v. United States, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)).

## D.    The Stay Is Necessary In The Public Interest

The review of the Bankruptcy Courts' legal determination on appeal is a matter of acute public interest. This factor greatly weighs in favor of granting a stay. The issues and ramifications of this case make the public interest factor one of primary importance, far beyond the mere interests of Regal Ware, SEB or the WearEver Debtors.

There is a significant public interest in ensuring that trademark law is consistent nationwide and ensures appropriate protection and guidance to trademark owners worldwide. Regal Ware's appeal involves extremely important legal issues that have broad ramifications for existing trademark licenses, as well as future ones. Regal Ware respectfully submits that the Bankruptcy Court's ruling represents a significant change in existing trademark law. On an issue of such importance, there is a public interest in allowing an effective appeal, as opposed to allowing the Debtors and SEB to seek to moot to appeal for tactical reasons, to prevent any appellate review. Mooting this appeal would forever lock in the Bankruptcy Court's decision. In that circumstance, this major ruling will be untested for perhaps years, creating a very large amount of uncertainty in the field of trademark law. As word of the Bankruptcy Court's ruling spreads, parties in a great many trademark licensing transactions will have difficulty predicting their rights

32

in the event of a licensee's bankruptcy, or even in a possible assignment dispute outside of bankruptcy.

Under the exigencies of the WearEver Debtors' sale transaction, the Bankruptcy Court has not been afforded enough time to carefully weigh and study substantive trademark law. Indeed, the timing was such that the parties' competing memoranda of law were received by the court all less than 24 hours before the Sale Hearing was to begin. As a result of this timing, moreover, the Bankruptcy Court was not in position to write a precedential opinion. Even assuming that the Debtors are right on the law and Regal Ware is incorrect, there is a significant public interest in allowing an appeal on the merits so that a precedential, reported opinion can be published by the District Court on this important issue. Indeed, Regal Ware believes that the precise issue decided by the Bankruptcy Court was an issue of first impression under section 365(c)(1): whether under federal trademark law, a restriction on assignment of an exclusive trademark license agreement is enforceable under any circumstances. As has been correctly noted, the NCP case was itself a case of first impression for a bankruptcy case, and it addressed only a non-exclusive trademark license agreement.

## E.     Regal Ware Should Not Be Required To Post A Bond

The Court has great discretion in fashioning relief relating to a stay pending appeal. Bankruptcy Rule 8005 allows the Bankruptcy Court and the District Court to tailor relief to the unique circumstances of the case. In re Trans World Airlines, Inc., 18 F.3d. 208, 212 (3d Cir. 1994). Bankruptcy Rule 8005 states that:

> Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved

33

PHIL1 691776-1

> hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order the pendency of an appeal on such terms as will protect the rights of all parties in interest.

Id. Under this rule, the Court has a uniquely flexible tool that grants to it great, but not completely unbridled, discretion. In re Gleasman v. Jones, Day, Reavis & Pogue, 111 B.R. 595, 599 (Bankr.W.D.Tex. 1990).

With respect to the stay of execution of money judgments, a bond is sometimes required in order to preserve the status quo that exists as of the time of the judgment. "The purpose of requiring a supersedeas bond to be posted is to preserve the status quo while protecting the non-appealing party's rights pending appeal." Beatrice Foods Co. v. New England Printing and Lithography Co., 930 F.2d 1572, 1574 (Fed.Cir. 1991) (citing Poplar Grove Planting & Refining Co., Inc. v. Bache Halsey Stuart, Inc., 600 F.2d 1189, 1190-91 (5th Cir. 1979)). To the extent that the Debtors argue that Regal Ware should be required to post a bond, Regal Ware demonstrates herein that the status quo in this case will be adequately preserved without the need for a bond.

If a court determines that the non-appealing party will not suffer any loss as a result of a stay pending appeal, a stay may be granted without any bond. In re United Merchants and Manufacturers, Inc., 138 B.R. 426, 431 (D.Del. 1992). The purpose of a bond is to protect a party from a loss, not to confer a windfall. Gleasman, supra, 111 B.R. at 604 (emphasis in original). Where an appeal is taken on a non-monetary judgment, the non-appealing party needs only to be protected from the diminution of the value of the collateral and the time-value of the loss of use of the property. See id. (specifically rejecting request for bond in the amount of the value of the property).

34

The Court should apply general equitable principles to determining how to secure the non-appealing party from a loss. In re Texas Equipment Co., Inc., 283 B.R. 222, 229 (Bankr.N.D.Tex. 2002) (citing Miami Int'l Realty Co. v. Paynter, 807 F.2d 871, 873 (10th Cir. 1986). In the current case, there will be no loss to the Debtors during the pendency of the appeal, thus no bond should be required. Alternatively, any asserted loss posited by the Debtors will be speculative.

