IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - X
REGAL WARE, INC.,                 :
                                  :
          Appellant,              :
                                  :
     v.                           :   Case No. 1:06-cv-00508
                                  :
GROUPE SEB USA, SEB S.A.,         :
and GLOBAL HOME PRODUCTS          :
LLC, et al.,                      :
                                  :
          Appellees.              :
- - - - - - - - - - - - - - X
In re:                            :
                                  :   Chapter 11
GLOBAL HOME PRODUCTS LLC,         :
et al.,                           :   Case No. 06-10340 (KG)
                                  :   Jointly Administered
          Debtors.                :
- - - - - - - - - - - - - - X
```

**MEMORANDUM OF PURCHASERS IN OPPOSITION TO EMERGENCY
MOTION OF REGAL WARE, INC. FOR STAY PENDING APPEAL
OF ORDER APPROVING MOTION OF THE DEBTORS FOR AN
ORDER (I) APPROVING SALE BY THE WEAREVER DEBTORS
OF SUBSTANTIALLY ALL OF THE WEAREVER DEBTORS
OPERATING ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES AND OTHER INTERESTS
PURSUANT TO SECTIONS 363(b), (f) AND (m) OF
THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, AND (III) GRANTING RELATED RELIEF**

SEB S.A. and Groupe SEB USA (together, "SEB" or

the "Purchasers"), the purchasers of certain assets of the

debtors and debtors-in-possession in the above-captioned

cases, hereby submit this memorandum in opposition to the

Emergency Motion of Regal Ware, Inc. for Stay Pending

Appeal of Order Approving Motion of the Debtors for an Order (I) Approving Sale by the WearEver Debtors of Substantially All of the WearEver Debtors Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief (the "Emergency Motion").

### STATEMENT OF THE CASE AND NATURE OF THE PROCEEDINGS

On April 10, 2006, the above-captioned debtors and debtors-in-possession (the "Debtors") each filed a voluntary petition for relief under chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  (B. Ct. Dkt. 1)

On July 7, 2006, the Debtors filed a motion (as supplemented on July 11, 2006, the "Bidding Procedures Motion") to approve, among other things, bidding procedures for the sale (the "WearEver Asset Sale") of certain assets (the "WearEver Assets") of Mirro Acquisition Inc., Mirro Puerto Rico, Inc., and Mirro Operating Company LLC (the "WearEver Debtors").  (B. Ct. Dkt. 511, 525)  The Bankruptcy Court entered an order approving the Bidding

2

Procedures Motion (the "Bidding Procedures Order") on July 14, 2006.  (B. Ct. Dkt. 547)

On July 14, 2006, the Debtors filed a motion (the "Sale Motion") to approve, among other things, the WearEver Asset Sale.  (B. Ct. Dkt. 549)  Pursuant to the Bidding Procedures Order, SEB provided the Debtors with a bid to purchase the WearEver Assets on August 3, 2006.  (Auction Trans. at p. 2)

On August 3, 2006, Regal Ware, Inc. ("Regal") filed a late objection to the Sale Motion (the "Regal Objection").  (B. Ct. Dkt. 618)  In the Regal Objection, Regal objected to the sale, assumption and assignment of an exclusive worldwide trademark sublicense (the "Trademark Sublicense") pursuant to which the Debtors were permitted to use a number of Regal, Regal & Design, and Coronet Regal trademarks (collectively, the "Trademarks").  Id.  A copy of the Trademark Sublicense is attached hereto as Exhibit A.

On August 7, 2006, the Debtors filed their reply to the Regal Objection (the "Debtors' Reply").  (B. Ct. Dkt. 631)

Pursuant to the Bidding Procedures Order, the Debtors conducted an auction with respect to the WearEver

Assets on August 7, 2006.[1]  The Bankruptcy Court then

conducted a hearing on the Sale Motion on August 8, 2006

(the "Sale Hearing"), at which hearing the Bankruptcy Court

found that the bid submitted by SEB was the highest or

otherwise best offer, and approved the sale of the WearEver

Assets to SEB.  (Sale Hearing Trans., B. Ct. Dkt. 665, at p.

285)  The Bankruptcy Court further overruled the Regal

Objection, and approved the sale, assumption and assignment

of the Trademark Sublicense to SEB.  (Id. at p. 284)  Regal

appealed the Bankruptcy Court's decision overruling the

Regal Objection on August 14, 2006.  (B. Ct. Dkt. 673)

Regal's appeal on that decision is currently pending before

this Court.

Subsequent to the Sale Hearing, Regal objected to

certain provisions in the proposed order approving the Sale

Motion.  (B. Ct. Dkt. 656)  The Bankruptcy Court conducted

an emergency hearing on those and other objections to the

proposed sale order on August 11, 2006 (the "Sale Order

Hearing").  After a lengthy hearing on the form of the Sale

---

[1]  A copy of the transcript of the August 8, 2006 auction (the "Auction Transcript") is attached hereto as Exhibit B and is referred to herein as (Auction Trans. at __).  A copy of the Auction Transcript was submitted into evidence before the Bankruptcy Court at the Sale Hearing.  (B. Ct. Dkt. 665, at p. 58)

Order, the Bankruptcy Court entered an order approving the Sale Motion (the "Sale Order").  (B. Ct. Dkt. 664)

On the morning of August 12, 2006, Regal filed its Emergency Motion of Regal Ware, Inc. for Stay Pending Appeal of Order Approving Motion of the Debtors for an Order (I) Approving Sale by the WearEver Debtors of Substantially All of the WearEver Debtors Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief (the "Bankruptcy Court Stay Motion") in the Bankruptcy Court.  (B. Ct. Dkt. 660)  In the Bankruptcy Court Stay Motion, Regal requested a stay of the effectiveness of the Sale Order and/or the sale, assumption and assignment of the Trademark Sublicense pursuant to the Sale Order.  Id.

On August 14, 2006, the Bankruptcy Court conducted a hearing that lasted nearly four hours with respect to the Bankruptcy Court Stay Motion.  After hearing lengthy testimony from three witnesses, and hearing all interested parties' arguments, the Bankruptcy Court denied the Bankruptcy Court Stay Motion.  (B. Ct. Dkt. 676)  The

order denying the Bankruptcy Court Stay Motion (the "Bankruptcy Court Order") was entered on August 15, 2006. Id.

On August 15, 2006, Regal filed the Emergency Motion in this Court, again seeking a stay of the sale, assumption and assignment of the Trademark Sublicense to SEB but also ex parte relief.

## STATEMENT OF FACTS

This dispute arises from the Debtors' sale of substantially all of the business of certain debtors (the "WearEver Debtors") to SEB, including but not limited to the sale, assumption and assignment to SEB of the WearEver Debtors' exclusive, worldwide, non-royalty trademark license for the Trademarks.

On October 29, 1999, Regal entered into a Trademark License Agreement with Newell Operating Company ("Newell"). A copy of the Trademark License is attached hereto as Exhibit C. The Trademark License was an exclusive, worldwide, royalty-free license for the Trademarks, and provided no restriction on Newell's right to sublicense the Trademarks. See Trademark License § 1.3 ("Licensee shall have the right to sublicense others, including its Affiliates, to use the Licensed Trademarks in

the Defined Field."). Pursuant to the sublicensing provision, Newell sublicensed the Trademarks to one of the Debtors, Mirro Operating Company LLC ("Mirro"), pursuant to the Trademark Sublicense. See Exhibit A, Trademark Sublicense. The Trademark Sublicense does limit further sublicensing by Mirro as well as the assignment of the sublicense held by Mirro. Id. § 1.3.

After commencing their chapter 11 cases, the Debtors determined that they would maximize the value of their estates for their creditors by selling substantially all of the business of the WearEver Debtors. (Sale Hearing Trans., B. Ct. Dkt. 665, at p. 55) By the Sale Order, the Bankruptcy Court approved the Debtors' sale of the WearEver Business, including the sale, assumption and assignment of the Trademark Sublicense, to SEB. (Sale Order, B. Ct. Dkt. 664, at ¶¶ P, Q, 2, 3)

By the Emergency Motion, Regal has requested this Court, as it unsuccessfully did before the Bankruptcy Court, to stay the sale, assumption and assignment of the Trademark Sublicense to SEB.

The Bankruptcy Court properly concluded that Regal failed to meet its burden of proof to grant such a stay. For the same reasons, this Court should deny Regal's

request for any stay pending appeal.  In that regard,

Regal's request for an ex parte stay should be denied

because Regal has failed to post a bond.

**ARGUMENT**

### I.   THE COURT SHOULD DENY REGAL'S EX PARTE REQUEST FOR A STAY PENDING APPEAL AS PROCEDURALLY IMPROPER

In the Emergency Motion, Regal requests this

Court ex parte to stay that part of the Sale Order that

authorizes the sale, assumption and assignment of the

Trademark Sublicense to SEB.  See Emergency Motion, at 17.

Regal has sought only a discretionary stay under Rule 8005

of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), see Emergency Motion, at 3, 20.

A party that unsuccessfully seeks a stay of an

order before the bankruptcy court, as Regal has done here,

may seek a stay before the district court.  Bankruptcy Rule

8005 provides:

> A motion for a stay of the judgment, order, or
> decree of a bankruptcy judge, for approval of a
> supersedeas bond, or for other relief pending
> appeal must ordinarily be presented to the
> bankruptcy judge in the first instance . . . . A
> motion for such relief, or for modification or
> termination of relief granted by a bankruptcy
> judge, may be made to the district court or the
> bankruptcy appellate panel, but the motion shall
> show why the relief, modification, or termination
> was not obtained from the bankruptcy judge.

Fed. R. Bankr. P. 8005.

The terms of Bankruptcy Rule 8005 do not authorize any relief <u>ex parte</u>. Accordingly, the relief requested by Regal more properly is characterized as an <u>ex parte</u> temporary restraining order. However, in order to obtain an <u>ex parte</u> restraining order, the movant must identify specific facts in an affidavit or verified complaint that prove immediate and irreparable injury, and must certify the efforts that the movant has made to give notice to the opposing party. Specifically, Rule 65(b) of the Federal Rules of Civil Procedure (the "Federal Rules") provides:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed. R. Civ. P. 65(b).

Regal did not submit any affidavit with the Emergency Motion. Nor has it filed a verified complaint. Additionally, Regal has failed to describe its efforts, or

lack thereof, that it has made to provide notice of the
request for a restraining order to SEB's counsel.  Indeed,
when Regal circulated the Emergency Motion to counsel for
the Debtors', their lenders, and the Official Committee of
Unsecured Creditors on the afternoon of August 15, 2006,
Regal failed to include SEB's counsel in the transmittal.

More importantly, Federal Rule 65(c) requires,
without exception, that a restraining order may not issue
without the posting by the applicant of adequate security.
Specifically, Federal Rule 65(c) provides:

> No restraining order or preliminary injunction
> shall issue except upon the giving of security by
> the applicant, in such sum as the court deems
> proper, for the payment of such costs and damages
> as may be incurred or suffered by any party who
> is found to have been wrongfully enjoined or
> restrained.

Fed. R. Civ. P. 65(c).

Despite numerous invitations to do so, including
at the Stay Hearing before the Bankruptcy Court, Regal has
not posted any bond to protect SEB or the Debtors in the
event that it suffers damages as a result of the issuance
of a restraining order.  Therefore, Regal's Emergency
Motion for ex parte relief should be denied.

## II.  REGAL IS NOT ENTITLED TO A DISCRETIONARY STAY UNDER BANKRUPTCY RULE 8005

### A.  The Applicable Standard

Even to the extent that this Court applies Bankruptcy Rule 8005 rather than Federal Rule 65, Regal nonetheless has failed to carry its burden of proof to stay the Sale Order.  To obtain a discretionary stay pursuant to Bankruptcy Rule 8005, Regal must prove (1) a strong likelihood of success on the merits of the appeal; (2) that Regal will suffer irreparable injury if the stay is denied; (3) that SEB will not suffer substantial harm if the stay is granted; and (4) that the stay will not harm the public interest, if implicated.  See In re Del. and Hudson Ry. Co., 90 B.R. 90, 91 (Bankr. D. Del. 1998); see also In re Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 18 F.3d 208, 211 (3d Cir. 1994); The Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.), Case No. 02-154, 2002 U.S. Dist. LEXIS 9409, *4-5 (D. Del. May 22, 2002), attached hereto as Exhibit D.

No one factor is determinative; however, "[p]roper judgment under Rule 8005 entails a delicate balance of all elements."  In re Trans World Airlines, Inc., Case No. 01-0056 (PJW), 2001 Bankr. LEXIS 723, *8 (Bankr. D.

11

Del. Mar. 27, 2001), attached hereto as <u>Exhibit E</u>

(quotations omitted); <u>see also</u> <u>In re Charles & Lillian</u>

<u>Brown's Hotel, Inc.</u>, 93 B.R. 49, 53 (Bankr. S.D.N.Y. 1988)

("All four criteria must be satisfied by the movant before

relief under FRBP 8005 can be granted."). Regal must,

however, carry its burden on each of the four factors with

"clear and satisfactory" evidence.  See <u>Charles & Lillian</u>

<u>Brown's Hotel</u>, 93 B.R. at 54 (denying motion under

Bankruptcy Rule 8005 because movant's "affidavit lacks the

clear and satisfactory evidence that is required under FRBP

8005").

**B.    Regal Has Failed To Carry Its Evidentiary Burden
With Respect To The Emergency Motion**

At the outset, the Emergency Motion must be

denied because Regal has not offered any evidentiary

foundation with respect to the four requisite factors.

Regal has not filed any affidavit to substantiate the

factual allegations in the Emergency Motion.  Nor is that

Emergency Motion verified.  The Bankruptcy Court has heard

testimony from numerous witnesses, both at the Sale Hearing

and the hearing on the Bankruptcy Court Stay Motion.

Although Regal relies on that testimony in their respective

papers, there is no reason based on that evidence for this

Court to rule any differently than the Bankruptcy Court ruled in denying the Bankruptcy Court Stay Motion.  Nor does Regal provide such grounds.

### C.   Regal Has Failed To Carry Its Buren On Each Of The Elements Necessary To Obtain A Stay

#### (1)   Regal has failed to show that it is likely to succeed on the merits.

The Emergency Motion provides no basis upon which this Court may properly conclude that Regal is likely to succeed on the merits of its appeal.

"Probable success on the merits means that 'the movant has a substantial case, or a strong case on appeal.'"  In re Columbia Gas Sys., Inc., Case No. 92-127 (SLR), 1992 U.S. Dist. LEXIS 3253, at *4 (D. Del. Mar. 10, 1992), attached hereto as Exhibit F (quoting In re Pub. Serv. Co. of N.H., 116 B.R. 347, 349 (Bankr. D.N.H. 1990)). Regal has not, and cannot, sustain this burden.

First, although briefing on the relevant issues was expedited, the briefing was substantial in number of pages and more than adequate on the underlying legal principles and existing case law.  Regal submitted both an objection and an amended objection to the sale, assumption and assignment of the Trademark Sublicense.  The Debtors submitted, in addition to the original Sale Motion, a

specific reply to Regal's Objection, and all parties argued
as to both the applicable case law and the application of
such case law to the evidence.

Second, the Bankruptcy Court spent substantial
time at the August 8, 2006 Sale Hearing focusing
specifically on whether to approve the sale, assumption and
assignment of the Trademark Sublicense.  At that hearing,
the Bankruptcy Court heard lengthy testimony, both on
direct examination and cross examination regarding,
regarding among other things: (i) the history of Regal
selling an exclusive, worldwide, non-royalty trademark
license for the Trademarks to Newell in October 1999;
(ii) the terms of the Trademark License and the fact that
the Trademark License placed no limitations on sublicensing
the Trademarks, see Exhibit C, Trademark License § 1.3; and
(iii) Regal's last minute purchase of Newell's right to
limit assignments and sublicensing pursuant to an August 1,
2006 agreement with Newell.

At the conclusion of the Sale Hearing, the
Bankruptcy Court recessed to review the evidence and
arguments.  It then resumed the hearing.  After advising
the parties that it had fully reviewed the briefing and the
underlying cases cited by the parties, the Bankruptcy Court

14

went on to state that, after reviewing both the evidence
presented and the cases cited by the parties and
considering the arguments presented, it had determined that
the most helpful precedent was District Judge McKelvie's
opinion In re Golden Books Family Entertainment, Inc., 269
B.R. 311 (Bankr. D. Del. 2001). In that regard, the
Bankruptcy Court determined that notwithstanding the fact
that Golden Books involved an exclusive copyright license,
the Bankruptcy Court would follow the reasoning of District
Judge McKelvie and the Bankruptcy Court opinion In re
Rooster, Inc., 100 B.R. 228 (Bankr. E.D. Pa. 1989), and
approve the sale, assumption and assignment of the
Trademark Sublicense without Regal's consent.

Thus, the Bankruptcy Court determined to apply
the Golden Books analysis to the Trademark Sublicense,
concluding that "the Sublicense Agreement is not subject to
the limitations of Section 365(c)(1) of the Bankruptcy Code,
and as such may be assumed and assigned to the Buyer
pursuant to Section 365(b) and (f) of the Bankruptcy Code."
Sale Order ¶ P. In so doing, the Bankruptcy Court
specifically found, based on the evidence presented, that
the Trademark Sublicense was not a personal services
contract.

15

The Bankruptcy Court had the opportunity to again consider Regal's arguments at the August 14, 2006 Stay Hearing.  At the Stay Hearing, the Court again heard arguments from Regal's counsel regarding the proper application of intellectual property law to the Trademark Sublicense.  In addition, the Bankruptcy Court heard lengthy testimony from three witnesses regarding the history of the Trademark Sublicense and, more importantly, the potential harm that Regal, the WearEver Debtors and SEB would suffer, if a stay were granted.  Again, the Bankruptcy Court determined that based on law and facts specific to this case, it had properly held that the Trademark Sublicense was freely assignable.  The Bankruptcy Court specifically determined that the Trademark Sublicense was exclusive, not limited in time, and not revenue producing.  In these circumstances, the Bankruptcy Court determined that it was proper to apply Golden Books and Rooster, holding that the Trademark Sublicense was freely assignable and that Regal was not likely to succeed on appeal.

In the Emergency Motion, Regal makes exactly the same argument as it made in the Bankruptcy Court Stay Motion.  Compare Emergency Motion, at 22-30 with Bankruptcy

Court Stay Motion, B. Ct. Dkt. 660, at pp. 15-23.  These
arguments, in turn, are the same arguments that it made at
the Sale Hearing, namely, that the Golden Books and Rooster
opinions upon which the Bankruptcy Court relied are
distinguishable.  See Emergency Motion, at 15-19.
Therefore, the Emergency Motion offers no new legal
theories and Regal has altogether failed to demonstrate
that it has a substantial case to overturn the Bankruptcy
Court's reliance on Golden Books and Rooster.  Furthermore,
Regal has not challenged on new grounds the Bankruptcy
Court's finding that the Trademark Sublicense is not a
personal services contract subject to section 365(c)(1) of
the Bankruptcy Code, and the factual undermining of that
determination -- that Regal sold the Trademark License to
Newell without placing any limitation on Newell's right to
sublicense the Trademarks.

Consequently, Regal has not, and cannot, show
that it is likely to succeed on the merits of its appeal.
See Charles & Lillian Brown's Hotel, 93 B.R. at 54 (finding
that movant failed to show likelihood of success on merits
because the "order was entered after an evidentiary
hearing," and movant "presented nothing to persuade this
court that it erred").  Accordingly, Regal has failed to

17

meet its burden on the first Bankruptcy Rule 8005 factor, and on this basis alone the Emergency Motion should be denied.  See Morgan v. Polaroid Corp. (In re Polaroid Corp.), Case No. 02-1353 (JJF), 2004 U.S. Dist. LEXIS 1917, at *3 (D. Del. Feb. 9, 2004), attached hereto as Exhibit G (denying stay pending appeal because appellant had not established a likelihood of success on the merits).

     (2)  **Regal will not suffer irreparable injury absent a stay.**

     Regal also contends that it will suffer irreparable harm absent a stay pending appeal because any appeal might be mooted by the Bankruptcy Court's finding that SEB is entitled to the protections of Bankruptcy Code section 363(m).[2]  Regal's argument fails on both legal and factual grounds.

_____

[2]    Regal also argues that section 363(m) does not apply.  See Emergency Motion, at 2 ("Regal Ware submits that section 363(m) of the Bankruptcy Code does not apply to the distinct issue of assignment of the Trademark Sublicense Agreement, inasmuch as the sole predicate for such assignment is section 365").  Thus, Regal is trying to have it both ways: (i) use section 363(m) to show irreparable harm, but (ii) reserve for appeal the argument that section 363(m) does not apply.  This it cannot do.  In any event, Regal's position is not supported by applicable case law.  See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-99 (3d Cir. 1998) (rejecting argument that section 363(m) does not apply to sales of franchise agreements that are assumed and assigned under section 365, stating that "[t]rademarks are property, and franchises are licenses to use such property . . . and '[t]herefore, section 363(m) governs the sale of franchises . . . notwithstanding that section 365 applies to the

*(cont'd)*

As the Bankruptcy Court properly concluded "[e]ven if 363(m) adversely impacts the . . . objection it is well settled that an appeal being rendered moot does not itself constitute irreparable harm." In re Trans World Airlines, Inc., 2001 Bankr. LEXIS 723, at *28 (quotation omitted) (citing cases). Thus, here, as in the Bankruptcy Court, Regal must demonstrate something more or different than the legal possibility that its appeal might be moot. It must show that as a matter of fact, absent a stay, it will suffer actual irreparable harm. Regal has not, and cannot, make such a factual showing.

Specifically, in support of the Emergency Motion, Regal has not submitted an affidavit. Thus, there is simply no evidentiary basis for granting the stay. Moreover, if Regal submits the same evidence it submitted to the Bankruptcy Court, such evidence at best, shows a highly speculative possible damage claim that is compensable in monetary damages.

---

(cont'd from previous page)
    particular mechanics of conveyance"); see also 11 U.S.C. § 363(m)
    ("The reversal . . . on appeal of an authorization . . . of a
    sale or lease of property does not affect the validity of a sale
    or lease . . . to an entity that purchased or leased such
    property in good faith." (emphases added)).

Moreover, even if Regal faced any harm from consummation of the sale, assumption and assignment of the Trademark Sublicense to SEB, Regal nonetheless had the right (which it chose not to exercise) to seek to have the Bankruptcy Court condition the sale, assumption and assignment on SEB and the Debtors providing adequate protection under Bankruptcy Code section 363(e). Specifically, section 363(e) provides that:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased . . . , the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

Although SEB's counsel questioned Regal's general counsel at the Sale Hearing regarding what agreements or information it needed from SEB to consent to the sale and provide Regal with adequate protection of its interest in the Trademarks, Regal's witness testified that nothing would do, short of terminating the Trademark Sublicense. (Sale Hearing Trans., B. Ct. Dkt. 665, at pp. 237-38) Therefore, Regal knew the risks, and its contention that it will now suffer irreparable harm is disingenuous.

Second, as also set forth above, Regal sold a Trademark License to Newell in October 1999.  The Trademark License did not contain any restrictions on sublicensing.  See Exhibit C, Trademark License § 1.3 ("Licensee shall have the right to sublicense others, including its Affiliates, to use the Licensed Trademarks.").  The Bankruptcy Court determined at the hearing on the Bankruptcy Court Stay Motion that Regal's attempt to show irreparable harm from the sale and assignment to SEB becomes dramatically less persuasive in light of Regal's prior unrestricted license of the Trademarks to Newell.  Furthermore, Regal's witness testified at the Sale Hearing that Newell, indeed, was a competitor with Regal at the time of that transaction.  (Sale Hearing Trans., B. Ct. Dkt. 665, at pp. 221, 229)  Regal's witness also testified that it would consent to a sale of the Trademark Sublicense to Lifetime Brands, Inc. ("Lifetime"), another admitted competitor of Regal.  (Sale Hearing Trans., B. Ct. Dkt. 665, at p. 222, 238)  This testimony undermines any argument that Regal will face irreparable harm if the sale of the Trademark Sublicense to another competitor, SEB, is not stayed.

