**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Bankr. Case No 06-10340 (KG) |
| | ) | (Jointly Administered) |
| GLOBAL HOME PRODUCTS LLC, *et al.*[1] | ) | |
| | ) | Civil Action No. 06-00508 (JJF) |
| Debtors. | ) | |
| | ) | |

**OBJECTION AND MEMORANDUM OF WACHOVIA BANK, NATIONAL ASSOCIATION IN OPPOSITION TO: (1) MOTION FOR EMERGENCY HEARING AND (2) EMERGENCY MOTION OF REGAL WARE, INC. FOR STAY PENDING APPEAL OF ORDER APPROVING MOTION OF THE DEBTORS FOR AN ORDER (I) APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF THE WEAREVER DEBTORS OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(B), (F) AND (M) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRATING RELATED RELIEF**

Wachovia Bank, National Association, in its capacity as agent for itself and certain other lenders, by its attorneys, Otterbourg, Steindler, Houston & Rosen, P.C. and Stevens & Lee, P.C., hereby submits this Objection and Memorandum in opposition to, and also joins the Debtors in their opposition to, the Motion for Emergency Hearing of Regal Ware, Inc. dated August 15, 2006 and the Emergency Motion of Regal Ware, Inc. for Stay Pending Appeal of Order Approving Motion of The Debtors for an Order (I)

---

[1]    The Debtors are the following entities:  Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Debtors Acquisition Inc.; Debtors Puerto Rico, Inc.; Debtors Operating Company LLC.

Approving Sale by the WearEver Debtors of Substantially all of the WearEver Debtors Operating Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b),(f) and (m) of The Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief dated August 15, 2006 (the two motions, which seek the relief, will collectively referred to as the "Motion"). This Objection and Memorandum are submitted pursuant to Local Rule 7.1.2(b) in lieu of a separate response and brief.

## PRELIMINARY STATEMENT

Wachovia Bank, National Association ("Wachovia"), individually and as agent for the Debtor's post-petition lenders (collectively, the "Lenders"), objects to the Motion filed by Regal Ware, Inc. ("Regal") because of the detrimental impact that the stay requested in the Motion will have upon the Debtors' estates and the utter lack of merit upon which the Motion is based.

This matter arises out of the Delaware Bankruptcy Court's entry of an Order, dated August 11, 2006 (the "Sale Order"), approving the sale (the "Sale") of the Debtors' cookware and bakeware business to SEB SA ("SEB"). As an integral part of the Sale, the Sale Order, entered after a full day of testimony, also approved the assumption and assignment to SEB of a Trademark Sublicense Agreement (the "Sublicense Agreement") which had granted the Debtors exclusive use of certain trademarks registered to Regal and used by the Debtors to market inexpensive cookware and bakeware to retail chains such as WalMart. In the Motion, Regal seeks to stay those portions of the Sale Order approving the assumption and assignment of the Sublicense Agreement. If the Motion is granted, the purchase price will, pursuant to the terms of the Sale Order, be reduced by $2

2

million.   The record below reflects that this substantial sum will not be recoverable because after the Sale of the assets and business that are not subject to Regal's stay request, the Debtors will no longer be in the business of selling cookware and bakeware and will not be able to produce and maintain the product line relating to the Sublicense Agreement.    Thus, if a stay is imposed, the estate will suffer the immediate and unrecoverable loss of $2 million.

Regal, on the other hand, having objected to the assignment of the Sublicense Agreement to both of the competing bidders, will potentially receive a windfall in its effort to ultimately reacquire, for no monetary consideration, an exclusive, royalty-free license that it had originally granted to Newell Operating Company ("Newell"), for good and valuable consideration received by it seven years ago as part of an asset sale between Regal and Newell. As part of that sale, Regal granted Newell an exclusive license to use certain trademarks registered to Regal.  Thereafter, Newell sublicensed use of the Regal trademarks to Mirro Operating LLC ("Mirro"), one of the Debtors in this case, pursuant to the terms of the Sublicense Agreement.  One week before entry of the Sale Order, Regal acquired the Sublicense Agreement from Newell for no stated monetary consideration.

If the Motion is granted and the Debtor is precluded from assigning the Sublicense Agreement to SEB, the estate will lose $2 million, its ability to produce the product line pertaining to the trademark and its ability to market the products to WalMart. Although testimony before the Bankruptcy Court by Regal witnesses has indicated that the loss of the WalMart business will harm the "Regal Ware" name Regal, nevertheless, persists in its effort to prevent the assignment of the Sublicense Agreement.