The Licensed Trademarks question have been in existence since 1945 and have been continuously used since that time. The REGAL WARE marks are used not only by Mirro under the Trademark Sublicense Agreement, but are also used by Regal Ware in fields and classes of goods not covered under the Trademark Sublicense Agreement. The Trademark Sublicense Agreement only covered non-electric cookware under its own terms. Any assertion that the marks will suffer a decline in value pending appeal is speculation and unsupportable. Therefore, as to the value of the marks, the Debtors will not suffer any harm if the stay is granted without bond.

Additionally, the Debtors, SEB and Regal Ware all have an interest in protecting the value of the Marks during the pendency of a stay pending appeal. Regal Ware commits to allow the use of the Licensed Trademarks for any period of time necessary to allow the Debtors to perform their existing contractual obligations to any retailer to whom the Debtors supply covered goods, or to any suppliers from whom the Debtors purchase goods bearing the Licensed Trademarks (to the extent that such contractual obligations The Debtors have a fiduciary duty to maximize the value of the estates and, therefore, must not take any actions to significantly impair the value of the Marks during the appeal. Similarly, the Marks in question share a common name with many other

PHIL1 691776-1

Marks held by Regal Ware. If the Marks decline in value, they would negatively impact the value of the other Marks that are held by Regal Ware. Thus, Regal Ware has a significant incentive to preserve the value of the Marks during the pendency of this appeal.

In order to further protect the value of the Marks, Regal Ware has agreed to consent to the limited use of the Marks by the Debtors during the pendency of the appeal. This will allow the Debtors to continue to deliver product to retail customers using the Marks and therefore will protect the value inherent in the Marks by continually using such Marks and by protecting against claims by parties requiring delivery of product incorporating the Marks. SEB's interest should also be aligned with the Debtors in this respect, with the expectation that if Regal Ware is unsuccessful on appeal, SEB will be a position to thereafter acquire rights to the Licensed Trademarks as it seeks today.

In the event that this Court determines that a bond is required to protect the Debtors, the Court should permit Regal Ware a reasonable amount of time to comply with any such condition.

## VII.    CONCLUSION

Regal Ware respectfully submits that the assignment of the Trademark Sublicense Agreement does not fall within the ambit of § 363(m), and therefore its rights to appeal the assignability of the Trademark Sublicense Agreement are preserved and will not be mooted by the entry of the Sale Order. Nonetheless, Regal Ware respectfully requests entry of an order staying the effectiveness of the Assignment Approval Provisions of the

PHIL1 691776-1

Sale Order, and prohibit the Debtors from assuming and assigning or otherwise transferring rights under the Trademark Sublicense Agreement.

Cause exists to stay the Assignment Approval Provisions the Sale Order pending the disposition of Regal Ware's appeal to the District Court. Regal Ware meets all of the Roth American factors. First, federal trademark law shows that the Court's application of Golden Books and Rooster was erroneous as a matter of law and therefore Regal Ware is likely to succeed on the merits of its appeal. Second, absent a stay of the Assignment Approval Provisions of the Sale Order, Regal Ware's appellate rights are at a substantial risk of being forfeited. Third, the WearEver Debtors will not suffer any substantial harm if the Court invokes a stay, as the marks will be freely transferable after any reversal on appeal, coupled with Regal Ware's authorization of the continued use of the Licensed Trademarks pending appeal. Finally, the entry of a stay serves the public interest by ensuring that trademark law is consistent nationwide and ensures appropriate protection and predictability to trademark owners worldwide.

WHEREFORE, Regal Ware respectfully requests that the Court enter an order staying the effectiveness of the Assignment Approval Provisions of the Sale Order, and prohibit the Debtors from assuming and assigning or otherwise transferring rights under the Trademark Sublicense Agreement, pending the disposition of Regal Ware's appeal of the Sale Order to the District Court, and grant such other and further relief as the Court deems just and proper.

Date: August 15, 2006                    Respectfully submitted,

                                         KLEHR HARRISON HARVEY
                                         BRANZBURG & ELLERS LLP

37

PHIL1 691776-1

the Trademark Sublicense Agreement, pending the disposition of Regal Ware's appeal of

the Sale Order to the District Court, and grant such other and further relief as the Court

deems just and proper.

Date: August 15, 2006                          Respectfully submitted,

                                               KLEHR HARRISON HARVEY
                                               BRANZBURG & ELLERS LLP

                                               Morton R. Branzburg, Esq.
                                               Steven K. Kortanek (Del. Bar No. 3106)
                                               Jennifer L. Scoliard (Del. Bar No. 4147)
                                               919 N. Market Street, Suite 1000
                                               Wilmington, Delaware 19801
                                               (302) 429-1189 – telephone
                                               (302) 426-9193 - facsimile

                                               -and-

                                               RYAN KROMHOLZ & MANION, S.C.
                                               Daniel R. Johnson, Esq.
                                               Joseph A. Kromholz, Esq.
                                               P. O. Box 26618
                                               Milwaukee, Wisconsin 53226-0618

                                               *Attorneys for Regal Ware, Inc.*