Furthermore, as noted below, Regal had the right, which it chose not to exercise, to request the Bankruptcy Court to apply Bankruptcy Rule 7062, and thereby obtain a mandatory stay under Fed. R. Civ. P. 62(d).  If Regal were truly facing irreparable or even substantial monetary harm, it would have pursued this course.  It did not do so, and has not done so with this Court.

And finally, based on the evidence submitted by Regal to date, Regal will not suffer any damages, even monetary damages if a stay is not granted.  Specifically, if no stay is granted, SEB will take the assignment of the Trademark Sublicense and continue to sell the exact same products, Regal Ware cookware, to Wal-Mart Stores, Inc. ("Wal-Mart").  As the witnesses have testified, Wal-Mart is presently the only current customer for such cookware, and Regal has never received royalties from the sale of Regal Ware cookware.  Regal Ware cookware has, however, been sold in Wal-Mart since at least Regal's sale of the Regal Ware Trademark License to Newell in October 1999.  Moreover, Regal's witnesses testified at the Stay Hearing that Regal does not intend to compete or sell goods at the price point that Regal Ware cookware is sold at Wal-Mart.  Moreover, he conceded that the same competition that exists between

Regal and SEB today at the "high end" cookware price point
will be unchanged, unless, as he speculated, SEB determined
to use the Trademarks on high end cookware.  There was no
evidence on that point, only Regal's speculation.  Moreover,
any such "high end" Regal Ware cookware would directly
compete with a product SEB already sells under the All-Clad
name.

Therefore, during Regal's appeal, the status quo
is maintained, only the supplier of Regal Ware cookware to
Wal-Mart has changed, SEB.  Thus, Regal has failed to meet
its burden with respect to showing that it will suffer
irreparable harm absent a stay of appeal.

**(3)   The Debtors and SEB face substantial harm if
      this Court grants Regal's request for a stay.**

Regal acknowledges that one of the four factors
that a party requesting a stay pending appeal must prove is
that the appellee (here, the Debtors and SEB) will not
suffer substantial harm.  See Emergency Motion, at 20.
However, Regal altogether has failed to address this factor.
The Emergency Motion omits any analysis regarding this
factor of the test for a stay pending appeal.  Moreover,
Regal's witness at the hearing on the Emergency Motion did

not refute the evidence that the Debtors and SEB will, in
fact, suffer substantial harm.

First, Regal cannot dispute that the Debtors
would suffer immediate damages in the amount of $2 million.
The proposed Asset Purchase Agreement between the Debtors
and SEB, attached as Exhibit A to the Sale Order (the
"Asset Purchase Agreement"), provides that the purchase
price for the WearEver Assets shall be reduced by $2
million if at closing the WearEver Debtors have failed to
obtain an unstayed order approving the sale, assumption and
assignment of the Trademark Sublicense to SEB.  See Asset
Purchase Agreement §§ 2.5.4, 4.2.17.  SEB did not waive
that provision and fully intends to exercise such rights in
the event that this Court enters a stay pending appeal.

Second, although the Debtors' damages may only be
$2 million, SEB's monetary loss from a stay pending appeal
exceeds $2 million.  Specifically, Mr. Stengel, the
Debtors' Chief Restructuring Officer, testified before the
Bankruptcy Court at the Stay Hearing, that the $2 million
purchase price reduction was the result of negotiations
between the Debtors and the stalking horse bidder, Lifetime,
not SEB.  Thus, the $2 million represented a compromise
between Lifetime and the Debtors in light of the potential

risk that Regal would object and pursue an appeal.  SEB was not a party to those negotiations but was required to accept that term in the Lifetime stalking horse agreement. Thus, $2 million cannot be the imputed value of the sale, assumption and assignment of the Trademark Sublicense to SEB.  Indeed, SEB's potential damages are far in excess of $2 million.

Moreover, the sole distributor of Regal Ware cookware is Wal-Mart, and both Mr. Stengel and Mr. Meyer testified at the hearing on the Bankruptcy Court Stay Motion that the Debtors had gross sales to Wal-Mart of Regal Ware cookware of approximately $16 million, and gross profits of approximately $4 million.  Therefore, a stay pending appeal would result in SEB not receiving substantial revenues from Wal-Mart.

More importantly, perhaps, both Mr. Meyer and Mr. Stengel acknowledged that Wal-Mart has significant market power and had expressed concerns about the WearEver Debtors' service levels.  Thus, Mr. Meyer testified that he believed there was a substantial risk that Wal-Mart will discontinue offering the Regal Ware cookware line and that SEB and/or the Debtors will lose the Regal Ware business, if a stay were granted.

In that regard, Mr. Meyer testified at the hearing on the Bankruptcy Court Stay Motion that he believed that if product did not start showing up at proper service levels in the next couple of weeks, Wal-Mart might discontinue the line for 2007.  Mr. Meyer further testified that Wal-Mart is in a position to discontinue the Regal Ware line and obtain substantially similar priced product from another supplier.  If this were to happen, SEB and/or the Debtors face substantial financial harm, if not irreparable harm (the loss of Wal-Mart's Regal Ware business entirely), if a stay pending appeal is granted.

In sum, as the WearEver Debtors and SEB demonstrated at the Stay Hearing and will demonstrate at any hearing on the Emergency Motion, the WearEver Debtors and SEB would suffer substantial harm, possibly irreparable harm, if the sale, assumption and assignment of the Trademark Sublicense is stayed pending appeal.  Regal on the other hand, solely faces the status quo, sales of Regal Ware cookware by Wal-Mart.  Therefore, this factor also weighs in favor of denying the Emergency Motion.

**(4) Regal has failed to show that a stay furthers public policy.**

An overriding policy of Bankruptcy Code section 363 is to facilitate quick dispositions of a debtor's assets if it will result in the greatest recovery for the debtor's creditors. See, e.g., In re Hovis, 356 F.3d 820, 822 (7th Cir. 2004) ("[S]ometimes the best means to administer an estate is to sell the assets quickly in order to maximize their value."). In that regard, section 363(m) of the Bankruptcy Code provides Purchasers with protection that promote the public's interest in maximizing creditor recovery by ensuring finality of asset dispositions. See Cable One CATV, 169 B.R. 488, 492 (Bankr. D.N.H. 1994) ("The policy behind § 363(m) is to promote finality in judgments and encourage the obtaining of maximum value of assets notwithstanding the risks associated with bankruptcy sales."). Specifically, without the finality of sales provided by Bankruptcy Code section 363(m), bidders would be hesitant to participate, thereby jeopardizing the debtor's opportunity to maximize the proceeds generated by the sale. See In re Sax, 796 F.2d 994, 998 (7th Cir. 1986) ("Without the degree of finality provided by the stay requirement purchasers are likely to demand a steep

discount for investing in the property."); <u>Cable One CATV</u>,

169 B.R. at 492 (finding that purpose of section 363(m) is

"to overcome people's natural reluctance to deal with a

bankrupt firm . . . by assuring them that . . . they need

not worry . . . because some creditor is objecting to the

transaction and is trying to get [a reversal]'").

     Regal suggests that the Bankruptcy Court made its

decision too hastily in light of the importance of the

issue. <u>See</u> Emergency Motion, at 32-33. However, the

Debtors have worked tirelessly to dispose of their assets

in an efficient manner to maximize their creditors'

recoveries. Moreover, SEB, as the non-stalking horse

bidder, has worked expeditiously to close the sale and

begin to assure critical customers, such as Wal-Mart, that

their concerns about service levels will be immediately

addressed. To hinder this process, as Regal attempts to do,

by alleging that the Bankruptcy Court had insufficient time

to render knowledgeable opinions would contravene the

public's interest in a quick, final sale of the WearEver

Debtors' assets, thereby adversely affecting the creditors

in these cases.

     Nor is Regal's suggestion that the Bankruptcy

Court's ruling regarding the Trademark Sublicense a public

interest grounds to grant a stay.  As set forth above, and at the Sale Hearing and Stay Hearing, the Bankruptcy Court made clear that its decision was based on the facts, evidence and arguments presented, that given that the Court had not issued a written opinion, and had expressly applied the law only to the facts at hand, namely, an exclusive, non-revenue producing trademark license, the precential value of the ruling was limited.  Accordingly, the public interest in the trademark laws does not outweigh the policies and interests sought to be protected by section 363(m) of the Bankruptcy Code.

Thus, Regal also has failed to prove that public policy supports a stay of the sale, assumption and assignment of the Trademark Sublicense.

### III. REGAL SHOULD BE REQUIRED TO POST A SUPERSEDEAS BOND IN AN AMOUNT IN EXCESS OF $4 MILLION IF A STAY IS GRANTED

Although a bond is not expressly required by Bankruptcy Rule 8005, courts may require a bond in their discretion.  See In re Andy Frain Servs., Inc., 798 F.2d 1113, 1125 (7th Cir. 1986) ("Fed. R. Bankr. P. 8005 generally requires the appellant to post a bond or other security to cover any loss to the purchaser caused by the delay of an appeal should the appeal prove unsuccessful.");

Hartigan v. Pine Lake Vill. Apartment Co. (In re Pine Lake
Vill. Apartment Co.), 21 B.R. 395, 398 (S.D.N.Y. 1982)
(requiring movant to post bond in order to obtain stay
pending appeal under predecessor of Bankruptcy Rule 8005).
Courts are particularly inclined to require a bond when
Bankruptcy Rule 8005 is relied upon to stay an asset sale
under Bankruptcy Code section 363.  See Andy Frain Servs.,
798 F.2d at 1125 ("[R]equir[ing] the appellant to post a
bond or other security . . . is, of course, essential in
bankruptcy cases, for without such protection for good
faith purchasers, few, if any, persons would participate in
federal bankruptcy sales.").

　　　　As set forth above, although the Debtors only
stand to lose $2 million, SEB stands to lose in excess of
$4 million a year.  Moreover, Mr. Stengel testified at the
hearing on the Bankruptcy Court Stay Motion that because
the Trademark Sublicense is only terminable with the
consent of SEB, its value is a multiple of that amount.
See Exhibit A, Trademark Sublicense § 7.1.  Therefore, if
this Court determines to issue a stay, Regal should be
required to immediately post a bond in an amount not less
than two years expected gross profits, or $8 million.

## IV.  REGAL HAS WAIVED ITS RIGHT TO REQUEST A MANDATORY STAY UNDER BANKRUPTCY RULE 7062

Bankruptcy Rule 8005 provides, in pertinent part, that:

> Notwithstanding Rule 7062 . . . the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.

Fed. R. Bankr. P. 8005.

Thus, by pursuing a stay pending appeal solely under Bankruptcy Rule 8005, Regal has waived its right to obtain a mandatory stay "by posting a supersedeas bond" that is approved by the Court.  See Fed. R. Bankr. P. 7062; Fed. R. Civ. P. 62(d). [3]  Therefore, notwithstanding Regal's right to request a mandatory stay, Regal has waived any right to avoid the "irreparable harm" it allegedly will suffer, by not requesting this Court to apply Bankruptcy Rule 7062 and posting a supersedeas bond pursuant to Federal Rule 62(d).

---

[3]  Although Bankruptcy Rule 7062 is not automatically applicable in a contested matter, see Fed. R. Bankr. P. 9014, Regal could have requested, and this Court apply, Bankruptcy Rule 7062.  See Fed. R. Bankr. P. 9014(c) ("[T]he Court may at any stage . . . direct that one or more of the other rules in Part VII shall apply.").

WHEREFORE, SEB respectfully requests that the Court (i) sustain SEB's objection to the Emergency Motion, (ii) deny the Emergency Motion, and (iii) grant such further relief as is just and proper.

Dated:   Wilmington, Delaware
         August 16, 2006

Gregg M. Galardi (I.D. No. 2991)
Mark L. Desgrosseilliers (I.D. No. 4083)
Matthew P. Ward (I.D. No. 4471)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Attorneys for SEB S.A. and
Groupe SEB USA

# EXHIBIT A

## TRADEMARK SUBLICENSE AGREEMENT

This **TRADEMARK SUBLICENSE AGREEMENT** (this "Agreement") is made as of April _____, 2004 (the "Effective Date") by and between **NEWELL OPERATING COMPANY**, a Delaware corporation ("Licensor") and **MIRRO OPERATING COMPANY LLC**, a Delaware limited liability company ("Licensee") in connection with that Stock and Asset Purchase Agreement dated as of March 12, 2004, between Licensor and GLOBAL HOME PRODUCTS LLC (the "Purchase Agreement") (terms capitalized herein and not otherwise defined herein shall have their respective meanings set forth in the Purchase Agreement).

## R E C I T A L S

**WHEREAS,** pursuant to an Asset Purchase Agreement, dated as of September 15, 1999, between Licensor and Regal Ware, Inc., a Delaware corporation ("Regal"), Licensor acquired certain assets used in connection with the manufacture and distribution of non-electric aluminum cookware and bakeware and related accessories (the "Business"); and

**WHEREAS,** in operating the Business, Regal had acquired rights in the trademark "Regal" consisting of the registered trademarks or applications therefor listed in Schedule 1 hereto and any common law rights related thereto (the "Licensed Trademarks"); and

**WHEREAS,** in operating the Business, Regal had manufactured for sale to third parties various products using the Licensed Trademarks (the "Manufactured Products"), and Licensor has continued to distribute such products after taking over the Business; and

**WHEREAS,** in connection with acquiring the Business, Licensor acquired an exclusive license (the "Trademark License", a copy of which is attached hereto as Schedule 2) from Regal to use, directly and through its affiliates, the Licensed Trademarks in connection with all non-electric cookware, bakeware and other accessories and products in International Class 21 (the "Defined Field") as classified by the United States Patent and Trademark Office ("PTO") either as of the closing of the Regal Transaction or in the future; and

**WHEREAS,** under the terms of the Trademark License Licensor is permitted to grant sublicenses to others; and

**WHEREAS,** pursuant to the Purchase Agreement, Mirro Operating Company LLC and/or one of its Affiliates (as defined in the Purchase Agreement) acquired all intellectual property used exclusively in the Cookware Business (as defined in the Purchase Agreement) subject to certain liabilities; and

**WHEREAS,** the Licensed Trademarks are used in the Cookware Business, and Licensee and its Affiliates wish to acquire an exclusive sublicense to use the Licensed Trademarks in the continued operation of the Cookware Business; and

**WHEREAS,** Licensor is willing to grant a sublicense to Licensee and its Affiliates to use the Licensed Trademarks upon the terms and subject to the conditions as set forth herein.

9626310.2

-1-

**NOW, THEREFORE,** for and in consideration of the faithful performance by each party hereto of the obligations and covenants herein contained on its part to be performed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# AGREEMENTS

## Article 1: Sublicense Terms

1.1    Grant of Sublicense. Pursuant to the terms and subject to the conditions herein, Licensor hereby grants to Licensee and its Affiliates, an exclusive, worldwide royalty-free sublicense, subject only to termination as provided herein, to use the Licensed Trademarks on products within the Defined Field ("Products") and in connection with the manufacture, distribution and sale of Products. Licensor specifically acknowledges that the Manufactured Products fall within the definition of Products hereunder. The parties acknowledge and agree that (a) in the event the PTO redefines or deletes products or goods from International Class 21 after the Effective Date, such redefined or deleted products or goods shall remain within the definition of Products and (b) in no event will the Defined Field be interpreted not to include non-electric aluminum cookware and bakeware and related accessories.

1.2    Reservation of Rights. No rights or licenses, express or implied, other than those granted in Section 1.1, are granted by this Agreement to Licensee under any intellectual property owned or controlled by Regal, Licensor or their Affiliates. Licensor shall not use the Licensed Trademarks in connection with products similar to the Products.

1.3    Sublicensing and Assignment. Licensee shall not have the right to sublicense others to use the Licensed Trademarks without the written consent of Licensor, which consent will not be unreasonably withheld or delayed, except that Licensee may have Products manufactured by others for sale by Licensee and its Affiliates. Licensee may not assign or transfer this Agreement by operation of law or otherwise without the written consent of Licensor, which consent will not be unreasonably withheld or delayed. This Agreement and the rights and obligations of Licensor hereunder may be assigned or transferred by Licensor by voluntary action or involuntarily by operation of law or otherwise to any other person or entity. This Agreement shall be binding upon the successors and assigns of the parties.

## Article 2: Term.

This Agreement shall be effective as of the Effective Date and remain in effect until terminated as provided herein.

## Article 3: Maintenance of Secrecy.

The parties shall handle in a confidential manner all proprietary and confidential information and data furnished under or in connection with this Agreement and marked as such, and such information and data shall be used solely for the purposes stated herein. This provision shall not apply to such information or data (a) that through no act or failure of the receiving party is or becomes public knowledge, or (b) that the receiving party can show was owned by the receiving party prior to the other party's disclosure, (c) that is derived from any third party

9626310.2

-2-

having the right to make such disclosure or (d) that is required by law to be disclosed; provided that the disclosing party gives the other party prompt notice of such legal requirement. This obligation shall be in effect for the term of this Agreement, and five (5) years after its termination.

### Article 4: Trademark Provisions.

4.1    Ownership. Licensee acknowledges that Regal is the owner of all right, title and interest in and to the Licensed Trademarks and is also the owner of the goodwill attached or which shall become attached to the Licensed Trademarks. Licensee shall use the Licensed Trademarks in compliance with applicable legal requirements and the terms of this Agreement. Licensee's use of the Licensed Trademarks shall inure to the benefit of Regal. Licensee shall take no action to interfere with or dilute the value or goodwill of the Licensed Trademarks.

4.2    Marking. Licensee shall cause to appear on all Products bearing the Licensed Trademarks the appropriate statutory notice of registration or application for registration thereof. Nothing in this Agreement shall prevent Licensee from using other trademarks in addition to the Licensed Trademarks on the Products.

4.3    Maintenance. Under the Trademark License, Regal is initially responsible for paying the fees necessary to obtain and maintain registrations for the Licensed Trademarks (including without limitation, filing fees, issue fees, maintenance fees, annuities, taxes and attorneys' fees). Licensor shall provide to Licensee copies of any notification received from Regal that all such fees have been paid. If Licensor fails to provide Licensee with such notice, Licensee may, in its discretion, if such fees still remain unpaid fifteen (15) days after giving notice to Licensor, pay such fees. Licensee shall reimburse Licensor for all governmental fees and expenses actually paid by Licensor related to renewal or maintenance of the Licensed Trademarks in International Class 21 within thirty (30) days of receipt of an invoice and evidence of payment therefor from Licensor.

4.4    Quality Control. The quality of Products bearing the Licensed Trademarks that are manufactured or distributed by Licensee shall be as high as or higher than the quality of Business products sold on the Effective Date by Licensor under the Licensed Trademarks, generally comparable in quality to comparable products in the industry, and in conformity with all applicable laws and industry and government standards. If at any time Licensor, in the reasonable exercise of discretion, determines that the Products bearing the Licensed Trademarks do not comport to these quality standards, then upon written notice giving the reasons therefor and upon failure by Licensee within thirty (30) days to cure the defect, permission to use the Licensed Trademarks set forth herein may immediately be suspended by Licensor. Licensee hereby covenants and agrees that it will cease any manufacture of the Products and any use of the Licensed Trademarks related to the Products, upon such notice until such time as it is notified in writing by Licensor that use may be resumed. Notwithstanding the foregoing, nothing in this Agreement shall in any way restrict Licensee from manufacturing products that do not bear any of the Licensed Trademarks.

4.5    Prosecution. Under the Trademark License, Regal is responsible for additional prosecution of the Licensed Trademarks. In the event Licensee desires to have the Licensed

9626310.2

Trademarks registered in any jurisdiction other than those in which they are already registered, Licensee shall make such request in writing to Licensor, and Licensor shall make reasonable efforts to cause Regal to obtain such additional registrations of the Licensed Trademarks for use by Licensee subject to the terms of this Agreement. Licensee shall fully assist Licensor and Regal in the registration process for such additional registrations and will, within thirty (30) days of receipt of Licensor's or Regal's documented request thereof, reimburse Licensor or Regal for the reasonable fees, costs and expenses incurred in conjunction with obtaining, maintaining and renewing such additional registrations during the term of this Agreement. Any such additional registration of the Licensed Trademarks shall be the property of Regal and shall be considered a Licensed Trademark under this Agreement. During the process of registering in any such additional jurisdictions, Licensor and Regal shall have the initial right to determine whether to pursue an appeal or contested proceeding at their sole expense, provided, however, that if Licensor and Regal choose not to so pursue, Licensee, may so pursue at Licensee's sole expense and with the cooperation of Licensor. Licensee shall provide all necessary specimens.

4.6    Quality Monitoring. For the purpose of maintaining quality as provided in Section 4.4 of this Article 4, Licensor or its duly authorized representative shall have the right at reasonable times, not to exceed twice per calendar year unless quality control issues are found, to request that a reasonable quantity of sample Product be delivered to Licensor and/or Regal to determine whether such Products are being manufactured according to the standards set forth herein. Licensor shall not sell or distribute (other than on a charitable or non-commercial basis) such samples to third parties.

4.7    Cooperation. Licensee shall take such steps, and execute such further documents, as reasonably requested by Licensor or Regal in order to protect Licensor's and Regal's complete interest in and title to and ownership of the Licensed Trademarks.

4.8    Additional Registrations. If Licensor or Regal should obtain additional trademark registrations for the Products, notice shall be given by Licensor to Licensee of the existence of such additional registrations, which registration shall be included in the Licensed Trademarks at no additional cost to Licensee.

4.9    Notice of Infringement. In the event that either party has reason to believe that any person is infringing any of the Licensed Trademarks, such party shall promptly notify the other party by providing all information in its possession, custody or control to permit the other party to determine whether such infringement is occurring.

4.10    Enforcement. During the term of this Agreement, Licensee shall have the first right to bring any action to protect Licensee's rights in and to the Licensed Trademarks with respect to Products, and to defend against any infringement, dilution, imitation, unauthorized use, or other mark likely to cause confusion as if Licensee were the actual or registered owner of the Licensed Trademarks (such infringement, dilution, imitation, unauthorized use referred to herein as "Infringement"). To the extent the participation of Licensor is required to enable Licensee to pursue any such action or defense, Licensor shall so participate at Licensee' expense unless Licensor is obligated to indemnify Licensee therefor. Any and all recoveries from said suit or settlements thereof shall be for the sole benefit of Licensee (unless Licensor indemnified Licensee for Licensee's pursuit of said suit, said action or said defense). Should Licensee fail to

9626310.2

-4-

take the necessary steps by litigation or otherwise to defend against Infringement, Licensor or Regal may conduct at its own expense, and with the right to all recoveries, such litigation as Licensor or Regal deems necessary to defend against Infringement, provided that Licensor or Regal has first given Licensee thirty (30) days written notice of its intention to initiate such litigation, and provided further, that Licensee fails to initiate suggested action within ninety (90) days of such notice.  To the extent the participation of Licensee is required to enable Licensor or Regal to pursue any such action or defense, Licensee shall so participate at Licensor's or Regal's expense unless Licensee is obligated to indemnify Licensor therefor.  Any and all recoveries from said suit or settlements thereof shall be for the sole benefit of Licensor or Regal, as applicable.

## Article 5: Warranties.

5.1     Licensee represents and warrants that:

(a)     Licensee has the full right and power to enter into this Agreement and to perform the obligations set forth in this Agreement; and

(b)     there are no agreements, assignments or encumbrances in existence that are inconsistent with the provisions of this Agreement.

5.2     Licensor represents and warrants that:

(a)     Licensor has the full right and power to enter into this Agreement and to perform the obligations set forth in this Agreement; and

(b)     there are no agreements, assignments or encumbrances in existence that are inconsistent with the provisions of this Agreement.