723420.4                                                     3

Rather than focus principally on the elements that Regal is required to establish to obtain the requested stay, the Motion emphasizes a settlement "proposal" that Regal has made in an obvious effort to avoid posting security for the appeal that it seeks to pursue. As the Bankruptcy Court recognized, the proposal itself is not a matter that was before the Bankruptcy Court, nor is it before this Court for consideration. The proposal does not constitute a basis for this Court to determine that the Debtor's estate will not suffer substantial harm, which is one of the elements that Regal is required to establish, as more specifically discussed below, to obtain a stay. The proposal does not prevent the Debtor's estate from losing $2 million of the sale proceeds, nor could it be reasonably expected that SEB would be prepared to invest in and build a product line over what could be a multi-year appellate process, without the certainty of ultimately having the right to continue to use the trademarks under the Sublicense Agreement. It is, however, important to note that Regal's *willingness* to permit SEB to operate under the Sublicense Agreement for a period of potentially several years, is itself express testament that SEB's performance under the Sublicense Agreement will *not* result in immediate, irreparable harm to Regal.

Regal should not be allowed to damage the Debtors' estates by obtaining a stay of the transfer of the Sublicense Agreement. Regal has failed to establish even one of the four elements required to warrant a stay under Bankruptcy Rule 8005 and applicable law:

(1)    It is not probable that Regal will prevail on appeal. Regal maintains that the Bankruptcy Court erred in concluding that the Sublicense Agreement was assignable to SEB without Regal's consent (which it steadfastly refused to give under any circumstances). The Bankruptcy Court's decision was supported by law from this

723420.4                                    4

District and this Circuit and Regal, despite having ample opportunity to do so, has not presented any case or statute refuting the cases relied upon by the Bankruptcy Court or directly supporting the positions it intends to advance on appeal.

(2)    Regal will not suffer irreparable injury.    Regal's claim of irreparable injury rests upon the proposition that its appellate rights will be rendered moot by the closing of the Sale and the operation of section 363(m) of the Bankruptcy Code.    The great weight of the case law, however, holds that mootness resulting from the application of section 363(m) to a sale and assignment does not, as a matter of law, constitute irreparable harm.    If it did, all sales would be subject to stays pending appeal.

Regal expanded its irreparable injury argument at the stay hearing before the Bankruptcy Court by asserting that SEB "might" compete with Regal at the "high end" market.    This is a market where SEB already has substantial retail presence and Regal presently has none.    As Regal failed to question the SEB witness at the prior stay hearing on this subject, there is no testimony in the record to support Regal's speculation. Moreover, Regal emphatically admitted that it has no intention of entering the lower price point market and that the sale by SEB of products to WalMart under the Sublicense Agreement will not compete with Regal.    Thus, the harm posed by Regal is sheer speculation.    Such speculated harm is neither immediate, substantial or irreparable.

Additionally, even if SEB were to compete with Regal, its actions as sublicensor will at all times be governed by the terms of the Sublicense Agreement.    None of Regal's rights as licensor under the Sublicense Agreement have been eliminated or modified. Thus, it is difficult to see how approving an assignment of the Sublicense Agreement to a

723420.4                          5

party who is obligated to comply with the very contractual terms agreed to by Regal can cause irreparable harm to Regal.

      (3)    The Debtors will incur substantial harm. As has already been set forth above, if the Motion is granted, the purchase price will be reduced by $2 million and it is unlikely that the Debtors will ever be able to recover this money. The record below also demonstrates that discontinuance of the products subject to the Sublicense Agreement could negatively effect the Debtors' relationship with WalMart, jeopardizing not only its sale of products covered by the Sublicense Agreement but other merchandise sold to the giant chain as well, thereby harming the Debtors' reorganization effort. Such harm will not occur if the Sale is completed because SEB has taken steps to assuage WalMart's fears and assure the continued supply of the product lines subject to the Sublicense Agreement.

      (4)    A stay does not promote public interest. The public interest favors finality of bankruptcy estate sales and maximizing returns to creditors over affording a party, with meritless and singular interests, to prevent such transactions from proceeding to the detriment of the bankruptcy estate.

      Put simply, Regal has not sustained its burden in seeking a stay and the Motion should be denied.

## STATEMENT OF FACTS

On April 10, 2006 (the "Petition Date"), the Debtors commenced bankruptcy proceedings in the District of Delaware by filing voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). [Docket No. 1].[2] In connection with the Chapter 11 proceedings, the Debtors were granted permission by the Court to enter into a $130 million post-petition secured credit facility with Wachovia and several other Lenders (the "Lenders"). [Docket No. 184]. At the time of the sale hearing, approximately $76 million was due and owing under the credit facility.

On July 7, 2006, the Debtors filed a Motion seeking Bankruptcy Court approval of the sale of substantially all the assets of Mirro Acquisition Inc., Mirro Operating Company, LLC, Mirro Puerto Rico, Inc. (collectively, the "Wearever Debtors" and the motion, the "Sale Motion"). [Docket No. 511]. The Wearever Debtors were in the business, primarily, of selling cookware, bakeware and related items through retail chains such as WalMart.