## Article 6: Indemnification.

6.1     Licensor shall defend, indemnify and hold Licensee and Licensee's Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal fees) arising from or attributable to Licensor's breach of any warranties set forth in 5.2 or to any claim that the use of the Licensed Trademarks pursuant to this Agreement infringes upon the trademark, copyright or other intellectual property rights of any third party other than Regal or its Affiliates or their successors; provided that the foregoing indemnification for breach of Section 5.2 shall not be deemed to co-extend with or expand Licensor's indemnification obligations beyond those obligations set forth in the Purchase Agreement with respect to this sublicense Agreement.  In addition, Licensor shall defend, indemnify and hold Licensee and its Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal fees) arising from or attributable to Licensor's or Regal's unprivileged interference with the sublicense granted hereunder; provided that the foregoing shall not apply to Regal's or Licensor's exercise of reasonable discretion in good faith to monitor and exercise quality control over Products as required under <u>Section 4.4</u> hereof or the Trademark License.

6.2     Licensee shall defend, indemnify and hold Licensor, Regal and their Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal

9626310.2

-5-

fees) arising from or attributable to Licensee's breach of any representation or warranty set forth in Article 5. In addition, Licensee shall defend, indemnify and hold Licensor, Regal and their Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal fees) arising from or attributable to Licensee's failure to comply with all laws of the countries in which it sells Products, including product liability, labor, and patent laws; provided, however, that this indemnification shall not be construed to co-extend with or impede the indemnification obligations of Licensor under this Article 6.

## Article 7: Termination and Survival of Certain Obligations.

7.1   Term.   The initial term of this Agreement shall last through October 29, 2009. This Agreement shall always automatically renew for subsequent terms of ten (10) years unless both parties agree to not renew the Agreement.

7.2   Termination on Default.   Should either party breach this Agreement, or be in default, the non-breaching party may terminate the Agreement upon giving written notice of such breach or default to the other party, provided the breach or default is not cured within three (3) months after the date of such notice.

7.3   Effect of Termination.   The parties hereto agree:

(a) that upon expiration or termination of this Agreement for any cause, Licensee shall have the right to complete the manufacture of any Products then on order, and Licensee shall further be permitted to sell such Products as have been manufactured, in the case of Products and are still in stock; provided, however, that Licensee shall not, in any event, be permitted to sell or ship any Products bearing Licensed Trademarks more than six months after expiration or termination; and

(b) subject to the provisions of Section 7.3(a), upon termination of this Agreement, Licensee shall immediately discontinue use of the Licensed Trademarks, it being understood by the parties that upon termination all rights pertaining to the Licensed Trademarks shall automatically revert to Licensor.

7.4   Survival of Certain Obligations.   It is expressly understood and agreed that any and all provisions herein relating to the maintenance of secrecy shall survive the termination of this Agreement irrespective of the reason(s) for termination, for five (5) years after its termination and the provisions of Articles 5 and 6 shall likewise survive the termination of this Agreement.

## Article 8: Miscellaneous.

8.1   Expenses.   Except as otherwise expressly provided herein, all legal, accounting and other expenses incurred by either of the parties to this Agreement in connection with the transactions contemplated by this Agreement will be borne solely by the party incurring such expenses.

9626310.2

8.2    Relationship of the Parties.  Nothing in this Agreement shall be construed or interpreted as constituting either party hereto the agent, principal, employee or joint venturer of the other.  Each of Licensee and Licensor is an independent contractor.  Neither shall assume, either directly or indirectly, any liability of or for the other party.  Neither party shall have the authority to bind or obligate the other party and neither party shall represent that it has such authority.

8.3    Notices.  All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or by overnight courier with delivery charges prepaid, as follows:

|              |                                        |
|--------------|----------------------------------------|
| Licensee:    | Mirro Operating Company LLC            |
|              | c/o Cerberus Capital Management, L.P.  |
|              | 299 Park Avenue                        |
|              | New York, New York  10171              |
|              | Attention:   Lenard Tessler            |
|              |                                        |
| with a copy to: | Schulte Roth & Zabel LLP            |
|              | 919 Third Avenue                       |
|              | New York, New York  10022              |
|              | Attention:  Marc Weingarten, Esq.      |
|              |                                        |
| Licensor:    | Newell Rubbermaid Inc.                 |
|              | 10B Glenlake Parkway, Suite 600        |
|              | Atlanta, Georgia 30328                 |
|              | Attention:  General Counsel            |

or to such other person or address as either party shall specify by notice in writing to the other party.  All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date of delivery.

8.4    Force Majeure.  In the event that either party hereto is unable to carry out any obligation under this Agreement, wholly or in part, due to circumstances beyond its control, including without limitations, acts of God, fire, explosion, sabotage, acts of Government or Governmental Agencies, flood, strikes, lockouts, war, or civil commotion (collectively, "Force Majeure"), then, upon giving prompt notice of Force Majeure to the other party, the party so affected shall be released, without any liability, from the performance of its obligations under this Agreement, but only to the extent and only for the period that its performance of said obligation is prevented by circumstances of Force Majeure.

8.5    Governing law: Severability;  The interpretation of this Agreement shall be governed by the internal substantive laws of the State of Illinois, without giving effect to the conflicts of laws principles thereof, provided, however, that any questions respecting the validity, existence and effect of any Licensed Trademarks shall be determined under the Laws of the jurisdiction where such Licensed Trademarks exist or are registered.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be

9626310.2

ineffective to the extent and only for the duration of such prohibition or enforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

8.6    Counterparts. This Agreement may be executed by the parties hereto in one or more counterparts, each of which shall be considered original for all purposes, but all of which together shall constitute one and the same Agreement. This Agreement (and Schedule 1 hereto), contains the entire agreement between the parties with respect to the subject matter herein and neither this Agreement nor any of its provisions may be changed, waived or terminated except as herein expressly provided, or in a written instrument signed by both of the parties hereto. Nothing herein expressed or implied is intended or should be construed to confer upon or give to any other person or entity, other than the parties to this Agreement, any rights or remedies under or by reason of this Agreement.

8.7    Headings: References. The article, paragraph and section headings contained in this Agreement are inserted for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Unless otherwise indicated, (a) all references to Articles, Sections, subsections, clauses and schedules refer to the Articles, Sections, subsections and clauses of this Agreement and to the Schedules hereto, respectively; (b) the terms "herein," "hereof," "hereto" and "hereunder" and words of similar import refer to this Agreement; and words in the singular include the plural and vice versa.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives as of the date first set forth above.

MIRRO OPERATING COMPANY LLC


By: _____
Name: Jeff Zappone
Title: Treasurer & Chief Financial Officer


NEWELL OPERATING COMPANY


By: _____
Name: Stuart I. Graff
Title: Assistant Secretary

9626310.2

-8-

ineffective to the extent and only for the duration of such prohibition or enforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

8.6    Counterparts.  This Agreement may be executed by the parties hereto in one or more counterparts, each of which shall be considered original for all purposes, but all of which together shall constitute one and the same Agreement.  This Agreement (and Schedule 1 hereto), contains the entire agreement between the parties with respect to the subject matter herein and neither this Agreement nor any of its provisions may be changed, waived or terminated except as herein expressly provided, or in a written instrument signed by both of the parties hereto.  Nothing herein expressed or implied is intended or should be construed to confer upon or give to any other person or entity, other than the parties to this Agreement, any rights or remedies under or by reason of this Agreement.

8.7    Headings; References.  The article, paragraph and section headings contained  in this Agreement are inserted for reference purposes only and shall not affect the meaning or interpretation of this Agreement.  Unless otherwise indicated, (a) all references to Articles, Sections, subsections, clauses and schedules refer to the Articles, Sections, subsections and clauses of this Agreement and to the Schedules hereto, respectively; (b) the terms "herein," "hereof," "hereto" and "hereunder" and words of similar import refer to this Agreement; and words in the singular include the plural and vice versa.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their authorized representatives as of the date first set forth above.

**MIRRO OPERATING COMPANY LLC**

By: _____
Name: Jeff Zappone
Title: Treasurer & Chief Financial Officer

**NEWELL OPERATING COMPANY**

By: _____
Name: Stuart I. Graff
Title: Assistant Secretary

9626310.2

-8-

## SCHEDULE 1

### Licensed Trademarks

| Trademark | Appl. Date | Regis. Date | Serial No. | Regis. No. | Country |
|---|---|---|---|---|---|
| REGAL | | 03/30/1971 | | 910,552 | USA |
| REGAL | | 12/28/1982 | | 1,221,567 | USA |
| REGAL | | 07/03/1990 | | 1,604,362 | USA |
| REGAL | | 08/08/1995 | | 1,909,731 | USA |
| REGAL & DESIGN | | 08/08/1950 | | 528,672 | USA |
| REGAL & DESIGN | | 12/28/1982 | | 1,221,566 | USA |
| REGAL & DESIGN | | 11/20/1990 | | 1,623,288 | USA |
| REGAL 2000 | | 04/09/1985 | | 1,329,657 | USA |
| REGAL | | 03/28/1989 | | 1,531,859 | USA |
| REGAL | 02/02/1996 | | 2019705 | | Argentina |
| REGAL | | 10/28/1996 | | C62357 | Bolivia |
| CORONET REGAL | | 09/30/1988 | | TMA345,385 | Canada |
| REGAL | | 02/24/1967 | | TMA149,471 | Canada |
| REGAL WARE | | 07/14/1993 | | 409,231 | Chile |
| REGAL | | 08/14/1997 | | 1,075,700 | China |
| REGAL | | 09/10/1992 | | 178,330 | Czech |
| REGAL | | 03/21/1995 | | 0730-95 | Ecuador |
| REGAL | 03/30/1996 | | 144,444 | | CTM |
| REGAL | | 09/20/1993 | | 128,175 | Finland |
| REGAL | | 09/08/1992 | | 2,068,476 | Germany |
| REGAL | | 08/07/1985 | | 80.488 | Greece |
| REGAL | | 07/05/1994 | | 1,577,118 | England |
| REGAL | | 09/17/1992 | | 137,095 | Hungary |
| REGAL & CROWN DESIGN | 11/23/1994 | | 646431 | | India |
| REGAL | 11/23/1994 | | 646430 | | India |
| REGAL | | 12/28/1994 | | 320,424 | Indonesia |
| REGAL | | 12/20/1978 | | 363,225 | Italy |
| REGAL & CROWN DESIGN | | 04/10/1992 | | 235,572 | Korea |
| REGAL | | 06/02/1994 | | 162,932 | Norway |
| REGAL | | 06/17/1983 | | 031,520 | Panama |
| REGAL | | 05/12/1994 | | 007,516 | Peru |
| REGAL | | 12/02/1991 | | 51864 | Philippines |
| REGAL & CROWN DESIGN | 12/23/1994 | | 97307 | | Philippines |
| REGAL I | | 06/06/1994 | | 286,139 | Portugal |
| REGAL | | 10/14/1992 | | 19,883 | Romania |
| REGAL | | 10/08/1992 | | 167,456 | Russia |
| REGAL & DESIGN | | 09/08/1993 | | B6997-93 | Singapore |
| REGAL | | 02/21/1991 | | B989/91 | Singapore |
| REGAL | | 09/10/1992 | | 174,237 | Slovak |

9626310.2

| Trademark | Appl. Date | Regis. Date | Serial No. | Regis. No. | Country |
|-----------|-----------|-------------|-----------|-----------|---------|
| REGAL | | 02/25/1994 | | 255,649 | Sweden |
| REGAL | | 09/23/1992 | | 401,965 | Swiss |
| REGAL | | 07/16/1995 | | 684737 | Taiwan |
| REGAL | 02/26/1988 | | 03100/88 | | Venezuela |

9626310.2

## SCHEDULE 2

### Trademark License

CHI\4131071.4

9626310.2

-1-

# EXHIBIT B

080706br.txt

1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In the matter of            )
                            )
GLOBAL HOME PRODUCTS LLC,    )
et al.,                     )   Case No. 06-10340(KG)
                            )
       Debtors.             )


        Auction pursuant to notice at the law
offices of Pachulski, Stang, Ziehl, Young, Jones &
Weintraub, 919 Market Street, Suite 1700, Wilmington,
Delaware, beginning at 10:00 a.m. on Monday, August 7,
2006, before Vincent J. Bailey, Registered Professional
Reporter and Notary Public.


WILCOX & FETZER
1330 King Street – Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

2

1          MS. JONES:  I'm Laura Davis Jones for

2   Global Home Products LLC, case number 06-10340.  This is

3   the time scheduled for the auction in connection with the

Page 1

**EXHIBIT**

080706br.txt

4    sale of the WearEver debtor.  Pursuant to the sale

5    procedures order signed by the Court on July 14, 2006, we

6    had a stalking horse bid from Lifetime Brands.  The sales

7    procedures set forth what was needed for a next bid.  The

8    debtors did receive a qualified bid from SEB in the

9    amount of 21.8 million.  The debtors have determined that

10   that is a higher and better offer.

11              There are a number of clarifications and

12   representations being put on the record and I'm going to

13   yield to others to do that.  But before I do, let me talk

14   about a couple housekeeping items.

15              First of all, if you speak in the auction,

16   for the aid of the reporter, being we have a full room, I

17   would ask you to state your name and who you represent.

18              Secondly, I would ask that you sign the

19   sign-in sheet.  Only if you are listed on that sign-in

20   sheet are you here.

21              And, thirdly, I think everyone is aware of

22   the issue that we have with Regal Wear and the transfer

23   of their sub license.  I will ask each of the buyers,

24   both Lifetime and SEB, to confirm on the record that,

                                                              3


1    one, they are public companies with substantial revenues;

2    two, that they have dealt with third party licenses in

3    the past, they are used to dealing with them and know how

4    to do so; and, three, that they intend to comply with the

5    Regal sub license.

6              As everyone will recall from the sale

7    procedures, the maximum reduction in price is $2 million

8    if the debtors are not able to satisfy one of the closing

                           Page 2

080706br.txt

9   conditions set forth in paragraph 30 of the sale

10  procedures order.  It is not an option not to close --

11  that's a double negative there -- the successful bidder

12  designee not to close, but if the debtor is not able to

13  satisfy one of those conditions set forth in paragraph 30

14  of the sale procedures order, there can be a maximum of

15  $2 million towards price reduction at closing.

16          With that I'm going to yield to

17  Mr. Berthenthal with respect to clarifications.

18          MR. BERTHENTHAL:  Two clarifications, both

19  with respect to the SEB bid.  First, with respect to

20  Section 10.26 of the asset purchase agreement which has

21  been deleted by SEB, SEB has agreed to retract that

22  deletion.  The reps and warranties reflected in that

23  section have burned off with respect to Lifetime Brands

24  and are also burned off with respect to SEB.  And I would

                                                        4


1   ask counsel for SEB to confirm that?

2           MR. GALARDI:  Sure.  On behalf of SEB we

3   confirm that 10.26, the two reps that were referenced in

4   that have burned off and they are not conditions to

5   closing.

6           MR. BERTHENTHAL:  Another clarification for

7   lack of a better way of putting it is that SEB has

8   represented that their United States entity which holds a

9   number of their United States assets will be the assignee

10  under the asset purchase agreement and will be

11  responsible with SEB SA with respect to all obligations

12  of the buyer under the agreement.

13          MR. GALARDI:  I think it is SEB Groupe in

                        Page 3

080706br.txt

14  the United States that has substantial assets I think in

15  excess of $250 million, it will be at least one of the

16  parties that purchases the assets.  SEB France will, in

17  fact, stand behind the obligations under the asset

18  purchase agreement.  You will have both a collectable

19  entity in the United States and in France for the

20  obligations of the asset purchase agreement.

21              MS. JONES:  Would you make the confirmations

22  that I would request with respect to Regal?

23              MR. GALARDI:  I think I have three of them.

24  One, we are a public company with substantial assets.

                                                    5


 1  Two, we have dealt with licensing issues in the past.

 2  Three, we intend to comply with the sub license agreement

 3  that has gone back to Regal Wear.

 4              MS. JONES:  Thank you.

 5              May I ask counsel for Lifetime to make the

 6  same representations?

 7              MR. HERMAN:  Neil Herman from Morgan, Lewis

 8  & Bockius.

 9              We would make the same representation as to

10  the three representations:  public company with

11  substantial assets, dealt with third parties' licenses in

12  the past, we intend to comply with the Regal sub license.

13              MR. BERTHENTHAL:  With that, we will turn it

14  over to Mr. Lowrey from Houlihan who will discuss four

15  alternative credits that we have offered to both

16  potential buyers with respect to the auction today.

17              MR. LOWREY:  We have four potential bid

18  enhancements or credits we are offering today, each for

080706br.txt

19  $100,000.  The first being a reduction in the target

20  amount as defined in Section 2.5 of the asset purchase

21  agreement, reduction of $450,000 to that target amount.

22          Number 2, a removal of the Regal Wear price

23  reduction, $2 million price reduction found in Section

24  4.2.17, removal of their being no closing conditions and

                                                    6

1  no price reduction.

2          Third, a 50 percent reduction in the escrow

3  amount in amount 3.35.

4          And, lastly, elimination of the material

5  adverse change language found in Section 4.2.12.

6          Each of those represent a $100,000 bid

7  credit to anyone that would agree to those provisions,

8  any one of those provisions.

9          MS. JONES:  So I think at this point let me

10  start where I left off, which is at this point the

11  debtors believe the highest and best bid that they have

12  before them is the bid of SEB at 21.8 million.  The

13  bidding procedures were clear on the increments and I

14  would at this point ask Lifetime if they intend to make a

15  higher bid?

16          MR. GALARDI:  I want everyone in the room to

17  know that the bid -- and we already talked to the debtors

18  about the bidding -- we have made a bid of 21.8.  We have

19  also offered to purchase, although we're keeping this

20  separate to some extent for the time being, we have also

21  bid $750,000 for all of the excluded assets I believe it

22  is on Schedule 1.2 of the asset purchase agreement.  And

23  we have been told that we get no bid credit for all of

080706br.txt

24  those excluded assets at the price of $750,000.  So

7

1   essentially it doesn't add anything to the bid increment,
2   but our agreement if signed as is would include $750,000
3   additional value in exchange for that equipment.
4           With respect to that equipment -- this is
5   the equipment that I believe is in the Mexican
6   facility -- we have also agreed that all costs with
7   respect to shipping, dismantling, and taking that
8   equipment out of that facility will be borne by SEB, that
9   we will agree that we will get that equipment dismantled,
10  shipped and taken out within the 6-month period
11  contemplated by the supply agreement.  And I think that
12  was everything we agreed to do.
13          The question was if we should go greater
14  than 6 months would we agree to pay the carrying costs of
15  the lease?  My understanding is it is $140,000.  We
16  agreed to negotiate that we might pick that up.  We never
17  really specifically agreed.  I believe we will be out
18  within 6 months.
19          MS. JONES:  I will confirm for the record,
20  echoing Mr. Galardi's comments, for purposes of this
21  auction we have given no credit for the $750,000.
22          I'll turn to Lifetime.
23          MR. HERMAN:  Before we bid or proceed with
24  the auction, we have a couple of clarifying remarks and

8

1   questions.

Page 6

080706br.txt

2          First, we want SEB to confirm on the record
3  that their bid of 21.8 plus every subsequent bid
4  thereafter should include or will include, not just the
5  purchase price, but also repayment in full of all
6  inventory or other advances that were made by Lifetime.
7  So it is 21.8, plus repayment in full of all advances.
8  Can we get SEB to confirm?
9          MR. GALARDI:  Here is what I understand that
10  to be, so we will all be clear with respect to the asset
11  purchase agreement.  My understanding is that there are
12  advances made by way of letters of credit.  It is our
13  intention at closing to post letters of credit to the
14  debtors, so that they can either backstop or relieve you
15  of those obligations, and it is our intention to do so.
16          Are there other cash advances or -- that's
17  it.
18          MR. HERMAN:  Okay.  Second point is that can
19  we ask if there have been any other changes to the SEB
20  form of asset purchase agreement other than the ones that
21  were read on the record just at the commencement of the
22  auction?
23          MR. GALARDI:  No.  The only one we -- I
24  think we were strike happy on that paragraph 10.26, so

                                                      9


1  that's been back in the form, which basically makes it a
2  July 20.  I think that those reps and warranties ran out.
3          The only other thing is we have said here
4  we are purchasing what you called excluded assets for
5  that purchase price of $750,000.  Otherwise, the
6  black-line is where we stand on our bid.

                        Page 7

080706br.txt

7          MR. HERMAN:  We read paragraph 2.4 of our

8   asset purchase agreement as requiring that the buyer

9   shall repay -- that SEB if it is the winning bidder

10  shall repay to buyer in good funds an amount equal to all

11  inventory advances.  We do not believe the mere posting

12  of letters of credit will satisfy the condition.  We have

13  no intention of waiving that provision in our contract.

14          MR. GALARDI:  Let's read what it says,

15  because I may disagree with you.  If you are reading

16  2.4(ii) it says, "Sellers shall reimburse buyer," which

17  is you, "for the inventory advances promptly following

18  receipt, and to the extent, of payment for the inventory

19  collateral and, in any event, shall repay to buyer in

20  good funds an amount equal to the inventory advances less

21  the undrawn amount of each letter of credit sellers cause

22  to be returned to buyer on the earlier of." So it is not

23  a buyer obligation to do that if we are the buyer.  It is

24  the seller's obligation to do that.

10

1          MR. HERMAN:  We will turn to the buyers and

2   ask if they -- sellers and ask if the sellers will

3   confirm that they will comply with Section 2.4 if SEB is

4   the winning bidder?

5          Additional question for Wachovia.  Wachovia

6   also needs to confirm on the record that they will allow

7   cash to go out the door if the buyer merely posts letters

8   of credit.

9          (Discussion off the record.)

10         MS. JONES:  We will comply with Section 2.4.

11         MR. HERMAN:  Two other points.  With respect

080706br.txt

12    to the four potential items of credit for $100,000 each,

13    at this point Lifetime would not agree to any of the

14    four, but we reserve the right at any point during the

15    auction to talk amongst ourselves and decide and elect to

16    make one of those changes.  But at this point we are not

17    going to elect to make any of those changes.

18              Finally, before we commence the actual

19    auction and bidding, we want to make it clear for the

20    record that we object strenuously to the fact that the

21    competing bidder is using Citigroup, which is the same

22    investment adviser that Lifetime has used and, in fact,

23    has done numerous transactions with even just this year.

24    And, moreover, it is not just the same firm, it is some

                                                          11


 1    of the same people.  The Citigroup people have been privy

 2    to confidential and proprietary information of Lifetime,

 3    including their projections, their numbers, their

 4    strategies, the way they approach their assets, the way

 5    they approach acquisitions.  And we think it is highly

 6    objectionable and potentially grounds to overturn the

 7    auction and to contest the sale hearing tomorrow.

 8              We would urge the committees, the banks and

 9    the debtor in determining which offer is higher or better

10    to take into account that we certainly intend to sue and

11    to also object tomorrow and to appeal.  So there is a

12    litigation risk to any offer made by the competing

13    bidder.  We are going to reserve all our rights against

14    all parties on that issue.

15              MR. GALARDI:  People are reserving their

16    rights.  SEB reserves their rights on similar grounds to

080706br.txt

17  disqualify their counsel Morgan Lewis who has represented

18  them, in fact, is in active litigation on behalf of SEB,

19  perhaps not the same persons.

20        So with respect to reserving rights, note

21  SEB reserves all rights as well.  If we may get on with

22  the bidding.

23        MS. JONES:  Obviously the debtors reserve

24  all of their rights or any rights that may be raised,

                                                      12


1   whether by Lifetime or SEB, either at tomorrow's hearing

2   or in a future date, and reserves all rights to take any

3   and all discovery that we believe necessary in connection

4   therewith on behalf of all the estates.

5         MR. LOWREY:  Anything else?

6         MR. HERMAN:  No.  I think we are ready to

7   start.