Regal, the movant, is a manufacturer and marketer of high-quality stainless steel cookware. On or about September 15, 1999, Regal sold certain assets to Newell. In connection with this asset sale, on October 29, 1999, Regal and Newell entered into a Trademark License Agreement (the "License Agreement") that provided Newell with an exclusive, royalty-free license to use a number of REGAL, REGAL & DESIGN and CORONET REGAL trademarks registered to Regal (the "Licensed Trademarks"). See License Agreement, Attachment No. 1 to Docket No. 618. The License Agreement

---

[2] The reference to "Docket No." refers herein to the electronic docket maintained in the Chapter 11 proceedings.

provided Newell with the "right to sublicense to others, including its Affiliates, to use the Licensed Trademarks." See Section 1.3 of the License Agreement.

On or about April 13, 2004, Newell sublicensed the use of the Licensed Trademarks to Mirro Operating Company ("Mirro") pursuant to the terms of the Sublicense Agreement which, inter alia, obligated Mirro to maintain the quality of products distributed using the Licensed Trademarks and prohibited Mirro from taking any action "to interfere or dilute the value or goodwill of the Licensed Trademarks." See sections 4.1 and 4.4 of the Sublicense Agreement, Attachment No. 2 to Docket No. 618. The Sublicense Agreement also provided:

> 1.3    Sublicensing and Assignment. Licensee shall not have the right to sublicense to others to use the Licensed Trademarks without the written consent of Licensor, which consent will not be unreasonably withheld or delayed, except that Licensee may have Products manufactured by others for sale by Licensee and its Affiliates. Licensee may not assign or transfer this Agreement by operation of law or otherwise without the written consent of the Licensor, with consent will not be unreasonably withheld or delayed. This Agreements and the rights and obligations of Licensor hereunder may be assigned or transferred by Licensor by voluntary action or involuntary action by operation of law or otherwise to any other person or entity. This Agreement shall be binding upon the successors and assigns of the parties. Id.

On or about July 7, 2006, the Debtors filed a motion seeking approval of bid and sale procedures with respect to substantially all the assets of the Wearever Debtors (the "Bid Procedures Motion"). [Docket No. 511]. The Bid Procedures Motion was approved by the Bankruptcy Court by Order dated July 14, 2006 (the "Bid Procedures Order") and, on the same date, the Debtors filed a motion for an Order approving the Sale (the "Sale Motion"). [Docket Nos. 549 and 547]. Pursuant to the Bid Procedures Order, an auction was scheduled to take place on August 7, 2006. A final sale hearing was scheduled for August 8, 2006.

On August 1, 2006, just seven days before the final hearing on the sale, Regal purported to acquire the Sublicense Agreement from Newell, for no stated monetary consideration. On August 3, 2006, Regal filed an objection to the Sale Motion on the basis that the Sublicense Agreement could not be assumed and assigned without its consent and that it did not consent to an assignment to either Lifetime Brands, Inc., the initial bidder, or SEB, the subsequent highest bidder. [Docket No. 618].

Pursuant to the Bid Procedures Order, the Debtors conducted an auction with respect to the Wearever Debtors' assets on August 7, 2006 at which SEB was the highest bidder. The Bankruptcy Court then conducted a hearing on the Sale Motion on August 8, 2006 (the "Sale Hearing").

At the Sale Hearing, the Debtors, Regal and SEB presented witnesses and evidence. After considering the evidence and lengthy argument by counsel, the Bankruptcy Court found that applicable non-bankruptcy law did not prevent the assignment of the Sublicense Agreement and that, therefore, the Sublicense Agreement was not subject to the exceptions to assignment set forth in Bankruptcy Code section 365(c)(1). By Order dated August 14, 2006, the sale was approved. [Docket No. 664].

Under the terms of the approved asset purchase agreement, SEB and the Debtors are obligated to close the Sale by no later than Friday, August 18, 2006. See Section 3.2 of the Asset Purchase Agreement, Attachment No. 1 to Docket No. 664. On August 14, 2006, Regal applied to the Bankruptcy Court to stay that portion of the Sale Order relating to the assumption and assignment of the Sublicense Agreement (the "Regal Stay Motion"). [Docket No. 660]. Regal also filed a Notice of Appeal. [Docket No. 673].