8         MR. LOWREY:  The bid is to Lifetime.

9         MR. HERMAN:  Current bid of SEB is 21.8,

10  less the break-up fee of 650 and net amount to the estate

11  of 21,150,000.  As far as I understand the bidding

12  procedures, the next increment has to be $100,000.  So we

13  would bid 21,250,000.

14        MS. JONES:  Off the record.

15        (Discussion off the record.)

16        MS. JONES:  We heard Lifetime make their bid

17  of 21,250.  Mr. Galardi, if SEB intends to further bid,

18  would you scale your bid to deal with the break-up fee

19  and explain on the record how you are scaling the bid?

20        MR. GALARDI:  Okay.  SEB will bid the

21  following:  21,350 and will raise its price for the

Page 10

080706br.txt

22  additional equipment to 850.

23       MS. JONES:  Do you want to explain the

24  break-up fee?

13

1        MR. GALARDI:  I understand and SEB

2  understands that at any time we are bidding on this scale

3  we would be adding 650, which if we are the successful

4  bidder would go to the payment of the break-up fee to the

5  Lifetime people as a stalking horse break-up fee.

6        MS. JONES:  Thank you very much.

7        The bid presently on table by SEB is bid for

8  21,350.  Aside from that they have agreed to raise their

9  Nuevo Laredo bid, if you will, to 850, for which the

10  debtor is still not providing any credit, but we do see

11  the 21,350 as higher and better.

12        MR. GALARDI:  You don't see credit in the

13  $100,000 that I raised?

14        MS. JONES:  No.

15        MR. GALARDI:  Then we will take that back.

16        MS. JONES:  The bid of SEB is 21,350.  Their

17  Nuevo Laredo bid remains at 750.  That's an issue a

18  little bit off table at this point, for which the debtor

19  is not giving value.

20        MR. HERMAN:  Lifetime bids 21,450.

21        MS. JONES:  With Lifetime's bid of 21,450,

22  the debtors see that as a higher and better bid.  And

23  would ask SEB if they --

24        MR. GALARDI:  They will bid 21,550, and we

14

Page 11

080706br.txt

1  will bid a million dollars for that equipment that has no
2  value.  Ask if you are going to give us value now?
3              MS. JONES:  We will take a short break.
4              (Recess taken.)
5              MS. JONES:  The last bid by SEB was for
6  21,550, plus they did tell us that with respect to the
7  Nuevo Laredo facility they would increase that proposal
8  to $1 million.  The debtor believes the bid of 21,550 is
9  a higher and better offer.  The debtor is not willing to
10 give any value at this time for the $1 million.
11             MR. GALARDI:  We will change our bid to
12 21,550 and 750 for the equipment.
13             MS. JONES:  For purposes of the record, the
14 bid from SEB is 21,550.  And also they have their 750
15 Nuevo Laredo offer.  The debtor does determine that this
16 is a higher and better offer, and looks to Lifetime.
17             MR. HERMAN:  Lifetime bids 21,650.
18             MR. GALARDI:  We will bid 21,750 and bid
19 1.1 million for the equipment.
20             MS. JONES:  There was a bid by Lifetime of
21 21,650.  That is a higher and better bid.
22             SEB has now bid 21,750 and also increased
23 their Nuevo Laredo proposal to 1.1 million.  The debtor
24 believes 21,750 is a higher and better bid.  We will

                                                        15

1  provide no credit at the auction for the $1.1 million
2  proposal.
3              MR. GALARDI:  We will change our bid to
4  21,750 and bid $650,000 for the equipment.
5              MR. HERMAN:  I thought the bids were
                        Page 12

080706br.txt

 6  irrevocable.  I'm not sure that they are entitled to

 7  that.

 8              MR. GALARDI:  That's fine.  I'll leave my

 9  bid out there.  We will play the game correctly.

10              MR. HERMAN:  You can't float trial balloon

11  bids or --

12              MR. GALARDI:  I'll make a bid, 21,650 and a

13  million dollars for the equipment -- 21,750 and a million

14  dollars, because it is nonrevocable according to Neil

15  Herman.

16              MS. JONES:  The bid of SEB of 21,750 the

17  debtors determine is a higher and better bid.  And we

18  appreciate the proposal of $1 million for the Nuevo

19  Laredo facility, but at this time we will not be

20  providing value or giving credit for that.

21              MR. HERMAN:  Lifetime bids 21,850.

22              MS. JONES:  The bid of Lifetime at 21,850 we

23  determine to be a higher and better bid, and look to SEB.

24              MR. GALARDI:  We will bid $22 million and go

                                                     16


 1  back to 750 for the equipment.

 2              MS. JONES:  Last bid on the table is by SEB

 3  of $22 million and their Nuevo Laredo proposal of

 4  $750,000.  The debtor is not providing any value for the

 5  $750,000 offer, but does see the $22 million bid as a

 6  higher and better bid, and looks to Lifetime.

 7              MR. HERMAN:  22.1.

 8              MS. JONES:  Lifetime at 22.1 million.  The

 9  debtor determines that to be a higher and better bid, and

10  looks to SEB.

                          Page 13

080706br.txt

11          MR. GALARDI:  We will bid 22.2, $1.2 million
12  for the equipment at Nuevo Laredo.
13          MS. JONES:  The debtors will take a short
14  break.
15          (Recess taken.)
16          MS. JONES:  Last bid on the table by SEB at
17  $22.2 million, plus a proposal on the Nuevo Laredo
18  facilities of $1.2 million.  The debtors believe the bid
19  of 22.2 million is a higher and better bid, and we will
20  give no value for the $1.2 million proposal for Nuevo
21  Laredo.  We look to Lifetime.
22          MR. HERMAN:  Lifetime will bid 22.3.
23          MS. JONES:  Last bid on the table is
24  Lifetime at 22.3 million.  The debtors consider that a

                                                        17


1  higher and better offer and look to SEB.
2          MR. GALARDI:  We will bid 22.4 and
3  $1,300,000 for that equipment in Nuevo Laredo that will
4  have no value notwithstanding increasing it by $100,000
5  each time.
6          MS. JONES:  Last bid on the table is SEB at
7  22.4 million, plus a bid on the Nuevo Laredo assets of
8  1.3 million.  The debtors determine that the bid of
9  22.4 million is a higher and better offer, and will
10  provide no value at this auction for the 1.3 million bid
11  on Nuevo Laredo.  We look to Lifetime.
12          MR. HERMAN:  22.5 for Lifetime.
13          MS. JONES:  Lifetime has bid 22.5, which the
14  debtors determine is a higher and better offer.  We look
15  to SEB.
                        Page 14

080706br.txt

16           MR. GALARDI:  We will bid 22.6 and we will

17   bid $650,000 for the equipment at Nuevo Laredo.

18           MS. JONES:  Last bid on the table is by SEB

19   at 22.6 million, with a bid for Nuevo Laredo assets of

20   $650,000.  The debtors determine the bid of 22.6 million

21   is a higher and better bid, and provides no value for the

22   $650,000 bid for Nuevo Laredo assets.

23           MR. GALARDI:  Let me make clear:  Are you

24   willing to accept the 650, because that's part of our

                                                    18


1    deal?  We won't bid the 22.6, unless you accept the 650.

2            MS. JONES:  We will take a break.

3            (Recess taken.)

4            MS. JONES:  Last bid on the table is by SEB

5    in the amount of $22.6 million, along with a bid on Nuevo

6    Laredo assets of $650,000.  The question, I believe it

7    was a question, was asked whether we will consider that a

8    higher and better offer with both elements having to be

9    intact as, i.e. we have to take the bid at 22.6 and we

10   have to take the Nuevo Laredo assets proposal at

11   $650,000.

12           MR. GALARDI:  Let me clarify.  Let's take

13   the asset purchase agreement and move all of the excluded

14   assets over to the purchased assets and I bid essentially

15   23,250 for all of that.  I'm not agreeing to separate and

16   bid on separate scales at this point.

17           MS. JONES:  The debtor is not prepared to

18   answer your question -- the debtor would not be prepared

19   to accept a bid in that regard.  We will deal with the

20   assets as we have defined in the asset purchase

                            Page 15

080706br.txt

21  agreement.  So the debtor would not be prepared to accept

22  a bid that links the two, if you will.  We are prepared

23  to entertain a bid, though, on the same group of assets

24  that Lifetime has been bidding upon.

19

1           MR. GALARDI:  We will bid 22,600 for those

2  other excluded assets -- their last bid was 22,500.

3           MS. JONES:  22.6 on its own will be a higher

4  and better bid.  However, we will not link it to

5  receiving -- to having to take your proposal on the Nuevo

6  Laredo assets.

7           MR. GALARDI:  So you will not sell us those

8  Nuevo Laredo assets or you will?

9           MS. JONES:  We will not.

10           MR. GALARDI:  We will bid 22,600 -- we will

11  leave our bid at what it is.  We understand we are not

12  getting those assets.  We are at 22,600.

13           MS. JONES:  The SEB bid of 22.6 million the

14  debtors determine is a higher and better bid, and we look

15  to Lifetime.

16           MR. HERMAN:  22.7 for Lifetime.

17           MR. GALARDI:  22.8 and 750 for the Laredo

18  assets.

19           MS. JONES:  Lifetime bid of 22.7 million the

20  debtor determines is a higher and better bid.  SEB's

21  subsequent bid of 22.8 million we believe is a higher and

22  better bid.  And we provide, we are giving no value for

23  the $750,000 credit -- proposal for the Nuevo Laredo

24  assets --

20

080706br.txt

1              MR. GALARDI:  But they will be sold to us
2    for $750,000 as we started the whole auction that you had
3    agreed to -- want to make sure that we are going to still
4    get those assets for 750 like you agreed.
5              MR. DUNAYER:  We are prepared to sell the
6    assets for 750.
7              MR. GALARDI:  If we are not the successful
8    bidder, we have no interest in buying those.
9              MS. JONES:  So we have the clarification on
10   the record, the SEB bid of 22.8 million, the debtor
11   determines is a higher and better bid.  We look to
12   Lifetime.
13             MR. HERMAN:  Lifetime would bid 22.9, but we
14   want to make it clear that part of our bid is a 6-month
15   supply agreement dealing with the very assets that SEB is
16   trying to buy.  So we assume that the closing on those
17   assets will not occur until after the 6-month supply
18   agreement has been expired or terminated.
19             MR. GALARDI:  If we succeed it makes no
20   difference.
21             MS. JONES:  Off the record.
22             (Discussion off the record.)
23             MS. JONES:  For purposes of catching up the
24   record -- and I would ask that everybody not talk at once
                                                        21


1    when the court reporter is trying to write something
2    down -- the Lifetime bid is $22.9 million.  There was
3    confirmation by SEB that they are not interested in the

080706br.txt

4   Nuevo Laredo assets if they are not the successful

5   bidder.

6              The debtors determine that the bid of

7   Lifetime at $22.9 million is a higher and better bid, and

8   looks to SEB.

9              MR. GALARDI:  We will bid 23 million and 750

10  for the excluded assets, conditioned on our being the

11  highest and best bidder.

12             MS. JONES:  The debtors determine that the

13  bid of SEB of 23 million is a higher and better bid, and

14  notes the $750,000 proposal for the Nuevo Laredo assets

15  for which we are giving no value for purposes of this

16  auction.

17             We look to Lifetime.

18             MR. KLINGBAUM:  Leonard Klingbaum on behalf

19  of Lifetime.

20             Lifetime bids 23.1.

21             MS. JONES:  The debtors determine the bid of

22  Lifetime of 23.1 million is a higher and better offer,

23  and looks to SEB.

24             MR. GALARDI:  We bid 23.2 and still that

                                                    22


1   750.

2              MS. JONES:  The debtor determines the bid of

3   SEB of 23.2 million is a higher and better bid, and takes

4   note of the $750,000 proposed purchase of the Nuevo

5   Laredo assets for which we are giving no value at this

6   auction.

7              We look to Lifetime.

8              MR. KLINGBAUM:  Lifetime bids 23.3.

                        Page 18

080706br.txt

9          MS. JONES:  Debtors determine the bid of

10  Lifetime at 23.3 million is higher and better, and looks

11  to SEB.

12          MR. GALARDI:  We bid 23.4 and the 750.

13          MS. JONES:  Debtors determine that the SEB

14  bid of 23.4 million is a higher and better bid, takes

15  note of the $750,000 proposal for the Nuevo Laredo

16  assets, gives no value to that at this auction.  We look

17  to Lifetime.

18          MR. KLINGBAUM:  Lifetime bids 23.5.

19          MS. JONES:  Debtors determine that the bid

20  of Lifetime at 23.5 million is a higher and better bid

21  and looks to SEB.

22          MR. GALARDI:  SEB bids 23.6 and 750 for

23  those excluded assets.

24          MS. JONES:  Debtor determines the bid of SEB

                                                        23


1  of 23.6 million is a higher and better bid, takes note of

2  the $750,000 proposal for the Nuevo Laredo assets, but

3  gives no value to that bid of $750,000 at this auction.

4  We look to Lifetime.

5          MR. KLINGBAUM:  Lifetime bids 23.7.

6          MS. JONES:  Debtor determines that the bid

7  of Lifetime at 23.7 million is a higher and better offer

8  and we look to SEB.

9          MR. GALARDI:  23.8 and 750.

10          MS. JONES:  The debtor determines the SEB

11  bid of 23.8 million is a higher and better bid.  We note

12  the $750,000 bid for the Nuevo Laredo assets for which we

13  give no value at the auction and we look to Lifetime.

                        Page 19

080706br.txt

14          MR. KLINGBAUM:  Lifetime bids 23.9.

15          MS. JONES:  Debtors determine the bid of

16  Lifetime at 23.9 is a higher and better bid and we look

17  to SEB.

18          MR. GALARDI:  We bid 24.  And 750.  24

19  million --

20          MS. JONES:  The bid of SEB at 24 million

21  debtors determine is a higher and better bid.  We take

22  note of the offer of 750 for the Nuevo Laredo assets, but

23  we give no value for that bid of $750,000 at this

24  auction.  We look to Lifetime.

                                                 24

1          MR. KLINGBAUM:  Lifetime bids 24.1.

2          MS. JONES:  The debtors determine that the

3  bid of Lifetime at 24.1 million is a higher and better

4  bid and we look to SEB.

5          MR. GALARDI:  We will bid 24.2 million and

6  the same 750.

7          MS. JONES:  The debtor deems the bid of SEB

8  of 24.2 million to be a higher and better offer.  We take

9  note of the 750 bid for the Nuevo Laredo assets, but we

10  give no value for that $750,000 at this auction.  We look

11  to Lifetime.

12          MR. KLINGBAUM:  Lifetime bids 24.3.

13          MS. JONES:  Debtors determine the bid of

14  Lifetime of 24.3 million is a higher and better bid and

15  we look to SEB.

16          MR. GALARDI:  We will bid, SEB will bid 24.4

17  and raise our bid to $1.5 million for the Nuevo Laredo

18  assets.

080706br.txt

19          MS. JONES:  The debtor determines the bid of

20  SEB at 24.4 million is higher and better.  We take note

21  of the bid of 1.5 for the Nuevo Laredo assets, but we

22  give no value for the bid of 1.5 million for those assets

23  and we look to Lifetime.

24          MR. KLINGBAUM:  Lifetime bids 24.5.

                                                    25


1          MS. JONES:  The debtors deem the bid of

2   Lifetime at 24.5 million to be a higher and better bid

3   and we look to SEB.

4          MR. GALARDI:  Since we can't give our money

5   away, we will bid 24.6 and bid only $750,000 for the

6   Nuevo Laredo assets and reserve all rights as to whether

7   or not any bid that doesn't include those is a higher and

8   better bid.

9          MS. JONES:  The debtor determines the bid of

10  SEB in the amount of 24.6 million is a higher and better

11  bid.  We take note of the $750,000 bid for Nuevo Laredo

12  assets, but we give no value for that $750,000 bid at

13  this auction.  We look to Lifetime.

14          MR. KLINGBAUM:  Lifetime bids 24.7.

15          MS. JONES:  Debtor deems the bid of Lifetime

16  of 24.7 million as a higher and better bid and we look to

17  SEB.

18          MR. GALARDI:  Since you wouldn't take our

19  750 over there I guess we will have to go to 24.8 and

20  stay at 750 for those Nuevo Laredo assets that seem to

21  have no value at this auction.

22          MS. JONES:  The debtors determine that the

23  bid of SEB in the amount of 24.8 million is a higher and

Page 21

080706br.txt

24  better bid.  We take note of the bid of $750,000 on the

26

1   Nuevo Laredo assets, but give it no value to that bid of

2   $750,000 at this auction.  We look to Lifetime.

3               MR. KLINGBAUM:  Lifetime bids 24.9.

4               MS. JONES:  Debtor determines that the bid

5   of 24.9 million of Lifetime is a higher and better bid

6   and we look to SEB.

7               MR. GALARDI:  All right.  Let's bid

8   $23 million for the assets and $2 million for the Nuevo

9   Laredo assets.

10              MS. JONES:  For the record, I was asked the

11  question by SEB if a bid of $23 million for the assets

12  and a $2 million proposal for the assets of Nuevo Laredo

13  would be a higher and better bid, and the answer from the

14  debtor's perspective is no.

15              MR. GALARDI:  We will bid 25 million for the

16  assets and $750,000 for the Nuevo Laredo assets.

17              MS. JONES:  Last bid on the record is SEB at

18  25 million.  And the debtors take note of their bid of

19  $750,000 for the Nuevo Laredo assets, for which we give

20  no value for that bid of $750,000 at this auction.  We

21  look to Lifetime.

22              MR. KLINGBAUM:  Lifetime bids 25.1.

23              MS. JONES:  The debtors determine that the

24  bid of 25.1 million from Lifetime is a higher and better

27

1   bid and we look to SEB.

2               MR. GALARDI:  25.2 and 750 for the Laredo.

Page 22

080706br.txt

3              MS. JONES:  The bid of SEB at 25.2 million

4       the debtor determines is a higher and better bid.  We

5       take note of the $750,000 bid for the Nuevo Laredo

6       assets, but will give no value to that $750,000 at this

7       auction.  We look to Lifetime.

8              MR. KLINGBAUM:  Lifetime bids 25.3.

9              MS. JONES:  The debtors determine the bid of

10      Lifetime of 25.3 million is a higher and better bid and

11      we look to SEB.

12             MR. GALARDI:  SEB bids 25.4 and $750,000 for

13      the Laredo assets.

14             MS. JONES:  The debtors determine that the

15      SEB bid of 25.4 million is a higher and better bid.  We

16      take note of the bid of $750,000 for the Nuevo Laredo

17      assets, but we give no value for that bid of $750,000 at

18      this auction.  We look to Lifetime.

19             MR. KLINGBAUM:  Lifetime bids 25.5.

20             MS. JONES:  The debtor determines that the

21      bid of Lifetime of $25.5 million is a higher and better

22      bid.  And we look to SEB.

23             MR. GALARDI:  Can we take a break?

24             MS. JONES:  Absolutely.

                                                      28


1              (Recess taken.)

2              MS. JONES:  Last bid on the record was that

3       of Lifetime in the amount of $25.5 million.  The debtor

4       deemed that a higher and better offer and we look to SEB.

5              MR. GALARDI:  I think we are going to bid

6       25.6 and 750 for the Nuevo Laredo assets, and for every

7       bid from here on out we will stay at 750 for the Nuevo

                          Page 23

080706br.txt

8    Laredo assets, unless we decide to speak up and bid more

9    for those assets.

10            MS. JONES:  For purposes of the record, when

11   I acknowledge the bids of SEB going forward I will

12   assume, and Mr. Galardi will correct me if I'm wrong,

13   that the $750,000 proposal for the Nuevo Laredo assets is

14   part of their bid and the debtor will be giving no value

15   at this auction for that $750,000 bid.

16            Having said that, with respect to the SEB

17   bid now of 25.6 million, the debtors do consider that a

18   higher and better bid and we look to Lifetime.

19            MR. KLINGBAUM:  Lifetime bids 25.7.

20            MS. JONES:  The debtors determine the bid of

21   Lifetime at 25.7 million is a higher and better bid and

22   we look to SEB.

23            MR. GALARDI:  SEB looks back with a bid of

24   25.8.

                                                29

1             MS. JONES:  The debtors consider the bid of

2    SEB at 25.8 to be a higher and better bid and we look to

3    Lifetime.

4             MR. KLINGBAUM:  Lifetime bids 25.9.

5             MS. JONES:  The debtors deem the bid of

6    Lifetime at 25.9 million to be a higher and better bid.

7    And we look to SEB.

8             MR. GALARDI:  We bid 26.

9             MS. JONES:  The debtors deem the bid of SEB

10   at $26.0 million to be a higher and better bid and we

11   look to Lifetime.

12            MR. KLINGBAUM:  Lifetime bids 26.1.
                        Page 24

080706br.txt

13              MS. JONES:  The debtors determine the bid of

14    Lifetime at 26.1 million to be a higher and better bid.

15    We look to SEB.

16              MR. GALARDI:  We will bid 26.2.

17              MS. JONES:  The debtors determine the bid of

18    SEB at 26.2 million to be a higher and better bid and we

19    look to Lifetime.

20              MR. KLINGBAUM:  Lifetime bids 26.3.

21              MS. JONES:  Debtor determines the bid of

22    Lifetime at 26.3 million to be a higher and better bid

23    and we look to SEB.

24              MR. GALARDI:  26.4.

                                                        30


1              MS. JONES:  The debtor considers the bid of

2    SEB at 26.4 to be a higher and better bid we look to

3    Lifetime.

4              MR. KLINGBAUM:  Lifetime bids 26.5.

5              MS. JONES:  Debtor considers the bid of

6    Lifetime at 26.5 million to be a higher and better bid

7    and we look to SEB.

8              MR. GALARDI:  SEB bids 26.6.

9              MS. JONES:  The debtor determines the bid of

10    26.6 by SEB to be a higher and better bid and we look to

11    Lifetime.

12              MR. KLINGBAUM:  Lifetime bids 26.7.

13              MS. JONES:  The bid by Lifetime of

14    $26.7 million is determined by the debtors to be a higher

15    and better bid.  We look to SEB.

16              MR. GALARDI:  SEB bids 26.8.

17              MS. JONES:  The debtors determine the bid of

080706br.txt

18  SEB at 26.8 to be a higher and better bid and we look to

19  Lifetime.

20          MR. KLINGBAUM:  Lifetime bids 26.9.

21          MS. JONES:  The bid of Lifetime of

22  $26.9 million is determined by the debtors to be a higher

23  and better bid and we look to SEB.

24          MR. GALARDI:  SEB bids 27.

                                                    31


1           MS. JONES:  The bid of SEB of 27.0 million

2   is considered by the debtors to be a higher and better

3   bid and we look to Lifetime.

4           MR. KLINGBAUM:  Lifetime bids 27.1.

5           MS. JONES:  The bid of Lifetime at

6   $27.1 million is determined by the debtors to be a higher

7   and better bid.  And we look to SEB.

8           MR. GALARDI:  We bid 27.2.

9           MS. JONES:  The bid of SEB of 27.2 million

10  is determined by the debtors to be a higher and debtor

11  bid and we look to Lifetime.

12          MR. KLINGBAUM:  Lifetime bids 27.3.

13          MS. JONES:  The bid of Lifetime of

14  $27.3 million is determined by the debtors to be a higher

15  and better bid and we look to SEB.