On August 14, 2006, after hearing more than four hours of testimony and considering the submissions of Regal, the Debtors, SEB, Wachovia and other interested parties, the Bankruptcy Court denied the Regal Stay Motion finding that Regal had failed to demonstrate either that it would suffer irreparable harm if the Sale closed before Regal had an opportunity to appeal or that it had a likelihood of success on the merits of its appeal. [Docket No. 676]. In particular, the Bankruptcy Court observed that Regal had failed to point to any statute or case law holding that an exclusive trademark license is non-assignable. Despite having what is essentially a third bite at the apple, Regal, in the Motion, still fails to cite to any statute or case law holding that an exclusive trademark license is non-assignable. Absent such case law or statue, Regal cannot carry its burden that it is "likely" to prevail in its appeal. Accordingly, the stay should be denied.

## ARGUMENT

Regal, as the party seeking a stay under Bankruptcy Rule 8005, has the burden of establishing that: (i) it is likely to succeed on the merits of its appeal; (ii) it will suffer substantial irreparable injury unless a stay is granted; (iii) no substantial harm will come to the Debtors; and (iv) the stay will do no harm to the public interest. In re Roth American, Inc., 90 B.R. 94, 95 (Bankr. M.D.Pa 1988). If Regal "fails to make a showing on any one of these four factors, the court may deny the stay." In re Blackwell, 162 B.R. 117, 120 (E.D. Pa. 1993). Regal has not and cannot, establish any of the elements necessary to warrant a stay and this Court must deny the Motion.

**A.    Regal is Unlikely to Succeed on the Merits of the Appeal.**

723420.4                                    10

Regal is required to show that it is likely to succeed on the merits of an appeal. See e.g., In re Dobslaw, 20 B.R. 922, 924 (Bankr. D. Pa. 1982), In re Roth American, Inc., 90 B.R. 94, 95 (Bankr. M.D.Pa 1988). Likely success on the merits means more than a mere chance of prevailing on appeal. It means that "the movant has a substantial case, or a strong case on appeal." In re Columbia Gas Sys. Inc., Case No. 92-127 (SLR), 1992 U.S.Dist. Lexis 3253, at *4 (D.Del. Mar. 10, 1992) attached hereto as Exhibit A (quoting In re Pub. Serv. Co. N.H., 116 B.R. 347, 249 (Bankr. D.N.H. 1990)). Regal has not sustained this burden.

Under Bankruptcy Code section 365(a), the Debtors may assume "any executory contract" such as the Sublicense Agreement and under Bankruptcy Code section 365(f), the Debtors may freely assign the contract, "notwithstanding a provision in the executory contract . . . or in applicable law that prohibits, restricts or conditions the assignment of such contract." 11 U.S.C. §§ 365(a) and 365(f). Regal asserts that Bankruptcy Code section 365(c)(1) abrogates the Debtors ability to assign certain contracts and unconvincingly attempts to pigeonhole the Sublicense Agreement within that exception.

Bankruptcy Code section 365(c)(1)(A) provides that the Debtors may not assign an executory contract if "applicable law excuses a party, other than the debtor, . . . from accepting performance or rendering performance to an entity other than the debtor." 11 U.S.C. 365 (c)(1)(A). The inquiry for this Court (as it was for the Bankruptcy Court below) is whether "the common law would permit the non-debtor party from refusing to accept performance from a proposed assignee." Ford Motor Co. v. Claremont Acquisition Corp., Inc., 186 B.R. 977, 982 (C.D. Ca. 1995).

Regal has not cited any case or statute supporting the proposition that the Sublicense Agreement, an exclusive trademark license, cannot, as a matter of law, be assigned under Bankruptcy Code section 365(f) without Regal's consent. Absent any law to support Regal's position, the Bankruptcy Court was compelled to deny Regal's Stay Motion, just as this Court should do now with respect to the Motion.

Courts have long recognized that "[b]ecause they have the potential to thwart a debtor's reorganization efforts, exceptions to assignability are narrowly construed." In re Health Pan of the Redwoods, 286 B.R. 407, 409 (N.D. Ca. 2002), citing In re Grove Realty Corp., 200 B.R. 502, 507 (Bankr. E.D. N.Y. 1996); In re Rooster, Inc., 100 B.R. 228, 233 (Bankr. E.D. Pa. 1989); and In re Van & Storage Corp., 65 B.R. 1007, 1012 (Bankr. E.D.N.Y. 1986). Indeed, the cases relied upon by Regal, demonstrate precisely the limited circumstances, none of which are applicable here, in which Bankruptcy Code section 365(c)(1)(A) could be applied. In each of the cases cited by Regal, a statute specifically prohibited the assignment of the license without the licensor's consent. For example, In re Pioneer Ford Sales, Inc., 729 F.2d 27 (1st Cir. 1984) involved a Rhode Island statute which required the manufacturer's consent to transfer an automobile dealership franchise. Likewise, Ford Motor Co. v. Claremont Acquisition Corp., Inc., 186 B.R. 977 (Bankr. C.D. Cal 1995) and In re Van Ness Auto Plaza, Inc. 120 B.R. 545 (Bankr. N.D. Cal 1990) involved a California statute that prohibited the transfer of an automobile dealership franchise without the manufacturer's consent. Finally, In re West Elecs., Inc., 852 F.2d 79 (3d Cir. 1988) involved a specific provision of the United States Code that required the government's consent to an assignment of a contract.