16          MR. GALARDI:  27.4.

17          MS. JONES:  The debtors determine that the

18  bid of SEB in the amount of 27.4 million is a higher and

19  better bid and we look to Lifetime.

20          MR. KLINGBAUM:  Lifetime bids 27.5.

21          MS. JONES:  The debtors determine that the

22  bid of Lifetime in the amount of 27.5 million is a higher

080706br.txt

23    and better bid and we look to SEB.

24              MR. GALARDI:  SEB bids 27.6.

                                              32

1              MS. JONES:  The bid of SEB in the amount of

2    27.6 million is determined by the debtors to be a higher

3    and better bid and we look to Lifetime.

4              MR. KLINGBAUM:  Lifetime bids 27.7.

5              MS. JONES:  Debtors determine the bid of

6    Lifetime of 27.7 is a higher and better bid and we look

7    to SEB.

8              MR. GALARDI:  SEB is going to bid 27.9.

9              MS. JONES:  The debtor thanks SEB for its

10   bid of 27.9 million and the debtor determines the bid of

11   SEB of 27.9 million is a higher and better bid and we

12   look to Lifetime.

13             MR. KLINGBAUM:  Lifetime bids 28 million.

14             MS. JONES:  The debtor determines the bid of

15   Lifetime at 28 is a higher and better bid and we look to

16   SEB.

17             MR. GALARDI:  SEB wants to get back on even

18   numbers, so we will do 28.2.

19             MS. JONES:  Thank you for your bid.  The

20   debtor determines the bid of SEB in the amount of

21   $28.2 million is a higher and better bid and we look to

22   Lifetime.  We look forward to your creativity.

23             MR. KLINGBAUM:  Lifetime bids $28,300,000.

24             MS. JONES:  Thank you for your bid.  The bid

                                              33

080706br.txt

1  of Lifetime of 28.3 million the debtor determines is a

2  higher and better bid and we look to SEB.

3          MR. GALARDI:  We are going to bid

4  $28,401,000.

5          MS. JONES:  The debtor determines the bid of

6  SEB in the amount of $28,401,000 is a higher and better

7  bid and we look to Lifetime.

8          MR. KLINGBAUM:  Lifetime bids $28,501,000.

9          MS. JONES:  The debtor determines the bid of

10  Lifetime in the amount of $28,501,000 is a higher and

11  better bid and we look to SEB.

12          MR. GALARDI:  SEB will bid 28.7.

13          MS. JONES:  The debtor determines the bid of

14  SEB in the amount of 28.7 million is a higher and better

15  bid.  We look to Lifetime.

16          MR. KLINGBAUM:  Lifetime bids 28.8.

17          MS. JONES:  The debtor determines the bid of

18  Lifetime in the amount of 28.8 million is a higher and

19  better bid and we look to SEB.

20          MR. GALARDI:  SEB bids 30 -- $29 million.

21          MS. JONES:  The debtor determines that the

22  bid of SEB in the amount of 29.0 million is a higher bid,

23  higher and better bid and we look to Lifetime.

24          MR. KLINGBAUM:  Lifetime bids 29.1.

                                                34


1          MS. JONES:  The debtor determines the bid of

2  Lifetime in the amount of 29.1 million is a higher and

3  better bid and we look to SEB.

4          MR. GALARDI:  SEB bids 29.3.

5          MS. JONES:  The debtor determines the bid of

080706br.txt

6  SEB in the amount of 29.3 million is a higher and better

7  bid and we look to Lifetime.

8              MR. KLINGBAUM:  Lifetime bids 29.4.

9              MS. JONES:  The debtor determines the bid of

10 Lifetime in the amount of 29.4 million is a higher and

11 better bid and we look to SEB.

12             MR. GALARDI:  SEB bids 29.5.

13             MS. JONES:  The debtor determines the bid of

14 SEB in the amount of 29.5 million is a higher and better

15 bid and we look to Lifetime.

16             MR. KLINGBAUM:  Lifetime bids 29.6.

17             MS. JONES:  The debtor determines the bid of

18 Lifetime in the amount of $29.6 million is a higher and

19 better bid and we look to SEB.

20             MR. GALARDI:  SEB will bid $30 million.

21             MS. JONES:  The debtor determines the bid of

22 SEB in the amount of $30.0 million is a higher and better

23 bid and we look to Lifetime.

24             MR. KLINGBAUM:  Lifetime request s a break

                                                    35


1  at this point.

2              (Recess taken.)

3              MS. JONES:  Back on the record.  Last bid we

4  have is that of SEB for $30.0 million.  The debtors

5  determined that is a higher and better bid.  And we look

6  to Lifetime.

7              MR. KLINGBAUM:  We wanted to thank everyone

8  for your time and patience in allowing us a bit of time

9  to step out of the room.  As you can imagine, given the

10 significance of this acquisition, we wanted to have some

                            Page 29

080706br.txt

11  time to be able to discuss this with the appropriate

12  people before coming back and resuming the action.  So

13  thank you for the time and patience.

14              At this point Lifetime will bid 30.1.

15              MR. GALARDI: 30.2.

16              MS. JONES:  For purposes of the record to

17  catch it up, Lifetime bid 30.1 million.  The debtor

18  determines that is a higher and better offer.

19              SEB has bid $30.2 million.  The debtor

20  determines that is a higher and better bid and we look to

21  Lifetime.

22              MR. KLINGBAUM:  Lifetime bids 30.3.

23              MS. JONES:  The debtor determines the bid of

24  Lifetime of 30.3 million is a higher and better bid and

                                                    36


 1  we look to SEB.

 2              MR. GALARDI:  30.4.

 3              MS. JONES:  The debtor determines the bid of

 4  SEB in the amount of 30.4 million is a higher and better

 5  bid and we look to Lifetime.

 6              MR. KLINGBAUM:  Lifetime bids 30.5.

 7              MS. JONES:  Debtor determines the bid of

 8  Lifetime in the amount of 30.5 million is a higher and

 9  better bid and we look to SEB.

10              MR. GALARDI:  30.6.

11              MS. JONES:  The bid of 30.6 million

12  presented by SEB the debtors determine is a higher and

13  better bid and we look to Lifetime.

14              MR. KLINGBAUM:  Lifetime bids 30.7.

15              MS. JONES:  The debtors determine the bid of

080706br.txt

16    Lifetime in the amount of 30.7 is a higher and better bid

17    and we look to SEB.

18              MR. GALARDI:  31.

19              MS. JONES:  The debtor determines the bid of

20    SEB in the amount of 31.0 million is a higher and better

21    bid and we look to Lifetime.

22              MR. KLINGBAUM:  Lifetime bids 31.1.

23              MS. JONES:  The debtors determine the bid of

24    Lifetime in the amount of 31.1 million is a higher and

                                                      37


1    better bid and we look to SEB.

2              MR. GALARDI:  31.2.

3              MS. JONES:  The bid of SEB in the amount of

4    $31.2 million the debtors determine is a higher and

5    better bid and we look to Lifetime.

6              MR. KLINGBAUM:  Lifetime bids 31.3.

7              MS. JONES:  The debtors determine the bid of

8    Lifetime in the amount of $31.3 million is a higher and

9    better bid and we look to SEB.

10             MR. GALARDI:  31.4.

11             MS. JONES:  The bid of SEB in the amount of

12    31.4 million the debtors determine is a higher and better

13    bid and we look to Lifetime.

14             MR. KLINGBAUM:  Lifetime bids 31.5.

15             MS. JONES:  The bid of 31.5 million by

16    Lifetime the debtors determine is a higher and better bid

17    and we look to SEB.

18             MR. GALARDI:  31.6.

19             MS. JONES:  The debtors determine the bid of

20    SEB in the amount of $31.6 million is a higher and better

080706br.txt

21  bid and we look to Lifetime.

22          MR. KLINGBAUM:  Lifetime bids 31.7.

23          MS. JONES:  The bid of Lifetime in the

24  amount of 31.7 million the debtors determine is a higher

                                                    38

1  and better bid and we look to SEB.

2          MR. GALARDI:  31.8.

3          MS. JONES:  The debtors determine the bid of

4  SEB in the amount of 31.8 million is a higher and better

5  bid and we look to Lifetime.

6          MR. KLINGBAUM:  Lifetime bids 31.9.

7          MS. JONES:  The bid of 31.9 by Lifetime the

8  debtors determine is a higher and better bid and we look

9  to SEB.

10          MR. GALARDI:  32.

11          MS. JONES:  SEB bid of $32 million the

12  debtors determine is a higher and better bid and we look

13  to Lifetime.

14          MR. KLINGBAUM:  Give me a second.

15          (Discussion off the record.)

16          MR. KLINGBAUM:  Lifetime bids 32.1.

17          MS. JONES:  The debtors determine the bid of

18  Lifetime in the amount of 32.1 million is a higher and

19  better bid.  We look to SEB.

20          MR. GALARDI:  32.2.

21          MS. JONES:  The debtors determine the bid of

22  SEB in the amount of 32.2 million is a higher and better

23  bid and we look to Lifetime.

24          MR. KLINGBAUM:  Lifetime bids 32.3.

                                                    39

080706br.txt

1           MS. JONES:  Debtors determine the bid of
2  Lifetime in the amount of 32.3 million is a higher and
3  better bid and we look to SEB.
4           MR. GALARDI:  32.4.
5           MS. JONES:  The debtors determine the bid of
6  SEB in the amount of 32.4 million is a higher and better
7  bid and we look to Lifetime.
8           MR. KLINGBAUM:  Lifetime bids 32.5.
9           MS. JONES:  The bid of 32.5 million by
10  Lifetime the debtors determine is a higher and better bid
11  and we look to SEB.
12           MR. GALARDI:  32.6.
13           MS. JONES:  The debtors determine the bid of
14  SEB in the amount of 32.6 million is a higher and better
15  bid and we look to Lifetime.
16           MR. KLINGBAUM:  Lifetime bids 32.7.
17           MS. JONES:  The debtors determine the bid of
18  Lifetime in the amount of $32.7 million is a higher and
19  better bid and we look to SEB.
20           MR. GALARDI:  32.8.
21           MS. JONES:  SEB's bid of 32.8 million the
22  debtors determine is a higher and better bid and we look
23  to Lifetime.
24           MR. KLINGBAUM:  Lifetime bids 32.9.
                                                    40


1           MS. JONES:  The debtors determine the bid of
2  Lifetime in the amount of 32.9 million is a higher and
3  better bid and we look to SEB.
4           MR. GALARDI:  33.
                        Page 33

080706br.txt

    5              MS. JONES:  The bid of SEB in the amount of

    6    33.0 million is a higher and better bid as determined by

    7    the debtors and we look to Lifetime.

    8              MR. KLINGBAUM:  Lifetime bids 33.1.

    9              MS. JONES:  The debtors determine the bid of

   10    Lifetime in the amount of $33.1 million is a higher and

   11    better bid and we look to SEB.

   12              MR. GALARDI:  33.2.

   13              MS. JONES:  The debtors determine the bid of

   14    SEB in the amount of 33.2 million is a higher and better

   15    bid and we look to Lifetime.

   16              MR. KLINGBAUM:  Lifetime's bid is 33.3.

   17              MS. JONES:  The bid of Lifetime in the

   18    amount of $33.3 million the debtors determine is a higher

   19    and better bid and we look to SEB.

   20              MR. GALARDI:  33.4.

   21              MS. JONES:  The debtors determine that SEB's

   22    bid in the amount of 33.4 million is a higher and better

   23    bid and we look to Lifetime.

   24              MR. KLINGBAUM:  Lifetime bids 33.5.

                                                41



    1              MS. JONES:  The bid of 33.5 million by

    2    Lifetime the debtors determine is a higher and better bid

    3    and we look to SEB.

    4              MR. GALARDI:  33.6.

    5              MS. JONES:  Debtors determine the bid of SEB

    6    in the amount of 33.6 million is a higher and better bid

    7    and we look to Lifetime.

    8              MR. KLINGBAUM:  Lifetime bids 33.7.

    9              MS. JONES:  The bid of Lifetime in the

080706br.txt

10  amount of $33.7 million the debtors determine is a higher

11  and better bid and we look to SEB.

12          MR. GALARDI:  SEB will bid 34 million.

13          MS. JONES:  The bid of SEB in the amount of

14  34.0 million is a higher and better bid as determined by

15  the debtors and we look to Lifetime.

16          MR. KLINGBAUM:  Lifetime bids 34.1.

17          MS. JONES:  Debtors determine the bid of

18  Lifetime in the amount of $34.1 million is a higher and

19  better bid and we look to SEB.

20          MR. GALARDI:  34.2.

21          MS. JONES:  The debtors determine that the

22  bid of SEB in the amount of $34.2 million is a higher and

23  better bid and we look to Lifetime.

24          MR. KLINGBAUM:  Lifetime bids 34.3.

                                                    42


1           MS. JONES:  The debtors determine that the

2   bid of Lifetime in the amount of 34.3 million is a higher

3   and better bid and we look to SEB.

4           MR. GALARDI:  34.4.

5           MS. JONES:  The bid of $34.4 million by SEB

6   the debtors determine is a higher and better bid and we

7   look to Lifetime.

8           MR. KLINGBAUM:  Lifetime bids 34.5.

9           MS. JONES:  The debtors determine that the

10  bid of Lifetime in the amount of 34.5 million is a higher

11  and better bid and we look to SEB.

12          MR. GALARDI:  34.6.

13          MS. JONES:  The bid of 34.6 million by SEB

14  the debtors determine is a higher and better bid and we

080706br.txt

15    look to Lifetime.

16              MR. KLINGBAUM:  Lifetime's bid is

17    35 million.

18              MR. GALARDI:  35.1.

19              MS. JONES:  The bid of Lifetime in the

20    amount of 35.0 million, thank you for that bid and we

21    accept it and we see it as a higher and better bid.

22              We look to SEB, which has already raised

23    their bid to $35.1 million.  We thank you for that as

24    well and we do believe the bid of SEB in the amount of

                                                        43


1     35.1 million is a higher and better offer.  We look to

2     Lifetime.

3               MR. KLINGBAUM:  We will take a break.

4               (Recess taken.)

5               MS. JONES:  When last on the record, SEB had

6     given us a bid of 35.1 million.  The debtor determined

7     that was a higher and better bid, and we look to

8     Lifetime.

9               MR. HERMAN:  At this point Lifetime would

10    not be prepared to make any further bids.  We do want to

11    make a statement that we are going to protest the auction

12    and we are going to be contesting it tomorrow in court.

13    It's our view that having our financial adviser

14    whispering in the ear of the competing bidder tainted the

15    auction process.  It is as if somebody was tapping our

16    phones and got confidential information.  And we will be

17    putting people on notice that we will be in court

18    tomorrow challenging it and, therefore, we reserve the

19    right to argue that they are not a qualified bidder, that

080706br.txt

20  our bid at 21 million should be accepted.

21          MS. JONES:  As I mentioned at the beginning

22  of the auction, the debtor reserves its right, not only

23  in connection with the hearing tomorrow to defend

24  whatever allegations or assertions might be being made,

                                                    44


1   but to take discovery as well.

2           MS. LEVINE:  The committee and I would

3   assume all the estate parties in interest would reserve

4   their rights.

5           MR. GALARDI:  First with respect to SEB, so

6   the record is clear on what our final bid was, so that

7   the record is clear our bid was 35.1 million, plus

8   $750,000 for the Nuevo Laredo assets.  When we -- plus,

9   wait a second, they don't get 650 if we don't get the

10  deal, but if we get the deal they would be paid 650 at

11  closing.  If they delay the closing, I assume they will

12  not get it.

13          Our bid is 35.1 plus 650 that we have to add

14  for the break-up fee, and then we make the revisions to

15  the agreement on the 10.26 that we mentioned before.  I

16  think those were all of the other terms that we had to

17  do.  We have to backstop LCs obviously that we said we

18  would do.  And I think those are the terms of the deal.

19          Obviously, SEB reserves its rights regarding

20  Morgan, Lewis & Bockius and their ability to prosecute

21  any such action, as we had mentioned before.  But, again,

22  we thank you for the auction.  And to the extent that

23  they challenge this and go back to the $21 million,

24  obviously we think they have waived any argument by

                        Page 37

080706br.txt

45

1  participating today and we will go back to our original
2  bid if that turns out to be the case, but we think they
3  have a good, valid bid and we thank you.
4           MS. JONES:  From the debtor and estate
5  perspective, we have accepted the bid of 35.1 million
6  from SEB as a higher and better offer.  Again, if they
7  are the successful winner tomorrow they will need to pay
8  $650,000 break-up fee at closing.  And as mentioned
9  earlier, the debtor reserves all of its rights, as does
10  the estate with respect to the issues that are now
11  raised.
12           MR. GALARDI:  May I ask a question?  When is
13  the closing, is there a condition we have to have a final
14  order, right?
15           MS. JONES:  Off the record.
16           (Discussion off the record.)
17           MS. JONES:  The auction at this point is
18  concluded.
19           (The auction concluded at 3:35 p.m.)
20
21
22
23
24

46

1  State of Delaware    )
                        )
2  County of New Castle )

080706br.txt

3

4

5                    C E R T I F I C A T E

6        I, Vincent Bailey, Registered Professional

7   Reporter, do hereby certify that the foregoing record,

8   pages 2 to 46 inclusive, is a true and accurate

9   transcript of my stenographic notes taken on Monday,

10  August 7, 2006, in the above-captioned matter.

11        IN WITNESS WHEREOF, I have hereunto set my hand

12  and seal this   7th   day of August, 2007, at Wilmington.

13

14

15

16

17                   Vincent Bailey

18                   Certification No. 171-RPR

19                   (Expires January 31, 2008)

20

21

22

23

24

# EXHIBIT C

## TRADEMARK LICENSE AGREEMENT

This **TRADEMARK LICENSE AGREEMENT** (this "Agreement") is made as of October 29, 1999 (the "Effective Date") by and between **REGAL WARE, INC.**, a Delaware corporation ("Licensor") and **NEWELL OPERATING COMPANY**, a Delaware corporation ("Licensee") in connection with that Asset Purchase Agreement, dated as of September 15, 1999, between Licensor and Licensee (the "Purchase Agreement") (terms capitalized herein and not otherwise defined herein shall have their respective meanings set forth in the Purchase Agreement).

### RECITALS

**WHEREAS**, Licensor is engaged in the manufacture and distribution of non-electric aluminum cookware and bakeware and related accessories (the "Business"); and

**WHEREAS**, pursuant to the Purchase Agreement, Licensee has acquired certain assets used in connection with the Business of Licensor and in connection therewith will acquire a license to use certain Licensed Trademarks owned by Licensor; and

**WHEREAS**, Licensor has manufactured for sale to third parties various products using the Licensed Trademarks in connection with the Business (the "Manufactured Products"), and Licensee will continue to distribute such products after the Closing; and

**WHEREAS**, Licensor has acquired rights in the trademark "Regal" in connection with the Business consisting of the registered trademarks or applications therefor listed in Schedule E-1 hereto and any common law rights related thereto (the "Licensed Trademarks"); and

**WHEREAS**, Licensee further desires to acquire an exclusive, license from Licensor to use, directly and through its Affiliates, the Licensed Trademarks in connection with all non-electric cookware, bakeware and other accessories and products in International Class 21 (the "Defined Field") as classified by the United States Patent and Trademark Office ("PTO") either as of the Closing or in the future; and

**WHEREAS**, Licensor is willing to grant a license to Licensee and its Affiliates to use the Licensed Trademarks upon the terms and subject to the conditions as set forth herein.

**NOW, THEREFORE**, for and in consideration of the faithful performance by each party hereto of the obligations and covenants herein contained on its part to be performed, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### AGREEMENTS

**Article 1: License Terms**

1.1    _Grant of License._  Pursuant to the terms and subject to the conditions herein, Licensor hereby grants to Licensee and its Affiliates, an exclusive, worldwide royalty-free license,

subject only to termination as provided herein, to use the Licensed Trademarks on products within the Defined Field ("Products") and in connection with the manufacture, distribution and sale of Products. Licensor specifically acknowledges that the Manufactured Products fall within the definition of Products hereunder. The parties acknowledge and agree that (a) in the event the PTO redefines or deletes products or goods from International Class 21 after the Effective Date, such redefined or deleted products or goods shall remain within the definition of Products and (b) in no event will the Defined Field be interpreted not to include non-electric aluminum cookware and bakeware and related accessories.

1.2    Reservation of Rights. No rights or licenses, express or implied, other than those granted in Section 1.1, are granted by this Agreement to Licensee under any intellectual property owned or controlled by Licensor or its Affiliates. Licensor shall not use the Licensed Trademarks in connection with products similar to the Products, provided however that nothing contained herein shall prohibit Licensor from using the name "Regal" outside the Defined Field, including without limitation, on products in International Classes 7 and 11 as classified by the PTO. In addition, Licensor shall retain the right to use the name "Regal" on accessories customarily sold with or as an integral or essential part or component of such products in International Classes 7 and 11 regardless of whether such accessories are in International Class 21. Licensor shall also retain the right to use the name "Regal" as part of its corporate name "Regal Ware Inc." on products in the Defined Field; provided that such use in the Defined Field is not as a trademark or brand name but only for identifying the corporate entity responsible for manufacturing, distributing or selling the products, and that Licensor shall not accent or emphasize its corporate name over any brand name or trademark for such products. Nothing in this Agreement shall modify or affect the non-competition provisions of the Purchase Agreement.

1.3    Sublicensing and Assignment. Licensee shall have the right to sublicense others, including its Affiliates, to use the Licensed Trademarks in the Defined Field. Licensee may not assign or transfer this Agreement without the written consent of Licensor; provided that Licensee may transfer this Agreement without such consent to one of its Affiliates or to an entity who acquires substantially all of Licensee's business, by merger, consolidation, sale of stock or assets or otherwise, with respect to the Licensed Trademarks. This Agreement and the rights and obligations of Licensor hereunder may be assigned or transferred by Licensor by voluntary action or involuntarily by operation of law or otherwise to any other person or entity, including any of its subsidiaries or any entity to which substantially all of its business with respect to the Licensed Trademarks is transferred by merger, consolidation, sale of stock or assets or otherwise. This Agreement shall be binding upon the successors and assigns of the parties.

**Article 2: Term.**

This Agreement shall be effective as of the Effective Date and remain in effect until terminated as provided herein.

**Article 3: Maintenance of Secrecy.**

The parties shall handle in a confidential manner all proprietary and confidential information and data furnished under or in connection with this Agreement, and such information and data shall be used solely for the purposes stated herein. This provision shall not apply to such information

2

or data (a) that through no act or failure of the receiving party is or becomes public knowledge, or (b) that the receiving party can show was owned by the receiving party prior to the other party's disclosure, or (c) that is derived from any third party having the right to make such disclosure. This obligation shall be in effect for the term of this Agreement, and five (5) years after its termination.

## Article 4: Trademark Provisions.

4.1    Ownership. Licensee acknowledges that, as between Licensor and Licensee, Licensor is the owner of all right, title and interest in and to the Licensed Trademarks and is also the owner of the goodwill attached or which shall become attached to the Licensed Trademarks. Licensee shall use the Licensed Trademarks in compliance with applicable legal requirements and the terms of this Agreement. Licensee's use of the Licensed Trademarks shall inure to the benefit of the Licensor. Licensee shall take no action to interfere with or dilute the value or goodwill of the Licensed Trademarks.

4.2    Marking. Licensee shall cause to appear on all Products bearing the Licensed Trademarks the appropriate statutory notice of registration or application for registration thereof. Nothing in this Agreement shall prevent Licensee from using other trademarks in addition to the Licensed Trademarks on the Products.