Significantly, Regal has not cited any federal or state statute prohibiting the assignment of the Sublicensing Agreement without Regal's consent.

The Bankruptcy Court, on the other hand, relied upon applicable precedent from this District and Circuit to conclude that the Sublicense Agreement was freely assignable. The Bankruptcy Court's reliance upon In re Golden Books family Entertainment, Inc., 269 B.R. 311 (D.Del. 2001) and In re Rooster, Inc., 100 B.R. 229 (Bankr. E.D. Pa. 1989), was not misplaced.    These cases, both involving exclusive licenses, support the proposition that an exclusive trademark license which permits, rather than precludes, assignment, is freely assignable and not subject to the limitations of section 365(c)(1) of the Bankruptcy Code. Regal has not presented any authority mandating a different result.

Regal's reliance upon In re Luce Industries, Inc., 14 B.R. 529 (Bankr. S.D.N.Y. 1981) is of no moment.  The Luce court did not address the assumption and assignment of a contract under section 365(c)(1) of the Bankruptcy.  Indeed, the court was not asked to consider this section because the debtor's objective was not merely to assign the FRUIT OF THE LOOM trademark license agreement to a new entity that would assume the debtors' obligations under the license agreement.  In Luce the debtor sought court approval to enter into a new contract with a third-party which refused to guarantee the debtors' performance under the licensing agreement.  The new contract would have terms materially different than then those of the licensing agreement and the licensor would be unable to enforce even those terms because it would not be a party to the contract. Here, like in Rooster, extensive quality control provisions are enforceable by Regal against SEB, as the Debtors' assignee.    Thus, safeguards are present to protect the Regal's remaining interest in the trademark. Regal concedes that SEB has the financial resources,

infrastructure and industry knowledge to comply with these provisions and, unlike the third-party in Luce, protect the value of Regal's trademark. Hence, there is simply no basis for this Court to conclude that Regal has a "strong case" and probability of success in its appeal. As a result of Regal's failure to establish that it is likely to succeed on the merits the Motion should be denied.

**B.    Regal Has Failed to Establish That It Would Be Irreparably Injured by a Denial of the Motion.**

Regal essentially concedes that, aside from its appeal rights, it will not be injured if the Sublicense Agreement is assumed and assigned to SEB without the entry of the stay. Indeed, it has offered in the Motion to withdraw its request for a stay, to allow the Sale to close and to permit all rights under the Sublicense Agreement to transfer to SEB, potentially for several years, as appellate litigation proceeds. Its offer, however, was conditioned upon the Debtors, SEB and other interested parties, agreeing to forfeit their right to contend that the closing of the Sale mooted Regal's appeal, which they were not prepared to do.

Courts have widely recognized that mootness alone is insufficient injury to stay bankruptcy court proceedings. See e.g. In re Edwards, 228 B.R. 573, 580 (Bankr. D. Pa. 1999) (holding something more than mootness is required to grant stay); In re Baldwin United Corporation, 45 B.R. 385 (Bankr. S.D. Ohio 1984) (rejecting notion that mooting of appeal, in itself, creates irreparable harm). Indeed, in Licensing by Paolo v. Sinatra (In re Gucci), 105 F.3d 837 (2nd Cir. 1997), a case heavily relied upon by Regal in its moving papers, the Second Circuit was quick to note that while district judges should be

aware of the impact of denying a stay of an asset sale, the potential mooting of an appeal as a result of the Sale does not, in itself, automatically create grounds to issue a stay:

> We do not mean to imply that district courts should routinely grant stays pending appeal, or even routinely grant brief stays to permit this Court to consider granting such stays. There may well be substantial reasons for closing a sale promptly and assuring a good faith buyer that the sale cannot be undone.

Id. at 840. Those "substantial reasons" are present in this case and provide additional reasons why the Bankruptcy Court was correct in denying Regal's request for a stay and why the present Motion should be denied by this Court.

Regal has expanded its irreparable injury argument by asserting that SEB might compete with Regal at the "high end" of the market where SEB already has a product line. There is nothing in the record before the Bankruptcy Court to validate such speculation, other than the unsubstantiated assertions of Regal's witness. Regal did not examine SEB's witness on this subject. Moreover, the testimony of Regal's representative is clear that, while Regal intends to enter the high end retail market, it does not presently compete in this market. Thus, the supposition that Regal will be irreparably harmed by the mere *potential* of competition from a party that already competes in that market is sheer speculation. Moreover, if SEB were to compete with Regal using the trademarks covered by the Sublicense Agreement, SEB would be required to comply with all of the terms and conditions of the Sublicense Agreement including the maintenance of acceptable quality products. Regal will retain all of its rights under the Sublicense Agreement. The assignment of the Sublicense Agreement to a party who agrees to be bound by and comply with the very contractual terms previously agreed to by Regal cannot constitute irreparable harm.