4.3    Maintenance. Licensor shall pay all fees necessary to obtain and maintain registrations for the Licensed Trademarks (including without limitation, filing fees, issue fees, maintenance fees, annuities, taxes and attorneys' fees) during the term of this Agreement. Licensor shall notify Licensee that all such fees have been paid no later than sixty (60) days prior to the due date for payment for such fees. If Licensor fails to provide Licensee with such notice, Licensee may, in its discretion, if Licensor still fails to pay such fees within fifteen (15) days of notice from Licensee, pay such fees and either (a) Licensor will reimburse Licensee therefor or (b) Licensor will assign the registration for such Licensed Trademark to Licensee. Licensee shall reimburse Licensor for all governmental fees and expenses actually paid by Licensor related to renewal or maintenance of the Licensed Trademarks in International Class 21 within thirty (30) days of receipt of an invoice and evidence of payment therefor from Licensor.

4.4    Quality Control. The quality of Products bearing the Licensed Trademarks that are manufactured or distributed by Licensee shall be as high as or higher than the quality of Business products currently manufactured by Licensor, generally comparable in quality to comparable products in the industry, and in conformity with all applicable laws and industry and government standards. If at any time Licensor, in the reasonable exercise of discretion, determines that the Products bearing the Licensed Trademarks do not comport to these quality standards, then upon written notice giving the reasons therefor and upon failure by Licensee within thirty (30) days to cure the defect, permission to use the Licensed Trademarks set forth herein may immediately be suspended by Licensor. Licensee hereby covenants and agrees that it will cease any manufacture of the Products and any use of the Licensed Trademarks related to the Products, upon such notice until such time as it is notified in writing by Licensor that use may be resumed. Notwithstanding the foregoing, nothing in this Agreement shall in any way restrict Licensee from manufacturing products that do not bear any of the Licensed Trademarks.

3

4.5    Prosecution. In the event Licensee desires to have the Licensed Trademarks registered in any jurisdiction other than those in which they are already registered, Licensee shall make such request in writing to Licensor, and Licensor shall make reasonable efforts to obtain such additional registrations of the Licensed Trademarks for use by Licensee subject to the terms of this Agreement. Licensee shall fully assist Licensor in the registration process for such additional registrations and will, within thirty (30) days of receipt of Licensor's documented request thereof, reimburse Licensor for the reasonable fees, costs and expenses incurred in conjunction with obtaining, maintaining and renewing such additional registrations during the term of this Agreement. Any such additional registration of the Licensed Trademarks shall be the property of Licensor and shall be considered a Licensed Trademark under this Agreement. During the process of registering in any such additional jurisdictions, Licensor shall have the initial right to determine whether to pursue an appeal or contested proceeding at Licensor's sole expense, provided, however, that if Licensor chooses not to so pursue, Licensee, may so pursue at Licensee's sole expense and with the cooperation of Licensor. Licensee shall provide all necessary specimens.

4.6    Quality Monitoring. For the purpose of maintaining quality as provided in Section 4.4 of this Article 4, Licensor or its duly authorized representative shall have the right at reasonable times, not to exceed twice per calendar year unless quality control issues are found, to request that a reasonable quantity of sample Product be delivered to Licensor to determine whether such Products are being manufactured according to the standards set forth herein. Licensor shall not sell or distribute (other than on a charitable or non-commercial basis) such samples to third parties.

4.7    Cooperation. Licensee shall take such steps, and execute such further documents, as reasonably requested by Licensor in order to protect Licensor's complete interest in and title to and ownership of the Licensed Trademarks.

4.8    Additional Registrations. If Licensor should obtain additional trademark registrations for the Products, notice shall be given by Licensor to Licensee of the existence of such additional registrations, which registration shall be included in the Licensed Trademarks at no additional cost to Licensee.

4.9    Notice of Infringement. In the event that either party has reason to believe that any person is infringing any of the Licensed Rights, such party shall promptly notify the other party by providing all information in its possession, custody or control to permit the other party to determine whether such infringement is occurring.

4.10    Enforcement. During the term of this Agreement, Licensee shall have the first right to bring any action to protect Licensee's rights in and to the Licensed Trademarks with respect to Products, and to defend against any infringement, dilution, imitation, unauthorized use, or other mark likely to cause confusion as if Licensee were the actual or registered owner of the Licensed Trademarks (such infringement, dilution, imitation, unauthorized use referred to herein as "Infringement"). To the extent the participation of Licensor is required to enable Licensee to pursue any such action or defense, Licensor shall so participate at Licensee' expense unless Licensor is obligated to indemnify Licensee therefor. Any and all recoveries from said suit or settlements thereof shall be for the sole benefit of Licensee (unless Licensor indemnified Licensee for Licensee's pursuit of said suit, said action or said defense). Should Licensee fail to take the necessary steps by litigation or otherwise to defend against Infringement, Licensor may conduct

4

at its own expense, and with the right to all recoveries, such litigation as Licensor deems necessary to defend against infringement, provided that Licensor has first given Licensee thirty (30) days written notice of its intention to initiate such litigation, and provided further, that Licensee fails to initiate suggested action within ninety (90) days of such notice. To the extent the participation of Licensee is required to enable Licensor to pursue any such action or defense, Licensee shall so participate at Licensor's expense unless Licensee is obligated to indemnify Licensor therefor. Any and all recoveries from said suit or settlements thereof shall be for the sole benefit of Licensor.

## Article 5: Warranties.

5.1    Licensor represents and warrants that:

(a)    Licensor has the full right and power to enter into this Agreement and to perform the obligations and grant the licenses set forth in this Agreement;

(b)    there are no agreements, assignments or encumbrances in existence that are inconsistent with the provisions of this Agreement;

(c)    Licensor owns all right, title and interest, in and to the registrations listed in Schedule E-1 for the Licensed Trademarks; and

5.2    Licensee represents and warrants that:

(a)    Licensee has the full right and power to enter into this Agreement and to perform the obligations set forth in this Agreement; and

(b)    there are no agreements, assignments or encumbrances in existence that are inconsistent with the provisions of this Agreement.

## Article 6: Indemnification.

6.1    Licensor shall defend, indemnify and hold Licensee and Licensee's Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal fees) arising from or attributable to Licensor's breach of any representation or warranty set forth in Article 5. In addition, Licensor shall defend, indemnify and hold Licensee and its Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal fees) arising from or attributable to any claim that the use of the Licensed Trademarks pursuant to this Agreement infringes upon the trademark, copyright or other intellectual property rights of any third party.

6.2    Licensee shall defend, indemnify and hold Licensor and its Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal fees) arising from or attributable to Licensee's breach of any representation or warranty set forth in Article 5. In addition, Licensee shall defend, indemnify and hold Licensor and its Affiliates harmless against any judgment, damages, liability, loss, cost or other expense (including legal fees) arising from or attributable to Licensee's failure to comply with all laws of the countries in which it sells Products, including product liability, labor, and patent laws; provided, however, that this indemnification shall

5

not be construed to co-extend with or impede the indemnification obligations of Licensor under this Article 6.

## Article 7: Termination and Survival of Certain Obligations.

7.1    Term.  The term of this Agreement shall be ten (10) years.  This Agreement shall always automatically renew for subsequent terms of ten (10) years unless both parties agree to not renew the Agreement.

7.2    Termination on Default.  Should either party breach this Agreement, or be in default, the non-breaching party may terminate the Agreement upon giving written notice of such breach or default to the other party, provided the breach or default is not cured within three (3) months after the date of such notice.

7.3    Effect of Termination.  The parties hereto agree:

(a) that upon expiration or termination of this Agreement for any cause, Licensee shall have the right to complete the manufacture of any Products then on order, and Licensee shall further be permitted to sell such Products as have been manufactured, in the case of Products and are still in stock; provided, however, that Licensee shall not, in any event, be permitted to sell or ship any Products bearing Licensed Trademarks more than six months after expiration or termination; and

(b) subject to the provisions of Section 7.3(a), upon termination of this Agreement, Licensee shall immediately discontinue use of the Licensed Trademarks, it being understood by the parties that upon termination all rights pertaining to the Licensed Trademarks shall automatically revert to Licensor.

7.4    Survival of Certain Obligations.  It is expressly understood and agreed that any and all provisions herein relating to the maintenance of secrecy shall survive the termination of this Agreement irrespective of the reason(s) for termination, for two (2) years after its termination and the provisions of Articles 5 and 6 shall likewise survive the termination of this Agreement.

## Article 8: Miscellaneous.

8.1    Expenses.  Except as otherwise expressly provided herein, all legal, accounting and other expenses incurred by either of the parties to this Agreement in connection with the transactions contemplated by this Agreement will be borne solely by the party incurring such expenses.

8.2    Relationship of the Parties.  Nothing in this Agreement shall be construed or interpreted as constituting either party hereto the agent, principal, employee or joint venturer of the other.  Each of Licensee and Licensor is an independent contractor.  Neither shall assume, either directly or indirectly, any liability of or for the other party.  Neither party shall have the authority to bind or obligate the other party and neither party shall represent that it has such authority.

6

8.3    Notices.  All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or by overnight courier with delivery charges prepaid, as follows:

Licensor:          Regal Ware, Inc.
                   1675 Reigle Drive
                   Kewaskum, WI 53040-9400
                   Attention: David R. Beine, General Counsel

Licensee:          Newell Rubbermaid Inc.
                   One Millington Road
                   Beloit, Wisconsin 53512-0117
                   Attention: William T. Alldredge
                                    Vice President - Finance

                   with copies to:

                   Newell Rubbermaid Inc.
                   6833 Stalter Drive, Suite 101
                   Rockford, Illinois 61108
                   Attention: Dale L. Matschullat
                                    Vice President – General Counsel

or to such other person or address as either party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date of delivery.

8.4    Force Majeure.  In the event that either party hereto is unable to carry out any obligation under this Agreement, wholly or in part, due to circumstances beyond its control, including without limitations, acts of God, fire, explosion, sabotage, acts of Government or Governmental Agencies, flood, strikes, lockouts, war, or civil commotion (collectively, "Force Majeure"), then, upon giving prompt notice of Force Majeure to the other party, the party so affected shall be released, without any liability, from the performance of its obligations under this Agreement, but only to the extent and only for the period that its performance of said obligation is prevented by circumstances of Force Majeure.

8.5    Governing law; Severability;  The interpretation of this Agreement shall be governed by the internal substantive laws of the State of Illinois, without giving effect to the conflicts of laws principles thereof, provided, however, that any questions respecting the validity, existence and effect of any Licensed Trademarks shall be determined under the Laws of the jurisdiction where such Licensed Trademarks exist or are registered.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent and only for the duration of such prohibition or enforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

7

8.6    Counterparts.  This Agreement may be executed by the parties hereto in one or more counterparts, each of which shall be considered original for all purposes, but all of which together shall constitute one and the same Agreement.  This Agreement (and Schedule E-1 hereto), contains the entire agreement between the parties with respect to the subject matter herein and neither this Agreement nor any of its provisions may be changed, waived or terminated except as herein expressly provided, or in a written instrument signed by both of the parties hereto. Nothing herein expressed or implied is intended or should be construed to confer upon or give to any other person or entity, other than the parties to this Agreement, any rights or remedies under or by reason of this Agreement.

8.7    Headings; References.  The article, paragraph and section headings contained in this Agreement are inserted for reference purposes only and shall not affect the meaning or interpretation of this Agreement.  Unless otherwise indicated, (a) all references to Articles, Sections, subsections, clauses and schedules refer to the Articles, Sections, subsections and clauses of this Agreement and to the Schedules hereto, respectively; (b) the terms "herein," "hereof," "hereto" and "hereunder" and words of similar import refer to this Agreement; and words in the singular include the plural and vice versa.

8

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their authorized representatives as of the date first set forth above.

REGAL WARE, INC.

By: _____
Name: Jeffrey A. Reigle
Title: President & CEO

NEWELL OPERATING COMPANY

By: _____
Name: Dale L. Matschullat
Title: Vice President-General Counsel

<u>SCHEDULE E-1</u>

**Licensed Trademarks**

The following trademarks for non-stick, aluminum cookware in international class 21 will be licensed to the Purchaser:

| Trademark | Registration/ Appl. Date | Registration/ Serial Number | Docket Number | Status | Country |
|---|---|---|---|---|---|
| REGAL | 03/30/1971 | 910,552 | 4731 | Issued | USA |
| REGAL | 12/28/1982 | 1,221,567 | 8080 | Issued | USA |
| REGAL | 07/03/1990 | 1,604,362 | 0404 | Issued | USA |
| REGAL | 08/08/1995 | 1,909,731 | 11739 | Issued | USA |
| REGAL & DESIGN | 08/08/1950 | 528,672 | 4657 | Issued | USA |
| REGAL & DESIGN | 12/28/1982 | 1,221,566 | 0294 | Issued | USA |
| REGAL & DESIGN | 11/20/1990 | 1,623,288 | 0405 | Issued | USA |
| REGAL 2000 | 04/09/1985 | 1,329,657 | 8657 | Issued | USA |
| REGAL | 03/28/1989 | 1,531,859 | 0307 | Issued | USA |
| REGAL | 02/02/1996 | 2019705 | 12652 | Pending | Argentina |
| REGAL | 10/28/1996 | C62357 | 11784 | Issued | Bolivia |
| CORONET REGAL | 09/30/1988 | TMA345,385 | 8897 | Issued | Canada |
| REGAL | 02/24/1967 | TMA149,471 | 3075 | Issued | Canada |
| REGAL WARE | 07/14/1993 | 409,231 | 11721 | Issued | Chile |
| REGAL | 08/14/1997 | 1,075,700 | 11924 | Issued | China |
| REGAL | 09/10/1992 | 178,330 | 11453 | Issued | Czech |
| REGAL | 03/21/1995 | 0730-95 | 11922 | Issued | Ecuador |
| REGAL | 03/30/1996 | 144,444 | 12604 | Pending | CTM |
| REGAL | 09/20/1993 | 128,175 | 11454 | Issued | Finland |
| REGAL | 09/08/1992 | 2,068,476 | 11455 | Issued | Germany |
| REGAL | 08/07/1985 | 80,488 | 8809 | Issued | Greece |
| REGAL | 07/05/1994 | 1,577,118 | 12070 | Issued | England |
| REGAL | 09/17/1992 | 137,095 | 11456 | Issued | Hungary |
| REGAL & CROWN DESIGN | 11/23/1994 | 646431 | 12566 | Pending | India |
| REGAL | 11/23/1994 | 646430 | 12565 | Pending | India |
| REGAL | 12/28/1994 | 320,424 | 11502 | Issued | Indonesia |
| REGAL | 12/20/1978 | 363,225 | 0353 | Issued | Italy |
| REGAL & CROWN DESIGN | 04/10/1992 | 235,572 | 0990A | Issued | Korea |
| REGAL | 06/02/1994 | 162,932 | 11457 | Issued | Norway |
| REGAL | 06/17/1983 | 031,520 | 8136 | Issued | Panama |

| | | | | | |
|---|---|---|---|---|---|
| REGAL | 05/12/1994 | 007,516 | 11880 | Issued | Peru |
| REGAL | 12/02/1991 | 51864 | 0585 | Issued | Philippines |
| REGAL & CROWN DESIGN | 12/23/1994 | 97307 | 11970 | Pending | Philippines |
| REGAL | 06/06/1994 | 286,139 | 11459 | Issued | Portugal |
| REGAL | 10/14/1992 | 19,883 | 11460 | Issued | Romania |
| REGAL | 10/08/1992 | 167,456 | 11461 | Issued | Russia |
| REGAL & DESIGN | 09/08/1993 | B6997-93 | 11698 | Issued | Singapore |
| REGAL | 02/21/1991 | B989/91 | 1006B | Issued | Singapore |
| REGAL | 09/10/1992 | 174,237 | 11824 | Issued | Slovak |
| REGAL | 02/25/1994 | 255,649 | 11462 | Issued | Sweden |
| REGAL | 09/23/1992 | 401,965 | 11470 | Issued | Swiss |
| REGAL | 07/16/1995 | 684737 | 11783 | Issued | Taiwan |
| REGAL | 02/26/1988 | 03100/88 | 0265 | Pending | Venezuela |

# EXHIBIT D

LEXSEE 2002 U.S. DIST. LEXIS 9409

**In re: ANC RENTAL CORP., et al., Debtors. THE HERTZ CORPORATION, et al., Appellants, v. ANC RENTAL CORP., et al., Appellees.**

**Civil Action Nos. 02-154, 02-175, 02-288, 02-289, 02-290, 02-291, 02-292, 02-293, 02-294, 02-295, 02-296, 02-297, 02-298, 02-299, 02-360 and 02-364 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 9409*

**May 22, 2002, Decided**

**SUBSEQUENT HISTORY:** [*1] As Amended May 22, 2002.

**PRIOR HISTORY:** Chapter 11, Bankruptcy Case No. 01-11220 (MFW) (Jointly Administered).

**DISPOSITION:** Appellants' Motion for a Stay Pending Appeal DENIED. Hertz's Emergency Motion for a Stay Pending Appeal DENIED. Avis' Emergency Motion for a Stay Pending Appeal DENIED. None of the cases in this litigation stayed pending this appeal.

**COUNSEL:** Bonnie Glantz Fatell, Blank Rome Comisky & McCauley LLP, Wilmington, DE, for ANC IT Collector Corporation, debtor.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Sleet

**OPINION:**

### AMENDED MEMORANDUM AND ORDER

On February 27, 2002, the Hertz Corporation ("Hertz") and Avis Rent a Car System Inc. ("Avis") filed the first of several expedited appeals from the orders of the Honorable Mary F. Walrath of the United States Bankruptcy Court for the District of Delaware. Several subsequent appeals were filed. (Case Nos. 02-175 and 02-288 though and including 02-299). In particular, the appellants sought review of the January 28, 2002 and March 20, 2002 orders of the bankruptcy court that permitted [*2] the debtor to reject certain of their concession contracts and subsequently negotiate more favorable contracts at seven national airports. On March 25, 2002, Hertz filed a motion for a stay pending the appeals (D.I. 18 - 02-154), and Avis joined in that motion. (D.I. 20 - 02-154). On May 3, 2002, the bankruptcy court entered another order that permitted the debtor to reject contracts at four more airports. An appeal of this order was filed on May 10, 2002. (D.I. 1 - 02-360.) Hertz filed an emergency motion for a stay pending this appeal on May 13, 2002. (D.I. 2 - 02-360.) Avis also joined in this motion. ( D.I. 1 - 02-364.) The court finds that Hertz and Avis have failed to demonstrate the necessary irreparable harm. Moreover, the court finds that a stay will be harmful to the debtor. Therefore, both of the motions to stay will be denied.

The briefly stated facts of this case are as follows: The debtor, ANC Rental Corp ("ANC"), is the parent company of the Alamo Rent-A-Car and National Car Rental System companies. As the name makes obvious, Alamo and National are car rental companies. Hertz and Avis are also engaged in the car rental business.

The rental car industry is particularly [*3] active in the nation's airports. According to the parties, the normal procedure for operating at an airport requires that the rental car company first bid for a contract with the local airport authority. If the bid is acceptable, the airport authority will issue a contract to the winning bidder that will permit it to operate a rental car booth, or concession, at the local airport. The parties assert that the terms of such concession contracts usually include terms stating that the concessionaire must earn a certain profit each year. This is called the minimum annual guarantee ("MAG"). Additionally, the appellants contend that the contracts generally prohibit the practice of two concessionaires operating at the same concession booth. This practice is commonly known as "dual branding." The parties do not dispute that the contracts at issue contain MAG requirements, but the debtor disputes that the contracts contain prohibitions on dual branding. n1

n1 To the extent that the debtor disputes this contention, for the purposes of this motion only,

the court will accept that the contracts contain terms and conditions that prohibit dual branding.

**[*4]**

ANC, National, and Alamo filed for Chapter 11 bankruptcy on November 13, 2001. As part of their re-organization plan, National and Alamo sought to reject the concession contracts and have ANC, as the debtor-in-possession, assume the contracts pursuant to § 365 of the bankruptcy code. The bankruptcy court permitted this rejection and assumption in each of its three orders. The appellants assert that the effect of the orders is to permit Alamo and National to operate at the same concession, which effectively permits the dual branding that the appellants contend is prohibited by the concession contracts. The appellees further argue that when the contracts with the airport authorities were renegotiated with ANC, the MAG was also effectively reduced because only one of the companies at the concession would be subject to the MAG requirement. The orders of the bankruptcy court currently affect concession contracts at eleven airports nationwide.

*Federal Rule of Bankruptcy Procedure 8005* permits a party to seek a stay pending appeal of an order of the bankruptcy court. *See* FED. R. BANKR. P. 8005. The court may grant such a stay when the party seeking the stay can demonstrate that: (1) **[*5]** it has a likelihood of success on the merits of the appeal; (2) it will be subject to irreparable harm if the stay is not granted; (3) the granting of the stay will not substantially harm other interested parties; and (4) the granting of the stay would serve the public interest. *See In re Edwards, 228 B.R. 573, 575 (Bankr. E.D. Pa.1999).* If the movant fails to make a showing on any one of these four factors, the court may deny the stay. *See In re Blackwell, 162 B.R. 117, 120 (E.D.Pa.1993).*

Hertz and Avis both assert that they will suffer ir-reparable harm if the bankruptcy court's orders are not stayed and the debtor's reorganization plan is permitted to continue. The only argument the appellants present in support of this contention is that ANC, National, and Alamo will gain a "competitive advantage" if the reor-ganization scheme is permitted to continue because they will be able to operate at a lower cost than Hertz and Avis. The court is not persuaded by this argument. First, the amount of money the debtors will save during the con-solidation process has been quantified. The fact that the savings can be quantified weighs against a finding of irreparable **[*6]** harm. *See In re Shelly's, Inc.,* 87 B.R.931, 935 (Bankr. S.D.Ohio1988) (indicating that even where there might be some intangible loss to reputation, if injury is "at bottom, financial" and could be calculated, there was no irreparable injury).

Second, where a business is threatened with serious financial harm (i.e. going out of business) as a result of a competitor's actions, irreparable harm may be present. *See Sprint Corp. v. Deangelo, 12 F. Supp. 2d 1188, 1194 (D. Kan. 1998)* (collecting cases). However, where the sole injury is loss of a competitive advantage, the argument for irreparable harm is less compelling because "revenues and customers lost to competition which can be regained through competition are not irreparable." *Central & Southern Motor Freight Tariff Ass'n v. Household Goods Carrier's Bureau, 244 U.S. App. D.C. 226, 757 F.2d 301, 309 (D.C. Cir. 1985).* In other words, the marketplace should eventually be able to correct any harm suffered by Hertz and Avis.

Third, although Hertz and Avis claim that they will be irreparably harmed in the absence of a stay, they have failed to adduce evidence of the putative injury on the record **[*7]** before the court. "To constitute irreparable harm, however, an injury cannot be speculative, it must be certain, great, and actual." *Sprint, 12 F. Supp. 2d at 1194* (citations and internal quotations omitted). Although the appellants have provided some evidence of the alleged advantage the ANC companies will receive, they have failed to make even a prima facie showing which dem-onstrates a tangible financial or other loss to Hertz or Avis. In the absence of such evidence, any loss to Hertz or Avis is merely speculative.

Finally, the bankruptcy court orders thus far will only affect ANC operations at eleven airports nationwide. In contrast, there are eighty-seven international airports and over 700 other commercial airports in this country. n2 Moreover, the majority of the eleven affected airports are relatively small. Given the small number of airports that are affected at this time versus the large number of air-ports in this nation, the court is not persuaded that al-lowing the ANC companies to consolidate operations threatens irreparable harm at present. Additionally, al-though there is a possibility that the plan may be imple-mented at many more airports, the court **[*8]** also notes that both the appellants and the appellees have access to markets outside of the nation's airports. For all of the above reasons, the court finds that the appellants have failed to demonstrate irreparable harm.

n2 This information was obtained through telephone and electronic-mail communication with the Federal Aviation Administration ("FAA"). *See* E-mail from Ben Castalano, FAA, to Althea Brown, Judicial Administrator to the Honorable Gregory M. Sleet (May 21, 2002) (on file with chambers).