**C.    The Debtors, Their Estates and The Creditors' of the Estates Would be Substantially Injured as a Result of The Issuance of a Stay Pending Appeal.**

The uncontroverted testimony offered by the Debtors' witness at the Stay Hearing, demonstrates that the Debtors will be substantially harmed by the issuance of a stay. If granted, a stay will result in a $2,000,000 reduction of the aggregate purchase price to be paid by SEB. Not only does this reduction represent a real and substantial loss to the Debtors, their estates and the estates' creditors, but the testimony illustrates that the Debtors will likely be unable to recoup this loss because it will be financially unable to continue the product line subject to the Sublicense Agreement during the pendency of Regal's appeal and will have sold all of the remaining portion of this business to SEB.

The Debtors are selling their cookware and bakeware business to SEB in the Sale. The Debtors' chief restructuring officer, Ron Stengel, testified that the Debtors cannot further maintain the Licensed Trademark product lines independent of the other aspects of Debtors cookware and bakeware business. Logically, this would result in a substantial devaluation, if not destruction, of the worth of the Licensed Trademark, which even Regal admits is not in anyone's best interest.

**D.    Issuance of the Stay is Not in the Public Interest.**

Regal asserts a significant public interest in "ensuring that trademark law is consistent nationwide and ensures appropriate protection and guidance to trademark owners worldwide." See Motion at p. 25. Regal, however, cites no case law or statutes which are inconsistent with the conclusions reached by the Bankruptcy Court or its application of the law of this District and Circuit. Indeed, public policy of both trademark law and the Bankruptcy Code dictates that a stay should not be entered.

723420.4                                    16

The United States Code specifically provides that any registered trademark "shall be assignable with the good will of the business in which the mark is used." 11 U.S.C. § 1060. This is exactly what the Debtors are attempting to accomplish by assigning the Sublicense Agreement to SEB as part of the sale of the Wearever Debtors' assets to SEB.

An overriding policy of Bankruptcy Code section 363 is to facilitate quick dispositions of a debtor's assets if it will result in the greatest recovery for the debtor's creditors. See, e.g., In re Hovis, 356 F.3d 820, 822 (7th Cir. 2004) ("[S]ometimes the best means to administer an estate is to sell the assets quickly in order to maximize their value.")

One way to promote the public's interest in maximizing creditor recovery is to ensure finality of asset dispositions. See Cable One CATV, 169 B.R. 488, 492 (Bankr. D.N.H. 1994) ("The policy behind § 363(m) is to promote finality in judgments and encourage the obtaining of maximum value of assets notwithstanding the risks associated with bankruptcy sales."). Specifically, without the finality of sales provided by Bankruptcy Code section 363(m), bidders would be hesitant to participate, thereby jeopardizing the debtor's opportunity to maximize the proceeds generated by the sale. See In re Sax, 796 f.2d 994, 998 (7th Cir. 1986) ("Without the degree of finality provided by the stay requirement purchasers are likely to demand a steep discount for investing in the property."); Cable One CATV, 169 B.R. at 492 (finding that purpose of section 363(m) is "to overcome people's natural reluctance to deal with a bankrupt firm . . . by assuring them that . . . they need not worry . . . because some creditor is objecting to the transaction and is trying to get [a reversal]'").

Regal presents no reason why the policy considerations of Bankruptcy Code Section 365 should be disregarded in this case. The Debtors have worked tirelessly to dispose of assets relating to a business, that they can no longer afford to operate, in an efficient manner to maximize their creditors' recoveries. To hinder this process, as Regal attempts to do, by requesting that the Court delay a portion of the Sale to hear a meritless appeal, would contravene the public's interest in the finality and certainty of bankruptcy sales. Thus, Regal also has failed to prove that public policy supports a stay of the sale, assumption and assignment of the Sublicense Agreement and the Motion should be denied.