2002 U.S. Dist. LEXIS 9409, *

Turning to harm to other interested parties, it is clear that granting a stay would have a substantial and detrimental effect on the debtor's plan of reorganization. According to the debtors, once the plan is fully implemented, savings of $ 136,000,000 will be achieved. The appellants argue that any savings at present, prior to the national implementation of the plan, will only amount to $ 6,000,000. The court finds that even a savings of $ 6,000,000 is important to a bankrupt estate. Moreover, a one year delay [*9] in implementing the plan might well seriously jeopardize the plan. n3 Thus, the court concludes that the granting of the stay would produce substantial harm to other parties.

> n3 One year is the time the parties estimate for the appeal in the absence of a stay.

Since the appellants have failed to demonstrate irreparable harm or lack of substantial harm to other interested parties, the court will deny their motions for a stay of these proceedings. Therefore, none of the pending cases will be stayed on appeal. n4

> n4 Although the motions to stay were only filed in case numbers 02-154, 02-360, and 02-364, it is clear that the motions are intended to affect all of the pending cases. Therefore, the denial of the stay means that none of the pending cases will be stayed. The parties should therefore not attempt,

absent a showing of good cause, to file additional motions to stay in the remaining cases.

**[*10]**

For the aforementioned reasons, IT IS HEREBY ORDERED THAT:

> 1. The appellants' Motion for a Stay Pending Appeal (D.I. 18 - 02-154) is DENIED.

> 2. Hertz's Emergency Motion for a Stay Pending Appeal (D.I. 1 - 02-360) is DENIED.

> 3. Avis' Emergency Motion for a Stay Pending Appeal (D.I. 1 - 02-364) is DENIED.

> 4. None of the cases in this litigation [Case Nos. 02-154, 02-175, 02-288 through and including 02-299, 02-360, and 02-364] will be stayed pending this appeal.

Dated: May 22, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT E

LEXSEE 2001 BANKR. LEXIS 723

**Re: Trans World Airlines, Inc.**

**Case No. 01-0056 (PJW)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2001 Bankr. LEXIS 723*

**March 27, 2001, Decided**

**DISPOSITION:** [*1] EEOC's motion for stay pending appeal denied.

**COUNSEL:** Gwendolyn Young Reams, James N. Finney, Gerald D. Letwin, Equal Employment Opportunity Commission, Washington, D.C., for Equal Employment Opportunity Commission.

Stuart Schiffer, Carl Schnee, Ellen W. Slights, United States Attorneys Office, Wilmington, DE, for United States of America.

J. Christopher Kohn, Tracy J. Whitaker, Ruth A. Harvey, Margaret Newell, Lacey R. Harwell, Jr., United States Attorneys Office, Washington, D.C., for United States of America.

Laura Davis Jones, Bruce Grohsgal, Pachulski, Stang, Ziehl, Young & Jones, Wilmington, DE, for Trans World Airlines, Inc., Debtors.

Alexander Dimitrief, P.C., James H.M. Sprayregen, Kirkland & Ellis, Chicago, Illinois, for Trans World Airlines, Inc., Debtors.

Mark D. Collins, Michael Merchant, Richards, Layton & Finger, Wilmington, DE, for AMR Corp., AMR Finance, Inc. and American Airlines, Inc.

Alan B. Miller, Richard A. Rothman, Greg A. Danilow, Weil, Gotshal & Manges LLP, New York, New York, for AMR Corp., AMR Finance, Inc. and American Airlines, Inc.

**JUDGES:** Peter J. Walsh, United States Bankruptcy Judge.

**OPINIONBY:** Peter J. Walsh

**OPINION:** Dear Counsel: [*2]

This is my ruling on the Emergency Motion of the United States of America and Equal Employment Opportunity Commission for Stay Pending Appeal (Doc. # 971) and brief in support (Doc. # 972) ("Stay Brief") of the Court's March 12, 2001 order granting the motion of Transworld Airlines, Inc. ("TWA" or "Debtor") for sale of substantially all of its assets to AMR Corporation ("American"). The Debtor and American have filed a joint response (Doc. # 1024)("Response"). For the reasons set forth below, I will deny the stay motion.

TWA filed its chapter 11 case on January 10, 2001. This is TWA's third chapter 11 filing in ten years. Before filing, TWA and American entered into an asset purchase agreement under which TWA agreed to sell substantially all of its assets to American. On January 10, 2001, TWA filed a § 363 n1 motion for an order authorizing the sale of substantially all of its assets ("Sale Motion") to American outside the ordinary course of business and prior to filing a plan of reorganization. Even without the asset purchase agreement with American, TWA intended to file its bankruptcy petition in early January, 2001. Transcript n2 (vol. I) at 380.

n1 Unless otherwise indicated, all references to "§" are to a section of the Bankruptcy Code, *11 U.S.C. § 101* et. seq.

[*3]

n2 "Transcript" refers to the transcripts of the March 9, 10 and 12, 2001 hearings.

On March 9, 10 and 12, 2001, I held an evidentiary hearing on the Sale Motion ("Sale Hearing")and a related contract rejection motion. The Equal Employment Op-

portunity Commission and United States (together the "EEOC") objected to the sale to the extent it permitted TWA to transfer its assets "free and clear" of the EEOC claims.

The EEOC asserts two categories of what it characterizes as "successor liability" claims: (1) those arising from a settlement ("Settlement Agreement") of an EEOC lawsuit and a private class action against TWA based on alleged sexual discrimination; and (2) those based on pending prepetition charges filed with the EEOC against TWA. n3 (For convenience of reference I will use the EEOC label of "successor liability" claims. The Settlement Agreement requires TWA to provide ten travel vouchers for covered individuals and provides that the class member or his or her family member may use the vouchers for his or her lifetime ("Travel Voucher Program"). Stay Brief at p. 3. TWA has issued [*4] trip vouchers since the program was initiated in the latter half of 1995. Id.

n3 According to the EEOC, as of March 2, 2001, there were 29 charges of employment discrimination against TWA alleging various violations of federal employment discrimination statutes, including Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, and the Age Discrimination in Employment Act of 1967. Stay Brief at pp. 3-4.

After considering closing arguments on March 12, 2001, I overruled the EEOC's objection based on successor liability and entered an order (Doc. # 887)("Sale Order") authorizing the Sale Motion pursuant to § § 363(f), 105(a) and 106(a).

Section § 363(f) permits a debtor-in-possession to sell property of the estate outside the ordinary course of business

...free and clear of any interest in such property of an entity other than the estate, only if --

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity [*5] consents;
(3) such interest is a lien and the price at which such

property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is in bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*11 U.S.C. § 363(f).*

Section 105(a) provides that

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*11 U.S.C. § 105(a).*

The Sale Order states in relevant part:

The sale of the Transferred Assets to Purchaser shall be free and clear of Liens and other claims (other than Liens created by Purchaser) pursuant to *section 363(f) of the Bankruptcy Code* whatsoever known or unknown including, but not limited to, [*6] Liens and claims of any of the Sellers' . . . employees . . .and Purchaser shall not be liable in any way (as a successor to the Debtors or otherwise) for any claims that any of the foregoing or any third party may have against any of the Sellers; provided that, with regard to employees' claims, the free and clear delivery of the Assets shall include, but not be limited to, all asserted or unasserted, known or unknown, employment related claims . . . and successorship liability accrued up to the date of closing of such sale.

Sale Order at p. 6, P 4.

The Sale Order also contains the following injunctive provision:

> Pursuant to *Sections 105(a)* and *363 of the Bankruptcy Code*, all Persons are enjoined from taking any action against Purchaser or Purchaser's Affiliates including, without limitation, TWA Airlines LLC, to recover any claim which such Person had solely against Sellers or Sellers' Affiliates.

Sale Order at p. 8, P 11.

On March 12, 2001 the EEOC filed a notice of appeal of the Sale Order (Doc. # 890) and on March 15, 2001, it filed the present motion requesting a stay pending appeal. Bankruptcy Rule 8005 governs the issue and provides in relevant [*7] part:

> notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest. n4

> n4 *Fed.R.Bank.P. 7062* incorporates *Rule 62 of the Federal Rules of Civil Procedure* and lists several specific matters in which the court may issue a stay pending appeal.

The granting of a motion for stay pending appeal is discretionary with the court. The movant must show that: (1) it will likely succeed on the merits of the appeal; (2) it will suffer irreparable injury if the stay is not granted; (3) a stay would not substantially harm other parties in the litigation; and (4) a stay is in the public interest. *Family Kingdom, Inc. v. EMIF New Jersey Ltd P'Ship (In re family Kingdom, Inc.), 225 B.R. 65, 69 (D. N.J. 1998);* [*8] *In re Roth American, Inc., 90 B.R. 94, 95 (Bankr. M.D. Pa. 1988).* No factor alone is outcome determinative. *In re Roth, 90 B.R. at 95.* Proper judgment under Rule 8005

"entails a 'delicate balancing of all elements.'" *In re Roth, 90 B.R. at 95* quoting *In re Hotel Assocs., Inc., 7 B.R. 130, 132 (Bankr. E.D. Pa. 1980).*

I find that a balance of the Rule 8005 factors does not favor issuing a stay pending appeal and accordingly, I will deny the stay motion. I review each of the Rule 8005 elements in turn.

### I. Likelihood of Success on the Merits.

The EEOC argues it will likely prevail on appeal because neither § 363(f) nor § 105(a) permits the sale by TWA to American of substantially all of TWA's assets free and clear of the EEOC successor liability claims. It also raises the doctrine of sovereign immunity as a bar to the enforceability of the Sale Order. Finally, the EEOC argues that the Sale Order is procedurally defective in that it impermissibly imposes injunctive relief outside the confines of an adversary proceeding.

I am not persuaded by these arguments. I previously concluded, and I reaffirm, that "under [*9] § 363(f), [TWA's] assets can be transferred free and clear of [successor liability] claims . . . . And I find no basis in the statute for requiring that the purchaser assume those liabilities." Transcript (vol. III) at p. 816.

Section 363(f) authorizes sales free and clear of interests in the property being sold. *11 U.S.C. § 363(f); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987)* citing H.REP. NO. 595, 95TH CONG., 1ST SESS. 345 (1977), U.S.C.C.A.N. 1978, P. 5787. Even before the enactment of the Bankruptcy Code in 1978, a court sitting in bankruptcy had the authority to authorize the sale of estate assets free and clear based on its general equitable powers and its duty to distribute the debtor's assets and determine controversies relating thereto. *White Motor Credit, 75 B.R. at 948* citing *Van Huffel v. Harkelrode, 284 U.S. 225, 52 S. Ct. 115, 76 L. Ed. 256 (1931).* In other words, bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f). Id. [*10]

The authority to sell free and clear is broad. It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property. E.g., *Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982).*

In this regard, I find the facts and reasoning of New England Fish Co. persuasive. In that case, the debtor, a major fish processing company with extensive facilities in Alaska, faced a management and financial crisis which forced it to cease operations. *New England Fish Co., 19 B.R. at 325.* It filed a chapter 11 petition which converted

to a chapter 7 liquidation less than a month later. Id. The trustee for the debtor's estate entered into an asset purchase agreement with a buyer under which the trustee agreed to sell the debtor's assets. Id. With a new fishing season rapidly approaching, the Governor for the State of Alaska testified that operation of the debtor's facilities for the season was critical for the economy and that a sale of the debtor's assets was urgent. Id.

Prior to filing bankruptcy, the debtor was subject to [*11] two class action civil rights suits brought by its employees. *New England Fish Co., 19 B.R. at 324.* In one suit, the district court found that the debtor had discriminated based on race in the allocation of jobs and in housing its employees. Id. The asset purchase agreement obligated the trustee to sell the debtor's assets free and clear of the $ 15,156,371 civil rights claims. *New England Fish Co., 19 B.R. at 325.*

The claimants objected to the sale based on the successor liability of the buyer, claiming that the court could not authorize the sale of the debtor's assets free and clear of their civil rights claims. The claimants contended they were entitled to go to trial on the merits of a successor liability theory based on the buyer's substantial continuity of the debtor's business enterprise and continuity in the identity of the work force. *Id. at 324.*

In overruling these objections to the sale, the New England Fish Co. court reasoned as follows:

The trustee ... concluded that the operation of the business was not practical. He sold it to Ocean Beauty. The latter would not and will not take the business burdened with [*12] civil rights litigation. No purchaser would. Such a prospect would chill or render impossible any sale. Those who would suffer from the uncertainty and delay would be creditors, including the ... claimants themselves. ...

The apprehension that bankruptcy will become a convenient expedient for avoiding the successorship doctrine is not well founded. The adverse consequences of bankruptcies involving displacement of management, creditor control and liquidation hardly support the argument that employers will use bankruptcy to avoid their responsibilities under the civil rights acts.

Congress has stated relative priorities for various elements of the debtor's creditor constituency in the Code. It is contended there are now two court-created exceptions: NLRA and Title VII claimants. Assuming this is so, if both were present,

which of these would be prior to the other? Where is this to end? It is only a question of time before such a priority could and would be extended to other aggregations of claimants. To allow exceptions to be created by extrapolation from one case to another would eventually subvert the specific priorities which define Congressional policy for bankruptcy distribution [*13] to creditors.

We conclude that the assets of the [debtor's] estate being transferred pursuant to the Purchase Agreement may be transferred free and clear of the claims of the [civil rights claimants]...

*New England Fish Co., 19 B.R. at 328-29* (citations omitted).

I find this reasoning and outcome a *propos*. As in New England Fish Co., many factors weigh in favor of granting the injunction against the EEOC successor liability claims. TWA filed a good faith bankruptcy petition. Pursuant to a court approved bidding procedure, TWA determined that American's offer is the highest and best, and in fact, the only available offer for the purchase of substantially all of TWA's assets. TWA is unable to consummate the sale if the EEOC's claims are not extinguished. No other prospective purchaser exists. If the sale does not go forward, it is highly likely that TWA will be liquidated with the resultant material harm to various creditor constituencies, including its 20,000 employees and a likely significant adverse economic impact on the St. Louis, Missouri region, the location of TWA's hub airport.

Authorizing the sale of TWA to American free and clear of [*14] the EEOC's successor liability claims achieves the purpose of § 363 intended by Congress. "The purpose behind the 'free-and-clear' language is to maximize the value of the asset, and thus enhance the payout made to creditors. Without the 'free-and-clear' language, prospective buyers would be unwilling to pay a fair price for the property subject to sale; instead, the price would have to be discounted, perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset." *WBQ P'ship v. Virginia Dep't of Med. Assistance Serv. (In re WBQ P'ship), 189 B.R. 97, 108 (Bankr. E.D. Va. 1995).*

I also agree with TWA and American that (1) the prospect of successor liability would deter bidders and could create a serious impediment to the ability of debtors to effect going-concern sales under § 363, see, e.g., *In re Leckie Smokeless Coal Co., 99 F.3d 573, 586-87 (4th Cir. 1996); In re WBO P'ship, 189 B.R. at 108-09; New England Fish Co., 19 B.R. at 329;* and that (2) bidders faced

with prospective successor liability claims would lower their offered purchase price thereby [*15] indirectly subverting the priority scheme of the Bankruptcy Code. See, e.g., *White Motor Credit, 75 B.R. at 951; New England Fish Co., 19 B.R. at 328.*

The EEOC argues that the "Settlement Agreement prohibits TWA from reducing or limiting the benefits provided by the Travel Voucher Program. Id., Section VII, P A.3, at 8. As such TWA may not dispose of its assets, by sale or otherwise, without making appropriate arrangements for continuation of the voucher program." Stay Brief at p. 3. I find this statement a classic non sequitur.

The EEOC's conclusion would clearly not pertain in a TWA liquidation scenario. TWA leases 97% of its fleet of approximately 180 airplanes. Transcript (vol. I) at 21. Absent the American transaction it is highly likely that TWA will not be able to satisfy its aircraft lease obligations on an ongoing basis. Pursuant to § 1110 the lessors will simply repossess their planes. In that situation, how can TWA make "appropriate arrangements" as the EEOC suggests TWA is required to do? TWA will have no planes and accordingly, no ability to continue the Travel Voucher Program.

For similar reasons, I also reject the EEOC's argument [*16] that the Travel Voucher Program and the EEOC charges cannot be reduced to a monetary satisfaction. Stay Brief at p. 11. The EEOC characterizes the Travel Voucher Program as injunctive relief for which it cannot be required to accept a monetary settlement. From this it concludes that the claims are not subject to § 363(f)(5)and that the sale to TWA therefore cannot be free and clear of the EEOC successor liability claims. The EEOC fails to recognize, however, that if TWA were to liquidate, the "injunctive" award made to the flight attendants in the form of travel vouchers would be converted to a dollar claim and it would be treated like any other unsecured claim in this bankruptcy case. In fact, it appears the Settlement Agreement itself establishes a method for valuing the travel vouchers. Thus, I find no basis in the statute for requiring the purchaser to assume these liabilities.

The EEOC next argues that its successor liability claims are not "interests in property" within the meaning of § 363(f). I disagree. TWA and American cite extensive case law which undermines the cases on which the EEOC relies. The EEOC does not attempt to refute this contrary precedent. Compare Stay [*17] Brief citing *Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159 (7th Cir. 1994); Schwinn Cycling & Fitness, Inc. v. Benonis (In re Schwinn Bicycle, Co.), 210 B.R. 747 (Bankr. N.D. Ill. 1997)* aff'd *217 B.R. 790 (N.D. Ill. 1997)* with Response citing *Leckie Smokeless, 99 F.3d at 582, 585* (section 363(f) authorizes bankruptcy court to extinguish statutory

successor liability for employee benefit claims); *P.K.R. Convalescent Ctr. v. Virginia Dep't of Med. Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.), 189 B.R. 90, 96 (Bankr. E.D. Va. 1995)* (section 363(f) prevents state's statutory tax interest on property from passing to purchaser); *In re WBO P'ship, 189 B.R. at 107* (same); *White Motor Credit, 75 B.R. at 949* (section 363 sale was free and clear of prepetition tort claim against asset purchaser); *Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190-91 (Bankr. N.D. Ga. 1986)*(same).

I note that the leading cases which the EEOC cites in support of successor liability are from the Seventh Circuit. E.g., *Zerand-Bernal Group, 23 F.3d at 163* [*18] (bankruptcy court lacks authority to enjoin all possible future lawsuits against a buyer at a bankruptcy sale); *Schwinn Bicycle, 210 B.R. at 755.* As such they are not controlling precedent for this court. Equally important, these cases are factually distinguishable because they involve product liability claims against the debtors' alleged successor-in-interest that arose after the sale transaction or plan confirmation. Thus, these cases hold that a sale free and clear of claims cannot divest a product liability suit that arises after a sale of assets or plan confirmation, not that § 363(f) does not authorize a sale free and clear of successor liability based on prepetition claims against the debtor.

I also am not persuaded by the EEOC's attempt to distinguish the precedent cited by TWA. For example, the EEOC alleges that *Forde v. Kee-Lox Mfg. Co., 437 F. Supp. 631 (W.D.N.Y. 1977)* is no longer good law because it was decided under the Bankruptcy Act which did not have a provision authorizing asset sales free and clear of interests in property. Stay Brief at p. 12. As noted *supra*, it has long been established that bankruptcy courts have the equitable [*19] authority to authorize the sale of estate assets free and clear of interests even without § 363. The fact that Forde was decided under the Act therefore does not compromise its reasoning. And as TWA and American point out, Forde continues to be cited as good law by courts interpreting the Bankruptcy Code. E.g., *Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 731 (N.D. Ind. 1996); All American, 56 B.R. at 189.*

I disagree with the EEOC that New England Fish Co. "defies" *Folger Adam Security, Inc. v. DeMatteis/MacGregor, J.V., 209 F.3d 252 (3d Cir. 2000).* Stay Brief at p. 12. As noted above, I find the facts and analysis in New England Fish Co. highly relevant to the situation here. Furthermore, the EEOC's conclusion that Folger Adam makes a "pronouncement that general unsecured claims not arising from the ownership of property are not within section 363(f)'s ambit" is incorrect. Stay Brief at p. 12.

In Folger Adam, the Court of Appeals for the Third Circuit had to "decide whether the affirmative defenses of setoff, recoupment, and other contract defenses, which arose as a consequence of alleged **[\*20]** defaults under certain contracts with the debtors, constitute an 'interest' under *section 363(f) of the Bankruptcy Code* such that a sale of the debtors' assets in a consolidated Bankruptcy Court auction free and clear, extinguished such affirmative defenses and effectively transformed such contract rights into unimpeachable accounts receivable in the hands of the purchaser." *209 F.3d at 253-54.* The Third Circuit concluded that "affirmative defenses do not constitute an 'interest' for purposes of section 363(f) and, therefore, were not extinguished by the Bankruptcy sale." *Id. at 254.* The Court did not, however, otherwise define the scope of an "interest" for purposes of § 363(f).

In reaching its conclusion, the Court noted that "any interest" is not defined anywhere in the Bankruptcy Code. *Folger Adam, 209 F.3d at 257.* After reviewing existing case law, the Third Circuit concluded that right of recoupment is a defense and not an interest and is thus not extinguished by a § 363(f) sale. *Id. at 261.* The Court, however, did not otherwise define or surmise what comprises an 'interest' under § 363(f).

Likewise, the Court **[\*21]** of Appeals for the Fourth Circuit in Leckie Smokeless also refused to provide a full definition of interest, a case which the EEOC incorrectly cites for the proposition that the term "interests in property" is interchangeable with "lien" and that both mean a "charge against or interest in property to secure payment of a debt or performance of an obligation." Stay Brief at p. 7.

In Leckie Smokeless, two employer-sponsored benefit plans objected to the extinguishment of their right to payment of plan liabilities from a successor-in-interest by operation of § 363(f). In determining whether the plans had "any interest in property" within the meaning of § 363(f) the Fourth Circuit rejected what it called the District Court's "unduly broad interpretation" of the phrase. The District Court had found that simply the right to demand money from the debtor gave rise to an "interest" in the debtor's property under § 363(f). *Leckie Smokeless, 99 F.3d at 581.*

Rejecting this definition, the Fourth Circuit noted that

> ...while the plain meaning of the phrase "interest in such property" suggests that not all general rights to payment are encompassed by the statute, **[\*22]** Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to *in rem* interests, strictly defined, and we decline to adopt such a restricted reading of the statute here.

*Leckie Smokeless, 99 F.3d at 582.*

The EEOC maintains that § 105(a) does not support the sale "free and clear" of its successor liability claims. A predicate of this argument is that § 363(f) does not authorize the requested relief. However, because my order authorizing the sale of TWA to American is based on the "free and clear" language of § 363(f) as discussed above, the injunctive relief in the Sale Order is appropriate under § 105(a) because it is necessary to carry out the effect and purpose of § 363(f). *11 U.S.C. § 105(a).* It therefore follows that I am not using § 105(a) to create substantive rights or to contravene the Bankruptcy Code as the EEOC suggests.

The EEOC raises two additional arguments in support of its stay request. First, it invokes the doctrine of sovereign immunity because "in this matter, the effect of the Sale Order is tantamount to a suit by American against the United States **[\*23]** and EEOC for a declaratory judgment that it has no successor liability as a result of its purchase of substantially all of TWA's assets." Stay Brief at 14. This argument mischaracterizes the facts. TWA is the debtor and moving party. The Sale Order is pursuant to TWA's motion for authority to sell substantially all of its assets in TWA's chapter 11 bankruptcy. I fail to see how the Sale Order can be characterized as a declaratory judgment by American against the EEOC. It clearly is not a suit against the EEOC. Accordingly, I conclude that the Sale Order does not implicate the sovereignty of the EEOC as a government entity.