**E.    If the Court Determines to Impose a Stay, Such Stay Should Be Conditioned Upon Regal Being Required to Post a Bond.**

Although a bond is not expressly required by Bankruptcy Rule 8005, courts may require a bond in their discretion. See In re Andy Frain Servs., Inc., 798 F.2d 1113, 1125 (7th Cir. 1986) ("Fed. R. Bankr. P. 8005 generally requires the appellant to post a bond or other security to cover any loss to the purchaser caused by the delay of an appeal should the appeal prove unsuccessful."); Hartigan v. Pine Lake Vill. Apartment co. (In re Pine Lake Vill. Apartment Co.), 21 B.R. 395, 398 (S.D.N.Y. 1982) (requiring Movant to post bond in order to obtain stay pending appeal under predecessor of Bankruptcy Rule 8005). Courts are particularly inclined to require a bond when Bankruptcy Rule 8005 is relied upon to stay an asset sale under Bankruptcy Code section 363. See Andy Frain Servs., 798 F.2d at 1125 ("[R]equir[ing] the appellant to post a bond or other security . . . is, of course, essential in bankruptcy cases, for without such protection for good faith purchasers, few, if any, persons would participate in federal bankruptcy sales."). These concerns are particularly relevant here because the Debtors will, in fact, suffer a $2

million dollar reduction in the asset purchase price and will be unable to recoup this loss when they prevail on appeal. Regal's "straw man" proposal contained in the motion and discussed above does not constitute "security", as contemplated by Bankruptcy Rule 8005.

## CONCLUSION

It is incumbent on Regal to establish that (i) Regal is likely to succeed on the merits of the appeal; (ii) Regal will suffer irreparable injury; (iii) no substantial harm will come to the Debtors, their estates or the estates' creditors; and (iv) the stay will do no harm to the public interest. For the reasons discussed above, Wachovia submits that Regal has failed to establish any of these requirements. Accordingly, Wachovia joins the Debtors and SEB in their Objection to the Motion and, for the reasons set forth above, respectfully requests that the Motion be denied.

Dated: August 16, 2006                    STEVENS & LEE, P.C.

By: __/s/ Joseph H. Huston__
    Joseph H. Huston, Jr. (4035)
    Thomas G. Whalen, Jr. (4034)
    1105 North Market Street, 7th Floor
    Wilmington, DE 19801
    (302) 654-5180
    OTTERBOURG, STEINDLER, HOUSTON
        & ROSEN, P.C.

By: ____/s/ Steven B. Soll_____
        Steven B. Soll (SBS 1436)
    230 Park Avenue
    New York, NY 10169
    (212) 661-9100

*Attorneys for Wachovia Bank, National Association, as Agent*

# EXHIBIT A

Case 1:06-cv-00508-JJF    Document 8-2    Filed 08/16/2006    Page 2 of 5

Page 2
1992 U.S. Dist. LEXIS 3253, *

LEXSEE 1992 US DIST LEXIS 3253

**IN RE: THE COLUMBIA GAS SYSTEM, INC. and COLUMBIA GAS TRANSMISSION CORPORATION, Debtors.  THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COLUMBIA GAS TRANSMISSION CORPORATION, Appellant, THE COLUMBIA GAS SYSTEM, INC. and COLUMBIA GAS TRANSMISSION CORPORATION, Appellees.**

**Civil Action No. 92-127-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1992 U.S. Dist. LEXIS 3253*

**March 10, 1992, Decided**

**PRIOR HISTORY:** [*1]  Chapter 11, Case Nos. 91-803, 91-804

**COUNSEL:** James L. Patton, Jr, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, attorney for Debtors and for Appellees The Columbia Gas System, Inc. and Columbia Gas Transmission Corporation.

Kevin Gross, Esquire, of Rosenthal, Monhait & Gross, Wilmington, Delaware, attorney for Appellant The Official Committee of Unsecured Creditors for the Columbia Gas Transmission Corporation.

**JUDGES:** ROBINSON

**OPINIONBY:** SUE L. ROBINSON

**OPINION:**

**MEMORANDUM OPINION**

ROBINSON, U.S. District Judge

**INTRODUCTION**

Pending before the Court is the emergency motion of the Official Unsecured Creditors Committee of the Columbia Gas Transmission Corporation ("the Committee") for stay pending appeal ("the motion"). The Committee has filed an appeal of the February 13, 1992 order of the Bankruptcy Court approving, inter alia, payment of "category one refunds and prepetition GRI surcharges on a pro-rata basis . . . to the extent of $ 3.3 million." Said order is based upon the Bankruptcy Court's conclusion that the "category one refunds and prepetition GRI surcharges" are not property of the Debtor's

bankruptcy estate, rather, that said refunds and surcharges when received [*2] are held by the Debtor "in trust" for the benefit of its customers.

The Committee bases its motion on two arguments. First, the Committee contends that, pursuant to Bankruptcy Rule 7062, which incorporates *Fed.R.Civ.P. 62(d)*, it is entitled to a stay as a matter of right so long as suitable means are implemented to protect non-appealing parties from any loss occasioned by a stay.  In this case, the Committee argues that the Debtor's retention of customer refund monies in an interest bearing escrow account insures that neither the Debtor nor its customers will be harmed by a stay.  Alternatively, the Committee argues that a stay is warranted pursuant to Bankruptcy Rule 8005 because the Committee has satisfied all the requirements for such discretionary relief.