Furthermore, § 106(a) expressly abrogates the EEOC's sovereign immunity under § 363 to the extent the EEOC could invoke the doctrine against TWA. The EEOC is a federal entity charged with enforcing federal statutes. "Congress has given no indication that bankruptcy courts cannot order property sold free and clear of interests that Congress has itself created by statute." *Leckie Smokeless, 99 F.3d at 586.*

Although the cases the EEOC cites in support of sovereign immunity do establish that a waiver of sovereign immunity generally must be clear **[\*24]** and is narrowly construed, the cases are otherwise inapposite. None of the cases concern a sale under § 363(f), and indeed most do not involve a bankruptcy proceeding. See Stay Brief at 14 citing *F.D.I.C. v. Meyer, 510 U.S. 471, 483, 114 S. Ct. 996, 1003, 127 L. Ed. 2d 308 (1994)*(sue-and-be-sued clause of FDIC's statutory predecessor waived FDIC's sovereign immunity from suit by discharged employee of failed savings and loan association); *United States v. Nordic Village, Inc., 503 U.S. 30,*

*38, 112 S. Ct. 1011, 1017, 117 L. Ed. 2d 181 (1992)* (§ 106(c) does not waive the sovereign immunity of the United States from chapter 7 trustee's action seeking monetary recovery) superseded by statute as stated in, e.g., *Field v. Montgomery County (In re Anton Motors, Inc.), 177 B.R. 58, 62 (Bankr. D. Md. 1995)*(in § 106(a) Congress has stated unequivocally its intention to abrogate sovereign immunity from bankruptcy causes of action for both the United States and the states, as to both nonmonetary and monetary judgments, except punitive damages); *United States v. Testan, 424 U.S. 392, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976)*(nonbankruptcy [*25] suit for reclassification of federal civil service positions and for back pay involving issues regarding jurisdiction of Court of Claims and relief available in that tribunal) criticized by *United States v. Mitchell, 463 U.S. 206, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983)*.

Second, the EEOC argues that the Sale Order may not impose injunctive relief outside the scope of an adversary proceeding. I disagree. An adversary proceeding is not required for an order under § 363(f), even if the order includes injunctive relief necessary to effectuate the sale "free and clear." If what the EEOC argues were true, all § 363(f) sales would have to proceed via an adversary proceeding -- a procedure finding no support in the Bankruptcy Code or twenty plus years of reported decisions interpreting that Code.

Section 363(f) does not contain any "notice and hearing" requirement beyond that set forth in § 363(b). Thus, courts have held that "the Code contemplates that hearings will be held on sales of estate property, including sales of property free and clear of liens, 'only when there is an objection.'" *In re Stogsdill, 102 B.R. 587, 589 (Bankr. W.D. Tex. 1989)* [*26] quoting H.R.REP. No. 595, 95TH CONG., 1ST SESS. 315 (1977) U.S.C.C.A.N. 1978, pp. 5787, 6272. This does not relieve the debtor-in-possession from complying with due process to interest holders. Nor may the court execute an order approving the allocation or distribution of sale proceeds in the absence an adversary proceeding. *Fed.R.Bank.P. 7001(2)*; e.g., *In re Collins, 180 B.R. 447, 449 (Bankr. E.D. Va. 1995)*(propriety and validity of liens on property were not properly before the court on a motion to sell free and clear).

Current *Fed.R.Bank.P. 7001* does not include a provision requiring an adversary proceeding to sell property of the estate free and clear of liens. See *In re J.B. Winchells, Inc., 106 B.R. 384, 394 (Bankr. E.D. Pa. 1989)* discussing former Bankr.R. 701(3), which required an adversary proceeding to "sell property free of a lien or other interest for which the holder can be compelled to take a money satisfaction." *Fed.R.Bankr.P. 7001(3)* includes as an adversary proceeding a request for approval of a sale under § 363(h), but no longer includes approval of a sale free and clear under § 363(f).

The cases on which the EEOC relies [*27] are not to the contrary. These cases involve proceedings specified in *Fed.R.Bank.P. 7001*, not § 363(f) sales. See Stay Brief at p. 16 citing *Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746, 763 (5th Cir. 1995)*(injunctive relief issued as component of settlement agreement between the debtor, three of its former directors and their D&O liability insurer required adversary proceeding); *Haber Oil Co. v. Swinehart (In re Haber Oil Co.), 12 F.3d 426, 437 (5th Cir. 1994)*(noting that claim seeking equitable interest in property such as constructive trust required an adversary proceeding because it is proceeding to recover money or property or determine interest in property); *Lyons v. Lyons (In re Lyons), 995 F.2d 923, 924 (9th Cir. 1993)*(sale under § 363(h) required adversary proceeding); *In re McKay, 732 F.2d 44, 45, 48 (3d Cir. 1984)*(holding that chapter 13 debtor was required to initiate adversary proceeding for lien avoidance action under § 522(f)). Not surprisingly, these cases confirm that an adversary proceeding is required for those actions listed in *Fed.R.Bank.P. 7001*. But a "free and clear" sale under § [*28] 363(f) is simply not such an action.

In sum, for the reasons discussed above, I conclude that the EEOC is not likely to succeed on the merits of its appeal.

## II. Irreparable Injury to EEOC.

The EEOC argues it faces irreparable injury because § 363(m) threatens the loss of its appellate rights if the American transaction is consummated. Stay Brief at pp. 17-18. It maintains that "this prospect itself suffices to meet the standard of irreparable harm." Id. at p. 17.

The EEOC does not provide any basis for concluding that § 363(m) will render its appeal moot. Although the EEOC is appealing the Sale Order *in toto*, its objection is based on an isolated provision of the Sale Order that authorizes the sale free and clear of the EEOC's successor liability claims. If the EEOC is successful on appeal, presumably it may then proceed against American on the merits of its claim.

Even if § 363(m) adversely impacts the EEOC's objection, "it is well settled that an appeal being rendered moot does not itself constitute irreparable harm." *In re 203 North LaSalle Street P'ship, 190 B.R. 595, 598 (N.D. Ill. 1995);* see also *Virginia Dep't of Med. Assist. Svs. v. Shenandoah Realty Partners, LLP (In re Shenandoah Realty Partners), 248 B.R. 505, 510 (W.D. Va. 2000);* [*29] *In re Kent, 145 B.R. 843, 844 (Bankr. E.D. Va. 1991); In re Charter Co., 72 B.R. 70, 72 (Bankr. M.D. Fla. 1987).*

More fundamentally, however, the EEOC fails to establish irreparable injury for the simple reason that the EEOC may have no recoverable claims against TWA in

the absence of a sale of substantially all of TWA's assets to American. In the likely event that a stay pending appeal aborts the American transaction, the EEOC will be relegated to holding an unsecured claim in what will very likely be a piece-meal liquidation of TWA. In that context, such claims are likely to have little if any value. Issuing a stay pending appeal therefore cannot be said to result in any greater recovery for the EEOC or its constituencies. Consequently, there is no irreparable injury to the EEOC in the absence of a stay.

### III. Substantial Harm to TWA and Other Litigants.

The EEOC argues that a stay will not substantially harm either TWA or American. The EEOC claims there is no substantial harm because (1) enforcing the Travel Voucher Program is not a burden on American as successor to TWA because travelers under the program would only use seats that would [*30] otherwise be empty; and (2) the value of the EEOC's successor liability claims is not material relative to the value of the entire sale transaction. Stay Brief at p. 19.

The EEOC's argument misses the point. The substantial harm to other litigants inquiry focuses on the harm caused by issuing a stay of the Sale Order pending appeal, not on the harm caused by preserving or enforcing the EEOC's successor liability claims against American. The evidence is overwhelming that TWA cannot be sustained as a viable business enterprise in the face of a material delay in closing the American transaction.

Specifically, the uncontroverted testimony at the Sale Hearing was that TWA has a cash burn rate of $ 3,000,000 per day. If the sale to American is unduly delayed there is a very serious risk of losing a sale transaction which materially benefits substantial and diverse creditor constituencies. At the conclusion of the Sale Hearing, I found that there would be an immediate and precipitous decline in the financial affairs of TWA followed by a very high probability, if not certainty, of liquidation if I were to deny or reject the Sale Motion. Transcript (vol. III) at 810. A stay of the Sale Order [*31] poses the same threat.

### IV. The Public Interest.

The EEOC argues that I should stay the Sale Order because it is contrary to the strong public interest in the enforcement of the federal statutes prohibiting discrimination in the workplace. Recognizing the compelling objectives of saving financially troubled businesses under the Bankruptcy Code, the EEOC nevertheless maintains that these salutary objectives do not justify the suspension of usual rules of fair employment practices. Stay Brief at p. 20.

I am somewhat puzzled by the EEOC's position in this regard. The testimony at the Sale Hearing established that if the sale of TWA's assets to American does not go forward, TWA will likely liquidate. Given TWA's financial condition, a liquidation would result in severe harm to all TWA's past and current employees because they would lose their jobs and retirement benefits.

Although I concur with the EEOC that there is a strong public interest in the enforcement of federal statutes prohibiting discrimination in the workplace, I do not agree that the public interest favors jeopardizing the job security of 20,000 TWA employees, including those EEOC claimants still employed at [*32] TWA, at the expense of preserving successor liability claims which will be rendered unenforceable absent a sale of substantially all of TWA's assets as a going concern. Stay Brief at 19.

Finally, I disagree that the Sale Order prevents the EEOC from enforcing federal statutes prohibiting discrimination in the workplace. It is TWA's failure as a viable standalone airline that prevents the EEOC from enforcing claims against TWA. The Sale Order is simply not the cause of any "suspension of usual rules of fair employment practice" at TWA, as the EEOC alleges. Stay Brief at 20. There is absolutely no evidence to suggest that TWA is availing itself of the provisions of the Bankruptcy Code to circumvent fair employment statutes. The simple fact is that TWA is a failing enterprise whose likely end, in my opinion, will either be a partial survival as a part of American or a liquidation resulting in no enterprise value and a consequent material loss to all non-priority general unsecured creditor classes.

### CONCLUSION

The EEOC has not advanced any law or facts which I have not already considered. For the reasons set forth above, I deny the EEOC's motion for stay pending appeal.

SO ORDERED. [*33]

Very truly yours,

Peter J. Walsh

United States Bankruptcy Judge

# EXHIBIT F

LEXSEE 1992 U.S. DIST. LEXIS 3253

## IN RE: THE COLUMBIA GAS SYSTEM, INC. and COLUMBIA GAS TRANSMISSION CORPORATION, Debtors. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COLUMBIA GAS TRANSMISSION CORPORATION, Appellant, THE COLUMBIA GAS SYSTEM, INC. and COLUMBIA GAS TRANSMISSION CORPORATION, Appellees.

### Civil Action No. 92-127-SLR

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### *1992 U.S. Dist. LEXIS 3253*

### March 10, 1992, Decided

**PRIOR HISTORY:** [*1] Chapter 11, Case Nos. 91-803, 91-804

**COUNSEL:** James L. Patton, Jr, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, attorney for Debtors and for Appellees The Columbia Gas System, Inc. and Columbia Gas Transmission Corporation.

Kevin Gross, Esquire, of Rosenthal, Monhait & Gross, Wilmington, Delaware, attorney for Appellant The Official Committee of Unsecured Creditors for the Columbia Gas Transmission Corporation.

**JUDGES:** ROBINSON

**OPINIONBY:** SUE L. ROBINSON

**OPINION:**

#### MEMORANDUM OPINION

ROBINSON, U.S. District Judge

### INTRODUCTION

Pending before the Court is the emergency motion of the Official Unsecured Creditors Committee of the Columbia Gas Transmission Corporation ("the Committee") for stay pending appeal ("the motion"). The Committee has filed an appeal of the February 13, 1992 order of the Bankruptcy Court approving, inter alia, payment of "category one refunds and prepetition GRI surcharges on a pro-rata basis . . . to the extent of $ 3.3 million." Said order is based upon the Bankruptcy Court's conclusion that the "category one refunds and prepetition GRI surcharges" are not property of the Debtor's bankruptcy estate, rather, that said refunds and surcharges when received [*2] are held by the Debtor "in trust" for the benefit of its customers.

The Committee bases its motion on two arguments. First, the Committee contends that, pursuant to Bankruptcy Rule 7062, which incorporates *Fed.R.Civ.P. 62(d)*, it is entitled to a stay as a matter of right so long as suitable means are implemented to protect non-appealing parties from any loss occasioned by a stay. In this case, the Committee argues that the Debtor's retention of customer refund monies in an interest bearing escrow account insures that neither the Debtor nor its customers will be harmed by a stay. Alternatively, the Committee argues that a stay is warranted pursuant to Bankruptcy Rule 8005 because the Committee has satisfied all the requirements for such discretionary relief.

Responses in opposition to the motion have been filed by Columbia Gas Transmission Corporation (the "Debtor"); West Ohio Gas Company, Virginia Natural Gas, Inc. and the Peoples Natural Gas Company; the Columbia Gas Distribution Companies; The Official Committee of Customers; and the Pennsylvania Public Utility Commission. For the reasons that follow, a stay will be granted pending an expedited appeal.

### DISCUSSION [*3]

This Court has jurisdiction pursuant to *28 U.S.C. § 1334*(b). I conclude that the issues at bar are primarily legal in nature and, therefore, subject to de novo review. *In Re Public Service Co. of New Hampshire, 116 Bankr. 347, 349 n.2 (Bankr. D.N.H. 1990).*

With respect to the Committee's first argument for relief, I decline to hold that the Committee is entitled to a stay as a matter of right. The Committee has not posted a bond, as required by *Fed.R.Civ.P. 62(d)*. I find no support

for the proposition that the Debtor, the prevailing party below, be required to place into escrow funds judicially determined to belong to its customers, in order to afford the Debtor and its customers protection against any loss as a result of the Committee's appeal.

The Committee submits that it is nevertheless entitled to a stay pending appeal pursuant to Bankruptcy Rule 8005. In order to obtain a discretionary stay, the Committee must demonstrate that: 1) it is likely to prevail on the merits of its appeal; 2) it will suffer irreparable injury absent a stay; 3) a stay will not cause substantial harm to other interested parties; and 4) a stay will not harm the public interest. **[*4]** See, e.g., In the *Matter of Delaware & Hudson Rv. Co., 90 Bankr. 90, 91 (Bankr. D.Del. 1988).* The Court will examine each of these four factors seriatim.

### Probable Success on the Merits

The Court concludes that the Committee has carried its burden of demonstrating the first factor, probable success on the merits. Probable success on the merits means that "the movant has a 'substantial case,' or a strong case on appeal." *In Re Public Service Co. of New Hampshire, 116 Bankr. at 349.* There is no dispute that the issues presented are novel and complex. I have concluded that the issues are entitled to de novo review. I, therefore, embrace the observations of the Court in *In Re Mader, 100 Bankr, 989, 991 (N.D.Ill. 1989),* as follows:

> This Court does not intend to go so far as to actually determine the merits of the legal issues which will be presented on appeal. Suffice it to say, however, that we have not found, nor been cited to, any controlling authority on this precise question, and the novel legal issue presented is not one in which the debtor has no likelihood of success. This case will **[*5]** likely present an issue of first impression and, on balance, the likelihood of success on the merits does not appear to weigh too heavily in favor of, or against, any of the parties to this proceeding.

See also *In Re Gleasman, 111 Bankr. 595, 601-02 (Bankr. W.D.Texas 1990).*

### Irreparable Harm

The Court finds that the Committee has carried its burden as well as to the irreparable harm factor. It is apparent that, absent a stay, the funds subject to the Bankruptcy Court's February 13, 1992 order will be disbursed to the Debtor's customers. In dispute is the question whether there is a mechanism in place to recover such funds in the event the Bankruptcy Court's order is reversed. I decline to resolve that question on the record before me. Given the complexity of the question, however, I conclude that the irreparable injury factor weighs more heavily in favor of granting the stay pending an expedited appeal.

### Harm to Other Parties

The parties filing in opposition to this stay argue that a stay exposes the Debtor "to the unnecessary risk of diminution of the estate due to interest payments and substantial tax liability that could be easily **[*6]** avoided if [the Debtor] timely flows through the refunds." (D.I. 6 at 19) Accepting such representations as accurate, I nevertheless conclude that the interests of the Debtor and the bankruptcy estate can be accommodated by an expedited appeal.

### Public Interest

Although the Court acknowledges that the refund of overcharges to individual customers represents a significant public interest, as does the public interest in enforcing the laws promulgated by Congress, I conclude that the public interest will not be adversely affected if the stay is granted pending an expedited appeal.

## CONCLUSION

For the reasons stated, the Court will granted the Committee's emergency motion for stay pending appeal.

An appropriate order will be entered.

SUE L. ROBINSON

# EXHIBIT G

LEXSEE 2004 U.S. DIST. LEXIS 1917

**In re: POLAROID CORPORATION, et al., Debtors. STEPHEN J. MORGAN, Appellant, v. POLAROID CORPORATION, et al., Appellees.**

**Civil Action No. 02-1353 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 1917*

**February 9, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, Appeal dismissed by *Morgan v. Polaroid Corp. (In re Polaroid Corp.), 2004 U.S. Dist. LEXIS 1879 (D. Del., Feb. 9, 2004)*

**PRIOR HISTORY:**    [*1]    Bankruptcy Case No. 01-10864 PJW.

**DISPOSITION:** Appellant's motion for stay pending appeal denied.

**COUNSEL:** Stephen J. Morgan, Pro Se Appellant.

Gregg M. Galardi, Esquire, Mark L. Desgrosseilliers, Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware.

Of Counsel: Eric W. Kaup, Esquire of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Chicago, Illinois. Attorneys for Debtors and Debtors-in-Possession, Appellees.

Joseph Malfitano, Esquire of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware.

Of Counsel: Nava Hazan, Esquire of AKIN GUMP STRAUSS HAUER & FELD, LLP, New York, New York. Co-Counsel to the Plan Administrator.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is the "Emergency" Motion For Stay Pending Appeal filed by Appellant Stephen J. Morgan. (D.I. 31.) For the reasons discussed below, the Court will deny Appellant's request for a stay pending appeal.

### BACKGROUND

The instant action is a bankruptcy appeal arising from the voluntary bankruptcy [*2] filing by Polaroid Corporation and certain of its subsidiaries and affiliates (collectively the "Debtors") in October of 2001. By his Motion, the Appellant requests the Court to stay the implementation of the Debtors' plan for reorganization. The Bankruptcy Court denied an identical request for a stay by Appellant on December 16, 2003.

### I. Parties' Contentions

The Appellant contends that the Court should stay the implementation of the reorganization plan because it is not in the best interest of Polaroid shareholders. The Appellant alleges that the auction of Polaroid's assets was fraudulent and that the value of Polaroid's assets far exceeded their sale price. Further, the Appellant contends that his appeal is likely to be successful because there remain unanswered questions about value and damaged shareholder and bondholder interests. The Appellant contends that if the Court denies his request for stay, he and other shareholders will be deprived of their right to appeal and their financial stakes in Polaroid. The Appellant also contends that a stay is in the public interest, because in light of recent corporate scandals, a resolution of the instant appeal is required.  [*3]

In response, the Appellee contends that the Court should deny Appellant's request for an emergency stay because he has not satisfied the standards for entitlement to a stay pending appeal. Further, the Appellee contends

that the Appellant's request is equitably moot. The Appellee also contends that Appellant failed to properly serve it and its counsel as required by the Federal Rules of Civil Procedure.

### DISCUSSION

*Federal Bankruptcy Rule 8005* enables a reviewing court to issue a stay pending appeal from a judgment, order, or decree of a bankruptcy judge. Courts interpreting *Federal Bankruptcy Rule 8005* have established a four prong test for an appellant to obtain a stay: 1) a strong likelihood of success on the merits of the appeal; 2) the movant will suffer irreparable harm if the stay is denied; 3) substantial harm will not be suffered to non-moving parties if the stay is granted; and 4) issuance of the stay will not harm the public interest. *In re 421 Willow Corp., 2003 U.S. Dist. LEXIS 18029, 2003 WL 22318022 at *3 (E.D. Pa. Oct. 9, 2003).* If a party fails to establish one of the four prongs, a court may deny the requested stay. **[*4]** *Hertz Corp. v. ANC Rental Corp.(In re ANC Rental Corp.), 2002 U.S. Dist. LEXIS 9409, 2002 WL 1058196 at *2 (D. Del. May 22, 2002)* (citing *In re Blackwell, 162 B.R. 117, 120 (E.D. Pa. 1993)).* Because the Court concludes that Appellant has not established a likelihood of success on the merits, the Court will deny the request for stay pending appeal.

Likelihood of success on the merits means that a movant has a "'substantial case,' or a strong case on appeal." *In re Columbia Gas Sys., 1992 U.S. Dist. LEXIS 3253 at *4 (D. Del. March 10, 1992)* (quoting *In re Public Serv. Co. of N.H., 116 BR 347, 349 (Bankr. D. N.H. 1990).* Appellant contends that "unanswered questions about value ... once answered will favor the appeal." (D.I. 31 at 3.) However, in the instant motion the Appellant does not identify for the Court any order, decree, or judgment by the Bankruptcy Court that was erroneous, and thus, potentially reversible on appeal. Moreover, Appellant has not identified any potentially incorrect factual finding or legal conclusion reached by the Bankruptcy Court.

Absent specific challenges to actions taken by the Bankruptcy Court, the Court must conclude that Appellant has **[*5]** not demonstrated a strong likelihood of success on the merits. The Court will not speculate as to what errors, if any, were committed by the Bankruptcy Court. Therefore, because the Court concludes that Appellant has failed to establish the first prong of the test for entitlement to a stay, the Court will deny Appellant's Motion. n1

n1 Based on this conclusion, the Court will not address Appellee's remaining bases for denial.

An appropriate Order will be entered.

### ORDER

At Wilmington, this 9th day of February, 2004, for the reasons discussed in the Memorandum Opinion issued this date;

NOW THEREFORE, IT IS HEREBY ORDERED that the "Emergency" Motion For Stay Pending Appeal filed by Appellant Stephen J. Morgan (D.I. 31) is **DENIED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I, Mark L. Desgrosseilliers, do hereby declare under penalty of perjury that on August 16, 2006, I caused the MEMORANDUM OF PURCHASERS IN OPPOSITION TO EMERGENCY MOTION OF REGAL WARE, INC. FOR STAY PENDING APPEAL OF ORDER APPROVING MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF THE WEAREVER DEBTORS OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(b), (f) AND (m) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF to be served on the parties listed on Exhibit A by overnight delivery unless otherwise indicated thereon.

Dated:     Wilmington, Delaware
           August 16, 2006

Gregg M. Galardi (I.D. No. 2991)
Mark L. Desgrosseilliers (I.D. No. 4083)
Matthew P. Ward (I.D. No. 4471)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Attorneys for SEB S.A. and
Groupe SEB USA

## Exhibit A

## Service list

(Counsel for Regal Ware, Inc.)
Morton R. Branzburg, Esquire
Steven K. Kortanek, Esquire
Jennifer L. Scoliard, Esquire
Klehr Harrison Harvey Branzburg & Ellers LLP
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
**(via Hand Delivery)**

Daniel R. Johnson, Esquire
Joseph A. Kromholz, Esquire
P.O. Box 26618
Milwaukee, Wisconsin 53226-0618

Joseph Smolinksy, Esquire
Chadbourne and Parke LLP
30 Rockefeller Plaza
New York, New York 10112

(Counsel to the Official Committee of Unsecured Creditors)
David M. Fournier, Esquire
Pepper Hamilton LLP
1313 Market Street, Suite 5100
Wilmington, Delaware 19801
**(via Hand Delivery)**

(Counsel to Wachovia Bank, National Association)
Joseph H. Huston, Jr., Esquire
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, Delaware 19801
**(via Hand Delivery)**

(Counsel to Lifetime Brands, Inc.)
Ronald S. Gellert, Esquire
Michael Busenkell, Esquire
Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1360
Wilmington, Delaware 19801
**(via Hand Delivery)**

(Counsel for Wachovia Bank)
Steven B. Soll, Esquire
Jonathan N. Helfat, Esquire
Matthew J. Miller, Esquire
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue,
New York, New York 10169-0075

Sharon Levine, Esquire
Bruce Buechler, Esquire
 Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068-1791

(Counsel to Citigroup)
Joseph Smolinksy, Esquire
Chadbourne and Parke LLP
30 Rockefeller Plaza
New York, New York 10112

(Counsel to Lifetime Brands, Inc.)
Leonard Klingbaum, Esquire
Neil E. Herman, Esquire
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178