Responses in opposition to the motion have been filed by Columbia Gas Transmission Corporation (the "Debtor"); West Ohio Gas Company, Virginia Natural Gas, Inc. and the Peoples Natural Gas Company; the Columbia Gas Distribution Companies; The Official Committee of Customers; and the Pennsylvania Public Utility Commission.  For the reasons that follow, a stay will be granted pending an expedited appeal.

**DISCUSSION** [*3]

This Court has jurisdiction pursuant to *28 U.S.C. § 1334*(b).  1 conclude that the issues at bar are primarily legal in nature and, therefore, subject to de novo review. *In Re Public Service Co. of New Hampshire, 116 Bankr. 347, 349 n.2 (Bankr. D.N.H. 1990)*.

With respect to the Committee's first argument for relief, I decline to hold that the Committee is entitled to a stay as a matter of right. The Committee has not posted a bond, as required by *Fed.R.Civ.P. 62(d)*.  I find no

support for the proposition that the Debtor, the prevailing party below, be required to place into escrow funds judicially determined to belong to its customers, in order to afford the Debtor and its customers protection against any loss as a result of the Committee's appeal.

The Committee submits that it is nevertheless entitled to a stay pending appeal pursuant to Bankruptcy Rule 8005. In order to obtain a discretionary stay, the Committee must demonstrate that: 1) it is likely to prevail on the merits of its appeal; 2) it will suffer irreparable injury absent a stay; 3) a stay will not cause substantial harm to other interested parties; and 4) a stay will not harm the public interest. [*4] See, e.g., In the *Matter of Delaware & Hudson Rv. Co., 90 Bankr. 90, 91 (Bankr. D.Del. 1988).* The Court will examine each of these four factors seriatim.

### Probable Success on the Merits

The Court concludes that the Committee has carried its burden of demonstrating the first factor, probable success on the merits. Probable success on the merits means that "the movant has a 'substantial case,' or a strong case on appeal." *In Re Public Service Co. of New Hampshire, 116 Bankr. at 349.* There is no dispute that the issues presented are novel and complex. I have concluded that the issues are entitled to de novo review. I, therefore, embrace the observations of the Court in *In Re Mader, 100 Bankr. 989, 991 (N.D.Ill. 1989),* as follows:

> This Court does not intend to go so far as to actually determine the merits of the legal issues which will be presented on appeal. Suffice it to say, however, that we have not found, nor been cited to, any controlling authority on this precise question, and the novel legal issue presented is not one in which the debtor has no likelihood of success. This case will [*5] likely present an issue of first impression and, on balance, the likelihood of success on the merits does not appear to weigh too heavily in favor of, or against, any of the parties to this

proceeding.

See also *In Re Gleasman, 111 Bankr. 595, 601-02 (Bankr. W.D.Texas 1990).*

### Irreparable Harm

The Court finds that the Committee has carried its burden as well as to the irreparable harm factor. It is apparent that, absent a stay, the funds subject to the Bankruptcy Court's February 13, 1992 order will be disbursed to the Debtor's customers. In dispute is the question whether there is a mechanism in place to recover such funds in the event the Bankruptcy Court's order is reversed. I decline to resolve that question on the record before me. Given the complexity of the question, however, I conclude that the irreparable injury factor weighs more heavily in favor of granting the stay pending an expedited appeal.

### Harm to Other Parties

The parties filing in opposition to this stay argue that a stay exposes the Debtor "to the unnecessary risk of diminution of the estate due to interest payments and substantial tax liability that could be easily [*6] avoided if [the Debtor] timely flows through the refunds." (D.I. 6 at 19) Accepting such representations as accurate, I nevertheless conclude that the interests of the Debtor and the bankruptcy estate can be accommodated by an expedited appeal.

### Public Interest

Although the Court acknowledges that the refund of overcharges to individual customers represents a significant public interest, as does the public interest in enforcing the laws promulgated by Congress, I conclude that the public interest will not be adversely affected if the stay is granted pending an expedited appeal.

## CONCLUSION

For the reasons stated, the Court will granted the Committee's emergency motion for stay pending appeal.

An appropriate order will be entered.

SUE L. ROBINSON

10798P

********** Print Completed **********

Time of Request:   August 16, 2006  03:12 PM EDT

Print Number:     1861:113726245
Number of Lines:  98
Number of Pages:

Send To:  WELLS, STUART
          OTTERBOURG STEINDLER HOUSTON & ROSEN PC
          230 PARK AVE
          NEW YORK, NY 10169-0005