# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL HOME PRODUCTS LLC, et al.,[1] | Case No. 06-10340 (KG) (Jointly Administered) |
| Debtors. | |

| | |
|---|---|
| REGAL WARE, INC., | |
| Appellant, | |
| v. | Civil Action No. 06-508 (JJF) |
| GLOBAL HOME PRODUCTS LLC, et al., | |
| Appellees. | |

## APPENDIX TO DEBTORS' OPPOSITION TO EMERGENCY MOTION OF REGAL WARE, INC. FOR STAY PENDING APPEAL OF ORDER APPROVING MOTION OF THE DEBTORS FOR AN ORDER: (I) APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF THE WEAREVER DEBTORS' OPERATING ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(B), (F) AND (M) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Dated:  August 16, 2006

PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Bruce Grohsgal (Bar No. 3583)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400

Counsel to Debtors, Global Home Products LLC, et al.

---

[1] The Debtors are the following entities:  Global Home Products LLC; GHP Holding Company LLC; GHP Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico, Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company LLC.

## TABLE OF CONTENTS

**Exhibit**   **Title**

A   Order Denying Emergency Motion to Stay Pending Appeal

B   Transcript Dated August 8, 2006 of Omnibus Hearing, Evidentiary Hearing Before Honorable Kevin Gross, United States Bankruptcy Judge

C   [Signed] Order Approving Motion of Debtors for the Entry of an Order (I) Approving Sale By the WearEver Debtors of Substantially All of WearEver Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f), and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re                                                )        Chapter 11
                                                     )
GLOBAL HOME PRODUCTS, LLC, et al.,                   )        Case No. 06-10340(KG)
                                                     )        (Jointly Administered)
                                                     )
_____Debtor._____     )        Re Dkt. No. 660

**ORDER DENYING EMERGENCY**
**MOTION TO STAY PENDING APPEAL**

1.     On August 11, 2006, the Court conducted an evidentiary hearing on the Emergency

Motion of Regal Ware Inc. to Stay Pending Appeal (Dkt. No. 660), the Court's Order, dated August

11, 2006 ("Sale Order") (Dkt. No. 664), in which the Court approved the sale by the WearEver

Debtors of substantially all of the WearEver Debtors operating assets to SEB S.A. and Groupe SEB

USA ("SEB"). The Sale Order followed this Court's approval of sale and bidding procedures, an

active auction, full motion practice and a full day of testimony and argument. Regal Ware, Inc.

("Regal Ware") objected to the sale of assets on the ground that one of the assets included in the sale

was the assignment of a trademark license for the Regal Ware name.

2.     Prior to the auction, indeed, only days before the auction, Regal Ware reacquired the

trademark license from Newell, Inc., and interposed its Objection to any assignment of the trademark

license (Dkt. No. 618). Regal Ware's legal theory is that by the reacquisition of the trademark

license, the Regal Ware trademark is unassignable or assignable only with its consent. For the

reasons set forth on the record and set forth in the Sale Order,* the Court ruled that the trademark

license was freely assignable.

_____

* The urgency of the asset sale and the emergency nature of the stay motion made the
issuance of written opinions impractical, which the Court regrets.

676
8-15-06

3.      Regal Ware is seeking a stay of that portion of the Sale Order which authorizes the trademark license assignment, not the entire Sale Order.

4.      SEB has proclaimed - as is its right - that it will close immediately if a stay of the Sale Order is not granted and, if it does close, the appeal Regal Ware has commenced may be rendered moot pursuant to Bankruptcy Code §363(m).

5.      The standards for granting a stay pending appeal pursuant to Bankruptcy Rule 8005 are:

- the likelihood that the movant will prevail on the merits of the appeal;

- the extent to which the movant will be irreparably harmed if the stay is denied;

- the extent to which the other parties will suffer irreparable harm if the stay is granted; and

- The public interest.

6.      The standards are to be viewed in their totality, i.e., in a balancing of all elements. No one element is determinative and the strength of one factor can balance the weakness of another - not the absence of an element entirely but the relative weakness of it.

7.      After considering the testimony and the extensive arguments of the parties, the Court applied the facts and law to the factors for a stay pending appeal. For the reasons stated on the record, the Court determined that a stay was not warranted.

2

8.    Accordingly, IT IS HEREBY ORDERED that the Emergency Motion for the Stay Pending Appeal is DENIED.

Dated: August 14, 2006.

_____
Kevin Gross, United States Bankruptcy Judge

cc:    Laura Davis Jones, Esquire
       Michael Busenkell, Esquire
       Steven K. Kortanck, Esquire
       Gregg M. Galardi, Esquire
       Joseph H. Huston, Jr., Esquire
       David M. Fournier, Esquire

3

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Case No. 06-10340(KG) |
| | ) Chapter 11 |
| GLOBAL HOME | ) |
| PRODUCTS, LLC, et al., | ) Courtroom No. 2B |
| | ) 824 Market Street |
| | ) Wilmington, Delaware 19801 |
| Debtors. | ) |
| | ) August 8, 2006 |
| | ) 10:21 A.M. |

TRANSCRIPT OF OMNIBUS HEARING, EVIDENTIARY HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:
Pachulski Stang Ziehl Young
    Jones & Weintraub
By:  LAURA DAVIS JONES, ESQ.
919 North Market Street, 16th Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705

Pachulski Stang Ziehl Young
    Jones & Weintraub
By:  ALAN KORNFELD, ESQ.
10100 Santa Monica Boulevard
11th Floor
Los Angeles, California 90067

For Lifetime Brands:
Morgan, Lewis & Bockius LLP
By:  NEIL E. HERMAN, ESQ.
101 Park Avenue
New York, New York 10178-0060

ECRO:
Nicki Barksdale

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

---

**TRANSCRIPTS PLUS**
**435 Riverview Circle, New Hope, Pennsylvania 18938**
e-mail courttranscripts@aol.com

**215-862-1115    (FAX) 215-862-6639**

665
8-14-06

Appearances:
(Continued)

| | |
|---|---|
| For Wachovia, Secured Lender: | Stevens and Lee<br>By:  JOSEPH H. HUSTON, JR., ESQ.<br>1105 North Market Street, 7th Floor<br>Wilmington, Delaware 19801<br><br>Otterbourg, Steindler, Houston<br>& Rosen, P.C.<br>By:  STEVEN SOLL, ESQ.<br>     JONATHAN HELFAT, ESQ.<br>230 Park Avenue, 29th Floor<br>New York, New York 10169 |
| For Lifetime Brands: | Eckert Seamans Cherin & Mellott, LLC<br>By: MICHAEL BUSENKELL, ESQ.<br>300 Delaware Avenue, Suite 1360<br>Wilmington, Delaware 19801 |
| For SEB, SA: | Skadden, Arps, Slate, Meagher<br>& Flom LLP<br>By:  GREGG GALARDI, ESQ.<br>     MATTHEW WARD, ESQ.<br>One Rodney Square<br>Wilmington, Delaware 19801 |
| For Citigroup: | Chadbourne & Parke LLP<br>By:  JOSEPH SMOLINSKY, ESQ.<br>     THOMAS HALL, ESQ.<br>30 Rockefeller Plaza<br>New York, New York 10112 |
| For IMASA: | Werb & Sullivan<br>By:  DUANE WERB, ESQ.<br>300 Delaware Avenue<br>Thirteenth Floor, P.O. Box 25046<br>Wilmington, Delaware 19899<br><br>Alston & Bird LLP<br>By:  DENNIS CONNOLLY, ESQ.<br>One Atlantic Center<br>1201 West Peachtree Street<br>Atlanta, Georgia 30309-3424 |

```
Appearances:
(Continued)

For Creditors'                Lowenstein Sander
Committee:                    By:  WOJCIECH F. JUNG, ESQ.
                                   SHARON LEVINE, ESQ.
                             65 Livingston Avenue
                             Roseland, New Jersey 07068-1791

                             Pepper Hamilton
                             By:  DAVID FOURNIER, ESQ.
                             Hercules Plaza, 1313 Market Street
                             Suite 5100, P.O. Box 1709
                             Wilmington, Delaware 19899-1709

For Perot Systems             Potter Anderson & Corroon, LLP
Corporation:                  By:  LAURIE SELBER SILVERSTEIN, ESQ.
                             Hercules Plaza, P.O. Box 951
                             1313 N. Market Street
                             Wilmington, Delaware 19899-0951


For Regal Ware:               Klehr Harrison Harvey
                             Branzburg & Ellers
                             By:  STEVEN K. KORTANEK, ESQ.
                                  JENNIFER SCOLIARD, ESQ.
                             919 Market Street, Suite 1000
                             Wilmington, Delaware 19801
```

4

## INDEX

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **RONALD STENGEL** | | | | |
| By Mr. Kornfeld | 28 | | 35 | |
| By Mr. Connolly | | 31 | | 37 |
| By Mr. Soll | | 32 | | 36 |
| | | | | |
| **BRETT LOWREY** | | | | |
| By Ms. Davis Jones | 92 | | | |
| By Mr. Herman | | 97 | | 104 |
| By Mr. Galardi | | 99 | | |
| | | | | |
| **JEAN PIERRE LAC** | | | | |
| Proffer by Mr. Galardi | 106 | | | |
| By Mr. Kortanek | | 110 | | |
| | | | | |
| **PHILIPPE SUMEIRE** | | | | |
| Proffer by Mr. Galardi | 115 | | 129 | |
| By Mr. Kortanek | | 120 | | |
| By Mr. Herman | | 127 | | |
| | | | | |
| **CHARLES HADID** | | | | |
| By Mr. Herman | 131 | | 138 | |
| By Mr. Galardi | | 135 | | 139 |
| By Mr. Hall | | 136 | | |
| | | | | |
| **DAVID BEINE** | | | | |
| By Mr. Kortanek | 145 | | 239 | |
| By Mr. Kornfeld | | 203 | | |
| By Mr. Galardi | | 225 | | 224 |
| By Mr. Herman | | 238 | | |

| IMASA Exhibits | ID | EVID |
|---|---|---|
| Exhibit 1 Budget | 17 | 21 |
| Exhibit 2 Ratification agreement | 17 | 21 |
| Exhibit 3 Operating report for April | 17 | 21 |
| Exhibit 3 Operating report for May | 17 | 21 |
| Exhibit 3 Operating report for June | 17 | 21 |

| DEBTORS' Exhibits | ID | EVID |
|---|---|---|
| D-1  Transcript of auction | 58 | 58 |

5

INDEX

| Regal Ware's Exhibits | | ID | EVID |
|---|---|---|---|
| R-1 | Sales brochure | 148 | 165 |
| R-2 | Trademark licensing agreement | 156 | 165 |
| R-9 | Letter | 160 | 165 |
| R-10 | Letter | 167 | |
| R-7 | Letter | 171 | |
| R-11 | Trademark sub-license agreement | 177 | 178 |
| | Agreement of right of Newell to Regal | 178 | |
| R-2A | Cease and desist letter | 179 | 179 |
| R-3A | Response letter | 180 | 181 |
| R-4 | Complaint | 181 | |
| R-6 | 4th Circuit opinion | 189 | 189 |

6

1          THE COURT:  Good morning, please be seated.  It's an

2     important day, it looks like.

3          Ms. Jones, good morning.

4          MS. DAVIS JONES:  Good morning, Your Honor.

5          THE COURT:  I know we have -- we have a -- a

6     difficult issue on the sale motion involving Regal Ware.  And I

7     was going to suggest -- I was going to ask if it might make

8     sense, you know, for the parties -- the businesspeople, now

9     that everyone is assembled in one place, to perhaps have some

10    discussions to see if there is any opportunity to resolve the

11    matter.

12         My ruling yesterday was on the timing issue.  And no

13    one should really take comfort or discomfort from that on the

14    substantive issues.  And I just thought it might make sense if

15    people did have an opportunity to exchange views and see if

16    there wasn't some way to come to a meeting of the minds.

17         MS. DAVIS JONES:  Thank you, Your Honor.  For the

18    record, Laura Davis Jones of Pachulski Stang Ziehl Young Jones

19    & Weintraub.

20         Your Honor, I am never opposed to people talking,

21    trying to communicate and trying to resolve matters.  And,

22    indeed, Your Honor has seen the results of our -- throughout

23    this case, really trying to negotiate with people and work

24    things out.

25         THE COURT:  Yes.

7

1           MS. DAVIS JONES:  We did make that invitation
2   yesterday.  I did not hear any response, so maybe today would
3   be a new day.  Maybe it would be -- it would make sense to have
4   a little time to see if people want to talk with us and see if
5   we can work out issues.

6           THE COURT:  And we can progress with the remainder of
7   the issues on the agenda for today, perhaps we wouldn't lose
8   time and people could be talking in the meantime.

9           MS. DAVIS JONES:  I think that makes sense, Your
10  Honor.  We had -- just to give Your Honor an idea of the flavor
11  for today's agenda.

12          THE COURT:  Yes.

13          MS. DAVIS JONES:  Your Honor, as you may have noted,
14  most things on the agenda are continued or resolved.

15          THE COURT:  Yes.

16          MS. DAVIS JONES:  Or uncontested.  Your Honor, we had
17  one matter, IMASA, which we've been successful with really
18  narrowing the issues.  There will be evidence presented there,
19  but that in toto I don't think will take very long.

20          Our proposal, Your Honor, was to get through those
21  matters and then ask Your Honor for a break before we moved to
22  the sale hearing so that we can get our ducks in a row
23  mechanically.  But also, Your Honor, maybe that's time that we
24  can use if people haven't already started talking --

25          THE COURT:  Okay.

8

1          MS. DAVIS JONES:  -- to talk with Regal.

2          THE COURT:  That makes sense.  Let's do it that way.

3          MS. DAVIS JONES:  Thank you, Your Honor.

4          THE COURT:  I have a jury room back here, people are

5   welcome to sit and talk.

6          MS. DAVIS JONES:  Thank you, Your Honor.

7          Your Honor, if I may, let me refer the Court to the

8   second amended notice of agenda for the matters that are

9   scheduled for hearing this morning.  As I mentioned, Your

10  Honor, there are a number of matters continued, and

11  specifically matters 1 through 8 have been continued on

12  agreement of the parties or by direction of the Court to the

13  September hearing date.

14         Your Honor, true to my word to you, back over a month

15  ago we have been reaching out, we've been trying to negotiate

16  resolutions, if we can.  And if we're not able to, at least to

17  narrow the issues, like Your Honor will see with IMASA today.

18         I am pleased to tell you that a number of these

19  matters are very close to resolution, and I'm hopeful when I

20  stand before you in September we'll have more than resolved.

21         THE COURT:  Thank you.

22         MS. DAVIS JONES:  Your Honor, that would bring us to

23  matter 9, which is the debtors' motion with respect to seeking

24  authority and approving payments under a management sale

25  incentive plan for the WearEver Debtors.

9

1          Your Honor, this is a performance based management

2  incentive plan conditioned upon the going concern sale of

3  substantially all the assets of the WearEver Debtors.  And I

4  remind the Court that the WearEver Debtors are Mirro

5  Acquisition, Inc., Mirro Puerto Rico, Inc., and Mirro Operating

6  Company, LLC.

7          As we described in the motion, this is a multi-tiered

8  incentive plan.  It is dependent on the closing of a WearEver

9  sales transaction, and it's in lieu of any other performance

10  bonus, severance pay, or retention compensation otherwise

11  payable to these employees.

12          Your Honor, we attached as Exhibit A a chart showing

13  the titles of the employees and the proposed incentive bonus

14  payable to each.

15          Your Honor, we did file a revised Exhibit A with the

16  Court.  That chart -- the chart as originally attached did

17  accurately reflect the current income of four of the employees

18  and did not reflect that one of the employees had left the

19  employ of the company.

20          THE COURT:  Okay.

21          MS. DAVIS JONES:  So, Your Honor, what we did is

22  filed a revised chart.  Frankly, it resolves in a slightly

23  lesser aggregate amount to be paid under the incentive plan.

24          Your Honor, as you can imagine, we've had a number of

25  discussions with the Creditors' Committee about this proposed

1 MIP. And, Your Honor, we have a revised form of order that we
2 would present to the Court if the Court is -- will approve the
3 program that reflects the comments of the Creditors' Committee,
4 their language that was clarified in the order.

5 Your Honor, there were no objections lodged to the
6 motion, and we'd ask that it be approved.

7 THE COURT: Did the Creditors' Committee wish to be
8 heard from? Ms. Levine? It's not necessary, but if you would,
9 you certainly have the opportunity.

10 MS. LEVINE: Two seconds, Your Honor.

11 THE COURT: Thank you.

12 MS. LEVINE: First of all, we appreciate that the
13 debtor incorporated our comments into the proposed form of
14 order.

15 Second, we also appreciate and wanted to note for the
16 Court that the debtor met with the Committee and its
17 professionals before filing the motion and discussed the form
18 of the incentive program, actually before it was presented
19 elsewhere, and we did appreciate that input.

20 THE COURT: Okay. Thank you, Ms. Levine.

21 MS. LEVINE: Thank you.

22 THE COURT: Well, the Court is certainly satisfied
23 that it is in the best interest of the debtors to have this
24 performance incentive program. And the amounts appear
25 reasonable, and obviously have been reviewed and approved by

11

1  the Creditors' Committee.  And I am prepared to enter the
2  order.

3        MS. DAVIS JONES:  Thank you, Your Honor.  Your Honor,
4  may I approach with a black line that reflects the changes that
5  Ms. Levine and I talked about?

6        THE COURT:  Yes.

7        MS. DAVIS JONES:  And also a clean form of the order.

8        THE COURT:  Thank you.

9                    (Pause)

10        THE COURT:  Okay.  Thank you, I'm going to enter the
11  form of order.

12        MS. DAVIS JONES:  Thank you, Your Honor.

13        THE COURT:  Thank you.

14        MS. DAVIS JONES:  Your Honor, matter 10 on the agenda
15  is the IMASA motion for allowance and immediate payment of its
16  Section 503(b)(9) administrative expense claim.

17        Your Honor, as I mentioned earlier, we had a lot of
18  discussions in connection with this motion.  And Mr. Connolly
19  and I spent a lot of quality time on the phone.

20        Your Honor, we have been able to agree to the amount
21  of the 503(b)(9) administrative expense claim.  And that
22  specifically would be $206,322.07.

23        Your Honor, we do have the issue to be adjudicated of
24  the timing of the payment of that claim.  And what I'd do, Your
25  Honor, is yield to Mr. Connolly to present his motion.

1          THE COURT:  Thank you.

2          MR. WERB:  Good morning, Your Honor.

3          THE COURT:  Good morning, Mr. Ward.

4          MR. WERB:  Duane Werb on behalf of IMASA.  To my

5   right stands Dennis Connolly of the law firm of Alston and Bird

6   in Atlanta, Georgia.  We have previously filed a motion seeking

7   his admission pro hac vice.  At this time, it's my pleasure to

8   introduce Mr. Connolly to the Court.

9          THE COURT:  Thank you.  Thank you, Mr. Werb.

10  Welcome, Mr. Connolly.

11         MR. CONNOLLY:  Thank you very much, Your Honor, and I

12  appreciate it.

13         As Ms. Jones rightfully identified, we had spent a

14  lot of time -- and I apologize, I didn't have a table here to

15  put this all on, Your Honor.  But we had spent a good bit of

16  time over the past week and a half or so trying to resolve a

17  number of issues.  And I just want to highlight that for the

18  Court at the outset, that we've got more than just a 503(b)(9)

19  application on today.

20         Your Honor, we had had conversations, and we'll be

21  reviewing the sale order as proposed to the Court to make sure

22  it incorporates our changes.  But we also had an issue with the

23  sale order today.

24         And then at the foot of the agenda today is the

25  status conference on our reclamation adversary proceeding filed

13

1  in late May.  The debtors filed their answer in late June.  We
2  decided to move it from the July 7 hearing to today.  Basically
3  to allow us more time to have these conversations.  And I think
4  they were very fruitful.

5          So, I wanted to give the Court the update that we had
6  multiple issues on for today for IMASA.

7          Your Honor, the precise issue before the Court this
8  morning or at this point in time on the calendar this morning
9  is the 503(b)(9) issue.  Your Honor, we were one of the first
10  to file a motion under the new section 503(b)(9).  I think
11  there will be some law created in this case, or in others,
12  about exactly how that interrelates to 546(c), how 503(b)(9) is
13  supposed to operate in general.  And I think it will be an
14  interesting development in the law as we proceed.

15          As Ms. Jones correctly indicated, the really two
16  issues that were out there, in terms of major issues, were
17  basically the amount of the claim, the so-called value of the
18  goods delivered within the 20 days.  The debtors had, at one
19  point, said, well, we don't even know if these are goods within
20  the meaning of the Statute.  We've resolved all of those
21  issues.

22          And so the stipulation is for the two-o-six three
23  twenty-two point zero seven.  And so at this point, Your Honor,
24  that is what the debtors have stipulated as the administrative
25  expense claim allowable under Section 503(b)(9) of the Code,

14

1  and we would ask that the Court enter an order authorizing that

2  allowance.

3          The issue that we could not resolve, Your Honor, was

4  how the payment was to be made on an administrative expense

5  claim.   The debtors' position was that the debtors were not

6  authorized under the financing agreement with Wachovia as

7  lender, and that the -- essentially the payment at this point

8  in time as opposed to a plan confirmation would somehow

9  endanger the reorganization case.

10         Ms. Jones and I discussed those issues, and we

11  debated those back and forth and obviously did not come to

12  agreement on timing.   IMASA would still like to have its

13  503(b)(9) claim paid at this point in time in the case.

14         However, we were able to address the evidentiary

15  issues.   And essentially what we worked out was that we would

16  rely -- IMASA would rely on the record in the case.   That, in

17  essence, as -- I assume the Court has read our reply brief.

18         THE COURT:   Yes.

19         MR. CONNOLLY:   What we were focusing on, Your Honor,

20  and what I will focus my comments on this morning on is the

21  ratification agreement itself, Section 5.2, in particular.   And

22  obviously the budget and the operating reports, at least

23  through June 30, which we had, and fortuitously they were filed

24  right before we filed a reply brief.   So, we were able to

25  incorporate more updated financial information in connection

 1  with our comments and our position, vis-a-vis the debtors'
 2  financial performance thus far in the case.

 3          Your Honor, as a general composition, as I indicated
 4  at the outset of my comments, 503(b)(9) is new.  We'll see how
 5  ultimately the Courts treat it.  It does create complexities
 6  for debtors, I don't dispute that at all.  And I think as I've
 7  -- I've done a fair amount of debtor work in my career, as
 8  well.  It creates some interesting timing issues and some
 9  interesting priority issues, as the 503(b)(9) claim if ones
10  look at it as a 507(a)(1) claim, it's allowable under 503(b),
11  and, therefore, it is pari passu with all other administrative
12  expenses.  And that's really part of the point -- an
13  overarching matter of IMASA is that the debtors' position
14  essentially discriminates against one administrative expense
15  claim vis-a-vis another in that post petition administrative
16  expense claims, that is trade vendor claims, are being paid
17  while the -- this strange animal that we have now, the
18  503(b)(9) claim, is not being paid.

19          And we respectfully would argue, Your Honor, that the
20  congressional carve out -- and almost -- we had the whole line
21  of cases and, Your Honor, I'm sure is familiar with K-Mart and
22  with the Just For Feet case and all these cases talking about
23  under what circumstances can pre-petition obligations be paid,
24  and under 105 or 363, what is the rubric.

25          Here we have a situation where Congress itself has

1 carved out from the automatic stay and from the general rule of
2 the cleavage in time that the automatic stay creates, a
3 category of claims that are related to the Chapter 11 case
4 clearly, that are claims against the debtor, but that are now
5 entitled to administrative expense priority.

6 And as a result, Your Honor, we would respectfully
7 contend that the Court has the authority and should order at
8 this time the payment of the IMASA 503(b)(9) claim as
9 stipulated to by the debtor.

10 Your Honor, I'd like to address the arguments in
11 terms of the ratification agreement, than the financial
12 arguments. I have a question, though, for Your Honor at this
13 point. In terms of the evidentiary presentation, as Ms. Jones
14 referenced both, in order to collapse the hearing somewhat, I
15 basically said, well, I'll rely on the filings in the case, and
16 what's there in terms of the financial performance, et cetera.

17 I'm happy to hand up to the Court the budget and the
18 financial operating reports, or not, as the Court would like,
19 in terms of the "evidence," quote/unquote. Certainly the Court
20 is authorized to take judicial notice of the pleadings and
21 filings in the case. So, I don't think there need be any other
22 evidentiary basis laid for the admission of that evidence into
23 the record. So, Your Honor, I'm happy to do whatever you'd
24 like in terms of handing out copies of the budget or the
25 reports or not, at your direction.

17

1          THE COURT:  Ms. Jones, do you have any views?

2          MS. DAVIS JONES:  Excuse me.

3          MR. CONNOLLY:  Sure, I'm sorry.

4          MS. DAVIS JONES:  Your Honor, I have no issue with

5   what Mr. Connolly has suggested, and that is just to pass out

6   the documents and let Your Honor take the judicial notice of

7   them.

8          THE COURT:  And that's fine with me, yes.

9          MR. CONNOLLY:  Your Honor, thank you.  And if I may,

10  I have premarked copies of the documents.  If I may hand them

11  up to the Court --

12         THE COURT:  Yes.

13         MR. CONNOLLY:  -- and then I will hand them out to

14  the parties, and it will just take me one moment, Your Honor,

15  and I appreciate the Court's indulgence.

16         THE COURT:  Take your time.

17                       (Pause)

18         MR. CONNOLLY:  Your Honor, if I may approach?

19         THE COURT:  Please.

20         MR. CONNOLLY:  What I've handed to the Court, Your

21  Honor, is Exhibits 1 through 5.  And I will now hand them out

22  to the parties.  Essentially, Your Honor, it is the budget, the

23  ratification agreement, the operating report for April, for

24  May, and then for June, which all of -- all of which were

25  reflected and addressed in the context of our reply brief.

18

 1              THE COURT:  Yes.

 2                          (Pause)

 3              MR. CONNOLLY:  Your Honor, thank you very much.  Your

 4  Honor, I will keep my remarks short and focus them on the

 5  points raised in the reply brief by and large.

 6              First, in terms of the authority issue, Your Honor,

 7  we would only point out to the Court that the Section 5.1

 8  language in the ratification agreement, upon which the debtors

 9  have relied to say we don't have the authority to make this

10  payment is interesting in that the 5.2 language, and this is

11  Exhibit 2 --

12              THE COURT:  Yes.

13              MR. CONNOLLY:  -- for Your Honor's -- Section 5.2.  I

14  gave the Court a clean copy.  If one looks at 5.2, there is a

15  carve out for administrative expenses and claims relating to

16  the Chapter 11 cases directly attributable to the operation of

17  the business of any borrower in the ordinary course of such

18  business in accordance with the financing arrangements.

19              And what's interesting, Your Honor, and this is also

20  a point made in the reply of the debtors or response to the

21  debtors, is that this does not make a distinction pre versus

22  post, this language in 5.2.  Nor does the Statute.  And the

23  Statute really reaches out and grabs what otherwise, I think,

24  would be a pre-petition unsecured claim and creates this status

25  for that.

1      One could debate the public policy argument, was that
2  a wise thing to do, who stuck this in the bill and when, and
3  under cover of night, I've heard various theories, Your Honor,
4  about that.  But it is the Statute, and it is an administrative
5  expense, and it is directly attributable to the debtors'
6  operation, and it's the debtor -- this is raw materials
7  delivered to the debtor pre-petition that were available to the
8  debtors to use or to sell at this point in time, to the extent
9  unused, to the buyer per the terms of the sale motion on for
10  hearing today.

11      So, Your Honor, we would contend that, as a result,
12  that there is no prohibition on -- as a -- as a matter of the
13  DIP financing on this particular use of proceeds or
14  authorization to basically use this financing to make this
15  payment at this point in time.

16      Your Honor, as I set back from this, I wanted to
17  address this and I apologize, if we look at the case law, the
18  Court clearly has discretion on this point.  I don't think
19  there's any debate on the opposition this is H2 Global
20  Holdings, the Garden Ridge case decided by Judge Kornreich and
21  others.  That the Court has discretion and is focusing on
22  prejudice to the debtors, the hardship to the claimant and
23  prejudice to other creditors.

24      And, Your Honor, as that initial matter as we focus
25  on the prejudice to the debtors and the other creditors, we

1  would respectfully suggest that there is not a prohibition and,
2  therefore, there's no prejudice to the debtor in that sense to
3  the payment of the 503(b)(9) claim as stipulated to at this
4  point in time.

5         In terms of the other primary argument made by the
6  debtors at this point, which is, well, we're a little tight on
7  the budget or we're going to create a -- you know, a run to the
8  bank or these other issues.  Your Honor, we believe that given
9  the debtors' financial performance and metrics during the
10 course of the case, and this is really Exhibits 1, and then 3,
11 4 and 5 that I'll be talking about, Your Honor, we believe that
12 it is not prejudicial to the debtor, not inconsistent with the
13 budget, and not inconsistent with their financial performance
14 thus far in the case.  And, therefore, not prejudicial to the
15 debtors or to the other creditors in the case.

16        The hardship to IMASA, I think, is relatively self
17 evident, Your Honor, in that we have the singling out of a
18 class, or an individual claimant for deferral of payment until
19 the end of the case when it is pari passu with the other
20 administrative claimants, otherwise allowable under Section
21 503(b) of the Code, and obviously is a priority now under
22 507(a)(2).  We now have this odd 507(a)(1) priority under the
23 reform legislation, as well.

24        Your Honor, in terms of the budget, and I won't
25 belabor this too much, but I do want to note this, which was

1 handed up to the Court and marked as Exhibit 1 and, Your Honor,

2 I presume that I -- I will ask for admission of the exhibits.

3 I presume there are no objections to the admission of the

4 exhibits at this point.

5          THE COURT:  That's correct.

6          MR. CONNOLLY:  Okay.  Thank you, Your Honor.  I

7 didn't know if anyone else had a comment from the Committee or

8 from other parties.

9          THE COURT:  Oh, excuse me.  Did anyone else have --

10 allow me to give people the opportunity.

11                    (No audible response heard)

12          THE COURT:  No objections.

13          MR. CONNOLLY:  Thank you, Your Honor.  I just want to

14 make sure the record is clear on that.

15          THE COURT:  Thank you.

16          MR. CONNOLLY:  Your Honor, really just a couple of

17 very brief points, and then I will sit down and cede the podium

18 to Ms. Jones.

19          If you look at the budget in terms of the trade

20 payables, and what they were projecting to pay trade payables,

21 I think that you see significantly less actual expenses in

22 terms of actual disbursements out to the trade vendors during

23 the course of the bankruptcy case.

24          And as a result, Your Honor, there's -- as I call it,

25 running room, under the terms of the financing arrangement and

1 the budget in order to make those payments.  And I would just

2 like to focus really on -- I believe it's Exhibit 5, which is

3 the June payment, which is the cumulative trade payables and

4 others of just north of $41 million, which is significantly

5 less than what they were projecting in the budget.

6        In addition, Your Honor, -- so, I guess my point is

7 you do have room in the budget and, indeed, it does not appear,

8 although the reports are not particularly clear on this, that

9 the critical vendor bucket was used at all or to a significant

10 extent, I recall that the -- I believe the critical vendor

11 bucket in the case was an $8 million bucket.

12        In terms of the actual balance of the revolver, and

13 as I understand the financing arrangements, Your Honor, the

14 Wachovia debt rolled into the revolver, Madeline or Madeline,

15 depending on your preference there, stayed as a term piece.

16 But the revolver debt is approximately $69 million.  As of --

17 again, as of June 30th, which is the most current financial

18 information we have, which is less than by a fair amount,

19 approximately $17 million, than what had been projected.

20        Now, that can reflect a couple of things, the Burnes

21 sale being a little bit better than what had been projected,

22 perhaps, and the budgeting process.  As well as the debtor not

23 needing the advances for reasons that would include, it

24 appears, the skinning down of the business or less purchase of

25 raw materials and other goods in connection with these sales as

23

1  we're moving into a liquidation mode with respect to the
2  WearEver Debtors -- to the WearEver Debtors.

3          That being said, Your Honor, we think that we -- we
4  have a situation where we don't think it is inconsistent with
5  and, therefore, not prejudicial to the debtors to make the
6  payment to IMASA at this point in time.

7          On other point I wanted to note, at least some
8  suggestion was made in the papers that this somehow would be
9  prejudicial to other creditors who have not sought this relief
10 as yet.

11          I -- and my reaction to that, Your Honor, we would
12 respectfully submit that that kind of prejudice is really not
13 what the cases are talking about.  People -- if creditors
14 choose to avail themselves of their legal rights at a
15 particular point in time, that is their decision making process
16 and they may decide their claim is not sufficiently large, they
17 may believe they may have some issues with respect to the
18 allowability of the 503(b)(9) claim.  There may be other
19 reasons.  But that the decision making by other creditors not
20 to seek relief at a particular point in time really should have
21 no impact on IMASA.

22          As I indicated, Your Honor, IMASA was one of the
23 first ones to file -- one of the first creditors to file the
24 503(b)(9) claim.  I believe is one of the first ones to file
25 the reclamation adversary proceeding, as well.  And we have

1  chosen obviously to vigorously prosecute our differing claims
2  in the bankruptcy case, obviously we'll file our proof of claim
3  for the unsecured portion at the appropriate time.

4           And I don't think that the -- and I don't think
5  there's any support in the case law for the analysis that
6  because others have chosen not to pursue their rights at any
7  particular point in time, that somehow they're prejudiced by
8  those who have chosen to proceed at a particular point in time.

9           So, I don't think that the argument is supported in
10 the case law or really logically in that sense.

11          In addition, Your Honor, I don't think this alters
12 the superpriorities and the other aspects of the financial
13 arrangements at all because there is an explicit contemplation
14 of the payment of trade payables that are relating to the
15 Chapter 11 case.  And because of this structural change by
16 Congress in the way one treats this one subcategory of claims
17 versus everyone else in Congress's policy judgment, this should
18 not -- this should fall within that and should be treated just
19 as a post petition trade payable.

20          So that we have, in essence -- this should be grouped
21 just as the post petition payables are.  Now, the debtor argues
22 that, well, we're not as important to the debtors because we're
23 not supplying goods post petition.  And I suppose at one level,
24 that's true for every post petition claimant, some are more
25 important than others perhaps.  But certainly there's authority

1 and the debtors can pay, and the Court could order the debtors

2 to pay, post petition payables as they arise.

3        Here we have a situation where, again, Congress has

4 basically reached out and grabbed a very slim, a very narrow

5 category of claims and said we're going to give you the same --

6 essentially the same treatment. And so there should not be

7 discrimination as between one set of claimants, 503(b)(1) trade

8 vendors on the one hand, and the 503(b)(9) claimants. There's

9 nothing in the Statute that would say they are distinct in

10 priority or distinct in timing or should be distinct in

11 treatment. Certainly at the end of the case, they would have

12 to be paid in full obviously under 1129(a)(9)(A) of the Code,

13 in any event.

14        But we think, Your Honor, given the circumstances and

15 the facts of the case, the Court has authorized, and we would

16 ask that the Court require the debtors to go ahead and pay

17 under H2 Global and the other case law, that the facts and

18 circumstances would justify the exercise of this Court's

19 discretion to require the payment of the 503(b)(9) claim at

20 this time.

21        Your Honor, I'm happy to answer any questions you may

22 have. We did -- the initial order was just sort of the

23 standard format order. So, we would submit whatever order the

24 Court would require at the end of the case, but I did want to

25 note, that we hadn't submitted anything else in light of these

26

1  circumstances with Ms. Jones.

2           THE COURT:  Okay.  Mr. Connolly --

3           MR. CONNOLLY:  Yes, sir?

4           THE COURT:  -- what evidence do I have before me

5  relating to the hardship to IMASA of --

6           MR. CONNOLLY:  The only evidence --

7           THE COURT:  -- later payment.

8           MR. CONNOLLY:  I'm sorry, Your Honor.

9           THE COURT:  Of later payment.

10          MR. CONNOLLY:  The only evidence I would submit, Your

11 Honor, is sort of the self evident hardship.  That we're

12 discriminating between five-o -- between 503(b) claimants.

13 That is to say some of them are going to be paid now, and

14 others are being deferred.  There's obviously interest carry on

15 that claim.  I don't think I needed to put evidence of sort of

16 that self evident fact, that in terms of timing, we have two

17 equivalent priority claims, trade vendors X, who supply the day

18 after the petition date, and IMASA, who supply the day before.

19 Trade vendor X are being paid now, and IMASA being, you know,

20 held up essentially for the year towards confirmation.  That

21 certainly there's an interest component to that fact that is a

22 hardship on IMASA that otherwise would not obtain if IMASA had

23 sold fortuitously the day after the petition date, and that

24 fortuitously Congress has now said we're going to basically

25 pull in and say, you guys are now basically equivalent to a

1  post petition trade payable.  That's my evidence on that

2  particular point, Your Honor.

3         THE COURT:  Okay.  Thank you.

4         MR. CONNOLLY:  Yes, sir.

5         THE COURT:  Well, I'll hear from the debtors in

6  response.

7         MR. CONNOLLY:  Yes, sir, I'm just trying to get out

8  of the way.

9         THE COURT:  Take your time.  I'm sorry.

10         MS. DAVIS JONES:  Thank you, Your Honor.  Your Honor,

11  what we would propose to do is we have both argument and

12  testimony in response to the IMASA motion.  It probably makes

13  most sense, Your Honor, for us to start with our testimony.

14         THE COURT:  Yes.

15         MS. DAVIS JONES:  We have one witness, Mr. Stengel,

16  who we would call.  Your Honor, my partner, Alan Kornfeld, will

17  handle the examination of Mr. Stengel.  And, Your Honor, and

18  then I have argument also in response.

19         THE COURT:  Okay.  Thank you.

20         MS. DAVIS JONES:  Thank you.

21         THE COURT:  Good morning, Mr. Kornfeld.

22         MR. KORNFELD:  Good morning, Your Honor.

23         THE COURT:  Welcome.  Welcome back.

24         MR. KORNFELD:  Thank you, Your Honor.

25         THE COURT:  Mr. Stengel, if you'll stand until you're

Stengel - Direct                                    28

1  sworn.    Thank you.

2              THE CLERK:    Please state your full name, spelling

3  your last name for the record.

4              MR. STENGEL:    Ronald F. Stengel, S-T-E-N-G-E-L.

5              RONALD STENGEL, DEBTORS' WITNESS, SWORN

6              THE CLERK:    Thank you.    You may be seated.

7              THE COURT:    Okay.    Mr. Kornfeld, you may proceed.

8              MR. KORNFELD:    Thank you, Your Honor.

9                      DIRECT EXAMINATION

10 BY MR. KORNFELD:

11 Q    Good morning, Mr. Stengel.

12 A    Good morning.

13 Q    Mr. Stengel, would you state your position with the

14 debtor, please?

15 A    I'm the Chief Restructuring Officer of the debtors.

16 Q    How long have you held that position?

17 A    Since the inception of the case.

18 Q    Let me ask you a couple of questions in general about

19 payment of 503(b)(9) claims:    First, would payment of 503(b)

20 claims in general have an adverse effect on the debtors'

21 borrowing ability under the DIP?

22 A    Yes.

23 Q    Would you describe why, please?

24 A    The -- we believe that the aggregate 503(b)(9) claims far

25 exceed the company's availability to borrow at this point in

Stengel - Direct                        29

1  time.

2  Q    Are the debtors concerned about the precedent that would

3  be set if the Court grants IMASA's request for immediate

4  payment?

5  A    Yes.

6  Q    Why so, sir?

7  A    Uh, it would represent, in our view, precedent and like

8  people situated to IMASA would seek to have their claims paid

9  currently, as well, when the company doesn't have the

10  availability to do so.

11  Q    Let me go now specifically to some of the contentions made

12  by IMASA, in particular those contentions that Mr. Connolly

13  referred to that are in the reply.  The first one in Paragraph

14  15 of the reply, as Mr. Connolly discussed with the Court, is

15  that according to the budget, you've got $80 million -- eighty

16  million five hundred thousand million dollars budgeted for

17  payments to vendors through June, 2006.  The debtors have only

18  disbursed aggregate cash payments of approximately 69.2.  So,

19  according to Mr. Connolly's reply and argument, the debtors

20  have plenty of money to pay IMASA and other 503(b)(9) vendors,

21  do you agree with that conclusion?

22  A    Not at all.  Because it doesn't equate at all to the

23  company's availability under the financing.

24  Q    What is the current availability under the financing?

25  A    As of yesterday, it was $1.7 million.

Stengel - Direct                    30

1  Q    What does the company need that $1.7 million for?

2  A    To fund continuing operations, in particularly the Anchor

3  Hocking season business.

4  Q    Is there any room in that $1.7 million for payment of

5  503(b)(9) claims?

6  A    No.

7  Q    Mr. Connolly made a similar argument in Paragraph 16 of

8  IMASA's reply.  He says, according to the June report, the

9  revolver DIP balance of approximately $69.6 million is

10 substantially below the budgeted projection of $86.1 million as

11 of June 30, 2006.  This is the argument you heard this morning.

12 A    Yes.

13 Q    Do you agree with the conclusion that Mr. Connolly argued

14 flows from that argument, that is there's plenty of money to

15 pay the debtors, $17 million extra?

16 A    Well, as I testified just a moment ago, our availability

17 is $1.7 million.  That is nowhere near the kind of room that he

18 would suggest with his analysis.

19 Q    So, budget does not equal availability, does it?

20 A    No, not at all.

21 Q    And, again, would you summarize what the debtor needs that

22 1.7 million in availability for, sir?

23 A    To pay for current operating costs, payroll, purchase of

24 inventory, the various things needed to run the business on a

25 current basis.

1              MR. KORNFELD:  Your Honor, may I have a moment,

2  please?

3              THE COURT:  Yes.

4                         (Pause)

5              MR. KORNFELD:  Thank you, Your Honor.  No further

6  questions at this time.

7              THE COURT:  Okay.  Thank you.  Mr. Connolly?

8              MR. CONNOLLY:  Thank you.

9                    CROSS EXAMINATION

10  BY MR. CONNOLLY:

11  Q    Good morning, Mr. Stengel, how are you?

12  A    Fine.

13  Q    I want to make sure I understood your points.  That at

14  this point, under the formula set forth in the DIP lending

15  arrangement, only $1.7 million is currently available to the

16  debtor, is that correct?

17  A    That -- that's correct.

18  Q    Does that reflect -- that -- check that.  That does not

19  reflect, though, the application of the sales proceeds and the

20  other financial arrangements in connection with the sale that

21  would be approved today, correct?

22  A    No, it doesn't.

23  Q    And the sale today is significantly higher than what had

24  been projected certainly as the stalking horse bid, as I

25  understand it, it's about $35.1 million, correct, sir?

Stengel - Cross/Connolly                    32

1  A    That's correct.

2  Q    And in terms of the precedent setting concerns, you have

3  not stated for the Court what your total aggregate of 503(b)(9)

4  claims, correct?

5  A    That's correct.

6  Q    And certainly the only claim left for hearing today is the

7  $206,000 claim of IMASA, correct, sir?

8  A    As far as I know.

9  Q    In the terms of the 1.7 --

10          MR. CONNOLLY:  Check that, if I may, Your Honor.

11 Your Honor, that's all the questions I have.

12          THE COURT:  Okay.

13          MR. CONNOLLY:  Thank you.

14          THE COURT:  Yes, thank you.

15          MR. SOLL:  Your Honor, just for the record, Steven

16 Soll from Otterbourg, Steindler, Houston and Rosen.

17          THE COURT:  Good morning.

18          MR. SOLL:  Good morning.  We are counsel to Wachovia

19 Bank.  One or two questions of Mr. Stengel, please.

20          THE COURT:  Yes.

21                    CROSS EXAMINATION

22 BY MR. SOLL:

23 Q    Are you aware that there are nine -- approximately nine

24 filed motions seeking 503(b)(9) relief?

25 A    I am.

Stengel - Cross/Soll                                      33

1  Q    Have you totaled the amount requested by each of those
2  claimants?
3  A    It's my understanding that the aggregate's the $2.1
4  million.
5  Q    And based upon your testimony that there is presently
6  availability of $1.7 million, is it fair to say that the
7  requests presently on file with the Court exceed the amount of
8  availability the debtor has?
9  A    Yes.
10 Q    Are you aware of the potential for other similarly
11 situated creditors who might assert 503(b)(9) claims in the
12 future in this case?
13 A    I am.
14 Q    Have you performed a rough estimate of what those claims
15 might total?
16 A    We're still working hard on trying to aggregate what those
17 -- that -- that amount might be.
18 Q    Based upon the work that you've done so far, would you say
19 it's potentially multiples of the $2 million already filed with
20 this Court?
21 A    Yes.
22 Q    What would happen to the debtors' reorganization efforts
23 if the debtor were required to pay those claims in full?
24 A    They'd collapse.
25 Q    Are you presently familiar with the current amount of

Stengel – Cross/Soll                                      34

1  indebtedness due to Wachovia?

2  A    Yes.

3  Q    What is that amount?

4  A    It's roughly $72 million as of yesterday.

5  Q    I presume you're familiar with the terms of the DIP

6  financing order?

7  A    I am.

8  Q    Pursuant to Section 1.2 of that order, is the debtor

9  permitted to -- let me -- excuse me.  Let me ask you one

10 question first.  Are the various 503(b)(9) motions included in

11 the budget that was attached to the DIP moving papers?

12 A    No.

13 Q    Moving to my prior question, in connection with the DIP

14 financing order, is it accurate that Section 1.2 of that order

15 precludes the debtor from using any proceeds of any loans to

16 pay claims or expenses that are not included in the budget

17 without the consent of Wachovia?

18 A    Yes.

19 Q    To your knowledge, has Wachovia's consent been provided in

20 connection with the motion that's on for today?

21 A    To my knowledge, no.

22         MR. SOLL:  Your Honor, I have no other questions of

23 the witness.  I reserve my right to make some comments

24 afterwards.

25         THE COURT:  Thank you.

Stengel - Redirect                    35

1          MR. SOLL:  Thank you.

2          THE COURT:  Mr. Connolly, recross?

3          MR. CONNOLLY:  Yes, sir.

4          MR. KORNFELD:  Your Honor, I have redirect.

5          THE COURT:  Okay.

6          MR. KORNFELD:  Whichever --

7          THE COURT:  Absolutely.  Forgive me.

8                    REDIRECT EXAMINATION

9  BY MR. KORNFELD:

10  Q    A couple of questions, Mr. Stengel.  Has anybody from

11  IMASA ever contacted the debtors, to your knowledge, and said

12  they really need the $200,000 or they're going to have to close

13  their doors?

14  A    Not to my knowledge.

15  Q    Has anybody from IMASA ever contacted the debtors and said

16  that that $200,000 -- getting the $200,000 today, as opposed to

17  at the close of the case, would create any financial hardship

18  for IMASA?

19  A    Not to my knowledge.

20  Q    Mr. Connolly asked you a couple of questions about

21  proceeds of the pending sale, assuming close of that sale.  The

22  liquidity would go up, right?

23  A    Not necessarily.

24  Q    Why not?

25  A    Uh, the DIP actually requires that all the proceeds be

Stengel - Redirect/Recross                              36

1  paid to Wachovia to pay down the loan.

2  Q    So, does the close of the sale change the reality of the

3  limited availability of the debtors' cash under the loan?

4  A    No.   And I don't expect it to.

5  Q    Does the debtor have within that limited availability

6  budgeted amounts or the wherewithal to make 503(b)(9) payments?

7  A    No, it doesn't.

8           MR. KORNFELD:   Thank you.

9           MR. SOLL:   Your Honor, I -- if I might ask one more

10 question?

11          THE COURT:   Yes, I think it makes sense for you to

12 ask before Mr. Connolly.

13          MR. SOLL:   Then I'll conclude and turn the podium

14 over.

15                    RECROSS EXAMINATION

16 BY MR. SOLL:

17 Q    Mr. Stengel, one more question.   Is it accurate that the

18 borrower is presently receiving advances from Wachovia over the

19 borrowing formulas?

20 A    Yes, that's correct.

21 Q    And what is the extent of that?

22 A    Uh, we have a $20 million over advance facility, and we're

23 utilizing 18.3 million of it.

24          MR. SOLL:   Thank you.

25          THE COURT:   Thank you.   Mr. Connolly, your turn

1 finally.

2          MR. CONNOLLY:  Thank you, Your Honor.  No problem at

3 all.  I appreciate the Court's indulgence.

4                    RECROSS EXAMINATION

5 BY MR. CONNOLLY:

6 Q    Mr. Stengel, just one quick question.  At this point in

7 time then, based on your testimony, the debtor is unable to pay

8 the administrative claimants of IMASA and other similar

9 situated 503(b)(9) claimants.  Yet at this point in time, it's

10 paying post petition trade payables, professional fees and

11 other 503(b)(9) -- or 503(b) claims, correct?

12 A    Largely, yes.

13          MR. CONNOLLY:  Thank you, sir.  That's all I have.

14 Thank you, Judge.

15          THE COURT:  Okay.  Anything further?

16          MR. KORNFELD:  No further questions, Your Honor.

17          THE COURT:  Okay.  I know that Ms. Jones was going

18 to follow-up with argument.

19          Mr. Stengel, if there are no further questions for

20 you, you certainly may step down.

21          MR. STENGEL:  Thank you, Your Honor.

22          THE COURT:  Ms. Jones?

23          MS. DAVIS JONES:  Thank you, Your Honor.  Your Honor,

24 several comments in response to what we've heard today:

25          First of all, Your Honor, the debtors respectfully

38

1  submit there's no basis to accelerate payment to IMASA.  The

2  standard rule is that the actual payment of administrative

3  claims is that they are not paid until the effective date of

4  the confirmation of a plan.

5       It is within the discretion of the Court to determine

6  the timing of payment of administrative expenses.  And

7  specifically, Your Honor, 503(b)(9) is silent on the timing of

8  payment.

9       Case law teaches us that the chief factors for the

10  Court to consider are the goals of orderly and equal

11  distribution among creditors, the need to prevent a race to the

12  debtors' assets, the needs and hardships of a particular

13  administrative creditor, and the length and expense of a case

14  administration.

15       Here, Your Honor, there's no basis to deviate from

16  the general rule.  This case is only four months old.  With the

17  Court's indulgence, there's been a lot of progress made in this

18  case.  We haven't had any languishing.  Including, Your Honor,

19  we've had the sale of Burnes, we're here on the sale of

20  WearEver.  We've stabilized our other businesses.  We've been

21  meeting and communicating with the Creditors' Committee.  We've

22  been dealing with 503(b)(9) claims, our schedules were on file

23  -- filed timely, our statement of financial affairs, our

24  monthly operating reports have been timely.  Your Honor, this

25  is a relatively large case with a lot of activity and a lot has

1 | happened over the last four months.

2 | Your Honor, on the point about hardship to IMASA,
3 | case law does not look at this alleged discrimination between
4 | post petition operation -- operated trade creditors and those
5 | that have claims that result from having provided something
6 | pre-petition, and by virtue of a Statute now have an
7 | administrative claim.  What the cases look to, Your Honor, is
8 | the -- is the individual hardship to that individual claimant.

9 | And, Your Honor, we've heard undisputed testimony
10 | from Mr. Stengel that this isn't a case where IMASA is knocking
11 | at the door of the debtor and saying, I've got to be paid
12 | $200,000 or our company is going out of business.  And, indeed,
13 | Your Honor, if you look at IMASA's own web site, they produce
14 | in excess of 70 million pounds of aluminum each year.  And I
15 | have copies of that web site here if Mr. Connolly is not
16 | familiar with it.

17 | But, Your Honor, we're only dealing with 122,000
18 | pounds of aluminum here.  Secondly, Your Honor, I understand
19 | that the sales of this company are in excess of $400 million,
20 | and I don't think there's any dispute about that.  And we're
21 | dealing with approximately a little less than $200,000.

22 | Your Honor, frankly, everyone with a pre-petition
23 | claim would like to be paid now.  I'm sure Ms. Levine would be
24 | able to tell you that every day she is hearing from her
25 | constituency that whether the folks have an administrative

40

1  claim by virtue of a reclamation claim or whether they're
2  general unsecured claims, they all need to be paid and they all
3  would like to be paid now.

4         Your Honor, the -- as pointed out, the payment of
5  IMASA is not provided for in the DIP financing agreements, and
6  it's not required by law. Your Honor, if it were just this one
7  claim -- when Mr. Connolly says how hard could this be for the
8  debtor, if it were just this one claim, maybe it would not be
9  so difficult. I don't even think I heard that from the
10 evidence. Mr. Stengel was quite clear that the liquidity here
11 is thin. We're talking about a company -- a company of this
12 size having liquidity of $1.7 million.

13        But, Your Honor, in terms of where we're going from
14 here, we do have nine such other motions filed. Indeed, there
15 was one filed yesterday. And we're sure there are more. So,
16 to Mr. Connolly's point, claimants are availing themselves of
17 their legal rights. This isn't a hypothetical. We have the
18 undisputed testimony of Mr. Stengel that at this point, he's
19 looking at claims that are probably roughly in the neighborhood
20 of $2 million. And in response to Mr. Soll, he said it --
21 sure, it could be multiples of that in dealing with the
22 503(b)(9) claimants.

23        So, surely, Your Honor, this would be prejudicial to
24 the debtor if we're weighing the hardships here. Every dollar
25 to this estate is important. We're dealing with thin

1 | liquidity. And we need to manage our funds prudently which,
2 | frankly, Your Honor, the budget, I think, shows the Court that
3 | Mr. Stengel has been jealously guarding the funds here and has
4 | been prudent in operating this debtor in possession.

5 | Your Honor, for the reasons that we stated in our
6 | papers, the undisputed evidence that Your Honor has heard
7 | today, and the arguments, we'd ask that the motion be denied.

8 | THE COURT: Thank you, Ms. Jones. Mr. Connolly,
9 | would you like to respond?

10 | MR. CONNOLLY: Yes, sir, just briefly. Thank you
11 | very much.

12 | THE COURT: Certainly.

13 | MR. CONNOLLY: Your Honor, I'll keep it brief. To
14 | start where we began, Your Honor, first we would ask the Court
15 | to enter an order allowing the 503(b)(9) claim as stipulated to
16 | by the debtors in the amount of 206,322.07.

17 | We would further ask that the Court enter an order
18 | requiring the payment of same.

19 | And I think the last question I asked Mr. Stengel was
20 | most interesting to me in that we -- in terms of the
21 | discrimination component, there, in fact, is discrimination
22 | between similarly situated creditors. And we think that that
23 | is, itself, a hardship, and that is in itself prejudice.

24 | And interestingly, there is no case law, as Ms. Jones
25 | indicated, that talks about this discrimination concept. Well,

42

1 of course, there isn't because there -- 503(b)(9) is brand new

2 and there has not been any case law discussing the exact

3 relationship between 503(b)(9) claimants and those holding a

4 503(b)(1) claim.

5 And so we'd respectfully request that the Court enter

6 an order authorizing and directing the immediate payment of the

7 amounts of 503(b)(9) claim, as well. And obviously, Your

8 Honor, also allowing that claim as stipulated to by the

9 debtors.

10 Thank you, Your Honor.

11 THE COURT: Thank you. Mr. Soll?

12 MR. SOLL: Thank you, Your Honor. First, I would

13 just like to point out to Your Honor that the reference in 502

14 -- 5.2 of the ratification agreement that is relied upon by Mr.

15 Connolly in saying that the DIP financing arrangements

16 contemplate and permit this payment is erroneous and also taken

17 out of context.

18 The definition of borrower as referred to in that

19 document, in each instance if the Court refers to the first

20 paragraph of the ratification agreement, borrower is defined as

21 being the debtor and the debtor in possession.

22 So, this section contemplates matters pertaining to

23 the operation of the business of the borrower as debtor and

24 debtor in possession. I believe just -- it's beyond dispute

25 that the goods that are in question here relate to pre-petition

43

1  transactions of the pre-bankrupt borrowers.  So, the reference

2  to 502 or the conclusion that he reaches with respect to 502 is

3  not accurate.

4        It's also taken out of context.  Because the

5  ratification agreement is incorporated into and part of the DIP

6  financing order.  So, the order in Section 1.2 has a clear

7  statement that says that the debtor shall not use the proceeds

8  of any loans for the payment of claims or expenses that are not

9  otherwise provided for under the financing agreements and the

10 budget unless in each instance the debtors receive the prior

11 written consent of agent and approval from the Court with

12 respect to such expenditure.

13       Now, Mr. Stengel's testimony was quite clear that the

14 IMASA indebtedness was not included in the budget.  And for

15 that matter, none of the other 503(b)(9) expenses are included

16 in that budget.

17       The DIP financing order is also clear, and the Court

18 has made a finding in that respect, in Section E-4 of that

19 order, which is on Page 11, that the -- and I'm quoting from

20 the last sentence of that paragraph.  "Agent and lenders are

21 relying upon the debtors' compliance with the budget in

22 accordance with Section 5.3 of the ratification agreement and

23 this order in determining to enter into the post petition

24 financing arrangements provided herein."

25       So, my client has reviewed the budget, relied upon

44

1  it, made advances in good faith in connection with this order
2  which included the right to have the ability to consent to
3  payments that are outside of the budget.

4          The testimony is also quite clear that if the Court
5  were to grant this type of relief for similarly situated
6  creditors, that the debtor would not have the ability to pay
7  those claims and would be unable to continue their operations.

8          I think, Your Honor, when you take all those
9  considerations into account, and I will simply adopt Ms.
10  Jones's comments as it relates to hardship of IMASA, and the
11  failure to demonstrate that they would suffer hardship.  That
12  it becomes quite clear in exercising your discretion that the
13  motion should be denied.

14          Thank you.

15          THE COURT:  Thank you.  Mr. Connolly, I just have one
16  brief question for you.  And obviously I also want to give you
17  an opportunity if you'd like to respond to Mr. Soll's comments.

18          MR. CONNOLLY:  I had -- yes, sir, I did have one
19  point to respond.  So, I'm happy to do that at your direction,
20  Your Honor.

21          THE COURT:  Okay.  My question is this.  If I allow
22  immediate payment to IMASA on its motion, doesn't it follow
23  that then I have to allow everyone else's payment?  Or else I
24  am discriminating on top of discrimination, according to your
25  conceptualization of this situation --

45

1              MR. CONNOLLY:  Your --

2              THE COURT:  -- in the Statute.

3              MR. CONNOLLY:  Your Honor, I think that's correct.

4  That is to say this category of claimants, we're the first ones

5  out of the box, so we're the first ones here.  And I think we

6  have demonstrated the requirements or the elements of getting

7  paid more rapidly than pursuant to our plan.

8              However, I think the Court's right that this is a

9  category of claims, and I can't argue with that point.  That

10  this is a category of claims that Congress has chosen to

11  basically make pari passu.

12              On the other hand, it sort of puts all of the

13  administrative claimants, and this is really the reason why I

14  asked Mr. Stengel this question, I thought it was interesting

15  that availability is down to a million seven.  All of the

16  administrative claimants, this discrimination concept and this

17  whole issue of risk and administrative insolvency and just the

18  entirety of the case is interesting to me because we have a

19  class of claimants who are being deferred and who are

20  apparently not favored by the debtors, or not deemed important

21  by the debtors.  And yet you have a class that are deemed

22  important and, therefore, they're getting paid more currently.

23  And that's really the discrimination concept.

24              Your Honor, one other quick point on the DIP.  Our

25  point on the reference to Section 5.2 is that -- as I think

1 admitted by the debtors in the answer to the reclamation

2 complaint, and certainly as proposed by the debtors as I

3 understand it in today's sale, they're taking the material --

4 the raw materials and to the extent still extant, selling them

5 -- selling those raw materials to the buyer. And thus, it is

6 attributable to the operations of the debtors. And so -- it

7 being the raw materials.

8 And so I'm -- I don't think I fully agree with

9 counsel's comments in terms of the application of 5.2, and that

10 was the one point I did want to make that I think it does fall

11 within that rubric of a 5.2 other than situation.

12 With that, Your Honor, I have no -- nothing further,

13 unless the Court has additional questions.

14 THE COURT: I have no further questions for you.

15 Thank you, Mr. Connolly.

16 MR. CONNOLLY: Thank you, Your Honor.

17 THE COURT: Well, the Court is certainly prepared to

18 enter an order allowing the claim in the amount specified by

19 the parties, that's not an issue.

20 And as far as the timing is concerned, I think on

21 this one, I would like to reserve decision and issue an opinion

22 as promptly as I can. And I do expect it to be fairly prompt.

23 MR. CONNOLLY: Thank you, Your Honor.

24 THE COURT: Thank you, sir.

25 MS. DAVIS JONES: Your Honor, going back to our

1 | agenda then.

2 | THE COURT: Yes.

3 | MS. DAVIS JONES: That would bring us to matter 11,
4 | the U.S. Ring Binder motion for an administrative expense
5 | claim. Your Honor, we have resolved that matter. And there
6 | will be a stipulation between the parties that we will submit
7 | to the Court under certification of counsel, if that is
8 | satisfactory to the Court.

9 | THE COURT: That is satisfactory. Thank you.

10 | MS. DAVIS JONES: Your Honor, with respect to matter
11 | 12, the motion of D.M. Sales, we have agreed to continue that
12 | matter to the September hearing.

13 | Matter 13, Your Honor, is on the agenda. Because
14 | this is our sales procedures motion. And Your Honor may recall
15 | that in connection with granting the -- approving the sale
16 | procedures, that you also approved on an interim basis the
17 | inventory, advances, liens and superpriority administrative
18 | claims that went along with that.

19 | Your Honor, we'll be taking that up and seeking final
20 | approval of that in connection with the sale.

21 | THE COURT: Okay.

22 | MS. DAVIS JONES: Your Honor, I think while there's
23 | one other matter, and maybe I should jump over 14 for a second.
24 | Your Honor, Mr. Connolly mentioned that we had our adversary
25 | status conference on agenda for today. Your Honor, we noted

1 that it would be a brief status conference, and I think that's

2 an accurate comment because -- unless Mr. Connolly disagrees

3 with me, what we've agreed to do, Your Honor, is to basically

4 get through the WearEver sale, get on the other side, and then

5 continue our quality of conversations and see if we can come up

6 with a discovery schedule and so forth and present a scheduling

7 order to the Court.

8          THE COURT:  Mr. Connolly?

9          MR. CONNOLLY:  Yes, sir, that -- I'm sorry, Your

10 Honor.  That's accurate.

11          What I thought, Judge, is that we'd come back on

12 October 11, and that will be after the closing, we hope, of the

13 WearEver sale, it will be after the Committee either asserts or

14 does not have claims against Madeline pursuant to the

15 stipulations.  And we'll have a little bit better sense of

16 where we're going in the case and it struck both of us that it

17 would make more sense to deal with discovery, timing, process

18 issues in light of those events and, therefore, if the Court

19 would allow us to simply roll this to October 11, that would

20 seem to us to make the most sense.

21          THE COURT:  That does make sense.  Of course.  I

22 agree with --

23          MR. CONNOLLY:  Thank you, Judge.

24          THE COURT:  I agree with you.  And while I've got you

25 up here --

49

1          MR. CONNOLLY:  Yes, sir?

2          THE COURT:  -- Mr. Connolly, will you be submitting

3   the order that I mentioned on the allowance of the

4   administrative claim under a certification?  Is that how we'll

5   proceed?

6          MR. CONNOLLY:  Yes, sir.  Mr. Werb and I will take

7   care of that.

8          THE COURT:  Thank you.

9          MS. DAVIS JONES:  Your Honor, and I trust I'll see

10  that order before Mr. Werb submit it to --

11         MR. CONNOLLY:  Absolutely.

12         THE COURT:  Okay.

13         MS. DAVIS JONES:  Your Honor, so I think for

14  housekeeping purposes --

15         THE COURT:  Thank you.

16         MS. DAVIS JONES:  -- then we would roll the adversary

17  status conference -- the adversary to a status conference on

18  October the 11th.

19         THE COURT:  Yes, that's fine.  That's acceptable to

20  the Court.

21         MS. DAVIS JONES:  Your Honor, that leaves us with one

22  matter and a very important matter on the agenda, and that is

23  the seeking Your Honor's approval of the WearEver sale.  Your

24  Honor, I suppose now is the time to take advantage of Your

25  Honor's offer and to take a break.  And I didn't know what Your

1  Honor had in mind in terms of timing of that and so forth.

2          THE COURT:  Give me a sense of how long you think --
3  I have -- I have a lot of time this afternoon.  So, I don't
4  want to hurry the parties.  I'd like the discussions to be
5  fruitful and to allow that to take place, whether it's here or
6  back in someone's office.  So, depending upon the number of
7  people -- number of people who will be participating.  And we
8  could -- I don't even know what time it is.  It's 20 after 11.
9  If we came back -- I see Mr. Kortanek arising to make a
10  suggestion.  Yes, Mr. Kortanek?

11          MR. KORTANEK:  Your Honor, thank you for recognizing
12  me.  Steve Kortanek with Klehr Harrison for Regal Ware, Inc.

13          Mr. Galardi is here, he represents Tefal -- or SEB,
14  rather, the winning bidder.  And we chatted very briefly about
15  this topic, whether it would be fruitful to have some dialogue
16  about a possible resolution.

17          And I want to be candid to the Court that we're not
18  sure that there will be any common ground.  For example, one
19  thing that we'd be willing to talk about would be a transition
20  plan.  But we, frankly, don't -- from our client's standpoint,
21  don't see a way to consent to the assignment.  My client
22  representative is here and will correct me.  But -- though I
23  don't -- while we're always willing in the abstract to talk
24  about a deal, I just don't know if it would be fruitful at this
25  point.

51

1           THE COURT:  Okay.

2           MR. KORTANEK:  So, I wanted to tell Your Honor that.

3           THE COURT:  Mr. Galardi, good morning.

4           MR. GALARDI:  Good morning, Your Honor.  For the

5    record, Gregg Galardi on behalf of SEB.

6           Your Honor, as you're aware in the asset purchase

7    agreement, hopefully Your Honor will approve today that we are

8    the highest and best bid, and we inherited the Regal problem

9    and also the $2 million deduction.

10          I did, in fact, ask Mr. Kortanek, understanding where

11   Your Honor was coming from, whether there would be any value to

12   having a conversation with the debtors or with us.  I think Mr.

13   Kortanek has advised us that short of a termination of this at

14   some future date, there's really nothing to resolve this issue.

15          THE COURT:  Okay.

16          MR. GALARDI:  So, although we would, again, be

17   willing to talk.  Again, Mr. Kortanek and I don't believe

18   there's probably much time.  Because I think as an inheritor of

19   the agreement, there will either be two million less in

20   purchase price to pay or there will be two million to pay,

21   depending upon how Your Honor rules.  And I think the parties

22   understood that when they signed the agreement and are prepared

23   to go forward based upon that unfortunate state of facts.

24          THE COURT:  Okay.  Thank you, Mr. Galardi.

25          Give me a sense, if you will -- I assume we're going

1  to have witnesses and probably -- do you think the hearing will
2  take the bulk of the afternoon, Ms. Jones?

3        MS. DAVIS JONES:  Your Honor, we only have the one
4  objection.

5        THE COURT:  Yes.

6        MS. DAVIS JONES:  And that is by Regal Ware.  We do
7  have an issue that arose at the end of the auction yesterday
8  that I think parties are going to want to talk about, they've
9  not filed a formal objection.  But I think there will be issues
10  that we need to talk about there, as well.

11        THE COURT:  Okay.

12        MS. DAVIS JONES:  And, Your Honor, we will have a
13  number of witnesses that need to be presented between the
14  various constituencies.

15        I'm hopeful, though, Your Honor, we're talking
16  something in the two- to three-hour range tops.  But it's
17  unfortunate that I'm hearing that discussion doesn't appear
18  that it would be helpful.  It kind of leaves the debtor in a
19  difficult position and I hope -- I had hoped we would be able
20  to reconcile this.

21        Your Honor, my suggestion would be that we do take at
22  least a brief break.

23        THE COURT:  Yes.

24        MS. DAVIS JONES:  Let people talk a little bit,
25  mechanically everybody get their stuff together, and then go

53

1 forward.

2       THE COURT:  Okay.  Well, given the number of bodies
3 there are to move around, and the time, and hopefully there
4 will be some discussions, I'm going to suggest that we recess
5 until one o'clock.  That will give people an opportunity also
6 to eat lunch -- and Mr. Galardi is coming back.  A problem with
7 the recess?

8       MR. GALARDI:  Yes, Your Honor.  I do end up losing
9 one of my witnesses at one o'clock.  He has business meetings,
10 hopefully on this transaction.  And then we also have issues
11 with SEC and the same sort of thing in France that will be
12 close of business and situations.  So, I hate to push this
13 matter --

14       THE COURT:  Can you take your witness out of order?

15       MR. GALARDI:  We could certainly -- it is a short --
16 it is a short proffer on the bona fides of the offer.  It goes
17 to the good faith finding that we'll ask Your Honor to make.

18       We can certainly proffer him up.  It's very limited
19 to the Regal issue.  We can certainly do that.  But to the
20 extent that we can proceed sooner rather than later, I would
21 very much appreciate it.

22       THE COURT:  Okay.  Well, then let me make it a more
23 limited opportunity to resolve this.  Let's come back at noon,
24 and then we'll proceed at noon so people can use that time as
25 they wish.

1             And I do have, as I suggested, a jury room available,
2    if parties would like to speak privately.  Or you can obviously
3    make use of whatever room there is outside the courtroom.

4             Thank you.  So, we'll stand in recess until noon.

5             (Recess 11:23 A.M./Reconvene 12:06 P.M.)

6             THE COURT:  Please be seated.  Ms. Davis Jones?

7             MS. DAVIS JONES:  Your Honor, I have learned in this
8    business that timing is everything.  And unfortunately the
9    first three-quarters of the break, there weren't really many
10   conversations and people were unavailable.  We've started just
11   to have some conversation, and now I think we need the five
12   minutes, Your Honor.

13            THE COURT:  Okay.

14            MS. DAVIS JONES:  If that's possible.

15            THE COURT:  Absolutely.  Take as long as you need.
16   Just have someone let us know when you're ready.

17            MS. DAVIS JONES:  Thank you, Your Honor.

18            THE COURT:  Thank you.

19            (Recess 12:07 P.M./Reconvene 12:21 P.M.)

20            THE COURT:  Please be seated.  Okay.  Well, we're up
21   to Item Number -- what is it, 14 on the agenda?  And I know
22   that Mr. Galardi has a witness with a time problem.  And it
23   probably would be helpful first to hear from you where we are
24   and then proceed with the testimony.

25            MS. DAVIS JONES:  Thank you, Your Honor.  Your

55

1  Honor, we did use the last five to ten minutes, some ideas were

2  circulated.  But, Your Honor, we're not in a position at this

3  point to tell Your Honor that we've resolved any issues.

4       Your Honor is correct, we're on Number 14 on the

5  agenda of the sale motion.  And if I may, Your Honor, I think

6  it may be helpful for me to spend about ten minutes just to

7  tell Your Honor where we are, and then I do realize we need to

8  take one witness out of order --

9            THE COURT:  Yes.

10           MS. DAVIS JONES:  -- and we can do that.

11           THE COURT:  Thank you.

12           MS. DAVIS JONES:  Your Honor, as I mentioned earlier

13  today, the WearEver Debtors that are selling substantially all

14  of their assets are Mirro Acquisition, Inc., Mirro Puerto Rico,

15  Inc., and Mirro Operating Company, LLC.

16           Your Honor, as described in our papers and at the

17  sale procedures hearing, the debtors lack sufficient cash flow

18  or financing to enable them to operate their businesses going

19  forward beyond the near term.  And the debtors determined to

20  sell the business as a going concern and, indeed, marketed the

21  WearEver Debtors' businesses, including the equity or assets of

22  their non-debtor foreign affiliates for sale.

23           Your Honor may recall that Brett Lowrey of Houlihan

24  -- I made an offer of proof of his testimony at the sale

25  procedures hearing.  And he is here, and if necessary, would be

1  called to testify.

2      But, again, Your Honor, just for completeness of the

3  record, he would tell Your Honor that the sales process began

4  in May.  That they prepared in-depth offering materials.  That

5  also Houlihan provided prospective buyers with access to an on-

6  line data room.  That they identified and approached more than

7  60 potential strategic and financial buyers, that there were

8  confidentiality agreements sent to approximately 20 buyers, and

9  approximately 15 of those requested and received offering

10  materials.

11      Your Honor, on July 7, the WearEver Debtors entered

12  into an asset purchase agreement with Lifetime Brands, and that

13  was attached as Exhibit A to our sale motion.

14      We brought the agreement before the Court and sought

15  the approval of the bidding procedures for sale with Lifetime

16  Brands as our stalking horse.  And the Court entered an order

17  approving those bidding procedures on July 14, and also

18  approving on an interim basis the inventory advance provisions,

19  the lien and a superpriority administrative claim, all

20  associated with that inventory advance.

21      We served the sales procedures order on the

22  interested and affected parties.

23      Your Honor, the notice set forth in the sale

24  procedures order set forth today as the hearing date for the

25  sale, set August 1 as the deadline for objections, and August 3

1  as the deadline for qualified bids.

2         We received one response and one objection to the
3  sale.  The response was filed by Perot Systems, reserving their
4  rights on issues discussed with this Court on several
5  occasions.  And that response has now been withdrawn by the
6  parties resolving their issues and adding language to the
7  proposed sale order, which I'll come back to later on in our
8  hearing.

9         I would also note, Your Honor, that we agreed with a
10 number of other folks on what I would call informal objections
11 or informal responses, namely the reclamation creditors, and so
12 forth, to change language in the proposed sale order so that
13 they could reserve their rights and clarify positions for going
14 forward in the case.  And we will also discuss those with the
15 Court when we get to the point of being able to present the
16 Court with the proposed order, I hope.

17        Your Honor, the objection we received was filed by
18 Regal Ware.  Your Honor heard quite a bit about it already, but
19 also during the discovery and scheduling hearing that we held
20 yesterday, with the objection being that Regal Ware objects to
21 the assumption and assignment of the Regal Ware sub-license
22 agreement and refuses to consent to our transfer of that
23 license.  And I'm going to come back to that in a moment, as
24 well, Your Honor.

25        With respect to the bids, we received one competing

1 bid.   That bid was submitted by SEB.   It was a qualified bid,
2 and we proceeded with what I would consider a spirited auction
3 yesterday at our offices here in Wilmington.

4          The auction resulted in an increase in the purchase
5 price from 21 million, as Your Honor may remember was reflected
6 in the asset purchase agreement, to SEB proposing to pay $35.1
7 million, plus a breakup fee to Lifetime Brands of $650,000,
8 plus satisfaction of the inventory advances.

9          Your Honor, I would note that SEB has also agreed to
10 pay 750,000 for the assets that were excluded assets.   They're
11 assets that we have at our Nuevo Laredo facility in Mexico,
12 which are owned by a non-debtor entity.

13          Your Honor, I have a copy of the transcript of the
14 auction that was provided to me by the court reporter last
15 evening.   And what I'd like to do is submit that to the Court
16 and move it into evidence, if I may.

17          THE COURT:   Yes, thank you.   Any objections to that
18 being admitted?

19                    (No audible response heard)

20          THE COURT:   Okay, fine.   It is admitted then, Ms.
21 Jones.

22          MS. DAVIS JONES:   Thank you, Your Honor.   And for
23 purposes of housekeeping, I have marked it as Debtors' Exhibit
24 1, if I may approach?

25          THE COURT:   Thank you.

59

1                              (Pause)

2          THE COURT:  When Mr. Galardi is involved, it's always

3  active and spirited.

4                             (Laughter)

5          MR. GALARDI:  You can take judicial notice of that,

6  Your Honor.

7          THE COURT:  Yes.

8          MR. GALARDI:  We're not done yet, Your Honor.

9          MS. DAVIS JONES:  Your Honor, at the sale procedures

10 hearing, I made an offer of proof also of Mr. Lowrey with

11 respect to the Lifetime asset purchase agreement being heavily

12 negotiated at arm's length with each side having its own

13 counsel, and there's been no issue about that, Your Honor,

14 raised.

15         The competing bid of SEB was based off that asset

16 purchase agreement that we had from Lifetime.  And, indeed, SEB

17 took the contracts as they found it, with no material changes,

18 except to increase the purchase price

19         Your Honor, the debtors, along with the Creditors'

20 Committee and the Wachovia Bank group, agreed that the bid of

21 SEB as described is the highest and best offer for the assets.

22         With respect to the objections, Your Honor, as I

23 referenced earlier, we do have the one objection that remains

24 open, that is Regal Ware.  And, Your Honor, we received some

25 insight onto that objection last evening when a document was

60

1  filed at the Court's direction for them to outline what the
2  basis of the lack of consent is. And, Your Honor, we'll
3  respond to that objection after we hear from Regal Ware.

4       Your Honor, depending on what is presented, I expect
5  we will have testimony and argument to present by both the
6  debtors and SEB as well maybe by others, the Creditors'
7  Committee and the bank group.

8       Your Honor, I did mention, as well, that one other
9  issue crept up at the auction. It's not an issue, we believe,
10 of the debtors or relating to the debtors, but it does put the
11 debtor in a little bit of a position, and it's an issue that's
12 been raised by Lifetime at the end of the auction about their
13 concerns with the financial advisor to SEB. I'm going to let
14 the parties, to the extent they wish, raise that with Your
15 Honor. There's been no papers filed in connection with that.
16 But I understand that parties to want to talk to Your Honor
17 about that.

18      So, Your Honor, I think at this point, and I -- and I
19 know Mr. Galardi's witness does have a time commitment. We're
20 at the point where we can take Mr. Galardi's witness out of
21 order and work through that, or we can have the issue that was
22 just raised put on the record.

23      So, Your Honor, I'll yield and let others figure out
24 what they want to do.

25             THE COURT:  Okay.

1           MS. DAVIS JONES:  Thank you.

2           THE COURT:  Mr. Galardi, yes, sir?

3           MR. GALARDI:  Your Honor, because there's been some

4  interesting developments, and I think my client is more

5  interested in hearing what has happened in the last few

6  minutes, I would defer my witness until later on in the day and

7  he'll make other arrangements perhaps.  Because I think what

8  Lifetime has to say, what Regal does will have a great bearing

9  on what our testimony will be.

10          THE COURT:  Okay.  That's fine.  Thank you, Mr.

11  Galardi.

12          MR. HERMAN:  Good afternoon, Your Honor.  Neil

13  Herman, Morgan, Lewis and Bockius representing Lifetime Brands.

14          Your Honor, I was previously admitted pro hac to

15  appear in this case at the bidding procedures hearing.

16          THE COURT:  Yes, sir.  You may proceed.

17          MR. HERMAN:  Thank you, Your Honor.

18          Your Honor, I have a tale of whoa to tell the Court

19  today.  But then at the end, I'm going to give you some

20  practical suggestions as to some ways you may, as a court of

21  equity, resolve the issues.  So, we're not here to just throw

22  Molotov cocktails, we're also here to give some relief to the

23  committees, the bank and the debtor.

24          Let me just start, Your Honor, by correcting one

25  misstatement by debtors' counsel.  Debtors' counsel said that

1  at the end of the auction, Lifetime Brands raises some issues.

2  If you take out the transcripts, it's actually Page 9, we

3  raised the issue before the auction even commenced.  And then

4  everyone reserved their rights and thought that it made sense

5  to continue the auction.  In fact, to commence the auction, the

6  auction -- the bidding had not started yet, and to see if

7  Lifetime Brands won, then the issue would be moot.  And if

8  Lifetime Brands lost, the issue was reserved.

9       So, it was not raised at the end of the auction.  It

10  was raised before the auction even commenced, it's Page 9 of

11  the transcript.

12       Here's the issue, Your Honor.  Lifetime Brands was

13  selected by the debtor as the stalking horse.  And late last

14  week, SEB submitted a competing bid.  The auction was held

15  yesterday here in Wilmington, Delaware.  We showed up, and

16  sitting right across from us, right across from Lifetime at the

17  auction is Citigroup, the investment banker for Lifetime

18  advising SEB, our competitor.  Now, why is this relevant?  So

19  what, you may ask.

20       Well, let me explain.  Citigroup has been Lifetime's

21  investment advisor on all significant matters going back as far

22  as 1999.  And within the past 12 months alone, Citibank and

23  Citigroup have advised Lifetime on a $75 million convertible

24  note private placement.  In June of '06, just five weeks ago,

25  and keep that in mind because we're going to come back to that

1 in a minute, also secondly, an offering of two and half million

2 shares of common stock of Lifetime Brands underwritten by Citi.

3 And, three, various bids and acquisitions, including Lifetime's

4 bid in 2005 for a company called World Kitchen.

5          Again, Your Honor, someone might say, so what?  You

6 share an investment advisor.  Well, it gets a lot worse, let me

7 explain.  When Lifetime did the $75 million note conversion

8 with Citibank doing the private placement just five weeks ago,

9 Lifetime discussed in detail all of its confidential and

10 proprietary information, its cash position, its available cash

11 and finances, and its investment strategies.  And specifically

12 --

13          THE COURT:  Mr. Herman, excuse me.  Mr. Galardi has

14 stepped to the podium.

15          MR. GALARDI:  Your Honor, unless Mr. Herman wants to

16 take the stand, I'd like to have a witness on this.

17          MR. HERMAN:  Your Honor, he can have a full

18 opportunity to respond as soon as I'm done.

19          THE COURT:  Do you have a witness available who would

20 be --

21          MR. HERMAN:  I can make a witness available, Your

22 Honor, if we can have a witness here this afternoon, if you

23 want.

24          THE COURT:  Mr. Galardi?

25          MR. GALARDI:  Your Honor, I'd like to have a witness

1  if he's going through facts.  I think there's a tale at the end

2  of the story, and I'd rather he get there, whether we need to

3  take the Court's time on the witness.

4         MR. HERMAN:  Your Honor, we need to hear the tale to

5  understand the proposal we're going to make at the end.

6         MR. GALARDI:  Then, Your Honor, I'll stand on I'd

7  like to have a witness testify to all these facts.

8         THE COURT:  Well, we have an objection from Mr.

9  Galardi.  And I think, under the circumstances, rather than we

10 be repetitive, it would be helpful if we did have a witness who

11 would be here to testify under oath.

12        MR. HERMAN:  Your Honor, the argument I'm making now

13 is in the nature of oral argument.  This is not in the nature

14 of a factual submission to the Court.

15        THE COURT:  But there's no motion really before the

16 Court upon which to make oral argument.  And is it possible for

17 you to get to the end of your -- of the point you're making,

18 perhaps?  And then we can follow-up with testimony, if need be.

19        MR. HERMAN:  Yes.

20        THE COURT:  Okay.

21        MR. HERMAN:  Great.  And it's interesting, Mr.

22 Galardi comes up at the key point, which is the very next

23 statement.  Your Honor, the very person that we told that we

24 were interesting in buying the WearEver assets and telling him

25 how much money we were going to spend is the exact same person

65

1  sitting across from us at the auction yesterday.  And that's
2  the key fact.

3          Now we can skip the whole factual story.  And as a
4  legal matter, what we have here is a competitor who's got the
5  same exact person who comes to our offices and hears our
6  stories and hears our interest in the acquisition and knows
7  everything about us now whispering in the competitor's ear at
8  the auction.  So, he knows our top number at the auction.

9          Therefore, the auction, Your Honor, was not proper.
10 It was not fair.  There was not just a thumb on the scale,
11 there was a brick on the scale tipping in favor of SEB.  They
12 have, in essence, tapped our phones or broke into our office
13 and stole our information.  To know what the other bidder is
14 going to bid at an auction fixes the auction.

15         So, Your Honor, what we are here to say to you today
16 is that the auction cannot be approved today as being fair.

17         However, having said that, and we reserved our rights
18 before the auction started because, again, this issue would
19 have been moot had we won the auction.

20         What we think should happen are one of three things,
21 Your Honor:

22         First, we think the Court should deem SEB not to be a
23 qualified bidder, and the auction improper and declare Lifetime
24 the winner at 21 million.  And let the debtor sue for any
25 damages that it suffered.

1          Alternatively, Your Honor, we can wipe out the last
2   bid over our top number.  The number that they knew that the
3   same person who was at our offices on May 18th was telling the
4   SEB people what our top number was.  So, that would be thirty-
5   five one.  If you knock out their top number, you take the next
6   bid, which is our bid at 35 million.  The debtor, the
7   Committees, the bank, they only lose $100,000.

8          A third alternative, Your Honor, is this:  During the
9   break you asked parties to talk to Regal Ware and see if a
10  consensual resolution could be had.  We used that time that you
11  gave us profitably.  And at this point, Your Honor, I'm
12  prepared to announce that subject to Regal's counsel standing
13  up and agreeing and advising the Court that it is an accurate
14  statement, Regal would consent to the assumption and assignment
15  of the license to Lifetime Brands.  And Lifetime Brands would
16  consent to waive the $2 million purchase price reduction which
17  appears in the asset purchase agreement.

18         Therefore, the bid of Lifetime Brands should be
19  deemed by the Court to be the highest or best bid because it
20  avoids the litigation and possible appeal by Lifetime on the
21  auction.  It avoids the litigation and the appeal and the risk
22  by Regal.  And it also deletes the $2 million purchase price
23  reduction feature.

24         With that, Your Honor, I would surrender the podium.
25              THE COURT:  Thank you.  Mr. Kortanek?

1             MR. KORTANEK:  Your Honor, Steve Kortanek again for

2    Regal Ware.

3             The one key detail in what Regal Ware indicated it

4    would agree to --

5             THE COURT:  Yes.

6             MR. KORTANEK:   -- and what Mr. Herman just recited is

7    that Lifetime would agree that our license, as assumed and

8    assigned, would terminate as of the end of 2006.  Or it's

9    basically a six-month deal.

10            MR. HERMAN:  That's correct, Your Honor.  The

11   agreement we have with Regal is that they would waive their

12   objection as it relates to Lifetime if Lifetime wins, provided

13   Lifetime agrees to a six-month license that would terminate in

14   six months from Regal.  And that is accurate.

15            THE COURT:  Okay.

16            THE COURT:  Thank you, Mr. Herman.  Thank you, Mr.

17   Kortanek.  Mr. Galardi?

18            MR. GALARDI:  Your Honor, although I'm often in the

19   debtor's role, I sort of would like to hear what the debtors

20   have to say about this.  Because I think I've heard two things:

21            One is the debtors have still deemed our bid of 35.1

22   the higher and better bid.  So, I assume that they don't want

23   Option Number 1, strike all the bids and be 21, that seems to

24   me obvious.

25            Second, Your Honor -- and I think if Your Honor looks

68

1  at the transcript, and, again, I don't need a witness for this.

2  Because the debtors actually offered something for waiving the

3  exact condition which we just heard was waived, and it was

4  $100,000.

5      Your Honor, has approved bid increments in the amount

6  of $100,000.  So, even with that waiver, based upon everything

7  we said at the auction yesterday, that bid is not a higher and

8  better bid without us waiving a condition.  It simply matches

9  and doesn't constitute an overbid.

10      Finally, what I don't think you heard, Mr. Herman,

11  and he was very clear about not saying is they have threatened

12  the good faith.  And we dispute the facts, we have a witness

13  here if we need to put on witnesses, about all the things that

14  we're somehow tapping their phones or anything like that.

15      The fact of the matter, Your Honor, is if you read

16  this transcript, there was 86 to 87 rounds of bidding at

17  100,000 increments.  Occasionally I made it a little

18  interesting by putting a thousand and one or just to break up

19  the monotony.  But at the end of the day, there was only one

20  dimension this was bid on, and that was price.  And even if you

21  assumed everything that Mr. Herman said as true, which it is

22  not, even if we knew the highest price, the debtors were

23  charged with one thing:  Get the highest price, and we outbid

24  him.  And the auction stopped when they weren't going to a

25  higher price.

1         So, they may have issues with Citibank, they may have
2  issues with financial advisors.  And, frankly, that has nothing
3  to do with our client who would testify that they didn't know
4  about these things.  But we still think even under any of these
5  scenarios right now, we are still the highest and best bidder
6  and have nothing more to do than to say let's go forward with
7  this hearing.  And I'd like to hear Mr. Herman says, well, if I
8  get one or two or three, and I'm sure the debtors, I'm not
9  going to appeal this reservations of rights, I've participated
10 in this auction, we made everybody sit there for six or seven
11 hours, bidding at a hundred increments only to come back
12 tomorrow to threaten, and now to go out and cut a deal on
13 consent, that he wants to say is greater than the bid
14 procedures and still challenge us on a 363(m) finding.

15        I think that's totally unfair, and I would turn to
16 the debtors as to what their determination is to do before we
17 actually respond to this.

18        THE COURT:  Okay.  Ms. Jones?

19        MS. DAVIS JONES:  Your Honor, the debtors stand by
20 their position, that they ran an integral auction yesterday.
21 We abided by this Court's procedures with respect to the sale
22 procedures.  We ran that auction.  It did run for a number of
23 hours.

24        Your Honor, there's a lot of assertions here.  I
25 haven't heard any facts in evidence.

70

1          But more importantly, Your Honor, this seems like an
2     issue between parties other than the debtor.  And,
3     unfortunately, the debtor is getting squeezed.

4          So, Your Honor, I think we have no choice but to go
5     forward with the hearing.

6          THE COURT:  Okay.  Mr. Herman, anything further?

7          MR. HERMAN:  Yes, Your Honor, just because I can't
8     help myself.  Um, Your Honor, Mr. Galardi concedes that
9     Lifetime Brands has reserved its rights on this issue at the
10    start of the auction, and then continued to participate in the
11    auction.  And that's the whole point of a reservation of rights
12    is that so when you participate, you haven't waived your
13    rights.

14         The record also says that they agreed and they
15    reserved their rights.  So, that's not even remotely relevant.

16         363 of the Code also says that a sale by the debtor
17    is not authorized until a court enters an order.  So, there
18    have been many cases, including many in this Court, where I
19    have been on both sides of this when the auction's over, and
20    you show up in court and the judge says, any objections, and
21    somebody in the back of the room raises their hand and says a
22    hundred and two million.  And the judges always say, it's my
23    job to maximize the recovery to the estate.

24         So, Mr. Galardi seems to be relying on a technicality
25    that the auction is over.  The auction was fixed.

71

1           Secondly, we reserved our rights.

2           So, the issue, I think, at this point now is whether

3   the $35 million with Regal consenting to the assignment to

4   Lifetime is higher and/or better than the 35.1 of SEB where

5   there is no consent and a risk, and we'd like to hear what the

6   debtors' view is on that.

7           THE COURT:  Ms. Jones, if you would like to respond,

8   you're welcome.  But I'm not instructing you to.

9           MS. DAVIS JONES:  Thank you, Your Honor.  Somehow,

10  Your Honor, I feel that the debtor here is just being put in

11  the middle of a ping-pong match.  And we're being negotiated

12  with in front of the Court, which I think is totally

13  inappropriate.  The debtor will not respond.

14          THE COURT:  Okay.

15          MS. DAVIS JONES:  Thank you.

16          THE COURT:  All right.  You know, it's obviously the

17  function of the Court to make certain that the auction is

18  fairly conducted.  And I think what I'd like to do, and I hate

19  to do it, but I think I'd like to go back and read the

20  transcript first before we proceed.  And then I think I would

21  want Mr. Galardi to put on his witness on the good faith issue,

22  which I think may sort of flesh out some of the issues that

23  have been raised here and get into some of the facts that Mr.

24  Herman was alluding to.

25          I don't think I need a lot of time to review the

1  transcript, but I think it would be helpful and in the interest
2  of everyone if I were to do so, for perhaps ten minutes.

3          So, let's take a ten-minute recess.  I'm going to
4  read the transcript, and then we'll resume.

5          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          (Recess 12:44 P.M./Reconvene 1:01 P.M.)

8          THE COURT:  Please be seated.

9          MS. DAVIS JONES:  Your Honor, I have to tell you
10  again, it's a timing thing.

11          THE COURT:  Okay.  I'm bad -- my timing has never
12  been great.

13          MS. DAVIS JONES:  I walk away, I'm here, I'm
14  available, nobody talks to me.  His Honor is coming in and
15  everybody wants to talk to me.

16          THE COURT:  Well, maybe that's what promotes it.  I
17  don't know.

18          MS. DAVIS JONES:  So, I think we need to have you
19  come in and out more often.

20          Your Honor, can we possibly have five minutes?

21          THE COURT:  As much as you need.

22          MS. DAVIS JONES:  Thank you.

23          THE COURT:  Because it's a difficult issue, I
24  recognize.  And -- so, certainly.

25          MS. DAVIS JONES:  Thank you, Your Honor.

1          THE COURT:  Just let us know when you're ready.

2          MS. DAVIS JONES:  We will.  Thank you.

3                    (Recess 1:02 P.M./1:09 P.M.)

4          THE COURT:  Please be seated.  Ms. Jones, what's the

5    latest?

6          MS. DAVIS JONES:  Thank you, Your Honor.  Your Honor,

7    there were some questions and answers, but unfortunately we

8    didn't make any progress.  So, I think we're in a position of

9    going forward.

10          THE COURT:  Okay.  Thank you.  Ms. Levine?

11          MS. LEVINE:  Your Honor, on behalf of the Committee,

12   given that our goal here is to maximize asset values, and given

13   that the Court has not yet entered a ruling with regard to the

14   issues before it, it would be our position that the Court

15   reopen and continue the hearing, since we seem to have new

16   developments which may actually result in either better

17   recoveries and/or elimination of a litigation risk.

18          Thank you.

19          THE COURT:  Thank you.

20          MS. DAVIS JONES:  Reopen the --

21          MS. LEVINE:  Apparently I said reopen and continue

22   the hearing, and I meant the auction.

23          THE COURT:  Oh, okay.  Ms. Jones, what's -- do you

24   take a position with regard to that suggestion?  And are you

25   proposing, Ms. Levine, that the auction would proceed from the

74

1  point where it was?

2       MS. LEVINE:  Yes, Your Honor.

3       THE COURT:  Mr. Galardi?  Let Mr. Galardi speak.

4       MR. GALARDI:  Your Honor, just so that I am

5  absolutely clear about what Ms. Levine is suggesting, if the

6  auction -- and I know Your Honor will decide one way or the

7  other.  If the auction is reopened, what I assume that the

8  Committee and the debtor would at least request that Lifetime

9  waive any objection to the procedures at that point, or else

10  we're all just bidding in err.

11       THE COURT:  Of course.

12       MR. GALARDI:  Thank you, Your Honor.

13       THE COURT:  Absolutely.  And that would certainly be

14  a prerequisite to doing so.  I'm just giving Mr. Herman an

15  opportunity to speak with his client.

16       Mr. Herman, do you have a position with respect to

17  the proposal?

18       MR. HERMAN:  Your Honor, I had to talk to my client.

19  The gentleman I was talking to is another attorney at Morgan

20  Lewis.  So, if you want to give me five minutes to call the

21  client?

22       THE COURT:  That would be fine.

23       MR. HERMAN:  If I could indulge the Court one more

24  time.

25       THE COURT:  Before you do, I see Mr. Kortanek.  May

1   as well hear from everyone before we take a recess.

2         MR. KORTANEK:  Your Honor, it's nonsubstantive.

3   Unfortunately at 1:30, I have a very short hearing, it will be

4   ten minutes.  So, you may see me absent when we come back and

5   my associate is here, but I'll be back shortly.

6         THE COURT:  Okay.  And I assume that if that's the

7   case, we may proceed in your absence with issues unrelated to

8   Regal Ware?

9         MR. KORTANEK:  That would be fine, Your Honor.  And I

10  apologize, I made every effort to get out of it, but --

11        THE COURT:  Of course.

12        MR. KORTANEK:  -- unfortunate I know --

13        THE COURT:  I understand.

14        MR. KORTANEK:  I know what the matter is.

15        THE COURT:  Okay.  That's fine.  Why don't we take

16  then another brief recess?  And when you're ready, you'll let

17  us know.  Thank you.

18               (Recess 1:13 P.M./Reconvene 1:20 P.M.)

19        THE COURT:  Okay.  Please be seated.  Mr. Herman?

20        MR. HERMAN:  Thank you, Your Honor.  We spoke to our

21  client and as we see the playing field as it currently exists,

22  yesterday -- yesterday the debtor said that the waiver of the

23  $2 million purchase price reduction would be given a $100,000

24  value.  So, our bid of $35 million, plus the waiver of that

25  condition, is valued at 35.1 and so is the bid of SEB.

76

1          Our bid, however, does not have the risk of an appeal
2    by Regal.  And Regal's bid -- and SEB's bid does have that
3    risk.

4          In addition, we've been advised that SEB is going to
5    put a $2 million in escrow, and we would not be.  So, we don't
6    see why we would reopen an auction when we currently are the
7    highest or best bid.  We would like the Court to just rule on
8    that today.

9          THE COURT:  Okay.  Mr. Galardi?

10         MR. GALARDI:  Your Honor, again, Mr. Herman must not
11   have heard me when I said directly to him that we're not
12   insisting on the two million in escrow.  So, we're not
13   insisting on the two million in escrow.  We have told the
14   debtors that.  I told that to debtors' counsel.

15         With respect to the bid, Your Honor can, again,
16   decide.  Mr. Herman failed to come back on the question that he
17   left for, they're not prepared to waive any objection to
18   363(m).  I wanted the Court to know that.  So, I -- even if
19   Your Honor gives them the $100,000 credit, he's equal.  And the
20   bid procedures clearly provide for 100,000 more.  Even if Your
21   Honor was willing to open the auction, and even if Your Honor
22   was willing to accept that and then put us in the threat of
23   well, but if I don't get my way, I'm going to sue you under
24   363(m) and challenge your good faith finding.

25         I don't think we have to respond at this point.  I

77

1  think our bid is still higher and better.  I turn to the

2  debtors.  But I do want Your Honor to know that Mr. Herman is

3  not waiving any objection to 363(m).  He has not left this

4  courtroom to call his client to bring the witness that he said

5  was available.  And we're prepared to go forward and put on our

6  evidence.

7          Thank you.

8          MR. HERMAN:  Your Honor, even with Mr. Galardi's

9  statement that they're not going to put up the escrow, both

10 bids are worth thirty-five one, and one bid is going to get the

11 consent of Regal, and one is not getting the consent of Regal.

12         So, the debtor needs to tell us whether they value

13 that at more than $100,000 or not.  And that would decide at

14 this point who was highest or best.

15         THE COURT:  Okay.  Mr. Kortanek?

16         MR. KORTANEK:  Your Honor, I -- thank you.  Steve

17 Kortanek again.

18         I wouldn't ordinarily do this, but given the dynamic

19 here, I think it may help the Court to know that Regal would

20 intend to appeal, would seek a stay pending appeal and would be

21 willing to post any security that -- reasonable security that

22 may be required.  The Regal Ware mark and the marks covered are

23 that, it's the house name, it's literally the family name of

24 the third generation family-controlled company.  So, we care

25 very deeply about it and we'll pursue it as far as we can.

1          So, I think to the extent that's relevant, I thought

2     it's incumbent of me to tell Your Honor that, to disclose it.

3          THE COURT:   Thank you.   It's helpful, Mr. Kortanek.

4          Ms. Jones, in this somewhat dynamic situation, would

5     it be helpful to the debtor and your advisors were you to have

6     a few minutes to reconsider what you believe is the highest and

7     best bid?   Or are you prepared to proceed as things sit at the

8     moment?

9          MS. DAVIS JONES:   Your Honor, I think from the

10    debtors' perspective, we have a second issue.   While this could

11    be or may be a higher and better offer, we're concerned about

12    protecting the integrity of our auction.   And so we would --

13    and I hate to bounce the ball into Your Honor's court, but,

14    Your Honor, we're in a position that we ran an auction.   We

15    thought we ran it in compliance with your sale procedures

16    order.   Your Honor has not yet had the opportunity to tell us

17    what you thought about that.   But, Your Honor, while this

18    negotiation is interesting, and I think it may be beneficial on

19    our side, and Ms. Levine is absolutely correct that we could be

20    maximizing value here, I am also, as debtors' counsel,

21    responsible for making sure that we are maintaining the

22    integrity of this process, which I think we did.

23         THE COURT:   And the Court, as well, obviously is very

24    concerned about the integrity of the process.   So, I

25    understand.

1         And I also understand Mr. Herman has not responded to
2    the offer -- the proposal of reopening the auction.  So, I
3    don't know that there's really any weight to be given to Ms.
4    Levine's proposal.

5         Ms. Levine?

6         MS. LEVINE:  Your Honor, just to -- just briefly.
7    The offer that Lifetime Brands has placed on the record today
8    is not the offer as I understood it from the conclusion of the
9    auction yesterday.  And the Committee shares the debtor's
10   concern that the auction -- people took pains to run the
11   auction in accordance with Your Honor's order.  I went formally
12   from a start to a finish time, and the transcript reflects
13   that.  And the offer that's on the table today, which includes
14   a potential settlement with Regal and a potential resolution of
15   an objection to the sale hearing was not a fact that was known
16   to anybody and was not included in the final bid prior to the
17   formal close of the auction yesterday.

18        So, to the extent that Your Honor would allow us to
19   consider the Lifetime Brands offer of -- that was placed on the
20   record this morning, on behalf of the Committee, I would still
21   think that that would require that Your Honor formally reopen
22   and allow us to continue the auction, even just for the purpose
23   of accepting at least that proposal.

24        Thank you.

25        THE COURT:  Mr. Herman?

1          MR. HERMAN:  Your Honor, what Committee counsel said
2   is 100 percent true.  The current proposal by Lifetime Brands
3   was made today, but it was made after Your Honor directed us to
4   go in the hallway and speak with Regal.  So, I don't think we
5   should be penalized for utilizing the opportunity that Your
6   Honor granted the parties.

7          We did meet with Regal and we cut a deal with Regal,
8   and SEB did not.  So, I don't think we should be relying on
9   such a technicality that the auction ended.

10          In addition, we've challenged the veracity of the
11  auction.  Charlie Hadid from Citibank is right here.  I'm going
12  to call him as a witness.  And he's going to tell you, on May
13  18th, he came to our offices.  The auction is tainted.

14          But the debtor needs to make a decision now on what
15  it wants to do.  But I don't think that we should be penalized
16  when Your Honor gave us the opportunity to talk to Regal and
17  cut a deal, and we actually did that.

18          THE COURT:  Okay.

19          MR. GALARDI:  Your Honor, I guess -- I won't stand on
20  the formality.  Everyone has come to us, as Your Honor could
21  well imagine, and asked us whether we would waive that
22  condition or not.  We have not made a decision because --

23          THE COURT:  That condition being the --

24          MR. GALARDI:  The $2 million condition.  We have not
25  waived that condition.  We have obviously talked about it.  But

1  until we know we're bidding against a real bidder who is going

2  to say if this auction were reopened, which we don't believe it

3  should be, they're going to waive the condition and we'll have

4  it right here, right now.  Or he's going to have to put on the

5  evidence and show that somehow there's a challenge to the

6  363(m) and we could have the whole process again.

7          We're prepared to go either way, but there's really

8  nothing for SEB to say other than I'll put my witness on in

9  good faith.  He can bring Mr. Hadid up here, they can testify,

10 Your Honor can decide, but that means the auction is closed.

11          THE COURT:  Correct.

12          MR. GALARDI:  And if the auction's open, then I want

13 to know whether I'm just bidding so that they can continue to

14 raise the price.  Because they're getting a free auction here,

15 they're making me bid more if we're prepared to bid more, on

16 the basis that we have a threat.  And if we do the threat, he

17 walks away.  And remember, Your Honor, these bid procedures

18 require Mr. Herman to keep his bid open as the second highest

19 bid, which you've also heard he doesn't want to commit to that

20 today because he's committing to, well, we're going to reserve

21 our rights, and the whole auction's tainted, and we'll come

22 back and have $21 million.

23          I haven't heard what I think are the key steps to get

24 us to either bid or have the 363 on finding.

25          So, I'm prepared to go forward, but I can't make

82

1  decisions until --

2           THE COURT:  Okay.

3           MR. GALARDI:  -- Your Honor rules or we get those

4  rulings.

5           THE COURT:  All right.  That's fair enough.  I'm

6  prepared to rule.  And my ruling is this: We will -- there are

7  enough issues concerning the bona fides of the auction

8  yesterday -- and I'm not saying one way or the other, but the

9  issues are certainly hanging in the air here -- that I am

10  prepared to reopen the auction and it can be reopened right

11  here in this courtroom, subject to Lifetime's agreement to

12  waive any objections on the 363(m) concerns that it has

13  submitted.

14           So, otherwise I'm prepared to proceed with the sale

15  hearing right now, or to offer -- or I'm offering a reopening

16  of the auction again, subject to the waiver of their objection

17  -- of Lifetime's objection.  Otherwise, we won't have really

18  accomplished anything.

19           Mr. Herman?

20           MR. HERMAN:  Your Honor, you're putting my client in

21  a position where -- and I realize it's not your fault, it's the

22  facts and circumstances we find ourselves in.

23           So, let me rephrase that.  My client is put in the

24  position of having to waive what it believes is a very valuable

25  claim against its investment bankers in order to just bid some

1 more money and then get into a bidding war with another person.

2      We are not prepared to reopen the auction. So,

3 perhaps we should start then the sale hearing, and we'll

4 challenge the veracity of the auction -- the veracity of the

5 363(m) findings. But we're not interested in reopening the

6 auction at this point.

7      THE COURT: Okay. Mr. Galardi?

8      MR. GALARDI: And, Your Honor, I don't want to put

9 words in Mr. Herman's mouth. But I think the issue here, as he

10 said, is no one is here asking his client to waive claims

11 against Citibank. I think Ms. Davis Jones started this hearing

12 with -- and this is how SEB feels. It's a two-party dispute.

13      THE COURT: Correct.

14      MR. GALARDI: Citibank/Citigroup and Lifetime. It's

15 not a dispute with SEB. It's not a dispute -- and we're not

16 asking to waive. So, if that makes Mr. Herman's client any

17 more comfortable to open the auction, I'm going to offer that

18 up, as well. Because no one is asking him to do that. It's

19 just SEB doesn't want to be caught, and we'll stand on the

20 evidence about what we will say and was said to us. We don't

21 want to be caught on the 363 and delay the sale.

22      As the order provides right now, you must close by

23 the 18th without a -- whether or not the order is stayed, and

24 if we don't have a good faith finding, that throws everything

25 in jeopardy.

1          Again, I would note for the record, Mr. Herman has

2   still not said that he's prepared to go forward on his second

3   bid if the debtors determine ours is the first bid and stand by

4   that bid.  And, again, given the kind of conduct we've had, and

5   I'm sure Your Honor already read part of the transcript about

6   Morgan Lewis, we're reserving our rights on his 363(m) finding,

7   and he doesn't even have a client here.

8          So, we're going to -- this will get wherever it goes

9   with litigants, Your Honor.  But we haven't had any

10  representations about that kind of fact.  And I think that's

11  fairly unfair.  But we'll go forward with the hearing, as I

12  said, with the evidence.

13         THE COURT:  Yeah, we're going to proceed with the

14  hearing.  And I think that Mr. Herman is a capable enough

15  lawyer to understand that reopening the auction with the waiver

16  of that objection, that 363(m) objection, would not -- might

17  not, I'm not going to give any legal advice here, of course,

18  but I'm not asking that you waive any cause of action you might

19  have against Citigroup.

20         MR. HERMAN:  Your Honor, let me address Mr. Galardi's

21  point about keeping our bid open.  Our bid does remain open.

22  The -- we were the stalking horse.  We drafted the bid

23  procedures.  We are committed to keeping our bid open.

24         If our bid is determined to be the highest or best

25  bid today, at any number between 35 -- 21 to 35, whatever it's

1  determined to be, we will close tomorrow.  Our -- and if it
2  turns out that Your Honor finds them to be the highest bid, our
3  bid will remain open.  If they fail to close, we will still
4  close.

5          The question before the Court as part of the hearing
6  today, though, is are we going to knock out the auction and
7  keep my bid at 21?  Or do we knock out their last bid because
8  they knew my highest number, and keep my bid at 35?

9          But, Your Honor, whatever number you determine my bid
10  to be, and if you determine it to be the second placed bid,
11  yes, it will remain open and irrevocable and we'll close.

12          MR. GALARDI:  We should just both stand up here, Your
13  Honor.

14          THE COURT:  I think so.

15          MR. GALARDI:  I apologize.  Again, it's kind of
16  interesting.  Mr. Herman -- and I'm just going to point this
17  out one more time.  Mr. Herman said he'll keep his offer open.
18  That's fine, we've nailed down one fact.

19          He's also said we've known -- and I'm just going to
20  note for the record this -- he's done enough podium testimony
21  today -- that he just said we knew their highest and best bid.
22  But yet he shows up today with what he now says is even a
23  higher and better bid.

24          Again, this is now August 7th (sic) and he said that
25  the person who was involved in -- and you'll hear the story --

1  knew all their strategy.  I think it's self defeating, even
2  today.
3          And with -- let's go to the hearing and I can put on
4  the testimony.
5          THE COURT:  Absolutely.  Okay.  Ms. Jones, do you
6  want to -- Mr. Galardi, is your issue with your witness, does -
7  - is he here?
8          MR. GALARDI:  I can do him.  But I wanted to ask Ms.
9  Jones one question.
10                          (Pause)
11          MR. GALARDI:  Your Honor, I was just somewhat unclear
12  at the beginning of the hearing that Mr. Lowrey's testimony was
13  proffer.  I can -- I know there were statements, and we tend to
14  be somewhat informal.
15          THE COURT:  Yes.
16          MR. GALARDI:  I understand it was proffered.  So, I
17  would like to cross examine Mr. Lowrey.  I can do that after I
18  put on my witness.  It's just about the -- I think -- and I'll
19  defer to you, Your Honor.  You've read the transcript.
20          THE COURT:  Yes.
21          MR. GALARDI:  There's the $100,000 issue for the
22  waiver.
23          THE COURT:  Correct.
24          MR. GALARDI:  My belief is, and I'll ask, that we're
25  going forward on our bid.

1          THE COURT:  That's correct.  That is correct.  That's
2  one thing -- that's the one the that's clear.
3          MR. GALARDI:  We are certain about that.
4          THE COURT:  Yes.
5          MR. GALARDI:  And then with that, since the debtor, I
6  don't think, has changed the increment, I can -- I don't need
7  to cross examine Mr. Lowrey.  I just wanted to make that clear.
8          THE COURT:  Okay.
9          MR. GALARDI:  Thank you.
10          THE COURT:  And, Ms. Jones, let me just make clear.
11  You did make a proffer of Mr. Lowrey's testimony.  And you have
12  incorporated his prior testimony into the record of this
13  hearing, is that correct?
14          MS. DAVIS JONES:  Yes, sir, that's correct.
15          THE COURT:  Okay, fine.
16          MS. DAVIS JONES:  Thank you.
17          THE COURT:  Thank you.  Mr. Galardi, would you like
18  to call your witness?
19          MR. GALARDI:  I believe Mr. --
20          MR. HERMAN:  I didn't -- I didn't hear a proffer.  In
21  fact, we'd love to cross examine the debtors' witness.  I
22  didn't hear a proffer at all.
23          THE COURT:  Okay.  Ms. Jones, take a few minutes and
24  gather yourself in order to make a proffer.  And then we can
25  make Mr. Lowrey available as a witness for cross examination.

88

1          MS. DAVIS JONES:  We can, Your Honor.  We did make an
2    offer of proof of Mr. Lowrey twice during my presentation, both
3    of them were brief.  If I may, Your Honor, just gather my notes
4    so I --
5          THE COURT:  Thank you.
6          MS. DAVIS JONES:  -- so we'll have that offer of
7    proof.
8          THE COURT:  Thank you.
9                    (Pause)
10         MR. GALARDI:  And, Your Honor, with respect to our
11   witnesses, given that we've already missed one of the time
12   frames, we will go after the debtors put on their case in
13   chief, and we'll make a proffer of our testimony at that point.
14         THE COURT:  Okay.
15         MR. GALARDI:  Try to get this back to --
16         THE COURT:  Back on line.
17         MR. GALARDI:  Back on line.  Thank you.
18                    (Pause)
19         MS. DAVIS JONES:  Your Honor, I thought it might be
20   helpful just if I can refresh for the gentlemen the context of
21   the Brett Lowrey offers of proof if there's something more or
22   something less they thought they heard, we can deal with it.
23         The first was, Your Honor may recall that I had -- I
24   had said that Brett Lowrey had -- I had made an offer of proof
25   of him at the sale procedures hearing.

1              THE COURT:   Correct.

2              MS. DAVIS JONES:   And he talked about -- I reiterated

3  that offer of proof of how they began their process in May and

4  who they talked to and their -- how many people signed

5  confidentiality agreements and so forth.

6              I expect that there's no issue as to that for

7  purposes of today's hearing because no one's raised any issue

8  on --

9              THE COURT:   Correct.

10             MS. DAVIS JONES:   -- how we came up to having the

11 Lifetime stalking horse bid.

12             The second -- and as part of that, I had then moved

13 into an offer of proof that the Lifetime asset purchase

14 agreement was heavily negotiated, that it was at arm's length

15 with each side having their own counsel.  And went on to say

16 that the competing bid of SEB was based off of that asset

17 purchase agreement.  And, indeed, SEB took the contract as they

18 found it, with no material changes except to increase the

19 purchase price.

20             Your Honor, the only thing I would add to an offer of

21 proof of Mr. Lowrey, and folks can tell me if they need to

22 cross examine him, is that, again, he -- he would testify that

23 the negotiations with SEB were spirited, there was counsel

24 representing both sides, it was heavily negotiated, and it was

25 at arm's length.

90

1          And, Your Honor, Mr. Lowrey would further testify
2   that there are no side deals that he's aware of with SEB or
3   with Lifetime.  That he was at the auction, it was a spirited
4   auction, and the market spoke.

5          THE COURT:  Okay.  Thank you.

6          MS. DAVIS JONES:  Thank you, Your Honor.

7          THE COURT:  Mr. Herman?

8          MR. HERMAN:  Your Honor, I have a very brief cross
9   examination of any witness of the debtor.  It's -- the witness
10  that the debtor is going to put on today for the factual
11  proposition that the SEB is currently -- that the debtor has
12  determined that the SEB bid is the highest or best bid.  I did
13  not hear debtors' counsel say that this witness is proffered
14  for that factual issue.

15         So, I'm happy to wait until that issue is raised by
16  the debtor by this or any other witness.  But I don't want to
17  cross examine on a scope beyond the direct examination.  But
18  the debtor has to have a witness at some point who says that
19  the highest bid is --

20         THE COURT:  Correct.

21         MR. HERMAN:  -- SEB, and that's the one person I have
22  literally two questions for.

23         THE COURT:  Okay

24         MR. HERMAN:  Three questions.

25         THE COURT:  And is that your concern, as well, Mr.

Lowrey - Direct                                91

1  Galardi?

2         MR. GALARDI:  Your Honor, we're having so much fun.
3  Why don't we put Mr. Lowrey on and I'll cross examine and
4  elicit that testimony?

5         THE COURT:  Okay.  That's fine.

6         MS. DAVIS JONES:  Your Honor, the only thing I wanted
7  to raise on behalf of the debtors is we are -- we're being put
8  in a position to talk about issues for which there were no
9  objection ever filed.  So, while the gentlemen can stand here
10 and say, you know, which witness is calling on that issue, the
11 issue of this being a highest and best bid, which I did say in
12 my statement, was the concerted decision of the debtors, the
13 Creditors' Committee, and the Wachovia Bank group that this was
14 the highest and best bid after -- as they sat through that
15 auction.

16        It's a little bit of a trial by ambush here, Judge,
17 in the sense that -- you know, we don't even have an objection
18 on file.  So, Your Honor, I do appreciate your patience with us
19 as we kind of work through this.

20        I believe Mr. Stengel or Mr. Lowrey could tell the
21 Court what happened at the auction, they were both there.

22        THE COURT:  Okay.

23        MS. DAVIS JONES:  And that how it was $100,000
24 increments, and this got to the highest number and it stopped.

25        THE COURT:  And we have --

Lowrey - Direct                                    92

1          MS. DAVIS JONES:  And Lifetime said we're not bidding

2    any further.

3          THE COURT:  We have the transcript --

4          MS. DAVIS JONES:  Right.

5          THE COURT:  -- of that.

6          MS. DAVIS JONES:  Right.

7          THE COURT:  But it is my understanding that today at

8    the hearing, Lifetime is questioning whether or not their bid

9    is the highest and best bid.  So, I think that issue is before

10   the Court.  And I think it would be helpful to hear from Mr.

11   Lowrey with regard to that issue.

12         MS. DAVIS JONES:  Thank you, Your Honor.

13         THE CLERK:  Please place your hand on the Bible.

14   Please state your full name and spell your last name.

15         MR. LOWREY:  Brett Allen Lowrey, L-O-W-R-E-Y.

16             BRETT LOWREY, DEBTOR'S WITNESS, SWORN

17         THE COURT:  Thank you, Mr. Lowrey.

18         THE WITNESS:  Um-hum.

19                     DIRECT EXAMINATION

20   BY MS. DAVIS JONES:

21   Q    Good afternoon, Mr. Lowrey.

22   A    Um-hum.

23   Q    For the record, would you state your full name?

24   A    Brett Lowrey.

25   Q    And by whom are you employed?

1  A    Houlihan Lokey Howard and Zukin.

2  Q    And what is your position at Houlihan Lokey?

3  A    I'm a Vice President in our Financial Restructuring Group.

4  Q    And how long have you been in that position?

5  A    Since January, 2000.

6  Q    Mr. Lowrey, what is Houlihan's Lokey's position with

7  respect to this case?

8  A    We service the debtors' investment bankers and responsible

9  for running the sale process of the WearEver assets.

10 Q    And, sir, was your engagement -- was Houlihan's engagement

11 expanded to pursue a buyer for the WearEver assets?

12 A    It was.

13 Q    And you heard my offer of proof earlier today on the

14 efforts that Houlihan made to get to the point of having the

15 Lifetime stalking horse bid, do you recall that?

16 A    I do.

17 Q    Was my offer of proof correct?

18 A    It was.

19 Q    And is it your testimony that the Lifetime bid was

20 negotiated in good faith and at arm's length?

21 A    Yes.

22 Q    Sir, are you familiar with the bidding procedures that

23 were approved by this Court?

24 A    I am.

25 Q    Did you attend an auction yesterday at the offices of

Lowrey - Direct                94

1  Pachulski Stang Ziehl Young Jones & Weintraub here in

2  Wilmington?

3  A    I did.

4  Q    Did you sit through that full auction?

5  A    I sat through the entire auction.

6  Q    Do you believe that the auction was ran in accordance with

7  the procedures order to your -- to the best of your knowledge?

8  A    Yes.

9  Q    Mr. Lowrey, was there incremental bidding that went on

10 during that auction?

11 A    Yes.

12 Q    And how long, roughly, did that auction take?

13 A    Three hours, beginning to end, I would say.  The bidding

14 part.

15 Q    How would you describe that auction?

16 A    Um, very thorough and very active.

17 Q    Were -- there were two bidders at that auction, Lifetime

18 Brands and SEB, is that correct?

19 A    Yes.

20 Q    Were they both represented by counsel?

21 A    They were.

22 Q    Did they both have business representatives there?

23 A    Yes.

24 Q    Sir, was everyone given an amount of time to decide their

25 next bid?  Was there any rush in the auction?

1 A    No.   Actually we gave ample time for people to take breaks

2 and consider all -- make their considerations.

3 Q    Sir, did there come a time in the auction where one party

4 or the other stopped bidding?

5 A    Yes.

6 Q    And do you recall what happened?

7 A    Um, the -- at that point in time, Lifetime Brands told us

8 they were not going to be bidding any further.   That was when

9 the bid -- prior to that, the bid had been made by SEB at $35.1

10 million, plus the satisfaction of the letters of credit or the

11 inventory advances, rather.

12      And at that point, Lifetime announced that they were

13 not going to -- that they were not going to be bidding further,

14 and we concluded the auction.

15 Q    Sir, before the conclusion of that auction, did the debtor

16 announce that it had found -- it found the bid of 35.1 million

17 to be a higher and best offer -- highest and best offer?

18 A    Yes.

19 Q    Was that decision joined in, to the best of your

20 knowledge, by the Creditors' Committee and the Wachovia Bank

21 group?

22 A    Yes.

23 Q    Why did the debtor, if you know, make the decision that

24 the 35.1 million was the highest and best offer?

25 A    Um, at that point in time, it was the highest bid received

1  and Lifetime had expressed that they were no longer willing to
2  bid any longer.
3  Q    And were the bids throughout the auction, to use the
4  analogy, were they apples to apples, oranges to oranges, or was
5  it a mix?
6  A    It was apples to apples, but for one exception, which was
7  the -- which -- as mentioned earlier today, the inclusion of
8  the $750,000 purchase of the excluded assets that are located
9  in the Nuevo Laredo facility.
10 Q    And --
11 A    But from an auction standpoint, it was apples to apples.
12 Q    And correct me if I'm wrong, sir, and let me just ask you
13 if my recollection is -- on this is correct.  With the proposal
14 for the Nuevo Laredo assets, was that thrown in by SEB along
15 the way as part of their bid?
16 A    It was not conditioned upon it, it was a separate piece
17 altogether.
18 Q    Did the debtor give any monetary value or credit, if you
19 will, at the auction for the proposals of the Nuevo Laredo --
20 of the purchase of the Nuevo Laredo assets?
21 A    No.
22 Q    So, both parties -- were both parties then bidding on the
23 same assets?
24 A    Yes.
25 Q    Mr. Lowrey, did you have any concerns with how the auction

1  was conducted yesterday?

2  A    No.

3  Q    Do you believe the auction was conducted in good faith?

4  A    Yes.

5          MS. DAVIS JONES:  I'll pass the witness, Your Honor.

6          THE COURT:  Thank you.

7          MR. HERMAN:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9  BY MR. HERMAN:

10  Q    Good afternoon.  Were you in the courtroom today?

11  A    Yes, I was.

12  Q    Okay.

13  A    I've been here all day.

14  Q    And so you were here when the Court allowed parties to

15  negotiate with Regal today?

16  A    Yes.

17  Q    And were you here when Lifetime announced that it had

18  successfully reached an agreement with Regal?

19  A    Yes, I was.

20  Q    And are you aware that the terms of that deal are that

21  Regal would consent to the sale if Lifetime is the winning

22  bidder, provided that Regal got a six-month return of its

23  license?

24  A    That's my understanding.

25  Q    Okay.  Now, yesterday, isn't it true that you proposed

1  that a waiver of the $2 million purchase price reduction would

2  be worth $100,000 to either bidder?

3  A    Yes, we offered that to both parties.

4  Q    Okay.  So, turning to apples to apples, if somebody bid

5  $35 million with a waiver, yesterday that was worth $35.1

6  million, right?

7  A    Yesterday it was.

8  Q    Okay.  Now assuming you had two bids today that were of

9  equal value at any number, let's just use 35.1 for hypothetical

10  purposes.  Two bids, apples to apples, both worth 35.1, right?

11  If one of those bids had consent from Regal and no appeal, and

12  another bid had no consent from Regal and Regal stood up today

13  and said it was appealing, which, in your opinion, would be

14  higher or better?

15  A    You know, I think we -- we had the auction yesterday.

16  Q    Yeah, but --

17  A    And --

18  Q    -- hypothetically today, which today would you say was

19  higher or better?

20  A    I would say we would have to consider the facts and

21  circumstances.  Other than that, you know, I don't have an

22  opinion on that right now.

23  Q    Okay.  So, in your view, there was no value whatsoever to

24  getting Regal consent?

25  A    I didn't say that.  I'd say I'm not the sole determinative

1  of whether --

2  Q    But --

3  A    -- that is --

4  Q    -- hypothetically, put aside whether the Court allows

5  these things to happen.  In your view, if two bids were exactly

6  the same monetarily, but one had the Regal consent, but one

7  didn't, isn't it true that the one with the Regal consent would

8  be a better bid?

9  A    Hypothetically speaking, there would be some benefit to

10  that.

11              MR. HERMAN:  No further questions, Your Honor.

12              THE COURT:  Thank you.  Mr. Galardi?

13                        CROSS EXAMINATION

14  BY MR. GALARDI:

15  Q    Mr. Lowrey, how many auctions or sale processes have you

16  run in Chapter 11?

17  A    Give or take, 20, 25.

18  Q    Okay.  And let me ask you, when was the first time that

19  you understood SEB to be interested in the potential purchase

20  of the WearEver assets?

21  A    Early June.

22  Q    Okay.  And -- and did they discuss with you the potential

23  to be serving as the stalking horse?

24  A    Um, they absolutely, you know, made it clear that they had

25  an interest in it.

Lowrey - Cross/Galardi                                    100

1  Q    Okay.  And at that point, had you actually -- had WearEver
2  even signed an agreement with Lifetime?

3  A    An agreement speaking to specifically an asset purchase
4  agreement, correct?

5  Q    Yes.

6  A    No, they hadn't.

7  Q    Okay.  And eventually SEB did not become the stalking
8  horse, correct?

9  A    That's correct.

10 Q    Okay.  And from the point in which they first made contact
11 until the point when they went to the auction, did SEB call you
12 and people in your office and ask whether there were ways in
13 which they could improve the bid over the Lifetime bid?

14 A    Um, they did.

15 Q    And do you remember phone calls with me saying, okay, put
16 money on an item, and maybe we'll change those conditions?

17 A    I do remember those calls.

18 Q    And we've had a few of those over the last couple of
19 weeks.

20 A    Sure.

21 Q    Okay.  And they -- though you said the auction lasted
22 roughly three hours, my recollection may be a little bit
23 different, the bidders came in at 10 A.M. yesterday, is that
24 correct?

25 A    That's correct.

1   Q   And the auction didn't begin until roughly one o'clock.

2   A   That's right.

3   Q   And why was it, other than a half hour or 45 minutes that

4 the Court was involved yesterday, why was it that the auction

5 didn't start until much later?

6   A   I would put it in the category of typical auction type

7 issues that had to be worked through.

8   Q   And in particular, weren't some of the issues put a money

9 value on certain of the types of changes to an asset purchase

10 agreement?

11   A   That's correct.

12   Q   And one of the changes was the waiver of the option?

13   A   Um, that's correct.

14   Q   And -- not the option.

15   A   Uh --

16   Q   The waiver of the condition on Regal.

17   A   On Regal Ware, yeah.

18   Q   And you put $100,000 on that.

19   A   We did.

20   Q   And you put $100,000 on a working capital issue.

21   A   Yes.

22   Q   And you put $100,000 on four issues.

23   A   Right.

24   Q   Okay.  Now, let me ask you, and you've been through 20

25 auctions.

Lowrey - Cross/Galardi                    102

1  A    Um-hum.

2  Q    And this is not -- I just want to know your impression.

3  If SEB knew what Lifetime was going to bid, would it have had

4  the kinds of conversations you had with it?

5  A    I would assume not.

6  Q    Now, Mr. Lowrey, did SEB and me, in particular, try to get

7  a strategy where we added assets that no one else would bid?

8  A    Um, yes.

9  Q    And did we put numbers as high as $1.5 million on the

10 Mexican assets?

11 A    I think at one point, you put $2 million on the Mexican

12 assets.

13 Q    Okay.

14                         (Laughter)

15 Q    And, again, you said at that point, there was no value to

16 that.

17 A    Correct.

18 Q    And -- and, again, the purpose was to keep apples to

19 apples.

20 A    That's correct.

21 Q    And so as -- if you read the entire transcript of 80 some

22 rounds of bidding, there was really one issue, and only one

23 issue that was being bid, isn't that correct?

24 A    That's correct.

25 Q    And that was the purchase price issue.

1  A    That's correct.

2  Q    And the bid procedures require that you increase over the

3  prior bid $100,000, isn't that correct?

4  A    That's my recollection.

5  Q    And -- and given yesterday's rules, and given today's bid,

6  has Lifetime increased its bid $100,000 more than the SEB bid?

7  A    At the -- yes, that's correct.

8  Q    Let me ask my question because I got the wrong answer.

9  A    Okay.

10                         (Laughter)

11  Q    I'll say it a little simpler.

12  A    Yeah, thank you.

13  Q    Given today's bid --

14  A    Yeah.

15  Q    -- of $35 million, and yesterday's condition --

16  A    Okay.

17  Q    -- that if you waived the closing condition on Regal, you

18  got $100,000, is that, under the bid procedures approved by the

19  Court, a higher or otherwise better bid?

20  A    Um, I would say, no.

21  Q    And it doesn't meet the bid increment, correct?

22  A    That's correct.

23            MR. GALARDI:   Thank you.

24            THE COURT:   Any re --

25            MR. HERMAN:   just --

1            THE COURT:  Yes.

2                    RECROSS EXAMINATION

3  BY MR. HERMAN:

4  Q    If the Court allowed us, Lifetime, to enter into the deal

5  with Regal today and make the waiver, would you still give it

6  $100,000 value today?

7  A    I thought we weren't having an auction today.

8  Q    If the Court allowed us to do it, wouldn't it still be

9  worth $100,000 today?

10 A    Once again, I think the offer's made to you to have an

11 auction.

12 Q    But if the Court turned to you and directed you to allow

13 us to do it, wouldn't you still put $100,000 value on it?

14 A    More than likely.

15            MR. HERMAN:  Okay.  Thank you.

16            THE COURT:  Anything further for the witness?

17                 (No audible response heard)

18            THE COURT:  Thank you, Mr. Lowrey, you may step down.

19            Ms. Jones, I assume the debtor has no further

20 witnesses?

21            MS. DAVIS JONES:  Your Honor, as dynamic as this

22 hearing is being, I'm going to make sure I reserve my right to

23 call someone.

24            THE COURT:  Please.

25            MS. DAVIS JONES:  But, Your Honor, it -- at this

1  point, no.  As I mentioned, we had the objection open of Regal.
2  And we have these issues that are now -- have now surfaced
3  between these parties.  So, we would pass the podium to let
4  others present their objections to Your Honor.
5          THE COURT:  Okay.
6          MR. GALARDI:  Your Honor, I think -- I think before
7  we move to the objections, I'd like to offer -- proffer up
8  testimony in support of the sale motion of the good faith
9  finding that I've referred to before.
10         THE COURT:  Okay.  Are you going to make this as a
11 proffer at this point?
12         MR. GALARDI:  I'll make it as a proffer, unless
13 someone has an objection.  And obviously they'll be passed to
14 cross examination, although their English may not be as fluent
15 as people may like it, if they'd be patient, but I can do a
16 proffer.
17         THE COURT:  Okay.  Mr. Herman, is that acceptable?
18         MR. HERMAN:  No objection.
19         MR. GALARDI:  Your Honor, first I'd ask Mr. Jean
20 Pierre Lac, who's in the courtroom today to stand, so Your
21 Honor knows with whom I have been whispering.
22         THE COURT:  Welcome.  Welcome.
23         MR. GALARDI:  Your Honor, with respect to the
24 proffer, in the courtroom today is MR. Jean Pierre Lac, Senior
25 Executive Vice President of Finance of SEB SA, a limited

106

1  company incorporated under the laws of France.

2          If called as a witness, Mr. Lac would testify that he

3  is the Senior Executive Vice President of Finance of SEB, and

4  is also a member of the Executive Committee of Groupe, G-R-O-U-

5  P-E, SEB USA, the United States company.

6          He and Mr. Sumeire, who is to his immediate left, who

7  I will also proffer testimony, have been the two persons

8  principally involved in pursuing SEB's interest in the WearEver

9  Debtors and their sale of assets.

10         Mr. Lac would testify that SEB is a public French

11 company with revenues in 2005 in excess of 2.4 billion euros or

12 approximately $3 billion U.S.

13         That SEB SA operations in North America account for

14 approximately 15 percent of those total revenues, or

15 approximately 352 million euros.  Your Honor, I couldn't put

16 that into dollars, but I think it's somewhere around $450

17 million.

18         THE COURT:  Okay.

19         MR. GALARDI:  That SEB has operations in the United

20 States since 1974, including a cookware business with Tefal,

21 the nonstick cookware.  That today, SEB operates three

22 factories in North America, two in the United States, including

23 one in Millville, New Jersey, and one in Canonsburg,

24 Pennsylvania and one in Mexico, as well as four marketing

25 companies.

1           Your Honor, I think that part -- the reference to
2   Mexico is important to help explain why we also wanted the
3   Mexican assets in this transaction.

4           That SEB is doing business in the United States under
5   such names as Rowenta, which is steam irons to Krups Coffee,
6   All-Clad and special -- All-Clad is specialist and premium
7   cookware, as well as Tefal, the nonstick cookware, and in
8   Mexico, under the name of Moulinex, you might have heard many
9   of those.  You might have heard of many of those.

10          That SEB SA and Groupe SEB USA, as well as their
11  Mexican subsidiaries, have the financial wherewithal to close
12  the transactions contemplated by the asset purchase agreement
13  with the WearEver Debtors, and there are two nondebtor
14  subsidiaries, Your Honor, at least that are also party to this
15  agreement.

16          Your Honor, I believe there's on Canadian entity that
17  is a seller under the agreement, whether it's with Lifetime or
18  with SEB, and then with us, there's Canadian -- there is
19  Mexican assets, as we have said.

20          If SEB -- if called as a witness, Mr. Lac would
21  further testify that SEB has extensive experience in the area
22  of manufacturing and distributing cookware.  That the price to
23  be paid by SEB as a result of the public auction constitutes
24  the highest or otherwise best price the WearEver Debtors
25  received for the assets after an auction that lasted a number

 1  of hours last night, and which bidding the substantially, if
 2  not exclusively, about the price to be paid for the assets
 3  notwithstanding their counsel's trying to change matters at
 4  various times.

 5          Finally, Mr. Lac would testify with respect to the
 6  Citigroup issue that Citigroup has long been one of the primary
 7  banks of SEB, both in the United States, France and worldwide,
 8  and provided advice regarding strategic alternatives for over
 9  ten years, and he has personal relationships with Citigroup.

10          That in early June of 2006, SEB contacted Citigroup
11  regarding the potential interest in an acquisition of the
12  WearEver assets.  That at no time was he, or to the best of his
13  knowledge, anyone at SEB ever provided confidential, nonpublic
14  information regarding Lifetime or its potential interest in
15  acquiring the assets and the intellectual property from the
16  WearEver Debtors.

17          Further, he would testify that at no time was SEB
18  ever advised that Citigroup or anyone working at Citigroup was
19  working on Lifetime matters or advising Lifetime with respect
20  to Lifetime's interest in WearEver.  And, indeed, was surprised
21  to find out in early July that Lifetime had extended -- had
22  entered into a stalking horse agreement with Lifetime.

23          That based on an analysis, and an internal analysis
24  of the value of the WearEver Debtors, and their synergies to be
25  expected as a result of the acquisition by SEB, and other

1  considerations, he, and Mr. Sumeire, advised the directors of
2  SEB and the SEB Board, approved pursuing an action, and
3  provided he and Mr. Sumeire with authority to bid at the
4  auction in an amount in excess of what they have actually bid
5  here today or yesterday.

6       That SEB's preparedness to bid it, and the price at
7  which it was prepared to bid was not based upon anything other
8  than SEB's own analysis of the value of the assets being sold.
9  And that although SEB had absolutely no information regarding
10 Lifetime's strategy regarding bidding, or the maximum price it
11 was prepared to pay, such information would have been
12 irrelevant to SEB in its decision and the authorization of the
13 Board to go forward and bid at that price.

14       That would be Mr. Lac's testimony, Your Honor.

15       THE COURT:  Mr. Kortanek?

16       MR. KORTANEK:  I would like to call Mr. Lac for cross
17 examination, Your Honor.

18       THE COURT:  Thank you.

19       THE CLERK:  Please place your hand on the Bible.
20 Please state your full name and spell your last name.

21       MR. LAC:  Jean Pierre Lac, spelled L-A-C.

22                    CROSS EXAMINATION

23       THE CLERK:  Thank you.  You may be seated.

24       THE COURT:  Thank you.

25 BY MR. KORTANEK:

1 Q    Good afternoon, Mr. Lac.  My name is Steve Kortanek and I

2 represent Regal Ware, Inc.

3 A    Good afternoon.

4 Q    Thank you.  Mr. Lac, your proffer presented by Mr. Galardi

5 indicated that SEB has significant financial wherewithal.

6 Would you -- how would you characterize SEB's financial ability

7 to expand its capacity of sales of U.S. goods or manufacturer

8 of U.S. goods?

9 A    So, I will refer -- just illustrated by our balance sheet,

10 which is extremely strong.  We have a gearing of 40 percent,

11 meaning that our debt is representing only 40 percent of our

12 equity capital.  And in addition really would say that our

13 ratio debt on EBITDA is very low, in the range of one year.

14 Q    Okay.

15 A    Okay?

16 Q    That puts you in a good position to compete with other

17 manufacturers, does it not?

18 A    Sure.

19 Q    Okay.  And it puts you in a good position to take on

20 competitive targets and try to increase your market share, as

21 opposed to their market share?

22 A    That's our target.  As anybody in business is to increase

23 market share, I think, and to make money on top of that.

24 Q    Are you -- are you familiar -- I assume you're familiar,

25 sir, with your All-Clad line of cookware?

Lac - Cross/Kortanek                111

1  A    Yes, I was the one to make the acquisition two years ago.

2  Q    Congratulations.

3  A    Thank you.

4  Q    Are you aware, sir, whether All-Clad, which in your

5  proffer, was characterized as premium cookware, that that would

6  be in Class 21 as trademark classifications are concerned in

7  the U.S.?

8  A    I am not familiar with Class 21.

9  Q    Okay, fair enough.

10  A    No.

11  Q    As premium cookware, however, it's true, is it not that it

12  --

13  A    It's true, yeah.

14  Q    -- that it would -- I'm sorry, I hadn't finished my

15  question.  It's the U.S. style of cross examination questions,

16  forgive me.  Sir, as premium cookware, Clad -- All-Clad

17  directly competes with at least some of the Regal cookware,

18  does it not?

19  A    Not that I am really aware.  Because I think our

20  competitors are brands like Calphalon, uh, and all those brands

21  that are sold in sales like Williams-Sonoma, which are the main

22  point of sales.

23  Q    So, if it was -- if someone relayed to you or you became

24  aware, for example, that Regal Ware had a product line that it

25  sold at Williams-Sonoma --

Lac - Cross/Kortanek                    112

1  A      Um-hum.

2  Q      -- in that premium class, that would put you in direct

3  competition --

4           MR. KORNFELD:  Objection.

5  Q      -- with Regal Ware would it not?

6  A      Yeah.

7           MR. KORNFELD:  Calls for speculation.

8           THE COURT:  Sustained.

9           THE WITNESS:  So, I have to answer?

10          THE COURT:  You don't have to -- you don't have to

11 answer.

12          THE WITNESS:  Thank you, Your Honor.

13                     (Laughter)

14 BY MR. KORTANEK:

15 Q      Sir, if -- if I represent to you that Regal cookware sells

16 in a price range of roughly $1,500 U.S. dollars per set and up,

17 to your knowledge, is that the price point at which All-Clad

18 premium cookware sets sell for?

19          MR. KORNFELD:  Objection.  Lacks foundation.  And,

20 therefore, calls for speculation also.

21          MR. GALARDI:  Your Honor, I would suggest that I

22 believe the direct is going -- I mean the cross examination is

23 going far afield of the direct of this particular witness.  I

24 would add that as my objection.

25          THE COURT:  I think that Mr. Kortanek's questioning

Lac - Cross/Kortanek                      113

1   relates to your objection, is that correct?

2          MR. KORTANEK:  Your Honor, and I understand the scope

3   of direct issue, and I'll -- I'll --

4          THE COURT:  Thank you.  I will sustain the objection.

5   Don't answer.

6                        (Laughter)

7   BY MR. KORTANEK:

8   Q    Mr. Lac, do you or do you not think it is a good idea to

9   license trademarks to a direct competitor?  Based on your own

10  knowledge in your capacity at SEB.

11  A    I think --

12         MR. KORNFELD:  Objection.  Objection.  That lacks

13  foundation.  It's beyond the scope of direct.  And it calls for

14  a legal conclusion.

15         THE COURT:  Yes, I agree with the objection and I

16  will sustain it.

17         And I would just ask you, Mr. Kortanek, you will have

18  an opportunity, of course, to make your case on your objection.

19  But we're not there yet.

20         MR. KORTANEK:  Thank you, Your Honor.  Just a couple

21  more questions.

22  BY MR. KORTANEK:

23  Q    Mr. Lac, does -- are you familiar with the U.S.

24  manufacturing capacity of your U.S. plants?

25  A    Sure I am, yeah.

1  Q    Okay.  How would you characterize -- are those plants --
2  do your existing facilities in the U.S. have additional
3  capacity, given where they are now?
4  A    The answer is yes.
5  Q    Okay.  Do any of those plants in the U.S. manufacture
6  premium cookware?
7  A    Sure.
8  Q    Okay.  Do any of those plants in the U.S. manufacture
9  cookware that is similar in quality to cookware manufactured by
10 the WearEver Debtors or Mirro?
11 A    To some extent, yes.
12 Q    Okay.
13 A    We have one of those two plants.
14        MR. KORTANEK:  I have no further questions, Your
15 Honor.
16        THE COURT:  Thank you, Mr. Kortanek.  Anyone want to
17 follow-up on that line of questioning?
18                (No audible response heard)
19        THE COURT:  Okay.  Mr. Lac, you may step down.  Thank
20 you, sir, for your testimony.
21        MR. LAC:  Thank you.
22                    (Pause)
23        MR. GALARDI:  Your Honor, the second witness that I
24 would like to proffer his testimony.
25        THE COURT:  Yes.

1            MR. GALARDI:  Again, Your Honor, to the left of Mr.
2   Lac is Mr. Philippe Sumeire.  He is in the courtroom today.
3   Mr. Philippe Sumeire.  He would testify he is the Vice
4   President of Legal of SEB SA, a limited incorporated company,
5   incorporated under the laws of France.  If called as a witness,
6   Mr. Sumeire would testify that SEB SA is the indirect parent of
7   a Groupe SEB Holdings, Inc., a Delaware holding company that
8   directly owns all of the stock of those companies conducting
9   business in the United States, including Groupe SEB USA, also a
10  Delaware company.

11            That he and Mr. Jean Pierre Lac, who is also present
12  in the courtroom today, have been the two persons principally
13  involving with pursuing SEB's interest in the WearEver Debtors
14  and their sale of assets since early June of this year.

15            That SEB is a public French company with revenues in
16  2005 in excess of 2.4 billion euros and approximately $3
17  billion.

18            That SEB has had operations in the United States
19  since 1974, including the cookware business with Tefal nonstick
20  cookware.

21            That today, SEB operates the three factories
22  mentioned by Mr. Lac in North America, two in the United
23  States.  That SEB is doing business in the United States under
24  such names as Rowenta, Krups, All-Clad and that SEB licensing
25  from such companies as Procter and Gamble, Heineken and

116

1  Nestlés.

2          If called as a witness, Mr. Sumeire would testify

3  that SEB has extensive experience in the area of manufacturing

4  and distributing cookware.  That it is part of -- it is a party

5  to numerous trademarks and other intellectual property

6  licenses.  That SEB has the resources to, and has vigorously

7  protected such intellectual property rights and has the

8  resources to and will continue to protect intellectual property

9  rights whether they own them outright or whether they are, in

10  fact, licensed.

11          With respect to the Regal Ware trademark license,

12  upon the assumption and assignment of the Mirro sub-license,

13  SEB will honor all of the obligations under the sub-licensing

14  agreement, including but not limited to the obligations of the

15  licensee with respect to secrecy, trademark protection, and

16  quality.

17          Mr. Sumeire would also testify that although Tefal

18  had had some trademark dispute with Regal, which is set forth

19  in their papers, numerous of those disputes have been commenced

20  by Regal, most are administrative in nature, and in each

21  instance, the parties have been, in good faith, protecting

22  their respective rights in the intellectual property, has is

23  common with companies doing business in the household goods

24  industry, and subject to trademark licenses.

25          In addition, Mr. Sumeire would testify that although

1  currently Regal brand and cookware appears primarily, if not
2  exclusively, in outlets, such as Wal-Marts, SEB intends to
3  change the price erosion and quality perception erosion of
4  which Regal has expressed concern, and to reverse those trends
5  as SEB is a well financed entity.

6       Mr. Sumeire would also testify that neither SEB nor
7  any of its direct or indirect subsidiaries is an affiliate, an
8  insider, or otherwise related to the WearEver Debtors or the
9  two nondebtor entities with whom it seeks to purchase -- from
10 whom it seeks to purchase the assets.  That SEB, nor any of its
11 direct or indirect subsidiaries has entered into any agreement
12 with any third party that would control or otherwise manipulate
13 the price at the auction conducted yesterday, or as some might
14 say, resumed today.

15      Mr. Sumeire would also testify that the agreement
16 entered into by the WearEver Debtors and Lifetime, to the best
17 of his knowledge, was negotiated at arm's length, and that SEB
18 executed substantially the same contract as was executed by
19 Lifetime, except that it increased the price and limited those
20 sections of the agreement that did not pertain to a competing
21 bidder.

22      Mr. Sumeire would further testify that the price to
23 be paid by SEB is the result of a public auction, constitutes
24 the highest or otherwise best price that the WearEver Debtors
25 received for the assets, after auction, that lasted a number of

 1   hours of bidding, roughly 80 to 100 rounds of bidding, which
 2   bidding was substantially, if not exclusively, about the price
 3   to be paid for the assets.

 4          Finally, Mr. Sumeire would testify that Citigroup has
 5   long been one of the primary banks of SEB, both in the United
 6   States, France, and worldwide, and is party to at least some of
 7   the credit agreements.   That in early June of 2006, SEB
 8   contacted Citigroup about regarding its potential interest in
 9   an acquisition of the WearEver assets.   That in connection with
10   SEB's due diligence with respect to WearEver, SEB relied almost
11   exclusively on the work done internally by its Finance
12   Department and in consideration of those -- the transactions,
13   the models, that -- and synergies that might be realized as a
14   result of that action.

15          That at not time was Mr. Sumeire, to the best of his
16   knowledge, or anyone at SEB, ever provided with confidential,
17   nonpublic information regarding Lifetime or its potential
18   interest in acquiring assets and intellectual property from the
19   WearEver Debtors, including at yesterday's auction or including
20   when it made its first bid, which was an overbid based on the
21   Lifetime contract.

22          Mr. Sumeire would further testify at no time was SEB
23   ever advised that Citigroup or anyone working at Citigroup was
24   working on Lifetime matters or advising Lifetime with respect
25   to Lifetime's interest in WearEver and, indeed, was surprised

1 to find out in early July that Lifetime had entered into a

2 stalking horse agreement with Lifetime.

3          That based upon analysis of the WearEver Debtors'

4 performance, the synergies and the acquisition, the Board of

5 Directors followed his request and Mr. Lac's to pursue the

6 acquisition of the WearEver assets and provided a price point

7 higher than that yesterday that they were prepared to go to at

8 the auction.  That SEB's preparedness to bid at -- and the

9 price at which it was prepared to bid was not based upon

10 anything other than SEB's own analysis of the value of the

11 assets being sold, and that although SEB had absolutely no

12 information regardless Lifetime's strategy regarding bidding,

13 or the maximum price that Lifetime was prepared to pay, such

14 information would have been irrelevant to SEB, and the

15 authorization that he and Mr. Lac had received from the Board.

16          That would be Mr. Sumeire's testimony, and I pass the

17 witness.

18          THE COURT:  Thank you.  Mr. Kortanek, did you want to

19 cross examine?

20          MR. KORTANEK:  Yes, I would, Your Honor.

21          THE COURT:  Thank you.  Mr. Sumeire?

22          THE CLERK:  Please place your hand on the Bible.

23 Please state your full name and spell your last name.

24          MR. SUMEIRE:  Yes.  Philippe Sumeire.  I'm Vice

25 President Legal SEB Groupe.

Sumeire - Cross/Kortanek                    120

1                     PHILIPPE SUMEIRE, SWORN

2              THE COURT:  Thank you, Mr. Sumeire.  May we have the

3   spelling of your name, sir?

4              THE WITNESS:  Sorry?

5              THE COURT:  The spelling?

6              THE WITNESS:  S-U-M-E-I-R-E.

7              THE COURT:  Thank you.

8              THE WITNESS:  You're welcome.

9              THE COURT:  Mr. Kortanek?

10                     CROSS EXAMINATION

11  BY MR. KORTANEK:

12  Q     Good afternoon, Mr. Sumeire.

13  A     Good afternoon.

14  Q     Mr. Sumeire, how long have you been serving in a legal

15  capacity at SEB?

16  A     I joined SEB on June 1st, 2002.

17  Q     Had you worked for SEB -- excuse me.  Had you worked for

18  SEB before that time in any capacity?

19  A     No.  During the six months before, in a subsidiary of SEB,

20  which has been in charge of the acquisition of assets, so it

21  was in December 1st, 2001 until May 31st, 2002.

22  Q     So, when your counsel or SEB's counsel just proffered your

23  testimony about 1997 disputes between Tefal and Regal Ware, you

24  didn't have any personal knowledge of that litigation or

25  disputes, did you?

Sumeire - Cross/Kortanek                    121

1  A    No, through recourse and information.  Not directly.

2  Q    Are you familiar, sir, with -- generally familiar with the

3  concept of U.S. trademarks in your capacity as an in-house

4  lawyer at SEB?

5  A    I think so.

6  Q    Okay.  Do you regularly engage in transactions regarding

7  trademarks in your capacity at SEB?

8  A    Uh, yes, that's true, worldwide.

9  Q    Okay.

10 A    Different locations of the world, yes.

11 Q    Has SEB, since you've been at the company, ever licensed a

12 trademark to a direct competitor?

13 A    Uh, yes, at least in one case.  Moulinex trademark has

14 been licensed to competitors --

15 Q    Okay.

16 A    -- in 2002 for a period of five years.

17 Q    Describe for the Court what kind of process SEB went

18 through in evaluating in deciding whether to issue that

19 license.

20       MR. GALARDI:  Objection, Your Honor.  Again, I would

21 just caution him not to give confidential privileged

22 information.  I don't know what the privilege of France is.

23 But to the extent that I would ask him just not to give his

24 legal advice.  He can certainly go to facts and the process

25 that they go through as a factual matter.

1        THE COURT:  Did you understand that, Mr. Sumeire?

2        THE WITNESS:  Sorry?

3        THE COURT:  Did you understand your counsel's advice?

4        THE WITNESS:  Yes, about the --

5        MR. GALARDI:  Just factual.

6        THE WITNESS:  Yes, factual.

7        THE COURT:  You may answer.

8        MR. GALARDI:  Factual issues.

9        THE COURT:  You may answer the question with that

10 provision -- proviso.

11        THE WITNESS:  I'm sorry.  Could you repeat your

12 question, please then?

13        MR. KORTANEK:  Sure.  Sure.

14 BY MR. KORTANEK:

15 Q    You mentioned that you have licensed one or more

16 trademarks to Moulinex --

17 A    Um-hum.

18 Q    -- I believe, is that correct?

19 A    Yes.

20 Q    Okay.  Can you describe what type of process SEB went

21 through to decide whether to extend that license or those

22 license rights to Moulinex?

23 A    Uh, the process is -- SEB has been induced by the European

24 Commission to grant license of this trademark in certain

25 countries in Europe.

Sumeire - Cross/Kortanek                         123

1  Q    Do the trademarks that you granted or the -- that you

2  licensed to Moulinex -- will Moulinex be selling that product

3  in places where SEB sells the same product?

4  A    Yes.  In fact, it was the license from SEB of the Moulinex

5  right to some competitors of the European market, in different

6  countries of the European market.

7  Q    Well, it's fair to say, is it not, that there's no such

8  political or competitive pressure from the -- from -- in the

9  U.S. market for cookware, isn't that correct?

10         MR. KORNFELD:  Objection.  Lacks foundation and is

11  completely irrelevant.

12         THE COURT:  I'll sustain that objection.  I do

13  believe it's relevant.

14  Q    Well, Mr. Sumeire, have you ever licensed to a competitor

15  any trademarks or any other intellectual property rights in the

16  U.S.?

17  A    In the U.S.?  Uh, no.  I don't remember that we have

18  license, so -- in U.S.

19  Q    What information has SEB offered to give to Regal in this

20  process to seek Regal's consent to assignment of its licenses

21  or its trademark rights to SEB?

22  A    I'm sorry?  Which information we --

23  Q    I'll ask it a different way?  Did you provide any

24  information to Regal Ware in this process?

25  A    I don't think so.

1  Q    Okay.  So, Regal Ware doesn't have -- didn't receive any

2  information from SEB upon which it could decide if it's

3  reasonable to assign its license rights to you?

4          MR. KORNFELD:  Objection.  Lacks foundation and calls

5  for speculation as to what Regal Ware's knowledge is.

6          MR. KORTANEK:  Your Honor, I -- I just asked --

7          THE COURT:  I'll allow --

8          MR. KORTANEK:  -- that SEB --

9          THE COURT:  I'll allow the question.  Overruled.

10          THE WITNESS:  I --

11          THE COURT:  You may -- do you remember the question?

12  Or would you like it repeated?

13          THE WITNESS:  Why we don't contact them or give

14  information about capacity to be a licensee, roughly?

15          THE COURT:  Yes.  Mr. Kortanek, I'm sorry, I said

16  yes, but I don't know.

17                        (Laughter)

18          THE COURT:  Usurp your right to ask a question the

19  way you want to.

20  BY MR. KORTANEK:

21  Q    Well, the -- the question -- I'll rephrase it.  It is

22  true, therefore, that SEB did not provide any information to

23  Regal Ware with respect to the request to assume and assign its

24  rights to SEB.

25  A    No, that's right.

Sumeire - Cross/Kortanek                                      125

1  Q    Now, in -- has S -- I assume, sir, that SEB has licensed

2  trademarks or some of its trademarks to companies that do

3  business in the U.S.?

4  A    Uh, granted license --

5  Q    Yes.

6  A    -- or received license?

7  Q    Granted licenses.

8  A    Um, just -- no, I -- I do not remember that SEB has

9  granted license of our trademarks to others in the U.S. market.

10 Q    Let me ask it more generally.  As to any SEB affiliated

11 company, such as Tefal, have licenses been -- out license been

12 given to any parties that do business in the U.S. by Tefal or

13 any affiliated SEB entity?

14 A    We received license, but we have not granted licenses.

15 Q    Okay.

16 A    On the U.S. market, huh?

17 Q    Well, with respect to Europe or anywhere else worldwide, I

18 believe you testified you have licensed to competitors.  So,

19 let's talk about that.  When you licensed -- or when you've

20 personally been involved in considering whether to license to a

21 business, can you describe in general terms what kind of due

22 diligence and what kind of valuation you undertake with respect

23 to that business decision?

24              MR. KORNFELD:  Objection, irrelevant.

25              THE COURT:  I don't think it's relevant to the area

1  of questioning at the moment.

2          MR. KORTANEK:  Well, Your Honor, what -- the one way

3  that it is relevant is I think this witness has been proffered

4  to talk about SEB's ability or capacity to serve as a good

5  licensee citizen.

6          But the fact is, and what I'd like the witness to

7  talk about, is how that -- how that is evaluated.  We could let

8  the witness's testimony stand that -- there isn't any.  But

9  here, I would like the Court to see how this entity goes about

10  that process.

11          MR. KORNFELD:  Your Honor, what he's doing, in

12  addition to relevance, is having this witness testify as an

13  expert witness on American process and law in terms of

14  licensing.  And that is improper also.

15          So, it's both irrelevant and seeking to use this

16  witness as an expert witness in an area that he's not an expert

17  in.  He's not an expert in American law.

18          MR. GALARDI:  And, Your Honor, I think what -- I'll

19  say it's also outside the direct.  What Mr. Sumeire's proffer

20  was is as a legal person that they had the resources, ability

21  and have, as a matter of fact, protected their licenses.

22          If Mr. Kortanek wants to ask him is that true, I

23  think that's within the direct.  But other than that, we

24  haven't offered any testimony other than the financial

25  wherewithal ability and legal ability to prosecute those

Sumeire - Cross/Herman                    127

 1 | matters.

 2 |          THE COURT:  I think that's right, Mr. Kortanek.

 3 | There has been no proffer and no testimony relating to the

 4 | process of licensing.  And --

 5 |          MR. KORTANEK:  That's fine, Your Honor.

 6 |          THE COURT:  I will --

 7 |          MR. KORTANEK:  I think I'll stop there because I

 8 | think we've exhausted the usefulness of the testimony.

 9 |          THE COURT:  Thank you.  Mr. Herman?

10 |          MR. HERMAN:  Thank you, Your Honor.

11 |                    CROSS EXAMINATION

12 | BY MR. HERMAN:

13 | Q    Good afternoon.

14 | A    Good afternoon.

15 | Q    What is your title at SEB?

16 | A    Uh, in English, Vice President, Legal.

17 | Q    Okay.

18 | A    Juridique in French.

19 | Q    So, do you primarily do legal work for SEB?

20 | A    Do you?

21 | Q    Do you do legal work for SEB?

22 | A    Yes.

23 | Q    Okay.

24 | A    Of course.

25 | Q    So, were you personally involved in evaluating the -- the

1  assets of WearEver?

2  A    Evaluating the assets?

3  Q    Coming up with a value for the assets?

4  A    No, it's financial phase to make valuation of the assets.

5  Q    Okay.  But that wasn't your job, though?

6  A    Evaluating the risks we have with the assets we would

7  acquire and to check, for instance, that trademark is good,

8  things like that.

9  Q    Aside from valuating risk, how about valuating the

10 economic value, the market value for the assets?  Were you

11 personally involved in coming up with a evaluation of the

12 economic market value of the assets that you were buying?

13 A    No, it's not my job.

14 Q    Okay.  And who is the primary person at SEB who dealt with

15 Citigroup on the acquisition of these assets?  Who was the

16 point person?  The primary person at SEB who would deal with

17 Citibank on a regular basis?

18 A    Jean Pierre Lac.

19 Q    But it wasn't you?

20 A    Sorry?

21 Q    It was not you?

22 A    No, it's Jean Pierre Lac, I said.

23 Q    Okay.  Do you know what specific services Citigroup

24 provided to SEB for this transaction?

25 A    Yes, customer refinancial advisor services.

1  Q    Okay.  And did they provide advice on the value of the
2  assets?
3  A    Um, I think so, yes, on values -- on assets -- on the
4  basis of the business assumptions that the people of SEB have
5  made.
6            MR. HERMAN:  That's it, Your Honor.  I have no
7  further questions.
8            THE COURT:  Thank you.  Mr. Galardi, do you have some
9  redirect?
10           MR. GALARDI:  Yes, please, Your Honor.
11                    REDIRECT EXAMINATION
12 BY MR. GALARDI:
13 Q    Mr. Sumeire, at any time before they filed their
14 objection, did Regal Ware ask for any information about SEB?
15 A    I'm not aware of that.
16 Q    And SEB is a public company.
17 A    Yeah.
18 Q    And is it true that Regal has been in litigation with
19 various SEB subsidiaries?
20 A    Yes, if I remember well, it's Tefal.
21 Q    Okay.  And so -- and -- and you've -- are you prepared
22 today to provide them information about your financial
23 wherewithal and ability to perform the license?
24 A    Oh, sure.
25 Q    And do you have any doubt that you can perform this

Hadid - Direct                 130

1  license and keep the quality in accordance with its licensed

2  terms?

3  A    Of course.  We are doing that all the time.  I could give

4  some examples of license we had from Hovist (phonetic).

5  Q    And it is your understanding if this contract is assumed

6  and assigned to you that you will have to perform to the letter

7  of those agreements, is that correct?

8  A    Certainly.  Yes.

9           MR. GALARDI:  No further questions, Your Honor.

10          THE COURT:  Anything further from anyone for this

11 witness?

12               (No audible response heard)

13          THE COURT:  You may step down, Mr. Sumeire.

14          MR. SUMEIRE:  Thank you very much, Your Honor.

15          MR. GALARDI:  We have no further witnesses, Your

16 Honor.

17          THE COURT:  Mr. Herman, any witnesses?

18          MR. HERMAN:  Your Honor, can we call Mr. Charlie

19 Hadid, who's here in the courtroom today and who attended the

20 auction yesterday?

21          THE COURT:  Mr. Hadid, is it?  Yes.

22               (Pause)

23          MR. GALARDI:  Your Honor, I understand that this

24 gentleman cannot hold the Bible, obviously if he could affirm?

25          THE COURT:  He may affirm, yes.

1          MR. GALARDI:  Your Honor, I think it maybe -- at this

2   point -- Your Honor, at this point, just because I do not

3   represent Citigroup, I'm representing SEB.  What I'd like to do

4   is move the admission of two individuals.  They are Thomas Hall

5   and Mr. Joseph Smolinsky, both of the firm of Chadbourne and

6   Parke in case there is a need for them to rise during the

7   examination, I wanted to move their admission pro hac vice.  I

8   understand they're in good standing, at least in the state of

9   New York.

10          THE COURT:  Okay.  Both are welcome and admitted for

11  the purposes of this.

12          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

13          THE COURT:  Certainly.

14          THE CLERK:  Please state your full name and spell

15  your last name.

16          MR. HADID:  Charles Jeb Hadid, H-A-D-I-D.

17          THE COURT:  Mr. Herman, you may proceed.

18          MR. HERMAN:  Thank you, Your Honor.

19                      CHARLES HADID, SWORN

20                      DIRECT EXAMINATION

21  BY MR. HERMAN:

22  Q    Are you currently employed?

23  A    Yes.

24  Q    And who is your employer?

25  A    Citigroup Global Markets.

Hadid - Direct                         132

1  Q    And how long have you worked for them?

2  A    Since May, 2004.

3  Q    Okay.  Do you know a company by the name of Lifetime

4  Brands, Inc.?

5  A    I do.

6  Q    Are they, in fact, a public company?

7  A    To my understanding, yes.

8  Q    Okay.  And isn't it true that in November of '05,

9  Citigroup was involved in the issuance of 2.5 million shares of

10 common stock with Lifetime Brands?

11 A    Citigroup, yes.  I was not involved in that transaction.

12 Q    Okay.  But Citigroup, right?

13 A    As they are in many, many, many transactions.

14 Q    Okay.  And isn't it true that Citigroup was also involved

15 as the investment banker for Lifetime Brands in the acquisition

16 of World Kitchen in 2005?

17 A    I cannot definitively say that because I did not work on

18 that transaction.

19 Q    Okay.  But it's true, isn't it?

20 A    I don't know.

21 Q    Okay.  And isn't it true that Citigroup represented

22 Lifetime Brands in numerous other deals and bids and

23 acquisitions?

24 A    I do not know because I only worked on one transaction for

25 that time, yes.

Hadid - Direct                133

1  Q    Okay.  Let's turn to the transaction that you worked on.
2  Isn't it true that in May and June of this year, of 2006, that
3  you personally worked on the issuance of $75 million or
4  convertible notes through a private placement?
5  A    Correct.
6  Q    Okay.  And isn't it also true that on May 18th of this
7  year, you went to Lifetime's office in Merrick, New York?
8  A    I'm not sure of the exact date, but mid-May sounds right.
9  Q    Okay.  And do you know a man by the name of Ron Shiftan?
10 A    I met him in mid-May.
11 Q    Okay.  And do you know it's true he's the Vice Chairman of
12 Lifetime Brands, right?
13 A    My understanding from him, yes.
14 Q    Okay.  And you met with him in May of this year, right?
15 A    Myself and other colleagues from Citigroup.
16 Q    Okay.  Now, in connection with the deal that you worked on
17 in May and June of this year, isn't it a fact that Citigroup
18 was provided with confidential information which was not
19 public?
20 A    Yes.
21 Q    Okay.  Now, isn't it also true that at the meeting on May
22 18th, in Merrick, New York, in connection with the $75 million
23 convertible note, that Ron Shiftan told you and told the
24 Citibank representatives that Lifetime Brands was interested in
25 making an acquisition of the WearEver assets?

1   A    Absolutely not.

2   Q    And isn't it also true that Mr. Shiftan told you that --

3   A    I said no.

4   Q    -- he expected SEB to be one of the bidders?

5   A    No.

6   Q    Now, um, isn't it true that you were at the auction

7   yesterday?

8   A    For the morning, yes.

9   Q    Okay.  And isn't it true that when Mr. Shiftan come into

10  the auction yesterday, you greeted him by saying that you would

11  be seeing him at the closing dinner for the most recent deal

12  you had just done with him?

13  A    Correct.

14  Q    Okay.  And in addition, prior to the commencement of the

15  auction, isn't it true that Lifetime Brands called you out of

16  the auction room and spoke to you in a separate conference

17  room?

18  A    Yes.

19  Q    Okay.  And isn't it true that when asked why you were here

20  working on this deal and the other deals, isn't it true that

21  your sole answer was that there was a Chinese Wall put in place

22  at Citibank -- at Citigroup?

23  A    I was -- don't recall the answer, I don't recall the

24  question.

25  Q    Okay.  Now, in addition to you, aren't there other

1  employees of Citi who worked on Lifetime Brands' matters who

2  were also working on the SEB matter?

3  A     No.

4             MR. HERMAN:  I have no further questions.

5             THE COURT:  Mr. Galardi?

6                      CROSS EXAMINATION

7  BY MR. GALARDI:

8  Q     Sir, how long have you been with Citigroup?

9  A     Since May, 2004.

10 Q     And before that, what did you do?

11 A     I worked at S.G. Cowen for two years.

12 Q     Okay.  And let me ask you, did you ever provide SEB with

13 any information that said, based on any conversations you ever

14 had with anybody at Lifetime, that Lifetime would definitely

15 bid X?

16 A     No, never.

17 Q     And in your involvement with SEB, did SEB run its own

18 financial information?

19 A     Yes.

20 Q     And did it provide you that financial information to do as

21 you do as a second year at Citigroup, run the model for them?

22 A     Yes.

23 Q     Did you do anything out of the ordinary with financial

24 modeling?

25 A     No.

1 Q     Did you ever provide them any confidential nonpublic

2 information that you obtained during the course of your work

3 for Lifetime?

4 A     Never.

5         MR. GALARDI:  Okay.  No further questions, Your

6 Honor.

7         THE COURT:  Thank you, Mr. Galardi.

8         MR. GALARDI:  Pass the witness.

9         MR. HALL:  Thomas Hall on behalf of Citigroup, Your

10 Honor.

11         THE COURT:  Thank you, Mr. Hall.

12                    CROSS EXAMINATION

13 BY MR. HALL:

14 Q     Mr. Hadid, can you give us the rough time frame that you

15 did work for Lifetime?  When did it start?  When did it end?

16 A     The actual execution of the transaction started mid-June

17 and ended the end of June, it was two and a half weeks or so.

18 Q     And have you done any work for Lifetime since then?

19 A     Never.

20 Q     And did you do any work for Lifetime before that?

21 A     Other than preparing for the materials in May, nothing.

22 Q     And did there come a time when you saw a public

23 announcement that Lifetime had become the stalking horse bid

24 for the WearEver assets?

25 A     Yeah, I saw a public press list for it on the Internet.

Hadid - Cross/Hall                                    137

1  Q     And prior to that time, were you aware that Lifetime
2  intended on bidding?
3  A     No, I was actually shocked to have seen that.
4  Q     And did anyone ever have any discussions with you about
5  the level of bidding that Lifetime would be going to go to
6  here?
7  A     Never, not once.
8  Q     Did you ever learn that from any source?
9  A     No.
10 Q     Was the subject matter of the work that you did for
11 Lifetime at all related to their bidding here for the assets?
12 A     No, it was to raise funds to pay down debt.
13 Q     To your knowledge, did anyone from Citigroup ever provide
14 to SEB any confidential information of Lifetime?
15 A     Never.
16 Q     Did anyone from Citigroup, to your knowledge, ever provide
17 to anyone from SEB any information concerning Lifetime's
18 bidding strategy here?
19 A     NO.
20 Q     How long did you stay at the auction yesterday?
21 A     I was there in the morning and when the auction began, I
22 excused myself less than 30 minutes after the auction began.
23 Q     Did you provide to SEB any strategic information as to how
24 SEB should go about the bid here?
25 A     Strategic, no.

Hadid - Redirect                            138

1  Q    What -- your position at Citigroup is what?

2  A    I'm an Associate in the Investment Banking Group.

3  Q    And where -- on the SEB transaction, where were you on the

4  pecking order?  Were you the senior guy?  The junior guy?

5  A    I was pretty low on the pecking order.

6  Q    Okay.

7  A    Working late at night.

8  Q    How about on the Lifetime transaction, where were you on

9  the pecking order?

10 A    I was close to the bottom, second to last.

11 Q    Did you, prior to yesterday, ever even meet anyone from

12 SEB?

13 A    Never, not once.

14         MR. HALL:  Thank you, that's all I have.

15         THE COURT:  Yes, Mr. Herman?

16                  REDIRECT EXAMINATION

17 BY MR. HERMAN:

18 Q    Well, let's just clarify a couple of issues here.  Let's

19 assume for a minute you were dead last on the pecking order,

20 out of 100,000 employees, you were the one hundred thousandth.

21 You were the lowest person on the bottom, okay?  Let's just

22 assume that for a minute.  If you knew somebody's maximum bid

23 at an auction, and you were representing the competitor, even

24 though you're the lowest person on the totem pole, you would

25 admit that's a pretty material piece of information, right?

Hadid - Recross/Galardi                    139

1          MR. GALARDI:  Objection, Your Honor.  I believe it

2     calls for speculation, a legal conclusion as to --

3          THE COURT:  I agree.  I'll sustain the objection.

4     Thank you.

5     BY MR. HERMAN:

6     Q     Now, you testified here today that apparently you weren't

7     doing anything.  So, why did you show up at the auction

8     yesterday?

9     A     I never said I wasn't doing anything.

10    Q     What were you doing?

11    A     Typical evaluation work.

12    Q     Just a valuation work, the value of the assets, right?

13    A     Based on information provided by WearEver, yes.

14         MR. HERMAN:  That's all I have, Your Honor.

15         THE COURT:  Thank you.

16         MR. GALARDI:  Your Honor, let me just ask a few

17    questions.  I unfortunately, I don't have many of these

18    exhibits.

19                    CROSS EXAMINATION

20    BY MR. GALARDI:

21    Q     Mr. Hadid, if you told you that on June 27th, Lifetime

22    Brands issued a press release about the 75 million convertible

23    notes, would that refresh your recollection about the day that

24    that closed?

25    A     Yes.

1  Q    And I believe your testimony was that the company was to

2  use that -- the proceeds of that for what?

3  A    To pay down debt.

4  Q    Did it ever discuss that that was going to be for the

5  purposes of acquisitions?

6  A    Never.

7  Q    Okay.  And is Lifetime Brands a public company?

8  A    To my understanding, yes.

9  Q    And they would -- to the best of your knowledge, they

10  would try to comply with the securities rules, correct?

11  A    To the best of my knowledge.

12  Q    Okay.  And now do you -- if I told you that I had an SEC

13  filing in my hand, that the deal with WearEver was announced on

14  July 7th, would that surprise you?

15  A    No.

16  Q    Okay.  And in the course of your engagement, did you ever

17  find out that they were negotiating such a deal?

18  A    Never.

19  Q    And during the course of your tenure with the Lifetime

20  engagement, did they ever say that they were going to use the

21  proceeds of this financing for the purpose of the acquisition

22  with respect to Lifetime?

23  A    No.  Our understanding was to raise proceeds to pay down

24  debt, it was a cheaper source of financing.

25           MR. GALARDI:  Thank you.  No further questions, Your

1  Honor.

2         THE COURT:  Okay.  Thank you.  Nothing further, Mr.
3  Hadid, you may step down.  Thank you.

4         MR. GALARDI:  Your Honor, on evidentiary grounds, I'd
5  like to make two -- two proffers.

6         THE COURT:  Yes.

7         MR. GALARDI:  First -- and I believe you could take
8  judicial notice of SEC filings Form 8Ks.  The first one, and
9  unfortunately I have to get other exhibits.  There is an 8K by
10 the Lifetime Industries saying on June 27th -- and I'd like to
11 read the sentence in the close -- in the first paragraph.  "The
12 company intends to use the net proceeds for private placement
13 to repay indebtedness outstanding under its existing credit
14 facility."

15        It never, in the closing, said that it was
16 contemplating acquisitions.  And I'd ask Your Honor to take
17 judicial notice of that fact.

18        Your Honor, again, the transaction was July 7, which
19 was first announced, I believe that there's an SEC filing and
20 press release with respect to the agreement, and Mr. Hadid has
21 already testified that he was done with the engagement on that
22 date.

23        Your Honor, I would also, on an evidentiary basis, I
24 believe that Mr. Herman mentioned, and I would just note the
25 fact that he no longer has any witnesses today, that the close

142

1  is on his offer.  I would like to cite, Your Honor, to a U.S.
2  Supreme Court case, which I happen to have with me on occasion.
3  It's 306 U.S. 208, it's called Interstate Circuit versus the
4  United States, it's the Supreme Court of the United States,
5  it's an old case, 1939, the principle is still applicable.

6         If you remember, Mr. Herman said that he had a
7  witness available today, but he not chosen to call that witness
8  or bring that witness.  By the Supreme Court's ruling, it says
9  the following:

10        "The failure under the circumstances to call as
11  witnesses those officers who did have authority to act, in this
12  case for the distributors, and who are in a position to know
13  whether they had acted pursuant to the agreement itself,
14  persuasive that their testimony, if given, would have been
15  unfavorable to the appellants, the production of weak evidence
16  when strong is available can lead only to the conclusion that
17  the strong would have been adverse."

18        I'd ask Your Honor to draw the presumption that his
19  failure to provide any witness or any testimony from Lifetime
20  be construed contrary to their accusation.

21        That's it.

22        THE COURT:  Thank you.  Mr. Herman, you do not have
23  any witnesses available to testify as to your 30 -- 363(m)
24  objection, is that correct?

25        MR. HERMAN:  Your Honor, we do not have a witness

1   here today.  But if the Court wanted to hear the evidence, we
2   can make somebody available probably tomorrow.

3          THE COURT:  Okay.  Well, the hearing, of course, was
4   set for today.  So, this was the time to bring forward any
5   witnesses.

6          Mr. Galardi rises?

7          MR. GALARDI:  I would only say that I think it's time
8   for the witnesses for Regal, and we would like to cross examine
9   if they have any.

10         THE COURT:  All right.  Let's take -- let's take a
11  ten-minute recess right now.  That will give us a chance to
12  change the format, and then we'll be back.

13              (Recess 2:45 P.M./Reconvene 3:11 P.M.)

14         THE COURT:  Please be seated.  And I think at the
15  recess we were preparing to proceed with -- Ms. Levine, I'm
16  sorry.  But let me just finish.  We were preparing at least
17  before you just stood to proceed with the Regal Ware objection.

18         MS. LEVINE:  Thank you, Your Honor.  Before we reach
19  that portion of the hearing, from the Committee's perspective,
20  we've heard a lot of evidence in support of good faith.  But we
21  still haven't truly addressed the issue of highest and best
22  offer.

23         And the Committee, given the information it's
24  received from the debtor and some of the testimony that Your
25  Honor has heard, is particular concerned about the timing issue

1  and the litigation risk associated with the appeal process.

2          And so we would just like to share with the Court

3  that I'm not sure that the Committee would be supportive of the

4  fact that the offer that's currently on the table is

5  necessarily the highest and best offer absent the agreement

6  with Regal that we saw Lifetime Brands talk about earlier.

7          THE COURT:  Okay.  I appreciate that, and that is

8  clearly a concern of the Court, as well.  But I think I can

9  better make an assessment after we hear more on the Regal Ware

10  objection, and that's why I thought we would proceed with that

11  objection and testimony, and then I would have an opportunity

12  to evaluate -- better evaluate the risks and the issue of

13  higher and better.

14          MS. LEVINE:  Thank you, Your Honor.

15          THE COURT:  Higher and best.  Highest and best.

16          MR. GALARDI:  Highest or otherwise best.

17          THE COURT:  Yes.

18          MR. GALARDI:  Your Honor, I'm glad Mr. Herman came

19  back.  I don't know -- I was asked whether the record is closed

20  for the good faith Citicorp matter.  And I just wanted to know,

21  and I don't think Mr. Herman has any further witnesses, we

22  don't.  And the Citigroup people would like to leave, and I

23  think their counsel would.  But I wanted to make sure the

24  record was closed on that.

25          THE COURT:  The record is closed.

1              MR. HALL:  Thank you, Your Honor.

2              THE COURT:  Thank you.  Mr. Kortanek?

3              MR. KORTANEK:  Yes, Your Honor.

4              THE COURT:  It is your turn to present your

5    objection.

6              MR. KORTANEK:  Thank you, Your Honor.  I would like

7    to call Mr. David R. Beine, who is general counsel of Regal

8    Ware, Inc.

9              THE COURT:  Thank you.  Mr. Beine, is it?

10             MR. BEINE:  Yes.

11             THE COURT:  Thank you.

12             THE CLERK:  Please state your full name and spell

13   your last name for the record.

14             MR. BEINE:  David Beine, B-E-I-N-E.

15               MR. BEINE, REGAL WARE'S WITNESS, SWORN

16             THE CLERK:  Have a seat, please.

17                         DIRECT EXAMINATION

18   BY MR. KORTANEK:

19   Q    Mr. Beine, can you briefly describe your personal

20   background for the Court before you joined Regal?

21   A    Uh, before I joined Regal Ware, I went to Marquette

22   University in Milwaukee, got my undergraduate degree.  Went on

23   to Marquette University Law School.  Got my law degree in 1992,

24   and then I was employed with a company in West Bend, Wisconsin

25   called M.T. Leather Products Company, it was the world's

Beine - Direct                                146

1  largest manufacturer of wallets.

2       And from there, in 1995, I was employed by Regal

3  Ware.

4  Q    Okay.  And your position with Regal, sir, is what?

5  A    I am currently a Vice President, Secretary and General

6  Counsel of Regal Ware.

7  Q    How long have you held those positions?

8  A    Uh, I've been General Counsel since 1995.  I've been Vice

9  President and Secretary since about 2001.

10  Q    Describe for the Court, please, a brief history of Regal

11  Ware.

12  A    Uh, Regal Ware was purchased in 1945 by J.O. Reigle.  He

13  came to Kewaskum, Wisconsin from Ohio and purchased Kewaskum

14  Utensil Company.  And the day after he purchased the company,

15  World War II ended and Regal Ware was a munition supplier to

16  the U.S. Army.  And as history goes, it was the fastest

17  peacetime retooling in history.  And J.O. Reigle was able to

18  retool the company and start manufacturing cookware and

19  consumer goods very quickly, otherwise he was going to be out

20  of business.

21  Q    Now, so the record's clear, Mr. Beine, the Reigle family

22  members who purchased the company, how is that -- how is their

23  last name spelled?

24  A    Their last name is spelled R-E-I-G-L-E.

25  Q    Okay.  And that's different from the spelling of the

Beine - Direct                                    147

1  company, correct?

2  A    Yes.  The -- they elected to spell the company name R-E-G-

3  A-L, just for simplicity sake, so the marketplace would be able

4  to spell the name.

5  Q    And has the company always had the current name that it

6  currently has?

7  A    Yes.

8  Q    Okay.  Can you briefly describe for the Court what product

9  lines Regal Ware manufactures?

10 A    Regal Ware currently manufactures high quality stainless

11 steel cookware that is sold through distributors through in-

12 home demonstrations sold door-to-door.

13      Regal Ware also manufactures non-stick aluminum

14 cookware that is sold in the same way.

15      Regal Ware is also introducing a line of non-stick

16 aluminum cookware to be sold in the retail marketplace.  And we

17 have a water filtration business unit.  And we also manufacture

18 commercial grade products, such as large commercial coffee

19 makers and commercial grade cookware that's sold to restaurant

20 supply houses and hotels.

21 Q    Good.

22           MR. KORTANEK:  Your Honor, may I approach?

23           THE COURT:  Yes.

24 Q    Mr. Beine, I've handed you what's been marked as R-1.

25                    (Off-the-record colloquy)

1  Q    Just so the Court can see an example, can you identify R-
2  1, Mr. Beine?
3  A    Exhibit R-1 is a sales brochure for what is trademarked
4  Lifetime Cookware, which is manufactured by Regal Ware.   It's
5  the stainless steel cookware which I mentioned which is sold
6  through in-home demonstrations, and which is not available at
7  retail.   And this is just one of the brand names or trademarks
8  which Regal Ware manufactures cookware under.
9  Q    Okay.  And approximately what price point or price point
10 for a set does that line of cookware sell for?
11 A    I would say that the open price point for this type of
12 cookware is going to start around $1,000 to twelve hundred
13 dollars.   And depending on the size of the set, it could go
14 upwards of $4,000 or a little bit higher.
15 Q    Now, you mentioned that the -- I think you generally
16 alluded to the way in which Regal manufactures cookware.   Could
17 you describe for the Court ways, if any, in which you believe
18 the manufacturing processes at Regal Ware are different from
19 that of other manufacturers?
20 A    Well, Regal Ware views its cookware as -- I would call it
21 heirloom cookware.   This is the highest quality cookware you
22 can buy.   It's manufactured in the United States of union
23 workers.   And Regal Ware is one of the last cookware
24 manufacturers in the United States.   And most of our employees
25 have been with us for 40 years.   And it's almost an art.   And

Beine - Direct                                    149

1  -- with Regal Ware's history back to 1945, we recently did an

2  acquisition in 2002 where we acquired the West Bend Company in

3  West Bend, Wisconsin, and their heritage goes back to 1911.

4  And the Lifetime trademark goes back to 1909.

5          So, it becomes a heritage.  It becomes a craft.  And

6  this is the best cookware you can buy, using the highest

7  quality, heaviest gauge materials available.  And Regal Ware

8  stands behind its products for the lifetime of the product, not

9  the lifetime of the consumer.

10         So, this cookware can be passed on from generation to

11  generation, and Regal Ware will stand behind it.

12  Q    Did you bring with you a -- one sample of Regal Ware

13  cookware?

14  A    Yes, I bought a sample of Lifetime Branded cookware.

15                          (Pause)

16          MR. KORTANEK:  Your Honor, may I approach?

17          THE COURT:  Yes.

18          MR. KORTANEK:  Of the pan, but I thought that without

19  too much ado, I wanted to have Your Honor at least feel the

20  heft of the pan.

21          THE COURT:  Yes.  Thank you.  I don't know if other

22  parties are interested in handling it, as well.  Thank you.

23  Very impressive.  I'd hate to be attacked with that thing, I'll

24  tell you all.  We have much lighter cookware at home, just in

25  case.

1          MR. KORTANEK:  The Court's security officers were a

2   little concerned.

3   BY MR. KORTANEK:

4   Q    Mr. Beine, does -- you mentioned earlier that Regal

5   currently sells direct to consumers, at least as to the

6   Lifetime product and these other premium cookware products.

7   Does Regal also manufacture a product that will be for sale in

8   retail outlets?

9   A    Yes.  As I mentioned before, we've taken some of our cast

10  aluminum cookware that we sell directly to consumer, and we've

11  modified it slightly, which would be nonstick aluminum

12  cookware, and we're going back into the retail market at the

13  high end to stores such as Williams-Sonoma, and Bed Bath and

14  Beyond.  And the product is, you know, at the -- it's been

15  developed, it's in production, and it's to be placed with these

16  customers.

17  Q    So, do -- what is your view of -- based on your position

18  at the company of whether that product competes in the same

19  class as All-Clad cookware, for example?

20  A    It will certainly be in the same class, it's all in Class

21  21.  It's all cookware.  It's going to retail for four to $500

22  per set.  And All-Clad probably retails close to $1,000 per

23  set.  So, we're competing in the same marketplace, in the same

24  distribution channels for the same consumers.

25  Q    You mentioned Class 21, and I made an effort to elicit

Beine - Direct                    151

1  what that was earlier.  Can you describe for the Court what
2  that means when you make that reference?
3  A    International Class 21 is a trademark classification which
4  includes top of stove non-electric cookware.
5  Q    Okay.  And why is that classification relevant to this
6  dispute today?
7  A    It's relevant because the trademark sub-license at issue
8  contains all of the Regal trademarks in Class 21.
9  Q    Okay.  How would you describe the targeted customer base
10  of Regal Ware?
11  A    Regal Ware makes the distinction between customers and
12  consumers.  Regal Ware's customer is the distributor who buys
13  cookware from us and then puts on the demonstration and sells
14  it to the consumer.
15        The targeted consumer is anyone who's interested in
16  healthy cooking for their family.  Because Regal Ware's
17  cookware operates differently than your typical cookware.  And
18  anybody who's interested in cooking healthy meals for their
19  family is our target concern.
20  Q    Let's talk now about Regal's trademarks, just generally.
21  How often in its entire corporate history has Regal licensed --
22  given out license of any of its trademarks?
23  A    Generally Regal Ware does not license any of its
24  trademarks.  The first time we did a license transaction was in
25  1999 when we sold the retail cookware business unit to Newell,

Beine - Direct                                  152

1  Rubbermaid.  And the second time we did a license transaction
2  was in 2003, after we acquired the West Bend Company, one of
3  the business units that we acquired from the West Bend Company,
4  we divested and sold to a company in Vernon Hills, Illinois,
5  and we structured a similar license agreement whereby they were
6  able to use, and still are able to use, the West Bend trademark
7  on certain products in certain distribution channels.
8  Q    Can you describe why it is that Regal has been -- has been
9  so careful about not licensing its trademarks?
10 A    Well, Regal Ware values its intellectual property, it
11 takes its trademarks very seriously.  And if Regal Ware owns a
12 trademark, it controls the trademark and it runs the business.
13 It doesn't rely on licensees to run those businesses for Regal
14 Ware.
15 Q    Let's talk about the name Regal or Regal Ware itself.  How
16 would you describe the importance of Regal standing alone, as
17 it were, or Regal Ware in the context of Regal Ware as a
18 corporation?
19 A    Well, there are trademarks, and then there are what I call
20 housemarks.  And Regal is not just a trademark, it is the
21 housemark, it's the Reigle family name.  It's the name of the
22 street that Regal Ware is located on.  It is Regal Ware.  So,
23 when people look at the trademark, they associate it with Regal
24 Ware and the Reigle family and the heritage that the company
25 brings with it.

Beine - Direct                                   153

1  Q     Now, you mentioned that there was a transaction in 1999,

2  that was with Newell, Newell Rubbermaid or a Newell Rubbermaid

3  entity, is that correct?

4  A     That's correct.

5  Q     Okay.  How did that transaction arise?

6  A     Uh, back in 1998 or 1999, Regal Ware made a strategic

7  decision to exit the retail marketplace because of, you know,

8  competitive pressures and things like that.  It's tough to

9  compete in that marketplace, so they made the decision to sell

10 the business unit.

11        And Newell Rubbermaid was actually the parent company

12 that owned Mirro, Mirro was located Manitowoc, Wisconsin, which

13 is probably 60 miles down the road from Regal Ware.  You know,

14 we've been friendly competitors forever.  And it just made

15 sense that Newell would be the logical buyer for that business

16 unit of ours.  So, we entered into the negotiations with

17 Newell, and within six or nine months, we had a transaction put

18 together and we divested the business unit.

19 Q     How familiar were the corporate decision makers at Regal

20 Ware with the business leaders at Newell?

21 A     Both business leaders were very familiar with each other.

22 We were in close proximity to each other.  They knew each other

23 from working in the businesses for 30, 40 years each.  Actually

24 Mirro is the one who wanted to put the transaction together,

25 and we were very close to them.  So, they all knew each other.

Beine - Direct                                        154

1  Q    In the context of that transaction when it was being
2  discussed or negotiated, what kinds of evaluation or
3  discussions were had regarding Mirro's plans to use these
4  marks?
5         MR. KORNFELD:   Objection.   Lack of foundation.
6         THE COURT:   Sustained.
7  Q    Were you personally involved in the negotiations that led
8  to the deal with Newell Rubbermaid in 1999?
9  A    Yes.
10 Q    And do you have personal knowledge of the various stages
11 in the negotiations between Regal Ware and Newell Rubbermaid?
12 A    Yes.
13 Q    Okay.   Do you have personal knowledge of what the
14 valuation or analysis or considerations Regal Ware took into
15 account when it was considering whether to enter into a license
16 agreement with Newell?
17 A    Yes.
18 Q    Okay.   Could you describe for the Court, please, what
19 considerations or factors Regal Ware took into account in
20 evaluating this potential transaction?
21 A    Well, we looked at, you know, the financial wherewithal of
22 someone like Newell to be able to operate this business unit,
23 to be able to come up with cash at closing to close the deal.
24 To be able to run the business unit afterwards with respect to
25 working capital requirements.   To be able to manage the brand.

Beine - Direct                                                      155

1   As we all know, Newell is very good at brand management because
2   they're a consumer goods company.  We were concerned about the
3   quality of the goods because the business unit that we sold to
4   Newell, it was all manufactured in the United States with union
5   employees, high quality goods, and Mirro in Manitowoc was the
6   same type of business with the same union that Regal Ware had,
7   and all the production that Regal Ware had was then moved to
8   Manitowoc, Wisconsin right down the road.  And it was -- you
9   know, it was as if Newell never missed a beat with that
10  transaction.

11          So, we wanted to make sure that that brand was going
12  to be managed properly.
13  Q    In the course of the analysis or the discussions that led
14  up to this transaction, did Regal Ware consider the
15  distribution channels or anything regarding with Mirro's plans
16  were for the -- for the -- for use of the mark?
17  A    Yes, we did.  And the distribution channels were to be
18  maintained, the same way that Regal Ware had.  Regal Ware was
19  distributing the product internationally, worldwide.  We were
20  probably in 200 countries or so.  We were in South America,
21  Canada, Mexico, Asia, the Middle East, Europe, we had broad
22  distribution.  And Newell had the same type of distribution
23  with their WearEver brands and Mirro brands and it was -- it
24  was just a perfect match.
25  Q    Did Regal Ware perceive any competitive threat by virtue

1  of granting this license to Newell?

2  A    No, we didn't because it was our decision to sell that

3  business unit.  We knew what we were entering into, and once we

4  sold that business unit to Newell, we weren't competing

5  anymore.

6  Q    Did at any time Regal consider licensing this trademark or

7  these group of trademarks to any company other than Newell back

8  in the 1999 time frame?

9  A    No.

10 Q    And your understanding of your familiarity with the

11 company, would Regal have considered licensing or otherwise

12 transferring those properties to any other company?

13 A    No, we wouldn't -- we would not have.

14          MR. KORTANEK:  Your Honor, may I approach the

15 witness?

16          THE COURT:  Yes.

17                    (Pause)

18 Q    Mr. Beine, I've handed you what's been marked as R-2, and

19 I'll ask you to identify what that is.

20 A    Exhibit R-2 is the trademark license agreement that Regal

21 Ware entered into with Newell Operating Company back on October

22 29th, 1999 so that Newell could use the Regal trademarks with

23 respect to the business unit that Regal Ware sold to Newell.

24 Q    Now, what -- can you describe briefly what scope of

25 trademarks was covered by that 1999 license agreement?

1  A    The scope of the trademarks is listed on Schedule E-1 on

2  the back, and it basically encompassed any trademark that had

3  legal in its name, because those are the -- that was the

4  housemark of Regal Ware, it's the company name, it's the family

5  name.  So, those are the trademarks that got carved out in the

6  license agreement.

7  Q    Okay.

8  A    Which Regal Ware retained ownership of.

9  Q    In connection with the 1999 transaction with Newell, was

10 there a noncompete provision or a noncompete agreement?

11 A    Yes, I believe there was a five-year noncompete, and that

12 was spelled out in the asset purchase agreement, not on the

13 trademark license.

14 Q    Okay.  Now, at some point, after the transaction with

15 Newell and --

16              (OBJECTIONS ARE NOT AT MICROPHONE)

17          MR. KORNFELD:  Your Honor, move to strike any

18 reference to that noncompete because that is seeking to prove a

19 document that isn't before the Court by testimony.  It's highly

20 inappropriate.  It came it by itself, otherwise I would have

21 objected before.

22          THE COURT:  Mr. Kortanek, any response?

23          MR. KORTANEK:   Your Honor, it's -- it's simply

24 testimony based on his personal knowledge that there was

25 noncompete.  The terms of it are obviously not in front of Your

Beine - Direct                                    158

1  Honor.  You know, this witness -- they're going to have a

2  chance to cross examine him about its terms and so forth.

3  We're not trying to prove anything other than his testimony

4  that there was a five-year noncompete.

5                (OBJECTIONS ARE NOT AT MICROPHONE)

6            MR. GALARDI:  Your Honor, I understand the way the

7  question was introduced was was there was a noncompete, it was

8  the main question, first of all.

9            Second, neither party has had any of the documents

10 provided with respect to today's hearing, it's not a document

11 that any of us is familiar with.  Even the asset purchase

12 agreement, I believe there's probably an integration clause,

13 this man's testified beyond what the testimony is with respect

14 to that.

15           But on the noncompete agreement, that document, I

16 think it is unfair and I think --

17           MR. KORNFELD:  Your Honor, I would -- at 20 minutes

18 to ten o'clock, documents were delivered to our offices.

19 Twenty minutes before ten today.  There's no noncompete in

20 them.  So, I object to any reference to the noncompete, and I

21 move that any testimony regarding that noncompete be stricken.

22           THE COURT:  All right.  I am going to strike that

23 testimony.

24           MR. KORTANEK:  Fine, Your Honor.

25 BY MR. KORTANEK:

Beine - Direct                                          159

1  Q    Mr. Beine, did, at some point, Newell, or any other party

2  approach you -- approach Regal Ware about a potential

3  disposition of those trademark rights?

4  A    Yes, in 2004, they did.

5  Q    And how did that come about?

6  A    Well, what happened was I believe I -- I got a telephone

7  call from Chris Ballenger (phonetic), he was outside counsel --

8                (OBJECTIONS ARE NOT AT MICROPHONE)

9                MR. KORNFELD:  Objection.  Your Honor, move to

10  strike.  This is, again, hearsay coming in through the back

11  door and it's highly inappropriate.

12                THE COURT:  It is hearsay.  And I will sustain that

13  objection.

14                MR. KORTANEK:  Your Honor, he can -- thank you, Your

15  Honor.

16  Q    Did you receive a contact from a representative of Newell

17  Rubbermaid in 2004?

18  A    Yes, we were contacted because Newell --

19                MR. KORNFELD:  Objection.  I don't object to the

20  question, did you receive a contact.  The answer was yes,

21  that's okay with me.  Anything after that is not, it's is

22  hearsay.  Move to strike anything after, yes.

23                MR. KORTANEK:  Your Honor, may I approach the

24  witness?

25                THE COURT:  Yes.  Are you withdrawing the question?

1          MR. KORTANEK:   I will, Your Honor, we'll get back to

2   it.

3   BY MR. KORTANEK:

4   Q    Mr. Beine,  I've handed you what's been marked as Exhibit

5   R-9, I'll ask you to identify that for me.

6   A    Exhibit R-9 is a copy of a letter that I sent to Chris

7   Ballenger on March 29th, 2004 regarding the proposal by Newell

8   to sell the business -- sell the Regal business unit that it

9   acquired from Regal Ware back in --

10  Q    Let's take this one step at a time because I hear rustling

11  over here.  How did -- how did you print or how did you bring

12  that document to court today, Mr. Beine?

13  A    Before I got on the plane last night, I went into my

14  computer and I printed off these documents that I drafted back

15  in -- back in 2004.

16  Q    And is this -- is there any way in your computer system of

17  ensuring that this particular printout was something you

18  actually sent?  How would you verify that?

19  A    I verified it because I did it and this is what I sent.

20          MR. GALARDI:   Your Honor, if I may interrupt for a

21  minute.  I guess I'm not sure where this is going.  But concern

22  is I feel I'm prejudiced in the following sense:  If this is

23  leading up to the acquisition documents, where this trademark

24  or sub-license was entered into, we don't have that asset

25  purchase agreement.  I believe it's an evidentiary matter.  If

Beine - Direct                                        161

1  there's a -- if there's going to be anything about what the

2  negotiations were, I will bet everything that there is an

3  integration clause that says this is the full document.

4         We can ask the gentleman, but all this testimony is

5  going in without a foundation that it's actually relevant or

6  admissible evidence with respect to negotiations regarding what

7  turns out to be a final -- probably integrated agreement.  Now

8  -- and that's where my concern is.  I don't know where to

9  object.  Because if it's an integrated agreement, my motion

10 would be to strike all of this testimony.

11        THE COURT:  Mr. Kortanek, can you lay a foundation

12 for this?

13        MR. KORTANEK:  Hopefully I can assuage counsel's

14 concerns.  This has nothing to do with the terms of the asset

15 purchase agreement.

16        This deals with how Regal undertook to evaluate

17 whether to enter in the transaction -- enter into a transaction

18 that involved licensing of its marks.  Nothing -- it's not

19 offered for any purpose other than that.

20        MR. GALARDI:  But, Your Honor, it goes to -- Your

21 Honor has a trademark license.  The terms of this license are

22 very clear.  I don't think there's any dispute about the

23 ambiguity.  So, how they got there, what they considered, what

24 they did, whether there was 75 people or one person that they

25 would sell to, the license speaks to those terms directly.  So,

Beine - Direct                                                    162

1 all this testimony is either irrelevant or was part of an
2 integration clause that says you can't introduce that kind of
3 testimony when you go to the terms.  Your Honor has to make a
4 determination first that this document is ambiguous on its face
5 before we hear any testimony about the origins or any of the
6 terms and how we got here.
7           THE COURT:  See, I think what Mr. Kortanek is saying,
8 and you'll correct me if I'm wrong, is this document does not
9 relate to a transaction.  It simply is background as to
10 someone's inquiry, is that correct?
11          MR. KORTANEK:  Yes, Your Honor.
12          THE COURT:  Or am I wrong?
13          MR. KORTANEK:  Your Honor, you're getting there.
14 This is about -- the issue today, Your Honor, is a very simple
15 issue to say, it's difficult to actually -- for Your Honor to
16 decide.  It's whether Regal is being unreasonable --
17          THE COURT:  Right.
18          MR. KORTANEK:  -- in refusing to consent.  This is
19 extremely relevant to that reasonableness.  And, you know, we
20 can virtually go to closing now.  But, frankly, reasonableness
21 can't simply be viewed in a vacuum as Mr. Galardi seems to
22 indicate, that we're supposed to just look at the closing
23 binder from 2004 and now we know how to decide reasonableness.
24 Well, that's not the standard.
25          The standard ought to be, and I think it is, an

Beine - Direct                                    163

1  objective measure of Regal's reasonableness for someone

2  standing in Regal's shoes.  This is evidence of what Regal

3  actually did or asked for in its due diligence to consider

4  whether to give away part of its house name.  That's all it's

5  for.

6          And so that's the single most important issue for --

7  it's the only for today.  So, how can I be precluded from

8  telling what Regal actually does to undertake the process that

9  got us here today?

10          MR. GALARDI:  Let me suggest a reason why it should

11  be excluded.  Your Honor will look at the sub-license

12  agreement.  The sub-license agreement is the context of an

13  acquisition of Cerberus.  These are negotiations with respect

14  to Cerberus, that's what that letter talks about.  So, it's

15  leading up to the transaction, and they could have done all the

16  due diligence in the world.  At the end of the day, they signed

17  a document that says what it says, and we'll argue about that.

18          And the question -- I'm not going to whether it's

19  reasonable or not yet with respect to whether that document on

20  its terms, it's reasonable to withhold the consent with respect

21  to my client.  But all of this and what they did is irrelevant

22  to how they came to those terms.  They came to the terms.  And

23  Your Honor can look at those terms and say, are there -- are

24  they ambiguous.

25          With respect to can that now be assigned to my

1  client?  The issue is solely what is the grounds for which they

2  don't want to assign to my client with the facts that they know

3  about?  My client.

4          The terms say it's assignable unless the consent's

5  unreasonable, unless they withhold consent.  And that can only

6  be done unreasonable.

7          None of this goes to that issue.  It goes to how they

8  got to this agreement, which is an integrated agreement, and

9  the evidence is irrelevant to that issue.

10         THE COURT:  I think it has probative value.  I'm --

11  and I'm going to permit the testimony and the document into

12  evidence because I think it shows the thought process behind

13  the licensing of the trademark.  So, I would permit the

14  testimony and the introduction of the document.

15         MR. KORTANEK:  Thank you, Your Honor.  I believe that

16  was R-9.

17         THE COURT:  Yes.

18         MR. KORTANEK:  I hadn't actually moved its admission,

19  but I appreciate -- I do now move the admission of R-9, as well

20  as R-1 and R-2, which I think is all that I've gone through at

21  this point.

22         THE COURT:  Any objection?

23             (OBJECTION IS NOT AT THE MICROPHONE)

24         MR. KORNFELD:  I will object to the admissibility of

25  R-9, I would join in Mr. -- with what Mr. Galardi stated.  I

Beine - Direct                                                       165

1  won't restate them.  I will also object on the grounds of

2  relevancy.

3          MR. GALARDI:  And I would reassert my objection, Your

4  Honor.

5          THE COURT:  Okay.  Thank you.  The objections are

6  overruled and the witness has testified that he prepared this

7  letter, it was on his computer, and that it was sent.  So, I

8  will admit R-9.

9  BY MR. KORTANEK:

10 Q    Now, turning to R-9, Mr. Beine, can you describe for the

11 Court why you wrote that letter?

12 A    The reason I wrote this letter is because a couple days --

13 probably three or four days before Newell Rubbermaid was about

14 to sell this business unit to Cerberus Capital Management and

15 Global Home Products, they gave us a call and said that they

16 wanted to --

17              (OBJECTIONS ARE NOT AT MICROPHONE)

18         MR. KORNFELD:  Objection.  Again, move to strike his

19 testimony about what they said.  What the representation was of

20 counsel today was that he would show the thought processes of

21 his client.

22         THE COURT:  Correct.  I -- sustained.

23         MR. KORTANEK:  All right.

24 BY MR. KORTANEK:

25 Q    And, Mr. Beine, given the colloquy we've had and the last

Beine - Direct                                166

1  three objections, please, let's just talk about your own

2  reasons and why you wrote the letter.

3  A    I wrote the letter because three to four days before

4  Newell was about to close the transaction with Cerberus and

5  Global Home Products, I requested some of these due diligence

6  materials from them because this is the first that Regal Ware

7  knew that a transaction was about to take place with respect to

8  its Regal trademark within three days.  So, Regal Ware was

9  trying to do some due diligence to determine whether or not it

10 would consent to that transaction.

11 Q    Now, why did you ask for the particular information

12 identified in R-9?

13 A    Well, these are some of the things that you would look at

14 for a trademark licensee or sub-licensee.  We wanted to get a

15 current Dun and Bradstreet on the company to see what their

16 financial wherewithal was.  We wanted to get some pro forma

17 income statements and balance sheets to see what their

18 financial position was.  We wanted to see what their business

19 plan was with respect to the Regal trademark and their

20 marketing plan.  And these are some of the things that we look

21 at.

22          And a big issue for Regal Ware was the name of

23 Cerberus, and how it affects the good will of the Regal name.

24 And I told these guys in my letter that Regal Ware did not want

25 its trademark associated with Cerberus, which means the three-

Beine - Direct                167

1  headed dog that guards the entrance Hades.  I mean that's bad
2  for trademarks.  And we didn't want to be associated with the
3  three headed dog.

4         Plus, Cerberus Capital held themselves out to be a
5  distressed asset buyer.  And here they are trying to, you know,
6  buy this business unit that the Regal trademark is associated
7  with.  So, Regal Ware,  at the time, we only had a couple of
8  days to go through this.  We were very concerned about all
9  these issues.  And, you know, lo and behold, two years later
10 we're in bankruptcy with our trademark.  So, Regal Ware's
11 concerns came true.

12        So, that was Regal Ware's thought process in trying
13 to approve or consent to a transaction with respect to its
14 trademark.

15        MR. KORTANEK:  Your Honor, may I approach?
16        THE COURT:  Yes.
17 Q   Mr. Beine, I've handed you what's been marked as R-10, and
18 would you identify it for the -- that for the Court, please?
19 A   Exhibit R-10 is a letter that I sent, again, to Chris
20 Ballenger on March 30th, 2004.
21 Q   And the same authentication questions I asked before, how
22 did -- how did you come by the letter that you're holding
23 today?
24 A   This letter was on my computer because I drafted it and
25 sent it to Chris Ballenger.

1  Q     And what is -- why did you write that letter?

2  A     I wrote this --

3                    (OBJECTIONS ARE NOT AT MICROPHONE)

4          MR. KORNFELD:  Your Honor, I'm sorry.  But I have to

5  object to this letter, too.  It's just rank filled with

6  hearsay.  It's just hearsay all over it about conversations

7  with George Hamilton.  So, I would object to any questions

8  related to this letter insofar as they relate to substantive

9  conversations with others.  And if the letter is being

10 introduced for any purpose other than to establish that those

11 conversations took place and they were true, then the letter is

12 irrelevant.

13         If it's being introduced for the purpose of proving

14 up those conversations and what went on, it's hearsay.

15         THE COURT:  I agree.  Just looking quickly at the

16 letter, but I've seen enough to know that it is replete with

17 hearsay.

18         MR. KORTANEK:  Well, Your Honor, it's not to prove

19 the truth of any of the matters asserted.  It's simply to prove

20 what Mr. Beine wrote, and what Regal's own views were at the

21 time.

22         And so for that limited purpose, I think it's

23 appropriate to have it admitted.

24         MR. KORNFELD:  Then it's irrelevant.  If it's not to

25 prove the truth of the matters asserted, it's completely

Beine - Direct                                              169

1   irrelevant.

2            THE COURT:  Well, I'd like to hear Mr. Beine's -- I'm

3   not going to admit the document into evidence.

4            MR. KORTANEK:  Um-hum.

5            THE COURT:  But I would like to hear Mr. Beine's, I

6   suppose, concerns and what prompted the writing of the letter.

7   BY MR. KORTANEK:

8   Q    Mr. Beine, without -- being careful not to attempt to

9   testify as far as what others told you, why -- you know, what

10  was the purpose for this letter?  What were you trying to

11  accomplish?

12  A    I wrote this letter because my previous with all of our

13  due diligence requests was never answered.  Regal Ware received

14  absolutely no due diligence on this transaction from any of the

15  parties.

16           So, I wrote this letter because -- because George

17  Hamilton called me to answer all of our questions.  And this

18  memorializes my conversation with Mr. Hamilton, so I won't go

19  into that.  But some of Regal Ware's concerns here were that

20  Mr. Hamilton wanted Regal Ware just to approve the deal because

21  he knew Jeff Reigle.  And because he knew Jeff Reigle, who was

22  Regal Ware's President and CEO, everything should be fine,

23  Regal Ware should look passed the issue that it got no due

24  diligence --

25           MR. KORNFELD:  Objection.  He's going into hearsay

Beine - Direct                                        170

1  again.

2          THE COURT:  Okay.  We'll strike that last comment

3  relating to the conversation regarding Mr. Reigle.

4          MR. KORTANEK:  We'll move on, Your Honor.  Thank you.

5                          (Pause)

6          MR. KORTANEK:  May I approach, Your Honor?

7          THE COURT:  Yes.  Let's take a minute and give your

8  colleagues a chance to look at it before we begin any

9  questioning.

10               (OBJECTIONS ARE NOT AT MICROPHONE)

11          MR. KORNFELD:  I would ask also that the document,

12  given the history here this afternoon, not be put in front of

13  the witness until we have a chance to look at it.

14          THE COURT:  Okay.  That's fine.  Is that the most

15  recent document?  If you would --

16          MR. KORTANEK:  It is.  If you could turn it over.

17          THE COURT:  Turn it over.  Thank you very much, Mr.

18  Beine.

19                          (Pause)

20          THE COURT:  Subject to authentication, is there any

21  objection?

22          MR. KORNFELD:  Not at this point.

23          THE COURT:  Okay.

24  BY MR. KORTANEK:

25  Q    Mr. Beine, could you please review the exhibit I've just

Beine - Direct                              171

1  handed you and identify it for the Court?

2  A     Exhibit R-7 is a letter that I wrote to Stuart Graff, he

3  was IP counsel -- in-house IP counsel for Newell Rubbermaid,

4  which I wrote on April 14th, 2004.

5  Q     And could you describe for the Court the purpose of that

6  letter?

7  A     I told Stuart that because Regal Ware had not received any

8  due diligence that it requested on the proposed sub-license,

9  that -- or on the proposed transaction, that Regal Ware was not

10 going to grant its consent to assign or transfer the trademark

11 license to Global Home Products.

12 Q     Now, at any point in connection with the 2004 transaction

13 involving Cerberus, did Regal Ware communicate anything to

14 Newell Rubbermaid or Cerberus regarding the ability of future

15 transfers of the trademark rights?

16 A     Well, what I told Stuart in this letter was that Regal

17 Ware would not grant its consent to assign a trademark license,

18 but Regal Ware would grant its consent to sub-license the

19 trademarks to Global Home Products.  And we told Newell that we

20 were only doing that out of relationship with Newell because

21 Regal had a good relationship with Newell.  We did not want to

22 damage that.  And that we would not allow any other sub-

23 licenses of the agreement, and that Regal Ware would continue

24 to have a relationship with Newell because there were certain

25 obligations of Newell in the original license agreement that we

1  did not want Global Home Products to step into.

2  Q    All right.  Shifting gears now.  How would you describe or

3  -- say it a different way.  What is Regal Ware's view of -- of

4  the current merchandising and marketing practices of Regal Ware

5  products manufactured by the debtors?

6                  (OBJECTIONS ARE NOT AT MICROPHONE)

7              MR. KORNFELD:  Objection.  Lacks foundation as to

8  this witness's knowledge.

9              MR. KORTANEK:  I'll parse it out, Your Honor.

10             THE COURT:  Sustained.

11 Q    Mr. Beine, are you in regular contact with the President

12 and CEO of Regal Ware?

13 A    Yes.

14 Q    Okay.  Are you also in regular contact with other senior

15 executives at Regal Ware?

16 A    Yes.

17 Q    And as part of your regular duties with the company, do

18 you and management of Regal Ware evaluate and monitor the

19 products, the quality of products, and the merchandising

20 practices of the Mirro businesses as far as Regal Ware

21 trademarked goods?

22 A    Yes.

23 Q    Okay.  Have you -- since you've been with Regal Ware as

24 general counsel, how would you characterize the consistency of

25 that monitoring process with regard to Regal Ware marked goods

Beine - Direct                    173

1  made by the debtors?

2              (OBJECTIONS ARE NOT AT MICROPHONE)

3          MR. KORNFELD:  Objection.  Lacks foundation as to

4  this witness's knowledge of the monetary process of operational

5  people like, for example, the President and Chief Operating

6  officer, other than for hearsay.

7          MR. GALARDI:  I'm going to join in that

8  (indiscernible).

9          THE COURT:  I'll sustain that -- I have to sustain

10  this objection.

11          MR. KORTANEK:  That's fine, Your Honor.  Thank you.

12  BY MR. KORTANEK:

13  Q    Mr. Beine, are you personally involved in the process of

14  monitoring or reviewing information as to the merchandising

15  practices of Regal branded products sold by the debtors?

16  A    Yes, it's my responsibility to administer the trademarks

17  for the company and the trademark license agreements for the

18  company.

19  Q    And in that capacity, do you personally, and are you

20  personally regularly or periodically involved in reviewing

21  information as to the marketing and merchandising practices of

22  these debtors as to Regal Ware branded products?

23  A    Yes.

24  Q    Now, with respect to those personal observations on your

25  part, what -- what are your own --

1          MR. KORTANEK:  Well, strike that.

2  Q    What are Regal Ware's views as to the -- both as to trends

3  and the current status of the merchandising practices of Regal

4  Ware branded products sold by the debtor?

5                  (OBJECTIONS ARE NOT AT MICROPHONE)

6          MR. KORNFELD:  Object.  Lack of foundation as to his

7  personal knowledge.  To recap the testimony, his testimony is

8  -- and he was careful in his answer -- he said he administers

9  trademarks.  He didn't -- and he said then that he reviews

10 marketing materials regarding the debtors' goods.

11         Well, that reviewing of marketing materials is

12 looking at hearsay.  So, he has no basis for answering the

13 question.  It lacks foundation.

14         MR. GALARDI:  Your Honor, I also add that he says --

15 that he's stating his position and not the basis of his own

16 personal knowledge (indiscernible) and it's hearsay.

17         MR. KORTANEK:  Well, Your Honor, as to hearsay, it's

18 the debtors' documents.  Um, I don't think that's a problem for

19 us.

20         But as to -- as to his own -- we'll ask him about his

21 personal knowledge --

22         THE COURT:  If you --

23         MR. KORTANEK:  -- and his company's knowledge.

24         THE COURT:  First of all, I'm going to sustain Mr.

25 Galardi's objection in speaking on behalf of the company that

Beine - Direct                                    175

1  way.

2            MR. KORTANEK:  Right.

3            THE COURT:  If you could just ask perhaps Mr. Beine
4  what specifically he does in administering the trademark, in
5  reviewing the -- the -- and so on.  I think -- I think we'll
6  get there.

7            MR. KORTANEK:  Right.

8  BY MR. KORTANEK:

9  Q    Mr. Beine, what -- what actions do you undertake to
10 monitor the merchandising practices of the debtors with respect
11 to these products?

12 A    I go to Wal-Mart periodically and look at the cookware
13 isle and see how the -- how Regal Ware's products is being
14 marketed.

15 Q    Is -- to your knowledge, is Regal Ware -- well, what
16 information and research is undertaken by Regal Ware as to
17 whether the debtors sell product to any other retail outlets?

18 A    Well, the research we do is -- all of us at Regal Ware,
19 including me, we walk retail stores and we go down the cookware
20 isle.  So, Regal Ware is known for a while that the Regal
21 branded cookware is only available at Wal-Mart.  And Regal Ware
22 also attended a management presentation by the debtors wherein
23 they told us that it's only marketed at Wal-Mart.

24 Q    Now, what's the -- what's the import to Regal Ware of --
25 of selling Regal Ware branded products at Wal-Mart?

Beine - Direct                                    176

1                (OBJECTIONS ARE NOT AT MICROPHONE)

2           MR. GALARDI:  Objection, Your Honor, as to

3    foundation.  The question as to what (indiscernible).

4           THE COURT:  If you could ask him in his capacity as

5    general counsel.

6           MR. KORTANEK:  Yes.

7    Q    Sir, in your capacity as general counsel --

8           THE COURT:  That's the only objection.  So, I'll

9    sustain the objection and we'll re-ask the question.

10          MR. KORTANEK:  Thank you, Your Honor.

11   Q    In your capacity as general capacity and the other

12   executive titles you hold, can you please advise the Court what

13   Regal Ware's position is as to the import of selling Regal Ware

14   branded products at Wal-Mart?

15   A    The import of selling Regal Ware branded product at Wal-

16   Mart affects Regal Ware because every time Regal Ware goes to

17   sell its other products or its other cookware in other

18   channels, the customers and the consumers always ask, well, is

19   this the same Regal that's sold at Wal-Mart.  And it affects

20   the brand image of Regal Ware's other product lines.

21               (OBJECTIONS ARE NOT AT MICROPHONE)

22          MR. KORNFELD:  Objection.  Lacks foundation to people

23   asking is this the same stuff that's sold at Wal-Mart.  Move to

24   strike that testimony.

25          THE COURT:  I'll strike it.  I understand the

Beine - Direct                                    177

1  objection.

2  BY MR. KORTANEK:

3  Q    Mr. Beine, have you been personally involved in any

4  meetings involving -- where such comments have come up from the

5  sales force, for example, with regard to the Wal-Mart

6  situation?

7                   (OBJECTIONS ARE NOT AT MICROPHONE)

8             MR. KORNFELD:  Objection, it's also hearsay.

9             MR. GALARDI:  Same objection, Your Honor.

10            MR. KORTANEK:  I'll strike that, Your Honor.

11            THE COURT:  Yes.  Sustained -- question withdrawn.

12            MR. KORTANEK:  Your Honor, just for identification

13 purposes, I'm going to hand the witness the trademark sub-

14 license agreement.  I don't think there's any problem with

15 that.

16            THE COURT:  I assume no objection?

17            MR. KORNFELD:  No objection to that.

18            MR. GALARDI:  No objection.

19 BY MR. KORTANEK:

20 Q    Mr. Beine, can you identify R-11 for the Court, please?

21 A    Exhibit R-11 is a copy of the trademark sub-license

22 agreement between Newell Operating Company and Mirro Operating

23 Company, LLC.

24 Q    Is that, to the best of your knowledge, a true and correct

25 copy of the trademark sub-license agreement?

Beine - Direct                                    178

1    A     Yes, it is.

2              MR. KORTANEK:  Your Honor, I would move the admission

3    of R-11.

4              THE COURT:  Admitted.

5              MR. KORTANEK:  Your Honor, I have with me the August

6    1, 2006 agreement whereby Newell assigned its rights to Regal.

7    May I approach --

8              THE COURT:  Yes.

9              MR. KORTANEK:  -- the witness, Your Honor?

10             THE COURT:  Any objection?

11             MR. KORNFELD:  No objection to that, Your Honor.

12             MR. GALARDI:  No objection, Your Honor.

13             THE COURT:  It is admitted.

14   BY MR. KORTANEK:

15   Q     Mr. Beine, did -- was there any point in time when -- when

16   you were at Regal Ware that a dispute arose with SEB or an SEB

17   affiliate regrading trademarks?

18   A     Yes, there was.

19   Q     Do you recall how that arose?

20   A     Yes, it was back in 1997 when Regal Ware introduced the

21   new line of cookware at the International Housewares Show in

22   Chicago and that new line of cookware was called Blue Pearl and

23   after we introduced that line of cookware, we were notified by

24   Tefal, which is a subsidiary of SEB, that Regal Ware's new line

25   of cookware was infringing upon several of Tefal's registered

Beine - Direct                                            179

1  trademarks.

2            MR. KORTANEK:  Your Honor, may I approach?

3            THE COURT:  Yes.

4                 (OBJECTIONS ARE NOT AT MICROPHONE)

5            MR. GALARDI:  Your Honor, before (indiscernible)

6  chance to review this?

7            THE COURT:  Absolutely.

8            MR. GALARDI:  Okay.

9            THE COURT:  If you would just turn that upside down.

10 Thank you, Mr. Beine -- Beine -- forgive me.

11                            (Pause)

12           MR. KORNFELD:  Your Honor, I'm not sure this witness

13 has personal knowledge of this document.  This is just a cease

14 and desist letter from an attorney from Tefal to Mr. Reigle,

15 President of Regal.

16           It's not a secret that there was a complaint filed.

17 And that complaint, the Court can probably take judicial notice

18 of.

19           So, given that this relates to the complaint, we

20 won't object to it.

21           MR. GALARDI:  Same, Your Honor.  We don't have any

22 objection to it.

23           THE COURT:  Okay.  It is admitted then.

24           MR. KORTANEK:  Thank you, Your Honor.

25 BY MR. KORTANEK:

Beine - Direct                                              180

1  Q    Mr. Beine, you can now look at the letter.  By the way,

2  for the record, Mr. Beine, do you have personal knowledge of

3  this letter?  And did you review it contemporaneously?

4  A    Yes, I do have personal knowledge of this letter.

5  Q    Thank you.  What's your understanding of this letter?

6  A    Exhibit R-2 is a letter dated February 6th, 1997 from

7  Tefal's counsel to Jeff Reigle, Regal Ware's President, stating

8  that they saw Regal Ware's new product at the Housewares Show

9  in Chicago, and that they believe that Regal Ware's new product

10 infringed some of their trademarks.

11        MR. KORNFELD:  Your Honor, I have just a

12 clarification point, as long as we're making a record here.

13 There are two R-2s now.  The first R-2 is the trademark license

14 agreement.  I would suggest of counsel, with the Court's

15 indulgence, that we mark the letter as something besides R-2.

16        THE COURT:  Okay.

17        MR. KORTANEK:  Let's call it R-2A, if that's all

18 right?

19        THE COURT:  That's fine.  R-2A.

20        MR. KORTANEK:  Thank you, Your Honor.  Thank you.

21 Your Honor, I have another letter that is -- I'll represent is

22 Regal Ware's counsel's response letter.  May I approach?

23        THE COURT:  Yes.  Let's give counsel an opportunity

24 to review it.

25                        (Pause)

Beine - Direct                          181

1          MR. KORTANEK:  I'm going to identify this as R-3A, I

2    may have doubled that numbering again, I'm not sure.

3                         (Pause)

4          THE COURT:  Any objection?

5          MR. KORNFELD:  Not at this time, Your Honor.

6          THE COURT:  Okay.  Mr. Galardi?

7          MR. GALARDI:  No objection, Your Honor.

8          THE COURT:  It's admitted as R-3A.

9          MR. KORTANEK:  Thank you, Your Honor.

10   BY MR. KORTANEK:

11   Q    Mr. Beine, are you personally familiar with the letter,

12   that is R-3A?

13   A    Yes, I am.

14   Q    And what is your understanding of that letter?

15   A    This is a letter dated February 13th, 1997 from Regal

16   Ware's intellectual property counsel, Joe Krumholtz writing by

17   to Tefal's counsel, replying to their previous letter that they

18   sent to us regarding infringement.

19          MR. KORTANEK:  I have the complaint, Your Honor, may

20   I approach?

21          THE COURT:  Yes.

22   Q    Mr. Beine, I've handed you what's been marked as Exhibit

23   R-4, and I would ask you to identify that for the Court?

24   A    Exhibit R-4 is a copy of a complaint that Tefal filed

25   against Regal Ware on March 21st, 1997, asserting trademark

Beine - Direct                              182

1  infringement.

2  Q    Can you describe for the Court what happened after filing
3  that complaint?

4  A    Well, if I may back up for a moment.  The previous lawyer
5  that Regal Ware's outside counsel sent to Tefal's counsel said
6  that Regal Ware would not manufacturer or sell the cookware in
7  question to avoid this trademark dispute, and then the
8  complaint was filed against Regal Ware.

9          And then what happened after this complaint was filed
10  was in order for Regal Ware to defend itself, Regal Ware filed,
11  I believe, four trademark cancellation proceedings against
12  Tefal to try to cancel the trademarks that were in dispute in
13  this complaint because that was our only defense.  Regal Ware
14  agreed not to manufacture the product, and Regal Ware was sued
15  regardless of that.

16  Q    Did Regal Ware have a view as to whether the suit was
17  brought in good faith or not?

18  A    Well, in Regal Ware's view, since Regal Ware agreed not to
19  manufacture or sell the cookware and, you know, within 30 days
20  Tefal served a complaint on us for trademark infringement for
21  products we didn't even sell, no, Regal Ware did not believe
22  that the suit was brought in good faith.

23  Q    Now, what steps did Regal Ware take after the -- excuse
24  me.  What -- what then happened in the litigation after Regal
25  Ware filed the cancellation proceedings?

1  A    Well, the cancellation proceedings were proceeding before

2  the TTAB, which is the Trademark Trial and Appeal Board.  And

3  this lawsuit was pending in the Eastern District of Virginia,

4  which -- I don't know if you're familiar, but that's a rocket

5  docket.  And Regal Ware basically -- and Tefal, this suit was

6  prosecuted and defended from start to finish within six

7  months.

8         And we were -- the case was pending before Judge

9  Brinkema out there.  So, this lawsuit happened very quickly.

10  It was very intense.  And every Friday afternoon was motion

11  practice in the Eastern District.  So, every Thursday night we

12  would fly to Washington, D.C. and get to Virginia and argue

13  motions, that was every Friday.  So, it was an intense lawsuit.

14  It was -- it was an expensive lawsuit for both parties.

15  Q    Now, how much -- let me ask this.  Were you personally

16  involved in that litigation?

17  A    Yes, I was.

18  Q    Is it fair to say that you were personally involved with

19  all phases of that litigation?

20  A    Yes.

21  Q    Okay.  Now, as the -- you mentioned that litigation

22  proceeded on a very rapid pace.  Did any evidence come out in

23  that litigation as to the actual amount of damages that Tefal

24  alleged it was suffered?

25  A    Well, after the --

1              MR. KORNFELD:  Objection.  This is now getting into

2    hearsay and irrelevance.  He's -- he's established his point

3    that there was a lawsuit.  I think it's irrelevant to try that

4    lawsuit in this court.

5                   (OBJECTIONS ARE NOT AT MICROPHONE)

6              MR. GALARDI:  And, Your Honor, I would note that

7    there is a motion pending on the record with respect to this

8    lawsuit (indiscernible).

9              THE COURT:  Okay.

10             MR. KORTANEK:  Well, Your Honor, it's not that

11   simple.  Because the -- what the witness should be permitted to

12   testify to is how it happened and what happened.  This is not

13   an integration clause issue.  This is what was a party's

14   conduct.  And that's what we're entitled to hear today.

15             MR. GALARDI:  Your Honor, again -- unfortunately I

16   don't have the settlement document between the two parties.  I

17   don't know whether this is a confidential of the terms or

18   whether this can be disclosed.  So, again, I feel that I'm at a

19   disadvantage when parties have settled litigation on an offer

20   of judgment.  There's a -- there's a court order that says that

21   this matter has been settled by an offer of judgment where

22   Regal paid Tefal.  They brought counterclaims, they dismissed

23   those counterclaims, and there was a judgment.  It was a very

24   small amount, it was $3,000, but it was resolved.

25             THE COURT:  I think that --

 1          MR. KORTANEK:  Your Honor --

 2          THE COURT:  Was that the answer to the question?

 3          MR. KORTANEK:  And I think you'll -- I think you'll

 4  hear --

 5          THE COURT:  Something different?

 6          MR. KORTANEK:  We're going to be very careful about

 7  anything that would even potentially cover any confidentiality

 8  issue.

 9          THE COURT:  I don't think -- I don't think this is

10  particularly relevant.  So, I'm going to sustain the objection,

11  I think, really on that ground.

12          MR. GALARDI:  Thank you, Your Honor.

13          MR. KORTANEK:  Well, the only thing I would say, Your

14  Honor, is I ought to be -- I think I ought to be allowed to ask

15  the witness what -- what transpired in front of the Court as to

16  the offer of judgment.

17          We're not trying to adjudicate anything, but in terms

18  of Regal's experience with Tefal --

19          THE COURT:  I think -- you could -- if your -- if the

20  point you're trying to make is that this lawsuit was brought,

21  for example, as harassment, or something to that extent --

22          MR. KORTANEK:  Right.

23          THE COURT:  -- then you could certainly ask that

24  question and elicit that answer.  I don't know that we need to

25  get into all of the details.

Beine - Direct                                186

1          MR. KORTANEK:  Right.

2          THE COURT:  But --

3          MR. KORTANEK:  That's fine, Your Honor.

4          THE COURT:  -- if that's your client's view, then

5   certainly he may express that view.

6          MR. KORTANEK:  We could do it at that higher level.

7   BY MR. KORTANEK:

8   Q    Mr. Beine, based on your personal experience in that

9   litigation and in the hearings that related to this offer of

10  judgment, did you personally observe, without disclosing what

11  they are, any conduct by Tefal that you considered or that

12  Regal considered was reflecting bad faith in that litigation?

13                (OBJECTIONS ARE NOT AT MICROPHONE)

14         MR. GALARDI:  Objection, Your Honor.  That would go

15  to what he may have observed, his.  But what Regal Ware

16  observed, I think it's beyond his personal knowledge.  He could

17  certainly say what his impression was without (indiscernible).

18         THE COURT:  Sustained.  Let's limit it to that.

19         MR. KORTANEK:  That's fine.

20         THE COURT:  The personal observation.

21  Q    I'll ask the same question as to your own personal views

22  as general counsel of the company.

23  A    Well, my personal views, and my views as an office of

24  Regal Ware, you know, there were several instances in the

25  litigation where Regal Ware just thought the litigation was

Beine - Direct                           187

1  vindictive.  And we got into a mediation session with one of

2  the judges out there where Tefal wanted Regal Ware to agree to

3  drop all of its --

4          MR. KORNFELD:  Objection.  I may be speaking for Mr.

5  Galardi here, to a certain degree, but any mediation that I've

6  been involved with, and I've been involved in hundreds, they're

7  confidential.

8          THE COURT:  That's right.

9          MR. GALARDI:  Same objection.

10          THE COURT:  Thank you.  I'll sustain that objection.

11          MR. KORTANEK:  Yeah, thank you, Your Honor.

12          THE COURT:  Nothing related to mediation, nothing

13  relating to anything filed confidentially.  No settlement

14  discussion should be elicited.

15          MR. KORTANEK:  Yes, Your Honor, I would agree.

16  BY MR. KORTANEK:

17  Q    Mr. Beine, did -- did the -- not referring to the

18  mediation, but did the actual District Court Judge in the Tefal

19  litigation make any comments to the parties about -- I guess I

20  have the question whether this is on the record, but did the

21  Judge make any comments to the parties regarding the merits of

22  the lawsuit?  I'm not asking what the Court said.

23              (OBJECTIONS ARE NOT AT MICROPHONE)

24          MR. KORNFELD:  Your Honor --

25          MR. GALARDI:  Your Honor, (indiscernible) say is

Beine - Direct                                        188

1  hearsay.

2            MR. KORNFELD:  I join --

3            MR. KORTANEK:  And I'm just asking a yes or no

4  question.

5            THE COURT:  And I don't -- I don't really want us to

6  retry that litigation here.  I think it's sufficient for the

7  Court to understand, and I certainly do, that in your client's

8  view, this was an ill advised litigation, at best.

9            MR. KORTANEK:  Correct.

10           THE COURT:  Harassment at worst.  And it created very

11  strong feelings from Regal Ware that it doesn't like, you know,

12  the folks at Tefal.  But I don't know that we need to get into

13  such hard specifics.  Because otherwise, we have to -- you

14  know, really investigate the entire record in that case, and I

15  don't think we want to do that here.

16           MR. KORTANEK:  Fair enough, Your Honor.  Thank you.

17           Mr. Galardi alluded to a decision or an opinion, I'm

18  not sure if he was referring to the 4th Circuit or not.  But

19  I'd like to approach, I have a copy of a per curium opinion

20  from the 4th Circuit --

21           THE COURT:  Certainly.

22           MR. KORTANEK:  -- relating to this case.

23           THE COURT:  Certainly, Mr. Kortanek.

24           MR. GALARDI:  That is the opinion, Your Honor, I have

25  no objection.

Beine - Direct                          189

1          MR. KORNFELD:  I have no objection to the admission
2   of the 4th Circuit opinion.

3          THE COURT:  It is -- it is admitted.

4          MR. KORTANEK:  Thank you.

5   BY MR. KORTANEK:

6   Q    Mr. Beine, can you identify for the Court or describe what
7   that opinion is?  Or procedurally how the parties got there?
8   A    Well, Exhibit R-6 is an unpublished opinion by the United
9   States Court of Appeals for the 4th Circuit.  And the way that
10  we got to this opinion is because Regal Ware offered judgment
11  to Tefal.  Tefal accepted the offer of judgment for the nominal
12  amount that we spoke of.

13         And then Tefal appealed the offer of judgment to the
14  4th Circuit.  The very offer of judgment that Tefal accepted.
15  So, when Regal Ware thought it was done with the District Court
16  case, and we offered $3,000 in judgment, and we had already
17  spent $250,000 defending ourselves, this second lawsuit starts
18  on appeal.  Because we had to appeal -- they challenged it on
19  appeal and said -- I could try to explain the appeal, if you
20  would like.  But it was a fine distinction that Tefal tried to
21  make on appeal that they didn't really accept everything in the
22  offer of judgment, even though they did.  And the 4th Circuit
23  didn't take their appeal lightly.

24         And I attended the appeal.  And the judges were
25  surprised that we were there.

Beine - Direct                    190

1  Q    Let's talk about other issues.  Do you have any other

2  issues or concerns, sitting here today, with respect to the

3  appropriateness of assigning the trademark sub-license to SEB?

4  A    Regal Ware has great concern about assigning this -- its

5  trademarks to Tefal and SEB because of our actual adverse

6  experience with them.  You know, we've been competitors in the

7  industry for all these years, we have this litigation history

8  that I view and Regal Ware views as frivolous.  Regal Ware --

9  you know, we settled the case for $3,000.  It went up on

10 appeal.  We won on appeal.  You know, we have such a history

11 with Tefal that it's not a company that Regal Ware would ever

12 license its trademarks to.

13 Q    Now, you mentioned competition, as well.  Let's talk about

14 that briefly.  To Regal Ware, are there any direct or indirect

15 competition issues that would arise if this license -- if these

16 license rights were assigned to SEB?

17 A    Well, one of the biggest competition issues is the All-

18 Clad product that SEB owns.  And that is a high end stainless

19 steel product that retails for $1,000 per set, just like most

20 of Regal Ware's own products do.

21       Regal Ware and Tefal and SEB go head-to-head in the

22 marketplace every day.

23 Q    Now, what is the impact of Regal's efforts to sell in the

24 consumer marketplace at retail outlets, such as Williams-

25 Sonoma?

1  A    Well, it's always difficult to get product placement in

2  retail outlets because, you know, the retail outlets already

3  have placement.  They say, well, we have All-Clad selling

4  for --

5          MR. KORNFELD:  Objection.  Lacks foundation and it's

6  hearsay.

7          MR. GALARDI:  Join.

8          THE COURT:  Sustained.

9  Q    Mr. Beine, are you personally involved in any of

10 management processes or management meetings at Regal Ware at

11 which, you know, merchandising practices and, in particular,

12 the Williams-Sonoma initiative have been discussed among Regal

13 Ware management?

14 A    Yes.

15 Q    Do you have personal knowledge based on those meetings

16 among executives at Regal Ware with respect to the Williams-

17 Sonoma initiative, in particular?

18 A    Yes.

19              (OBJECTIONS ARE NOT AT MICROPHONE)

20         MR. KORNFELD:  Phrasing the question do you have

21 personal knowledge does not cure the hearsay that is inherent

22 in the testimony counsel seeks to elicit.  I object on the

23 grounds that it seeks to elicit hearsay.

24         MR. GALARDI:  I'll wait until the next question

25 (indiscernible).

Beine - Direct                          192

1          MR. KORNFELD:  You know what?  I withdraw my

2    objection to this question.

3                      (Laughter)

4          THE COURT:  Okay.  Do you get the drift, Mr.

5    Kortanek?

6          MR. KORTANEK:  I do.  It's a long path today.

7    BY MR. KORTANEK:

8    Q    Are there any -- in management presentations at the

9    company, have there been any discussions within Regal with

10   respect to the retail initiative that Regal Ware has

11   undertaken?

12   A    Yes.

13   Q    Okay.  And what form have those discussions taken?

14         MR. KORNFELD:  Objection.  Vague.

15   Q    Well, are those discussions in the context of company

16   presentations?  Management presentations to senior executives?

17   What form or what process has been undertaken at Regal Ware?

18   A    The process is that the salespeople who are in charge of

19   the product line and the accounts present to the Executive

20   Committee, and other executives at Regal Ware.

21   Q    Okay.  Now, in the context of those management

22   presentations, or sales presentations, are those presentations

23   that you and other senior executives of the company attend?

24   A    Yes.

25   Q    Okay.  Have those presentations covered the retail

 1  initiative involving Williams-Sonoma?

 2              (OBJECTIONS ARE NOT AT MICROPHONE)

 3          MR. GALARDI:  Objection, Your Honor, hearsay

 4  (indiscernible).

 5          MR. KORNFELD:  Actually I'm going to object on the

 6  grounds that is hearsay.  That goes to the content of a

 7  conversation.

 8          THE COURT:  I'm going to overrule the objection.

 9          MR. GALARDI:  (Indiscernible).

10          THE COURT:  Still overruled.

11              (Laughter)

12          MR. KORTANEK:  Your Honor, I think with all due

13  respect to opposing counsel, I think that the way that we're

14  viewing the hearsay rule within an entity would make it such

15  that I need to bring people who actually go out and gather the

16  data.  That's not the standard.  I -- certainly I know the rule

17  to some extent.  And if -- if a vice president/general counsel

18  of the company is receiving that information as part of company

19  or entity processes, it is an entity, he is an authorized

20  official of the entity.  And if he comes by that information in

21  the context of regular sales presentations and marketing

22  meetings, I would be able to get that in through him.  If this

23  were General Motors and we're talking about global information

24  about sales practices, it's no different than having the head

25  of marketing come in from G.M. than this witness.

1          In other words, the head of marketing at G.M. is in
2    charge of 50,000 people who go out and actually gather the
3    data, prepare it, collate it, present it to him as an
4    executive.  It's no different than what we're seeing here.

5          This is not -- this is not stretching the rule all
6    that much, Your Honor.  And I appreciate counsel's trying very
7    hard to circumscribe our story, but I think you ought to be
8    able to talk about presentations made to him that are -- if
9    Your Honor wants us to establish more about how regular they
10   are, their business meetings within the regular course of the
11   company's business --

12         THE COURT:  See, I think -- I think the problem is
13   that along those lines, it would be a depth of foundation laid
14   that just has not been laid.  For example, you know, what does
15   the company do to gather its information, who makes the
16   presentations, when are they made, that sort of information.
17   Is it -- is this presented in the normal course of business at
18   regular meetings --

19         MR. KORTANEK:  Right.

20         THE COURT:  -- and so on.  We haven't had any of that
21   foundation, and I don't know if Mr. Galardi has other concerns
22   or not.

23         MR. KORTANEK:  Right.

24         MR. GALARDI:  Your Honor, let me discuss the
25   concerns, I think there's another issue.  This gentleman is the

Beine - Direct                              195

1  general counsel and secretary.  I'm sure it comes to him, but
2  there's no business record foundations, which is an exception.
3  There is no chain of authority, which is another exception.

4          To be able to say that he can -- he has been
5  authorized to testify in the ordinary course of his duties as
6  business records, that these are the sorts of things that he
7  does in the ordinary course, and testifies on the kinds of
8  things that he's trying to get the gentleman to testify.  And
9  whether we're stretching the rule a little bit or stretching
10 the rule a lot, you're stretching the rule and you can't
11 stretch the rules of evidence that way.

12         MR. KORNFELD:  I would just briefly add that in
13 counsel's hypothetical of vice president of marketing of G.M.
14 testifying as to sales practices, there might be an ability on
15 behalf of the person seeking to elicit that testimony to
16 qualify the vice president of marketing to talk about sales.
17 In fact, I'd be surprised if the vice president of marketing of
18 G.M. was not able to talk about sales practices.  Because,
19 after all, that's his job and there would be foundation laid.

20         I echo what Mr. Galardi said when you have -- and
21 what the Court commented on, when you have the vice president
22 and general counsel, he has no personal knowledge of the sales
23 practices.  The fact that he sat in a meeting and the V.P. of
24 sales talked doesn't qualify him to come testify.

25         So, the answer to counsel's question of do I need to

Beine - Direct                                    196

1  bring the vice president of sales to court, unfortunately, for
2  those of us who do trials, the answer is yes, otherwise we
3  don't get the evidence in.

4          MR. KORTANEK:  Well, Your Honor, I think maybe we're
5  getting tied up in titles, unduly so.  But, you know, I think
6  there's a perception and we could drill in more on the
7  foundation as to what Mr. Beine does in his day-to-day work.
8  But what we're looking at today is what information goes to him
9  and goes to senior management as to making the decision.
10 That's at issue today.

11         So, we'll move on, Your Honor.

12         THE COURT:  Okay.

13         MR. KORTANEK:  We'll come back to that theory.
14 BY MR. KORTANEK:

15 Q    Now, Mr. Beine, you heard testimony from SEB about how
16 well capitalized it is or its affiliated entities are.  Are
17 there any reasons to -- why Regal Ware would be concerned by
18 the capitalization of SEB?

19 A    Yes.  With as strong as they've testified to as their
20 balance sheet is, a strong balance sheet gives a company a lot
21 of market power because they have cash to do the things that
22 they need and working capital.  And if Regal Ware sub-licenses
23 its trademark to SEB and Tefal, we are basically sub-licensing
24 one of our major competitors in the marketplace who is well
25 heeled and well financed to be able to come into our markets

Beine - Direct                          197

1  and manufacture cookware with the Regal brand name on it and --

2  I mean that's like Coca Cola authorizing Pepsi to use its

3  trademark.  That's just something that Regal Ware does not want

4  to do.

5  Q    Is it also a --

6         MR. KORTANEK:  Strike that.

7  Q    Since -- going back a little bit to the -- what happened

8  after the lawsuit in 1997 with Tefal, since 1997, what's -- how

9  would you describe the nature of the relationship, if any,

10 between Tefal and Regal Ware?

11 A    The relationship between Regal Ware and Tefal is still

12 adverse.  Every year, both companies attend the International

13 Housewares Show in Chicago.  And if Regal Ware tries to enter

14 their booth, the Regal Ware people are asked to leave.  And if

15 the Tefal people try to enter Regal Ware's booth, they're asked

16 to leave.

17 Q    I also heard testimony that SEB did not provide any

18 information to you other than -- I suppose through the debtors

19 we received financials, is that -- is that your understanding

20 of the information flow from SEB?

21 A    Correct.  Regal Ware has not received any information from

22 SEB.

23 Q    Without information from SEB, is Regal Ware in any

24 position to evaluate reasonably or unreasonably the merits of

25 consenting to assignment to SEB?

1   A    Without any current information from SEB and Tefal, Regal

2   Ware can only base its decision on its past history with Tefal.

3   Q    Do you have any information from SEB about how it plans to

4   use the marks?

5   A    No.

6   Q    Now, there's been some implications, I'll say, that we

7   should have asked Regal Ware for -- should have asked SEB for

8   the information.  Where were you -- when did you first learn

9   that SEB was a potential bidder at this auction?

10  A    I found out the end of last week on Friday afternoon, I

11  believe, when I was on vacation that SEB was the winning

12  bidder.

13  Q    Did -- well, was --

14  A    Not the winning bidder, but a bidder.

15  Q    Now, you mentioned you were on vacation.  Where -- where

16  were you?

17  A     I was at home with my children.  I took a week off to

18  spend a week with my children.

19  Q    Okay.  Are these younger children, older children?

20  A    Uh, five-year-old, four-year-old, and a two-year-old.

21  Q    Okay.  Did you have any other care giver there or was it

22  just you?

23  A    Just me.

24  Q    Okay.  What -- what then transpired in terms of Regal

25  Ware's actions since you first learned of that SEB as a

Beine - Direct                                199

1  potential bidder, and let's say Monday, August 7th?

2  A    Well, yesterday I came back to my office from a week out

3  of the office.  So, I had a lot of work to do to try to get

4  caught up from the week.  And then I found out that the hearing

5  was going to go today.

6         So, I probably spent a couple of hours talking to

7  counsel, preparing for the trip, and then I got on an airplane

8  and came out yesterday afternoon and came in last night.  So,

9  Regal Ware hasn't -- excuse me -- Regal Ware hasn't had any

10 sort of time to look at SEB as a potential bidder.

11 Q    Now, is there any information -- well, what types of

12 information would you or would Regal Ware require from SEB if

13 we were outside the bankruptcy context and you were asked to

14 consent to the assignment of this license?

15 A    Well, Regal Ware would ask for some of the same

16 information that it asked from Cerberus and Global Home

17 Products back in 2004, such as marketing plans and, you know,

18 pro formas, and what they intend to do with the mark and how

19 they plan to maintain quality and what their distribution

20 channels would be and who their customers would be and how they

21 will segment the market and all those types of things.

22 Q    And how important would the business plans relating to

23 merchandise and the store locations and those types of things,

24 how important would that be to Regal?

25 A    It's very important because it's the Regal trademark and

Beine - Direct                                    200

1 the Regal company name and the Regal housemark.

2 Q    Mr. Beine, when was the first time that Regal Ware was

3 asked to consent to assignment to SEB or Lifetime?

4 A    On Friday afternoon, Tefal contacted Regal and asked for

5 consent.

6 Q    During that communication, did Tefal or SEB offer any

7 information in support of that request?

8 A    No.

9 Q    Did -- was there also a letter sent by counsel to the

10 debtors demanding consent?

11 A    Yes.

12 Q    Okay.  Did that letter provide any information relating to

13 Lifetime or SEB?

14 A    No.

15          MR. KORTANEK:  Your Honor, I'd like to have the

16 witness talk about Lifetime.  Because sitting here today or

17 standing here today, I'm still not sure where we're going to

18 head.  And if we're still at the position where we could be

19 either or, I need to make a record as to Lifetime.

20          THE COURT:  Understood.

21          MR. KORTANEK:  Unless --

22          THE COURT:  Understood.

23          MR. KORTANEK:  -- anyone has a problem with that, I'd

24 like to do that.

25 BY MR. KORTANEK:

1  Q    Does Regal Ware have any concerns regarding what I would
2  call a contested situation of an attempt by the debtors to
3  assign license rights to Lifetime?

4  A    Yes.  Yes, Regal Ware does because Regal Ware owns the
5  Lifetime trademark for cookware and Lifetime -- Lifetime Brands
6  uses the Lifetime name in its corporate name.  And, again,
7  there would be likelihood of confusion in the marketplace if
8  Lifetime Brands owns -- well, sub-licenses the Regal Ware
9  trademark and puts it on cookware when actually Regal owns the
10 Lifetime trademark for cookware.  You could understand that a
11 consumer would say, well, this is Lifetime Brands selling Regal
12 cookware, but Regal Ware, Inc. owns Lifetime cookware.  So -- I
13 mean -- yes, we have an issue with Lifetime Brands also.

14 Q    And Lifetime is -- your mark Lifetime is indicated on R-1,
15 is it not, the brochure?

16 A    Yes, it is.  Yes, it is, and Regal Ware's -- actually the
17 Lifetime trademark goes back to 1906, and Regal Ware has it
18 registered.

19 Q    Can you -- can you tell the Court anything about Regal
20 Ware's use of the -- of the Lifetime trademark or how extensive
21 it is in connection with all of Regal's marks that you ever
22 see?

23 A    Actually Lifetime is one of the -- I would call it a
24 flagship trademark of the company.  It's been around since
25 1906.  The West Bend Company was started in 1911, it has

1  heritage all the way back then.  It carries with it the

2  connotation of the Lifetime warranty that Regal Ware provides

3  to its consumers.  And, you know, it becomes synonymous with

4  the West Bend Company and Regal Ware and it's -- it's a good

5  size piece of Regal Ware's overall business.

6  Q    Are there -- does Regal Ware have any quality or concerns

7  regarding quality of products with respect to any potential

8  assignment to Lifetime?

9  A    Yes, we do because, like I said before, the Lifetime

10 products that Regal Ware manufactures are union made in the

11 United States with high quality materials.  And the products

12 that are currently being sold by debtors are manufactured in

13 Mexico and China.  And those countries cannot compete with the

14 level of quality that Regal Ware manufactures into its

15 products.

16 Q    Let me ask you briefly, you testify on quality.  There are

17 -- the documents speak for themselves.  But there are, sir,

18 quality audit provisions in the license agreement, as well as

19 the sub-license agreement?

20 A    Yes.

21 Q    Has Regal Ware been diligent in exercising those audit

22 rights?

23 A    Regal Ware reviews the quality of the products

24 periodically.

25 Q    Does Regal Ware take any other actions to protect its

Beine - Cross/Kornfeld                    203

1  rights to the Regal Ware trademarks that are covered under the
2  license agreement and the sub-license?
3  A    Well, we make sure that the use of the trademarks in the
4  marketplace is correct, correct specimens and proper usage and
5  everything that goes along with trademark maintenance.
6  Q    Would -- would Regal Ware today license to a director
7  competitor on a new licensing transaction?
8  A    No.
9         MR. KORTANEK:  No further questions, Your Honor.
10 Pass the witness.
11        THE COURT:  Thank you.
12                    CROSS EXAMINATION
13 BY MR. KORNFELD:
14 Q    This is a beautiful frying pan.  Is that right, it's a
15 frying pan?
16 A    Yes.
17 Q    You can't buy this at Wal-Mart, right?
18 A    Correct.
19 Q    Okay.  And it's really heavy and premium quality.  And if
20 I wanted to buy a set of this stuff, I'd have to have a Regal
21 representative over to my home and have a presentation and then
22 write a one or two or $4,000 check, right?
23 A    (No verbal response)
24 Q    For the whole set.
25 A    Yes.

Beine - Cross/Kornfeld                    204

1  Q    Okay.  Because this is really, really good expensive
2  stuff, right?

3  A    Yes.

4  Q    When I go to Wal-Mart, and I pick up what Wal-Mart is
5  selling, it's a lot cheaper, right?

6  A    Yes.

7  Q    And because it's a lot cheaper, and as you said, made in
8  Mexico and made in China, it's a different market, you would
9  agree with me there, wouldn't you?

10 A    No.

11 Q    The same -- the same people that go to Wal-Mart would
12 spend $4,000 on a set of this beautiful frying pan?

13 A    Yes.

14 Q    Okay.  That's your testimony.  So, if I go to -- if I go
15 to Wal-Mart, is there -- when you go to Wal-Mart, do you get
16 confused between what Wal-Mart has and what this is?  Because I
17 know you go to Wal-Mart at least to monitor Regal's products,
18 right?

19 A    Yes.

20 Q    You don't get confused about this beautiful lifetime
21 frying pan versus some Mirro frying pan, right?

22 A    I'm in the business, I don't get confused.

23 Q    Okay.  And when that Mirro frying pan is $39.95, versus
24 this frying pan, which is $500, that's one way you don't get
25 confused, too, right?

Beine - Cross/Kornfeld                                      205

1  A    Yes.

2  Q    Okay.  Now, you're familiar with the trademark sub-license

3  agreement marked as R-11, right?

4  A    Yes.

5  Q    Did you negotiate that agreement?

6  A    No.

7  Q    Okay.  Did you have any role in drafting up that

8  agreement?

9  A    No.

10 Q    Did you review the agreement before -- did -- did you see

11 the agreement before Newell entered into it?

12 A    No.

13 Q    Okay.  Let's, for a moment, put that one aside and go to

14 the trademark license agreement marked as R-2 between Regal and

15 Newell.  Are you familiar with that agreement?

16 A    Yes.

17 Q    Did you have any role in the negotiation of that

18 agreement?

19 A    Yes.

20 Q    Okay.  What was your role?

21 A    I was general counsel for Regal Ware.

22 Q    Okay.  So, you made sure that everything in this agreement

23 reflected all of Regal Ware's concerns and issues and all of

24 those concerns and issues were accurately documented in this

25 agreement, right?

Beine - Cross/Kornfeld                    206

1  A    Well, as you know, as negotiations go, both parties did

2  the best they could.

3  Q    Okay.  So, you did the best you could, right?

4  A    Yes.

5  Q    You're satisfied with this agreement, aren't you?

6  A    Yes.

7  Q    Okay.  And -- and in this agreement, we've marked as R-2

8  this trademark license agreement, there's no restriction on

9  sub-licensing, is there?

10 A    That's correct.

11 Q    Absolutely none, is there?

12 A    That's what I said.

13 Q    So, it wasn't important to Regal back in 1999 to restrict

14 sub-licensing, right?

15 A    The reason it wasn't restricted is because it was intended

16 to be able to sub-license among Regal Ware -- Newell's

17 affiliates.

18 Q    But it doesn't limit itself to Newell's affiliates in

19 Section 1.3, does it?

20 A    (No verbal response)

21 Q    It says, "Licensee shall have the right to sub-license

22 others, including its affiliates, to use the license trademarks

23 in the defined field."  Isn't that correct?

24 A    Yes.

25 Q    And there isn't any restriction that you can't sub-license

Beine - Cross/Kornfeld                                    207

1  to those French guys who weren't nice in that lawsuit in

2  Washington, D.C., right?  There's no French guy restriction

3  there, is there?

4  A    No.

5  Q    Okay.  And there's no Lifetime restriction because

6  Lifetime has that bad name restriction, is there?

7  A    Correct.

8  Q    And there's no Mirro restriction because Mirro sells to

9  that cheap store Wal-Mart, is there?

10 A    Correct.

11 Q    There's absolutely no restriction.

12 A    Correct.

13 Q    And that was okay back in 1999 when you did the deal,

14 correct?

15 A    Yes, but that's not the agreement that controls this

16 proceeding.

17 Q    Well, thank you for -- for clarifying that, sir.  But that

18 was an agreement that controlled exactly the same trademarks

19 that are at issue in this proceeding, isn't that correct?

20 A    Yes.

21 Q    Thank you, sir.  Let's move to the trademark sub-license

22 agreement.  The sub-license agreements between Newell and

23 Mirro, you said you weren't involved with, correct?

24 A    I was not involved, correct.

25 Q    You don't know what Newell was thinking when they

1  negotiated the agreement, correct?

2  A     Correct.

3  Q     And -- and you know that that agreement has an integration

4  clause in Section 8.6, right?  You know what an integration

5  clause is, don't you, sir?

6  A     Yes.

7  Q     An integration clause says at 8.6 that, "This is the

8  entire agreement between the parties with respect to the

9  subject matter herein, and neither this agreement nor any of

10 its revisions may be changed, waived or terminated except as

11 herein expressly provided or in a written instrument signed by

12 both of the parties hereto."

13            That's an integration clause, right?

14 A     Yes.

15 Q     And that means you can't change it unless you do it in

16 writing and both parties agree, right?

17 A     Right.

18 Q     And it also means that the agreement says what it says and

19 everything outside the agreement doesn't get considered unless

20 a judge decides that it should be because of some ambiguity,

21 right?

22 A     Right.

23 Q     Okay.  So, in Section 1.3, what Newell did was -- was say

24 that the licensee, in this case, Mirro, Global Home Products,

25 could sub-license the marks without the written consent of the

1  licensor, which is Newell, right?

2  A    (No verbal response)

3  Q    Which consent will not be unreasonably withheld or

4  delayed.  Do you see where I'm referring, sir?

5  A    Yes.

6  Q    Okay.  Is there any French company restriction in there?

7  A    Well, actually this says that they shall not have the

8  right to sub-license without Newell's consent.

9  Q    Thank you very much for that clarification.  With that

10  clarification and, sir, I understand that that's what it says,

11  is there any restriction on French companies in Paragraph 1.3?

12  A    The only restriction is reasonable or unreasonable

13  consent.

14  Q    Right.  And -- and Newell and Mirro are sophisticated

15  entities, correct?

16  A    Newell and Mirro?

17  Q    Right.  They're sophisticated entities, correct?  You know

18  Newell and you know Mirro, right?

19  A    Yes.

20  Q    So, you would agree they're relatively sophisticated

21  entities, both represented by counsel, right?

22  A    Yes.

23  Q    And if they would have wanted a French company restriction

24  in there, they could have put it in there, correct?

25  A    Correct.

Beine - Cross/Kornfeld                    210

1  Q    But they didn't, did they?

2  A    No.

3  Q    And if they would have wanted a company named Lifetime

4  restriction in there, they could have put that in there, too,

5  right?

6  A    That's correct.

7  Q    They didn't put any restrictions on the -- in there other

8  than the restriction of reasonableness, correct?

9  A    That's correct.

10  Q    Now, sir, R-12, entered into as of August 1, 2006, that's

11  the agreement between Regal Ware and Newell whereby Regal Ware

12  purports to get its sub-license -- to get its marks back.  What

13  did -- what did Regal Ware pay Newell, if anything?

14  A    I don't have a copy of R-12 in front of me.

15  Q    Okay.  Well, you counsel had put it in front of you.

16  A    That's actually one I never got.

17  Q    Okay.  Well, thank you.

18         MR. KORNFELD:  May I approach?

19         THE COURT:  Yes, you certainly may.

20                        (Pause)

21  Q    Now, you see it, sir?  It says, after the whereas clause,

22  "Now, therefore, in consideration of the premises and for good

23  and valuable consideration, the receipt and sufficiency of

24  which are hereby acknowledged, the parties hereby agree as

25  follows."  Do you see where I'm reading from on the first page?

1  A    Yes.

2  Q    What was the consideration?

3  A    Regal Ware did not pay any money to Newell for this

4  assignment.

5  Q    Not a penny, huh?

6  A    Correct.

7  Q    Did you have any role in negotiating the agreement?

8  A    With outside counsel, yes.

9  Q    And why did -- did you give Newell anything in order to

10 get Newell to give up its rights under the -- under the license

11 agreement?

12 A    We gave Newell a release in return, that we would release

13 Newell from all liability associated with --

14 Q    So, the only thing you gave Newell was a release, correct?

15 A    Well, the only thing, yes, but it's significant.

16 Q    Did you give Newell anything else?

17 A    No.

18 Q    Okay. So, the only thing was the release. Now, this

19 agreement says it's entered into as of August 1st. What date

20 did you sign the document, sir?

21 A    If it says August 1st, I -- I can't recall. I believe I

22 signed it on August 1st. I can't be sure, but that's when we

23 negotiated, and that's when I signed it.

24 Q    Well, sir, the agreement says it was entered into as of

25 August 1st, 2006, do you see that on the first page? That's

1   just a couple of days ago.

2   A    Yes.

3   Q    Do you see where your signature is on Page 3?

4   A    Yes.

5   Q    There's no date there.  So, my question, sir, is what date

6   did you sign the agreement?  I know it was entered into -- it

7   purports to state it was entered into as of August 1st.  My

8   question, did you sign it on August 1st or sign it later?

9   A    I believe I signed it on July 31st.

10  Q    What date did Newell sign it on?

11  A    I don't know.

12  Q    Was it after July 31st?

13  A    I don't know.

14  Q    Was it after July 1st?

15  A    (No verbal response)

16  Q    August 1st.  I'm sorry.

17  A    I don't know.

18  Q    Was it after August 2nd?

19  A    I don't know.

20  Q    When did you first receive the signed copy of this

21  agreement?

22  A    Today.

23  Q    You've never seen a signed copy of this agreement before

24  today?

25  A    No, I just got back from vacation.

1  Q    Now, let's go back to talking about rights under the sub-

2  license agreement.  It's very important to Regal that its

3  quality be maintained, correct?

4  A    Correct.

5  Q    And when it enters into trademark license agreements, it

6  makes sure those license agreements allow it protect its

7  quality, correct?

8  A    Yes.

9  Q    And one of the ways it does that is it provides itself

10 with the right to monitor the marks -- the products that used

11 the marks as being licensed, correct?

12 A    Yes.

13 Q    And it did that when it assigned marks to Newell, correct?

14 A    Correct.

15 Q    And the other way -- or a related way that Regal protects

16 its rights is there's a quality control provision in its

17 agreements, that's -- that's in Exhibit R-2, Paragraph 4.4,

18 correct?

19 A    Yes.

20 Q    And that quality control provision provides Regal with the

21 right to go and look at the quality of its product.  And if the

22 licensee is not maintaining quality, Regal has remedies, right?

23 A    Yes.

24 Q    And the first remedy is that it gets to give written

25 notice to the licensee to get the quality fixed, cure the

Beine - Cross/Kornfeld                    214

1  defect and get the quality up to what Regal expects and what

2  the licensee is supposed to do, right?

3  A    Yes.

4  Q    And the next thing, if the licensee still doesn't do that,

5  is that Regal has the right to terminate the agreement, is that

6  correct?

7  A    No.

8  Q    No?  Regal doesn't have the right to terminate the

9  agreement?

10 A    Not as a second step.

11 Q    Well, let's -- let's see.  In Paragraph 4.4 regarding

12 quality control, it says, "If the licensee does not cure within

13 30 days," then what happens?

14 A    If cure is not -- does not take place in 30 days --

15 Q    Yes.

16 A    -- they lose permission to use the license trademarks and

17 their use is immediately suspended by Regal Ware.

18 Q    Exactly.  So, if the licensee does not maintain quality,

19 and after written notice does not maintain quality, Regal can

20 suspend the licensee's rights to use the mark, correct?

21 A    Correct.

22 Q    That's a pretty draconian remedy, right?

23 A    Yes, but it's not termination.

24 Q    Well, it's not termination.  But if the licensee can't use

25 the mark, it's equivalent or pretty much like termination,

1  isn't it?

2  A    No.

3  Q    No?  So, basically you're saying that a licensee has been

4  told they must cease and desist, it can't used the mark, but

5  that's not like termination?  That's your testimony?

6  A    That's different than termination.

7  Q    I understand.  So, let's -- let's talk about what it is

8  then.  What Regal has the right to do under the license

9  agreement where the licensee is not maintaining quality is to

10  stop the use of any mark or quality that's not maintained,

11  correct?

12  A    Correct.

13  Q    Okay.  Thanks.  And did Regal ever stop the use of any

14  marks under the trademark license agreement we've marked as R-

15  2?  That is the agreement between Regal and Newell?

16  A    No.

17  Q    Did Regal ever give notice that any of its marks were not

18  up to snuff as provided for in the notice provisions of

19  Paragraph 4.4?

20  A    No.

21  Q    So, basically Newell manufactured products that met

22  Regal's quality expectations, correct?

23  A    Correct.

24  Q    And did Regal ever tell Newell to give notice to Mirro

25  that Mirro wasn't manufacturing products that were up to Mirro

Beine - Cross/Kornfeld                          216

1  -- up to Regal's quality expectations?

2  A    No.

3  Q    Regal could have done that, correct?

4  A    Correct.

5  Q    Did Regal ever tell Newell to terminate Mirro's rights

6  under the sub-license agreement for quality reasons?

7  A    No.

8  Q    Did Mirro -- did Regal ever tell Newell to inform Mirro

9  that it must stop manufacturing a product that had the Regal

10 mark on it?

11 A    No.

12 Q    And the Regal had the right under that, correct?

13 A    Correct.

14 Q    And Newell had the right under its agreement with Mirro,

15 Paragraph 4.4, which is substantively identical in Exhibit R-11

16 to Paragraph 4.4 in R-2, Newell had -- had the right to tell

17 Mirro, under Paragraph 4.4 to stop manufacturing product with

18 the Regal mark on it, correct?

19 A    Correct.

20 Q    So, isn't it true, sir, that during the time that Mirro

21 had the mark, Mirro's -- Regal's concerns about Mirro never

22 even rose to the level whereby Regal gave any notice that Mirro

23 manufactured products were not up to quality standards?

24 A    That's true.

25 Q    So, all this quality talk we're hearing today is just

Beine - Cross/Kornfeld                217

1  speculation, isn't it?

2  A    Actually the bankruptcy proceeding beat Regal Ware to the
3  quality issue.

4  Q    Well, from 1999 to today, Regal didn't even issue any
5  notice with respect to quality, correct?

6  A    That's because the quality was fine before Newell spun the
7  business unit off to Global Home Products.

8  Q    Well, that was in 2004, correct?

9  A    Yeah, and they took it --

10 Q    And -- and today's 2006, right?

11 A    (No verbal response)

12 Q    And you had about two years before the bankruptcy, from
13 April, 2004 to April, 2006.  And -- and during those two years,
14 you went to Wal-Mart a couple of times to look at what Mirro
15 had sold to Wal-Mart, correct?

16 A    Correct.

17 Q    And you lifted those pans up, you looked at them, you
18 lifted the pots up, you looked at them.  And you saw -- saw
19 what they looked like, correct?

20 A    Correct.

21 Q    And you saw that those pots and pans were of whatever
22 quality they were, correct?

23 A    Correct.

24 Q    Whatever you saw didn't make you send them notice, or did
25 it?

Beine - Cross/Kornfeld                    218

1  A    Regal Ware doesn't take these decisions lightly.

2  Q    Oh, okay.  Listen to my question.  My question is, sir, I

3  understand you don't take those decisions lightly, and I

4  respect that.  Whatever you saw didn't make you take the

5  decision, the serious decision to send a notice to Mirro that

6  Mirro's products were not of proper quality, correct?

7  A    Correct.

8  Q    And since you take those decisions seriously, you would

9  have sent that notice if you had a legitimate quality concern,

10 correct?

11 A    We would have gone through the proper process, we would

12 have evaluated it.  That basically, as you said, shuts down the

13 license agreement and, in your words, terminates that license

14 agreement.  If we go down that road, we're in a termination

15 proceeding and we're in litigation and Regal Ware doesn't take

16 that lightly.

17 Q    I understand, sir.  You didn't begin to go down that road

18 by sending out a notice, correct?

19 A    (No verbal response)

20 Q    The notice doesn't put you in litigation, does it?

21 A    You'll end up there.

22 Q    Sir, listen to my question.  Does the notice put you in

23 litigation?  The notice that says, please make better stuff?

24 That doesn't put you in litigation, does it?

25 A    No.

1  Q    You didn't send a notice, did you?

2  A    No.

3  Q    Thank you.  Now, there was only one dispute really between

4  SEB and Regal, correct?

5  A    No.

6  Q    One dispute -- one lawsuit, a related Patent or Trademark

7  Office ancillary litigation, correct?

8  A    I would say it was five lawsuits.

9  Q    All related to the same mark, correct?

10  A    All related to four different marks.

11  Q    Okay.  And -- and all of those -- but they were related

12  lawsuits, weren't they?

13  A    Yes.

14  Q    Okay.  All of those related lawsuits got resolved about

15  what, seven, eight years ago?

16  A    In 1997.

17  Q    Okay.  Well, that's nine years ago, right?

18  A    Yes.

19  Q    Okay.  So, have you had any lawsuits with SEB or any of

20  its affiliates since 1997?

21  A    No.

22  Q    No?

23  A    Just typical every day marketplace issues.

24  Q    Okay.  You're competing with them, right?

25  A    Yes.

1  Q    Okay.  Other than they're a competitor, you haven't had

2  any litigation with them, right?

3  A    No, I don't think either party wants to litigate the way

4  we did back in '97.

5  Q    My question, sir, is a simple one.  Did you have any

6  litigation or didn't you?

7  A    And I answered that as no.

8  Q    Okay.  Thank you.  So, in the last nine years, no

9  lawsuits, only competition.  That's correct?

10 A    Correct.

11 Q    Okay.  It's like competition you had with Newell, right?

12 You have competition with Newell, they're in the cookware

13 business, right?

14 A    It's different competition.

15 Q    Okay.  Newell -- Newell -- let's talk about what they do.

16 They worked at international Class 21, right?

17 A    There is a difference between trendy competitors and

18 regular competitors.

19 Q    Sir, listen to my question.  Does Newell work in

20 international Class 21?  The same class that you work in?

21 A    Yes.

22 Q    Okay.  You like them, right?

23 A    (No verbal response)

24 Q    You can answer, it's okay.

25 A    What's like?  I mean --

Beine - Cross/Kornfeld                                221

1  Q    Well, they're friendly.  They're nice guys.  They don't

2  have an accent.  You know, the -- the --

3  A    Regal Ware fairly competes with Newell.

4  Q    Okay.  They compete with Newell.  And you compete with --

5  with the gentlemen back here, and you compete with Lifetime,

6  correct?

7  A    Correct.

8  Q    Okay.  So, your competition with Newell didn't stop you

9  from doing a trademark license agreement with Newell, correct?

10 A    Correct.

11 Q    Okay.  Now, you knew Mirro sold to Wal-Mart from about

12 2004 on, correct?

13 A    Yes.

14 Q    You didn't do anything to stop Mirro from selling to Wal-

15 Mart, did you?

16 A    No.

17 Q    You don't sell in a single retail outlet right now, do

18 you?  At the moment.

19 A    (No verbal response)

20 Q    Not Wal-Mart, not Williams-Sonoma, not -- not any other

21 store.

22 A    Some of our products are at retail.

23 Q    Okay.  But not -- but not your -- but not your pots and

24 pans, right?

25 A    Actually some of the new cookware that I mentioned is at

1  retail.

2  Q    Okay.  That's just a brand new cookware that you just

3  decided to come out with, correct?

4  A    Correct.

5  Q    Okay.  When'd you decide to come out with that?

6  A    Uh, it was shortly after the five-year noncompete expired

7  with Newell.

8  Q    Okay.  And that would have been about 2005, 2006?

9  A    Correct.

10  Q    Okay.  So, very recently, you went into retail.  Before

11  that, you weren't into retail, correct?

12  A    Correct.

13  Q    So, you're -- you're still in retail in a very limited

14  way, correct?

15  A    Correct.

16  Q    Okay.  And -- and SEB is in retail in a big way, correct?

17  A    That's what they say.

18  Q    That's what they say.  And Lifetime is in retail in a

19  pretty big way, too, correct?

20  A    Yes.

21  Q    Okay.  But you're not.  You do most of your marketing of

22  pots and pans, which is really what we're here about, in -- in

23  -- you know, the pots and pans equivalent of, you know, the

24  washing -- the vacuum salesman coming to somebody's house and

25  selling product, correct?

Beine - Cross/Kornfeld                    223

1  A    Correct.

2  Q    Somebody -- somebody calls your company and says I'm

3  really interested in the beautiful pots and pans, would you

4  send a rep out, correct?

5  A    Correct.

6  Q    Okay.  So, it's a very different distribution system,

7  correct?

8  A    Correct.

9  Q    In fact, as you testified, your target customers are your

10  distributers, right?

11  A    Correct.

12  Q    Not the consumer who's buying at Wal-Mart, right?

13  A    Well, like I said, the distinction is difficult to make.

14  I mean you have to be able to market to the consumer in order

15  to sell your product to your distributor, otherwise the

16  consumer won't buy it.

17  Q    I -- I -- I understand, and that's a fine distinction.

18  But really what you're doing is getting the product to the

19  distributor, SEB and Lifetime are getting their product to a

20  Wal-Mart, a Target, a store who's going to sell to the

21  consumer.  You're getting to the consumer through kind of a

22  multi level marketing system, right?

23  A    No.

24  Q    Through a -- just distributors?

25  A    Correct.

Beine - Cross/Kornfeld                            224

1  Q    Okay.  Now, if this trademark was, in fact -- if the marks
2  at issue were assigned, you would have rights under the quality
3  control provisions of the documents to -- whoever got the mark
4  -- to make sure that whoever got the marks maintain quality,
5  correct?
6  A    Correct.
7  Q    And you would take those rights very seriously.  And if
8  whoever got the marks didn't maintain quality, you would issue
9  the notice after due consideration, right?
10 A    Correct.
11 Q    And if the notice didn't cause whoever got the marks to
12 get the quality up to where you wanted it to be, you would tell
13 them that they could no longer manufacture using your marks,
14 correct?
15 A    Correct.
16 Q    So, the documents give you all those rights to maintain
17 quality, correct?
18 A    Correct.
19 Q    Okay.
20         MR. KORNFELD:  May I have a moment, Your Honor?
21         THE COURT:  You may.
22                        (Pause)
23 Q    The name that you're using for your new product in the
24 retail chain in that Williams-Sonoma skews that you talked
25 about, those products are marketed under the name of Regal

Beine - Cross/Galardi                                    225

1 Renaissance, is that correct?

2 A    It's called Renaissance by Regal Ware.

3 Q    Renaissance.  So, Renaissance by Regal Ware is -- is, in

4 effect, the mark that goes on every pot and pan there?

5 A    Yes.

6 Q    Okay.

7         MR. KORNFELD:  I have no further questions at this

8 time, Your Honor.

9         THE COURT:  I would love to push through, but I'd

10 like to give the witness and the staff just a brief break, at

11 least.

12         MR. GALARDI:  (NOT AT MICROPHONE - Indiscernible).

13         THE COURT:  Okay.  Then let's take -- let's make it

14 15 minutes.  We'll resume at 5:30.  Thank you.

15             (Recess 5:12 P.M./Reconvene 5:34 P.M.)

16         THE COURT:  Please be seated.

17                     CROSS EXAMINATION

18 BY MR. GALARDI:

19 Q    Good evening.  Before we start, let me just ask you, when

20 we were on break, did you have any conversations with your

21 attorney?

22 A    Yes.

23 Q    Anything about your testimony?

24 A    No.

25 Q    Thank you.  Let me ask you, in your testimony -- I just

Beine - Cross/Galardi                                226

1  want to get it right -- I think you've described the Regal

2  cookware as heirloom cookware, correct?

3  A    Correct.

4  Q    And that they actually outlive people, so they would be

5  passed down for generations, correct?

6  A    Correct.

7  Q    And have you found that with Wal-Mart cookware?

8  A    I don't know.

9  Q    Do you think it's the same quality to be passed down for

10 generations?

11 A    I have Regal Ware cookware, I don't have Wal-Mart

12 cookware.

13 Q    Why not?

14 A    Because we buy products that our company manufactures.

15 Q    Okay.  Do you think that Wal-Mart is the same quality?

16              (OBJECTIONS ARE NOT AT MICROPHONE)

17         MR. KORTANEK:  Your Honor, I'm sorry, I have to

18 object (indiscernible).

19         THE COURT:  All right.  I'll sustain that.  Let's

20 move on.

21         MR. GALARDI:  That's fine, Your Honor.  I'll move on.

22         THE COURT:  Thank you, Mr. Galardi.

23 BY MR. GALARDI:

24 Q    Let me ask you.  Were you involved in the original Newell

25 transaction where the trademark license went over to Newell?

Beine - Cross/Galardi                    227

1  A    Yes.

2  Q    Okay.  And do you remember the consideration paid in that

3  transaction by Newell?

4  A    Yes.

5  Q    What was the consideration?

6  A    That's confidential with Regal Ware.

7  Q    More than $100 million?

8  A    That's confidential.

9  Q    Was it a substantial transaction?

10                (OBJECTIONS ARE NOT AT MICROPHONE)

11             MS. SCOLIARD:  Your Honor, he's said it's

12  confidential.  He can't say it's substantial, small, over 100,

13  less than 100?

14             THE COURT:  Okay.  I'll -- it's confidential.  Let's

15  -- I'll sustain that.

16             MR. GALARDI:  That's fine.  I'll move on, Your Honor.

17  BY MR. GALARDI:

18  Q    But you did say in your testimony -- your testimony is

19  that at the time of that transaction, Regal decided to get out

20  of the retail cookware business, is that correct?

21  A    Correct.

22  Q    And now you've decided to come back into the retail

23  cookware business, correct?

24  A    Correct.

25  Q    Now, did you put any limitations on those licenses

1  thinking that you were going to get out of the retail cookware
2  business?

3  A    The restrictions -- if there are any restrictions, without
4  reviewing the trademark license agreement.  They are what they
5  are.

6  Q    Well, you were asked that question before and you had no
7  restrictions on an ability to sub-license that, isn't that
8  correct?

9  A    That's correct.

10 Q    And so it was possible that that trademark would be sub-
11 licensed to somebody who would do cookware, isn't that correct?

12 A    Correct.

13 Q    And in the retail industry, correct?

14 A    Correct.

15 Q    And at that time, that was not a concern because you
16 didn't plan to ever be in the retail cookware business again,
17 correct?

18 A    Actually, no, that's not correct.  It's -- it's correct in
19 the fact that Newell and Regal Ware intended Newell would be in
20 that business for a long time, and that would not be sub-
21 licensed.  It was not because that Regal Ware did not intend to
22 be in the retail market.

23 Q    So, you intended to get back into the retail business
24 eventually?

25 A    Yes, when our noncompete expired.

Beine - Cross/Galardi                                    229

1   Q     Okay.  But you didn't put anything in the sub-license that
2   said that they couldn't use it after that -- the time that the
3   covenant not to compete terminated, did you?
4   A     Correct.
5   Q     And so if you had gotten back in the business, you would
6   have been competing with Newell at that point, correct?
7   A     Correct.
8   Q     And that didn't bother you, you sold it to Newell,
9   correct?
10  A     We did not sell it to Newell.
11  Q     You sold it -- you licensed it to them in the context of
12  an acquisition, is that correct?
13  A     Correct, and Regal Ware continues to own the trademarks.
14  Q     Okay.  And did you do due diligence with respect to that
15  transaction?  Were you involved in that?
16  A     Yes.
17  Q     And in the context of your due diligence, did you
18  investigate Newell Operating Company?
19  A     Yes.
20  Q     And did you investigate where Newell sold most of its
21  products?
22  A     Yes.
23  Q     And did you know at the time that they were -- that they
24  sold products to Wal-Mart?
25  A     Yes.  Regal Ware and Newell had similar distribution

Beine - Cross/Galardi                    230

 1  channels.

 2  Q    Okay.  And did you know that they might sell to K-Mart?

 3  A    Yes.

 4  Q    And did you know that they might sell to J.C. Penney?

 5  A    Yes.

 6  Q    And did you put any restrictions that they couldn't sell

 7  your product in those stores?

 8  A    No.

 9  Q    But now you object to those products being sold in those

10  stores?

11  A    No.

12  Q    You don't object to that.  So, what exactly do you object

13  to?

14  A    We object to sub-licensing Regal Ware's trademarks to a

15  direct competitor, SEB and Tefal.

16  Q    Okay.  So, it's -- let's talk about the competitor.

17  You're trying to get into the Williams-Sonoma brand -- stores,

18  right?

19  A    Yes.

20  Q    Okay.  And the brand that would compete, does the

21  Williams-Sonoma brand that you would like to have compete with

22  the Wal-Mart brand?

23  A    All cookware competes with all cookware.

24  Q    Regardless of store types?

25  A    Yes.

Beine - Cross/Galardi                    231

1  Q    Or are you more concerned that your cookware competes with

2  All-Clad?

3  A    We're concerned with all cookware competing with all

4  cookware.

5  Q    And regardless of what happens today, you're going to have

6  that competition that you have right now with All-Clad, isn't

7  that correct?

8  A    Yes.

9  Q    And this doesn't add to the competition.  Because I think

10 your testimony is you're not intending to sell Regal Ware in

11 Wal-Mart?

12 A    That's not my testimony.

13 Q    Well, let me ask you.  Are you intending to send -- sell

14 Renaissance by Regal Ware in Wal-Mart?

15 A    We don't know yet.

16 Q    So, is it your testimony that this would be sold in Wal-

17 Mart?

18 A    That will not be sold in Wal-Mart.

19 Q    Now, did you do financial due diligence on Newell in the

20 context of the transaction with Newell?

21 A    Yes.

22 Q    And do you recall the size of Newell's operations and

23 assets at the time of that transaction?

24 A    No.

25 Q    Would you have looked at SEC filings with respect to

Beine - Cross/Galardi                                  232

1  Newell at the time of that transaction?

2  A    I doubt that we looked at SEC filings.  We would have

3  looked at their financial statements, which end up in their SEC

4  filings.

5  Q    Okay.  Now, is it your testimony today that you intend to

6  sell Regal Ware in discount stores?

7  A    What product are you referring to?

8  Q    I'm asking you.  Do you have any products that you -- you

9  said you're getting into the retail business, correct?

10 A    Yes.

11 Q    And the products that you have under development, is it

12 your intention to sell those to discount stores?

13 A    We will sell products where our marketing and salespeople

14 decide to sell products.

15 Q    But do you have any personal knowledge whether you'll be

16 selling in discount stores?

17 A    That would probably be hearsay.

18 Q    Thank you for correcting me this time.  But if your

19 counsel asks you, you'll certainly let him ask those questions.

20 What about warehouse clubs?

21 A    (No verbal response)

22 Q    Are you going to be selling Regal Ware in warehouse clubs?

23 A    I don't know.

24 Q    Okay.  What about home centers?

25 A    I don't know.

Beine - Cross/Galardi                    233

1  Q   Okay.  Did you know at the time of the acquisition with
2  Newell that they would be selling Regal Ware in those types of
3  stores?
4  A   They were going to be selling Regal Ware in all the stores
5  that Regal Ware was selling its cookware.
6  Q   And at the time you were selling Regal Ware in Wal-Mart.
7  A   Yes.
8  Q   Were you selling it in K-Mart?
9  A   Yes.
10 Q   Now, I think you and your attorney made the following --
11 and I'm just perplexed by what this means.  It's like Coca Cola
12 being sold by Pepsi.  What do you mean by that?  Could you
13 explain to me what the issue is there?
14 A   The issue is direct competition.  Coca Cola would never
15 license its Coca Cola mark to Pepsi to be sold in the same
16 marketplace that both companies compete in.  Just like Regal
17 Ware would not license its mark to Tefal.
18 Q   Well, you licensed it to Newell, didn't you?
19 A   Yes.
20 Q   And that's the same marketplace that you want to be in
21 now.
22 A   It's not the marketplace we want to be in.
23 Q   Well, it's the --
24 A   It's - it's --
25 Q   -- marketplace that you've targeted, the retail

Beine - Cross/Galardi                    234

1  marketplace, correct?

2  A    Well, the retail marketplace is the retail marketplace.

3  Q    Okay.  So, you did, in fact, do exactly what you said you

4  wouldn't do.  You have given to Newell past the license in

5  markets that you intend to want to go sell in, isn't that

6  correct?

7  A    Could you rephrase that?

8  Q    I don't know if I can, but I'll try.  You did license it

9  to a person -- to an entity that is in the retail store market.

10  A    Yes.

11  Q    And they are distributing Regal Ware and Newell did

12  distribute Regal Ware in the retail market.

13  A    Yes.

14  Q    And it is your intention to get back into that market.

15  A    Yes.

16  Q    So, aren't you doing exactly what you said you wouldn't

17  do?  Coke distributing, giving the license to Pepsi?

18  A    No.

19  Q    Why not?

20  A    Because Regal Ware abided by its noncompete with Newell to

21  stay out of the retail market.

22  Q    But now the covenant -- the compete is no longer in

23  existence, correct?

24  A    Correct.

25  Q    And you knew at some point that that would happen,

Beine - Cross/Galardi                      235

1  correct?

2  A    Correct.

3  Q    And so you knew that eventually you might want to compete?

4  A    Correct.

5  Q    And nonetheless, you didn't make this license terminable,

6  did you, upon a five-year term?

7  A    Correct.

8  Q    And you gave them an exclusive worldwide trademark

9  license, isn't that correct?

10 A    Yes.

11 Q    You didn't restrict the markets in which they could sell.

12 A    Yes, we did.

13 Q    What markets did you restrict?

14 A    They were restricted to the retail marketplace.

15 Q    Okay.  But worldwide, correct?

16 A    Correct.

17 Q    And the same products, product -- I guess it's category

18 Number 21.

19 A    Correct.

20 Q    Okay.  Now, did Regal file an objection to the bid

21 procedures?

22 A    I don't recall.

23 Q    Do you recall that there was a hearing on the bid

24 procedures which resulted in there being this $2 million

25 closing condition if this license was not assumed and assigned?

Beine - Cross/Galardi                    236

1  A    I do not recall that.

2  Q    Okay.  Let me ask you, did you know the date and time for

3  new bids to come in with respect to overbids of the Lifetime

4  contract?

5  A    No.

6  Q    You had no idea when the bid deadline was?

7  A    No.

8  Q    Okay.  And do you know when the discussions regarding the

9  taking back of the sub-license from Newell started?

10 A    Discussions with whom?

11 Q    With Newell and with Regal.

12 A    I don't recall the exact date.

13 Q    And do you recall approximately when that was?

14 A    No, that was handled by outside counsel.

15 Q    Do you recall if it was after Lifetime was announced as

16 the stalking horse bidder?

17 A    I don't know.

18 Q    And at any time from July 17th to the present date, have

19 you ever contacted Lifetime and requested information from them

20 regarding the kinds of things you asked Cerberus for?

21 A    No.

22 Q    Why not?

23 A    It's not my obligation.

24 Q    Now, in your letter, I think your testimony is that you

25 were advised that there was going to be a closing on a

1  transaction three days, and you found out about that, correct?

2  A     Correct.

3  Q     And at that point, you wrote a letter to Cerberus asking

4  for the information.

5  A     Correct.

6  Q     So, why is it not in this circumstance to find out that

7  information your responsibility?

8  A     Because Regal Ware is a trademark owner.   Everyone knows

9  -- everyone in this room knows that Regal Ware owns the

10 trademark.   Through your own due diligence, you should know

11 that the license agreement is out there.   It's not my

12 obligation to seek information from you.   It's your obligation

13 to provide me with information to make a reasonable decision on

14 whether or not we would consent.

15 Q     And if I understood your testimony, it was because you did

16 not receive information that you're withholding your consent?

17 A     There's more reasons than that.

18 Q     And what are the more reasons?

19 A     The competitive nature of the marketplace and the history

20 with Tefal and the trademark issues with Lifetime.

21 Q     And the history is that history about the 1997/1998 case?

22 A     Yes.

23 Q     Now, is there any amount of information that my client,

24 SEB, can give you that would make you satisfied to give

25 consent?

Beine - Redirect                                    238

1  A     Based upon Regal Ware's litigation history with Tefal?

2  No.

3                          (Pause)

4              MR. GALARDI:  Excuse me one second, Your Honor.

5              THE COURT:  Sure.

6                          (Pause)

7              MR. GALARDI:  Your Honor, I have no further

8  questions.

9              THE COURT:  Okay.  Mr. Herman?

10                     CROSS EXAMINATION

11  BY MR. HERMAN:

12  Q     Based on the agreement reached today with Lifetime, isn't

13  it true that if Lifetime Brands was approved as the buyer, that

14  Regal would not appeal the sale order?

15  A     That's correct.  Regal Ware would not appeal.

16  Q     And if SEB is approved as the buyer and the Court holds

17  that your license can be assumed and assigned to SEB, isn't it

18  true that Regal will appeal?

19  A     That's true.  Regal Ware will appeal.

20              MR. HERMAN:  Thank you, Your Honor.  No further

21  questions.

22              THE COURT:  Thank you.  Mr. Kortanek, redirect?

23                     REDIRECT EXAMINATION

24  BY MR. KORTANEK:

25  Q     Mr. Beine, does Regal Ware have experience in selling

Beine - Redirect                                                      239

1  products at -- to retailers?

2  A    Yes, we have a long history of experience selling products

3  at retail.

4  Q    And what do you think -- or -- does Regal Ware have

5  contacts at retailers which it can try to exploit in connection

6  with selling the new product line --

7  A    Yes.

8  Q    -- at retail?

9  A    Yes, Regal Ware has good contacts with its retailers based

10 upon its reputation in the marketplace.

11 Q    You talked -- you testified about the issue of

12 consideration, turning to the August -- the agreement dated

13 August 1, 2006 between Newell and Regal.  And you mentioned

14 that there was a release given.  Was there also an

15 indemnification provision given to Newell?

16 A    Yes, Regal Ware agreed to indemnify Newell --

17 Q    Okay.

18 A    -- as part of the agreement.

19 Q    Were -- was there -- can you elaborate a little bit on why

20 that release would or would not have value standing in Newell's

21 position?

22         MR. KORNFELD:  Objection.  Calls for speculation.

23         MR. KORTANEK:  Well, I'll rephrase it.

24         THE COURT:  Okay.  Otherwise I would sustain the

25 objection.

Beine - Redirect                    240

1  Q     The -- the -- in your view, what is the value of that

2  release and indemnification provision?  I'm not asking for a

3  dollar figure, but what is your view of the responsibilities or

4  liabilities that were discharged by that provision?

5  A     Well, the release and the indemnification provides any

6  company with great value because Newell can basically walk away

7  from this whole proceeding, they have no liability, Regal

8  Ware's agreed to release them from everything, Regal Ware's

9  agreed to indemnify them for anything that may fall out of

10 this.  And if I were Newell, that would have great value to me

11 as a corporation.

12 Q     Now, before that agreement, Newell stood in between you

13 and Mirro, is that right?

14 A     That's correct.

15 Q     Did -- do you have any view as to whether Newell owed any

16 duties to Regal Ware as far as the marks and under the license

17 agreement?

18 A     Newell has obligations under the license agreement.  But

19 in terms of duties, I would say that Newell owes no duties to

20 anybody.

21 Q     Now, counsel for -- I think it was the debtors asked you

22 -- turning now to some of the SEB history -- asked you about

23 the -- how long ago the dispute with Tefal was.  Do you

24 remember that line of questioning?

25 A     Yes.

Beine - Redirect                                241

1  Q    Okay.  Even though nine years or more or less has passed,
2  has Regal Ware's view changed in any way as to Tefal or SEB?
3  A    Actually nine years is recent history in this industry.
4  And Regal Ware's views has not changed -- they have not changed
5  and, you know, people may want to dismiss it as, well, it's no
6  big deal, it's just a lawsuit, it happened, it's over.  But
7  that lawsuit runs deep in the company and I was deeply involved
8  in it, and Jeff Reigle was involved in it, Chairman of the
9  Board, Jim Reigle, Jeff's father was involved in the lawsuit.
10 That lawsuit and litigation will not be taken lightly.  And it
11 was fierce litigation, in my opinion.
12 Q    Now, do you recall your testimony on direct about trade
13 shows and the conduct of Tefal representatives at trade shows?
14 A    (No verbal response)
15 Q    Does that, in any way, reflect where the parties are or
16 how they think of one another at this time?
17 A    Yes, Regal Ware and Tefal do not get along.
18 Q    Is there any difference between Newell and Newell as they
19 appeared to Regal at the time you entered into the transaction
20 with Newell back in 1999, any difference between Newell and a
21 global manufacturer like SEB and Tefal, in terms of whether
22 it's appropriate from Regal's view to extend the license to
23 them?
24 A    Well, actually at the time, Newell was, like I said, a
25 friendly competitor.  They were a logical buyer for the

Beine - Redirect                                    242

1  business unit that Regal was willing to divest itself of.  And
2  it didn't stand in the same competitive shoes as Tefal does
3  with Regal Ware.
4  Q    Is there a kind of competitor that can actually do damage
5  to Regal Ware's market share if they were to obtain rights to
6  your trademarks?
7  A    Yes, there are certain competitors that can do great
8  damage.  And like I said, Tefal's one of those competitors
9  based upon our litigation history, based upon their strong
10 balance sheet, based upon their -- I guess strong stands today
11 that they insist that the Regal Ware trademark go with this
12 transaction, even though Lifetime has agreed with Regal Ware to
13 exit this license agreement within six months.  I mean that
14 causes Regal Ware great concern that they want this trademark
15 so badly as part of this bankruptcy proceeding, Regal Ware just
16 doesn't know what they intend to do with the trademark in the
17 marketplace.
18 Q    Are you familiar with the notion that a trademark license
19 is a personal services type of agreement?
20 A    Yes, I am.
21 Q    Now, is it -- is one of the key times that you get to
22 decide who holds your license when you first grant a license to
23 a party?
24 A    Yes.
25 Q    Okay.  How about when your original licensee comes to you

Beine - Redirect                                    243

1  and asks for consent and identifies a new party?  Is that -- is
2  that another time when you have input as to who your ultimate
3  licensee is?

4  A    Yes, there are a few opportunities to choose the licensee:
5  At inception and at an assignment or a sub-license or a consent
6  period.  And that's exactly why the consent language is in that
7  paragraph in the agreement.

8  Q    Now, there's been a lot of testimony elicited from you
9  about quality.  In between identifying who the person is or
10 entity that actually is the ultimate holder of your license,
11 all you really have is quality rights, right?

12 A    Correct.

13 Q    Okay.  But does that limit the concerns and your
14 evaluation when you're going to pick the next person to just
15 quality?

16 A    No.  Actually quality is not the biggest issue here today.
17 The biggest issue is that Regal Ware's trademark would go to a
18 direct competitor.  I mean Regal Ware can control the quality
19 procedures, just like as stated in my cross examination, that
20 we can go through those procedures in the agreement and that we
21 can control, to some degree.  But, you know, you don't have
22 many opportunities to control who the sub-licensee is, and this
23 is one of them.

24 Q    Now, are you withholding consent to assignee to SEB
25 because it's French?

Beine - Recross/Galardi                    244

1  A    Absolutely not.

2  Q    Okay.  Now, is it a -- in your view, a reasonable basis to

3  withhold consent if your new ultimate licensee intends to sell

4  at Wal-Mart or similar levels in the distribution chain?

5  A    Well, that's one issue.  I mean once you're brand is at

6  Wal-Mart, it's difficult to elevate that brand to anything

7  higher than that.

8  Q    Is capitalization of an entity a major factor in terms of

9  who should be your ultimate licensee?

10 A    Yes.  And capitalization can go both ways.  I mean it's

11 good to have the capital to drive the brand and take it places,

12 but if that capital is in the hands of a competitor, that

13 competitor can go head-to-head with you in the marketplace and

14 they have the wherewithal to do it with Regal Ware's own

15 trademark.

16 Q    Would you ever do a new licensing deal or consent to a

17 licensing deal if you had no information about the proposed

18 licensee's marketing plans, use of the mark, or anything else

19 related to merchandising and use of the mark?

20 A    No, that would be malpractice.

21 Q    Okay.  Do you think that would show responsibility or lack

22 of responsibility to equity holders in Regal Ware?

23 A    Lack of responsibility.

24         MR. KORTANEK:  I have no further questions, Your

25 Honor.

Beine - Recross/Galardi                            245

1          THE COURT:  Redirect (sic)?

2          MR. GALARDI:  Your Honor, very minimal.

3                    RECROSS EXAMINATION

4   BY MR. GALARDI:

5   Q    Mr. Herman asked you that if Lifetime is the successful

6   bidder, it's assumed and assigned over to Lifetime, that you

7   would not appeal, correct?

8   A    That's correct.

9   Q    And when you answered that question, is it based on your

10  understanding that Lifetime has also agreed that they will have

11  that license for only six months?

12  A    That's correct.

13  Q    And if they told you that, no, we want that license as

14  written, exclusive, worldwide license, renewable, I think it's

15  every ten years so long as both parties don't agree to

16  terminate it, would you appeal that decision?

17  A    Yes.

18  Q    Now, if I sat down with you with SEB today and I gave you

19  the marketing plan, and we said we'll just go to what's going

20  on right now, we'll continue to live by the quality that's

21  there, and we're not going to expand it into other markets,

22  we're not going to expand it into every store, but we're going

23  to continue to supply Wal-Mart.  Would that make any difference

24  to your decision regarding consent?

25  A    No.  Because, frankly, I don't trust what Tefal says to

1  Regal Ware.

2  Q    And if there was an agreement to that effect, you still

3  wouldn't trust it, isn't that correct?

4  A    I don't believe that they would live up to the agreement

5  based upon them filing an appeal after they accepted the offer

6  of judgment in our litigation in '97.

7  Q    Well, if you want to go to that opinion, wasn't the only

8  issue there whether that appeal -- whether that case was

9  dismissed with or without prejudice by accepting the offer of

10  judgment?

11  A    No, that's not the issue.

12  Q    What does it say in the opinion?  Isn't that what the

13  opinion was about?

14  A    I haven't read the opinion since 1997.

15  Q    And if -- if SEB or Tefal, which is now Groupe SEB, said

16  that we will agree not to expand into markets like Williams-

17  Sonoma with this particular cookware, would that make any

18  difference to Regal Ware?

19  A    No.  I mean you're talking hypotheticals.

20  Q    Well, again, you're the one, I think, that testified that

21  there was no amount of information that SEB could give you that

22  would make you consent to SEB being the assignee, isn't that

23  correct?

24  A    That's correct.

25              MR. GALARDI:  No further questions.

1          THE COURT:  Any -- anyone else?

2                    (No audible response heard)

3          THE COURT:  Thank you very much.

4          MR. BEINE:  You're welcome.

5          THE COURT:  You may step down.

6                         (Pause)

7          THE COURT:  Does anyone else have a witness that

8     they'd like to present, or any further testimony?

9                    (No audible response heard)

10         THE COURT:  I would like to hear some brief argument

11    then.  That would be helpful after, you know, a long day here.

12    And I think -- why don't we start with the debtor's counsel,

13    Ms. Jones?

14         MS. DAVIS JONES:  Thank you, Your Honor.  And thank

15    you for your indulgence in what has been a long day.

16         Your Honor, the debtors stand before the Court

17    requesting approval of the sale, substantially all of the

18    assets of the WearEver Debtors.  There's been a lot of dynamics

19    here today, but let me just come back to focus.  To approve a

20    sale, Your Honor needs to find:

21         One, a proper exercise of business judgment to make

22    the decision to sell the assets.

23         Two, fair notice.

24         Three, good faith.

25         And, four, fair price.

248

1          Your Honor, there's been no dispute on the debtors'
2     exercise of business judgment to sell these companies.

3          Secondly, Your Honor, there's been no issue that has
4     been provided.

5          Third, there's been no issue of the debtors' good
6     faith.   Lifetime and Citigroup may have some issues between
7     them, but there's no evidence of any problems with the debtors'
8     good faith.

9          Mr. Lowrey's testimony in support of good faith is
10    undisputed.   There were no side deals.   The negotiations were
11    at arm's length with both sides represented by counsel.

12         With respect to fair price, we had a full, and Your
13    Honor is getting a feel for, spirited auction.   It went on for
14    at least three hours, is the undisputed testimony.   Mr. Lowrey
15    testified that everyone was given an opportunity to make their
16    bids, to have consideration, to take the time.   There was no
17    rushing.

18         The testimony today does not support any assertion of
19    there not being a fair price received.

20         With respect to the Lifetime objection, that issue,
21    Your Honor, is between Lifetime and Citigroup.   There's no
22    evidence at all of any problems with the auction.   The Court
23    established bidding procedures.   The debtor complied with those
24    bidding procedures.

25         The transcript bears out that we ran a

249

1  straightforward auction.   And Mr. Lowrey testified that the
2  bids were apples-to-apples, everyone was bidding on the same
3  assets.

4          There's no dispute with the debtors' decision that
5  the bid of $35.1 million was the highest and best bid received
6  at the auction yesterday.

7          The SEB testimony that there was -- that they had
8  received no confidential information about Lifetime, Lifetime's
9  strategy with respect to bidding on this deal, their pricing
10 and so forth, remains undisputed and unrefuted.

11         Likewise, SEB's testimony that their bid was based
12 solely on their judgment on what they were prepared to pay was
13 confirmed.   There was no dispute about that.

14         Likewise, Your Honor, there was no dispute and no
15 refuting of the Citigroup witness's testimony that he did not
16 contain confidential information about Lifetime's involvement
17 in this case, and what it was going to do in bidding and
18 strategy and so forth.

19         Your Honor, with respect to Regal, we filed a reply
20 that I hope Your Honor has had the opportunity to review, to
21 their objection.   There were two basic points:

22         One, Your Honor, this sub-license agreement in an
23 exclusive worldwide sub-license, which is freely assignable to
24 a successful bidder.   Even if Regal's consent were required to
25 assign the sub-license, the agreement explicitly states that

1 such consent may not be unreasonably withheld.

2    In our reply, we set forth the legal precedent
3 applicable to the transfer of such licenses.  Courts have
4 recognized that exclusive trademark licenses may be freely
5 assigned.  The cases cited by Regal in support of their
6 position either deal with nonexclusive license agreements or in
7 cases where the licenses, either there were no licenses or the
8 licenses were not at issue.

9    The original Newell license, Your Honor, from Regal
10 was very broad, permitting license -- the licensee to sub-
11 license others.

12    Going forward, it was clearly thought about because
13 they changed the language.  But still, you ended up with an
14 agreement that explicitly provided that it could be assigned
15 with consent, and that consent could not be unreasonably
16 withheld.

17    Your Honor, we established at the auction yesterday,
18 and it was established in testimony today, that SEB and
19 Lifetime are both publicly traded companies with significant
20 revenues, they're used to dealing with third party license
21 agreements and know how to deal with them, and that they intend
22 to comply with the Regal Ware license.

23    Regal stated that they were concerned about licensing
24 -- transmitting its license to a competitor.  Your Honor, Mirro
25 is a competitor.  Anywhere in the cookware industry -- anyone

1  in the cookware industry could be found to be a competitor.

2      We understand that -- and the testimony is that Regal
3  is concerned that it does not want its trademarks eroded.   The
4  testimony by SEB was unrefuted that they do not intend to erode
5  the image.   That they will carefully protect the mark.   That
6  they have an experience at protecting marks.

7      And, Your Honor, very importantly, the sub-license
8  provides for quality control by Regal.   Regal testified that
9  they do and will monitor their marks.   And there's no dispute
10 that Regal has quality control rights.   Your Honor, and frankly
11 in the past, they have licensed to competitors, the example
12 Mirro.

13     Your Honor, we cannot escape the reality that the
14 sub-license does provide, and the document explicitly states
15 that it can be transferred, and that that consent cannot be
16 unreasonably withheld.   It does not have a restriction about
17 transfers to competitors.

18     Your Honor, we don't like them is not a ground that
19 is recognized as a reasonable reason for withholding consent.
20 The testimony from Regal was clear.   It was not only said once,
21 then it was said twice, and then it was said for a third time,
22 that there's nothing SEB can do to satisfy any of the concerns
23 of Regal.

24     Your Honor, that cannot be the basis for a reasonable
25 withholding of consent.

1       Your Honor, I'll make one comment about Lifetime in
2  this concern about confusion simply because their asset
3  purchase agreement does lock in the runner up bidder until we
4  get to the outside date.  Your Honor, as I -- as I understood
5  the testimony, there should be no confusion.  Regal is not
6  going to use its Lifetime mark as its trade name in the retail,
7  but I believe it stated several times that it would be using
8  the name Renaissance by Regal, so I don't think there'd be an
9  issue there or any confusion.

10      Your Honor, we spent a lot of time this afternoon
11 giving Regal every opportunity to explain why it will not
12 consent to a transfer of this license.  And, frankly, Your
13 Honor, there has been no evidence that rises to a reasonable
14 basis for withholding the consent.

15      Your Honor, therefore, the debtor respectfully
16 requests and submits to the Court that we have met our burden
17 for this Court to find approval of this sale, including the
18 transfer of the sub-license and we ask that it be approved.

19          THE COURT:  Thank you, Ms. Jones.

20          MS. DAVIS JONES:  Thank you, Your Honor.

21          THE COURT:  No questions.  I think -- Mr. Galardi?

22          MR. GALARDI:  I am pleased to say that Ms. Jones
23 adequately summarized the argument.  So, I will not even add to
24 it.

25          Thank you.

253

1          THE COURT:  Thank you, Mr. Galardi.  Mr. Herman?
2          MR. HERMAN:  Good afternoon, Your Honor.  Thanks for
3  indulging us in this long hearing today.

4          I'm going to address the Court on two issues that
5  we've now heard testimony on:  The first is the auction and the
6  second is highest or best.

7          On the auction, to me, it still smells bad.  We had a
8  lot of proffering, which is interesting.  But let's hear what
9  the witness actually said when he was on the stand.  This is
10 now the witness from Citigroup, Mr. Hadid.  It's the only
11 Citigroup witness we heard from today.  He admits that he
12 personally had confidential information from Lifetime Brands as
13 recently as May and June of this year.  And he also admits that
14 Citigroup had confidential information from Lifetime Brands.

15         He also then says, oh, I'm low man on the totem pole.
16 But then he admits that he said yesterday to the Vice Chairman
17 of the company, oh, we're going to dinner next week to
18 celebrate the closing of the recent transaction.  It's very
19 interesting that the low man on the totem pole is having dinner
20 with the Vice Chairman.

21         He also admits he worked on SEB's acquisition of the
22 WearEver assets.  So, he now admits that he's on both sides of
23 the Chinese wall.

24         At this point, we now have an appearance of
25 impropriety and a bad smell.

1        He then says he never told SEB.  Well, so what?  He
2   and Mr. Galardi can say that all they want, that Citigroup
3   didn't do it.  But the only testimony we have so far is that
4   the lowest man on the totem pole didn't tell SEB about the
5   confidential information.

6        What we have, though, is the appearance of
7   impropriety at the auction.  The question remains if anyone
8   else at Citibank told SEB.

9        We then get a proffer from Mr. Galardi from the --
10  Mr. Sumeire, is that his name -- S -- I don't know how to
11  pronounce his name.

12       THE COURT:  Sumeire.

13       MR. HERMAN:  A proffer for the fact that SEB came to
14  its own conclusions on value.

15       Well, as soon as we cross examine the witness, that
16  proffer becomes meaningless.  Because what does the witness
17  concede?  First of all, he concedes he's in the legal
18  department, doesn't do anything on valuation.  So, he has no
19  personal knowledge on valuation.

20       Then he admits that Citigroup -- he then admits that
21  he was not the point person with Citigroup for the SEB
22  transaction.  So, he doesn't really now.

23       And then he admits that among the services provided
24  by Citi were valuation.

25       So, the only witness that we heard from on that topic

1 about how they magically came up with their own number actually
2 said Citigroup did valuation services, and he didn't have any
3 other information about it.

4         I find it hard to believe that they hired an
5 investment bank and didn't use them for valuation and
6 strategies.

7         On the highest or best case, counsel for the debtor
8 says the issue is really between Lifetime and Citigroup.  Well,
9 not today it isn't.  Today the issue is whether the debtors'
10 business judgment is correct that the bid from Lifetime is not
11 higher or better than the bid from SEB.  That's the issue for
12 today.

13         Let's take if -- take a look at Mr. Lowrey's
14 testimony under oath.  He says that at the conclusion of the
15 auction yesterday, he and the debtors determined that the $35.1
16 million bid by SEB was higher or better than the $35 million
17 bid of Lifetime Brands.  Terrific.

18         He then says and admits that yesterday, all the
19 parties in the room valued the waiver of the $2 million closing
20 condition at $100,000.  He then concedes that today he still
21 values that condition at $100,000.

22         He then further concedes that if this Court allowed
23 Lifetime to make that waiver today, that our bid would now be
24 valued at $35.1, exactly the same economic value as SEB.

25         Mr. Lowrey then further concedes that if the Court

1  allowed it, he would consider two bids, both of the value of
2  35.1, but one which had Regal's consent and which didn't, he
3  would say in his view, that the highest and better bid is the
4  one with the Regal consent.  Well, that's my client's bid.

5        Now, is Your Honor going to allow me to do this?
6  Well, the very first thing that happened in this courtroom
7  today was Your Honor came out and said you were troubled by the
8  Regal issues.  And asked the parties if they would go and try
9  to approach Regal and settle it.  Well, my client did exactly
10  what you told us to do, and we obtained their consent.

11        So, at this point, the sale hearing is not over.  You
12  have not entered an order.  And we now have a bid from Lifetime
13  that is valued at 35.1 and has Regal's consent.  According to
14  the unrebutted testimony of Mr. Lowrey, that's a higher or
15  better deal.

16        Finally, Your Honor, I just want to make two other
17  points:

18        If I had said that my client was now willing to pay
19  $40 million, debtors' counsel would be screaming and yelling
20  here that it's the debtors' duties to maximize value of the
21  assets for the benefit of all creditors, and we shouldn't be
22  relying on bidding procedures orders, oh, they're just
23  procedural anyway, they're not some sacred text.  But that's
24  what we -- that's what happens in all these cases.  The fact
25  that we're only slightly better doesn't take away from the fact

1 that we're better.  If I was at 40 million or 50 million, this
2 hearing would have a completely different flavor.

3        But the point is that bidding procedures are, in
4 fact, only procedural, and they're not a sacred text.  In fact,
5 the bidding procedures order itself says, notwithstanding all
6 this wonderful stuff, there's a catchall, the debtor can change
7 the rules of the game at any time in their discretion.  So,
8 there's not some holy text that people have to listen to.
9 They're flexible.  And the policy in maximizing the value of
10 the estate always trumps the procedural rules.  So, at this
11 point, Your Honor, you have not entered the order yet, so in
12 terms of whether the auction's closed or not, it doesn't
13 matter.  The debtor can only sell until you say it's approved.
14 So, in essence, the bids are always open and people can still
15 amend their bids at hearings.  It's a very -- very common at a
16 hearing when there are objections.  The bidder says, I'm going
17 to modify my bid to move that objection or take care of it, it
18 happens all the time, right in the middle of the hearing.

19       So, at this point, Your Honor, we would submit that
20 Mr. Lowrey's testimony that our bid should be valued at thirty-
21 five one and in his view, since we have the Regal consent, and
22 SEB does not, that our bid is higher or better.  And we are
23 prepared to close immediately.

24              Thank you.

25              THE COURT:  Thank you.  Yes, Mr. Helfat?

1         MR. HELFAT:  First of all, I wanted to thank the --

2         THE COURT:  It's your money.  It's your money.

3         MR. HELFAT:  That's right.

4         THE COURT:  So, I'd like to hear from you.

5         MR. HELFAT:  That's right.  And it took until 6:15,

6    and I certainly respect and appreciate the Court taking the

7    time it took today.

8         THE COURT:  My pleasure.

9         MR. HELFAT:  Unfortunately, Your Honor, Wachovia is

10   probably the leaving some money on the table.  As Lifetime

11   earlier today probably made a higher and better offer, and yes,

12   the debtor may be taking on litigation from Regal Ware, which

13   may be expensive and reduce the purchase price.

14        But unless Your Honor agrees to reopen the auction,

15   quite frankly, Wachovia supports the SEB offer as the highest

16   and best offer.

17        THE COURT:  Thank you.  Mr. Galardi?  Oh, I'm sorry.

18   Mr. Kortanek, please.

19        MR. KORTANEK:  Your Honor, the -- first of all, this

20   is a pretty important decision Your Honor is being asked to

21   make.  It's far beyond this case.  We cited the NCP case in our

22   papers, our original objection.  And that dealt with Billy

23   Blanks and trademarks related to his Tae Bo -- Tae Bo

24   trademark.  And that Court noted that that was the first time

25   that, to that Court's knowledge, and to our knowledge, as well,

1  that a Bankruptcy Court looked at the question of 365(c)(1) and

2  the enforce ability of a restriction on assignment of a

3  trademark license.

4       We're at another level with the dispute before Your

5  Honor today because I think this is the first time that a

6  trademark license and the issue of unreasonableness or

7  reasonableness is before a Court.  So, it's going to have far-

8  reaching ramifications, and I know Your Honor knows that.

9       But first of all, I can't let it -- let -- I can't

10 leave it unsaid that how we got here today and the case we were

11 able to put on was the product of an extremely hasty and, as I

12 think as Your Honor recognized yesterday, more than compressed

13 schedule.

14      Suffice it to say that Regal Ware's ability to

15 evaluate whatever information would be given to it -- by the

16 way, there was none other than financials.  But let's -- let's

17 talk about that later.  But as of yesterday, you know, we were

18 scrambling and trying very, very hard to address this situation

19 where we're alleged to be unreasonable when no one had given us

20 anything.  Just the names of the companies.

21      So, the process standpoint is very important.  And,

22 frankly, that's -- that's -- we continue to object to that

23 process.  No, we didn't object to the bid procedures order, and

24 we would never have anticipated that we would be at this stage,

25 that the fundamental decision of your personal services

1  trademark goes to is going to be this heavily litigated
2  unreasonable consent issue.  Okay?  And there's no reason we
3  should have anticipated that.

4          So, that when we get hit with all this, you know, ten
5  days before today, and it matures into the current context,
6  this is not the way, frankly, Regal would like to address this
7  issue.

8          Now, this is a personal services contract.  Nobody
9  contests that.  The identity of a trademark licensor, the
10  actual trademark owner, and the identity of the trademark user,
11  the licensee, is absolutely a critical decision for that
12  trademark owner of who exactly that person is.  It's not
13  exaggeration to make illusions to the Michelangelo and the
14  other types of artists analogs that you see in the IP case law.
15  That's what we have.

16          I mean it's -- I think everyone wants to be
17  dismissed, we're talking about cookware.  But people's
18  livelihoods depend on this.  This is a company that is still
19  manufacturing this -- these products in the U.S., and it's a
20  family-run business.  This is of critical importance to them.

21          This is their livelihood, this is their family name,
22  the Reigle family who owns this.  And so when you think about
23  what's reasonable, here you have all these parties telling Your
24  Honor it's just a cold, hard determination.  And by cold and
25  hard, I mean you just have to satisfy a couple of basic things.

1 As long as you have your quality rights, don't worry about it.

2 As long as it's a big company that can tie its shoes in the

3 morning and maintain your trademarks or, you know, protect them

4 from infringement or whatever, stamp the pots the right way and

5 make the quality, don't worry about it.

6       And it -- I think the factors really do boil down to

7 just those two things.  Is it a big company?  Is it reputable?

8 That's not the standard.  That can't be the standard.  This is

9 a personal services deal.

10       Now, when we -- we told Your Honor and our witness

11 told Your Honor about how much care Regal actually put into the

12 last two iterations of licensing transactions, and the only

13 other licensing transaction it's ever done in its entire

14 corporate history.  And the evidence is unrebutted that that

15 was a significant degree of care reflecting a careful and

16 deliberate consideration of who the person was going to be

17 manufacturing products with our -- our family name on it.

18       So -- now, they tell you, well, Newell is a

19 competitor.  The evidence is unrebutted.  Newell is a friendly

20 competitor.  They're located up the road, same union.

21       Now, there is a point -- there is -- there's --

22 there's not just one kind of competitor.  Let me give Your

23 Honor an example.  Let's say that a small technology or

24 software company has a trademark that relates to something that

25 would go on a computer or a computer system.  And they enter

1   into a licensing agreement that has the same term we have in
2   our trademark sub-licensing agreement.  You have to consent,
3   but it shall not be unreasonable.  It doesn't have a French
4   company restriction.  It doesn't have a big company/small
5   company restriction, Wal-Mart, it doesn't have all those bells
6   and whistles.  This provision, I think, is probably in tens of
7   thousands of agreements out the in the country.  So, what you
8   decide today, or if you take it under advisement, it's going to
9   affect all that.

10         Okay.  The rest of my hypothetical is the licensee
11  approaches the trademark owner and say, I just filed bankruptcy
12  and I just had an auction or I'm going to have an auction, and
13  I want to assign it to Microsoft.  Don't worry about it,
14  they've got money.  They know how to protect trademarks and
15  intellectual property rights.  And the licensor thinks to
16  itself, I would submit reasonably, they're going to crush me.
17  Microsoft can take that name and the relevance of the original
18  owner of that name can just go up in smoke.

19         Now, again, it's very fact intensive, Your Honor, so
20  that's why it's not an easy decision.  There are circumstances
21  where a competitor can elevate the name or some licensee can
22  elevate it.  We don't have any of that evidence here.   We
23  don't have any evidence of what SEB intends to do with the
24  mark.

25         And I'd recommend to Your Honor an interesting quote

1  from one of the cases we've cited.  The case is -- relates to
2  Ferrari, which I was going to make another analogy to.
3  Ferrari, I'll give you the name of the case, it's In RE:
4  R.B.B., Inc. and it's actually a 9th Circuit decision, 211 F.
5  3d 475.

6        And that worked its way up from a bankruptcy case in
7  which a franchise agreement from Ferrari North America was
8  sought to be assumed and assigned.  It went to District Court,
9  it went to -- it went to the 9th Circuit.  And the Court
10  actually had to decide an unreasonable consent issue.  And I'll
11  just -- the case speaks for itself, and I don't want to keep us
12  here all night, but I'll just read part of the opinion.  "For
13  the same reasons we have held that the purchaser was not
14  identified, we hold that FNA," Ferrari North America, "did not
15  unreasonably withhold its consent.  An automobile manufacturer
16  with a special line of luxury motor cars and an unhappy
17  experience with an unreliable dealer, FNA was not unreasonable
18  in objecting to dealing with the shifting financial structure
19  presented under the fictitious business name Symbolic."

20        And Symbolic, my understanding is, was actually, not
21  the debtor, but was one of the -- was the proposed assignee.

22        And the Court said the burden of proving that FNA was
23  unreasonable in finding that Symbolic flunked the objective
24  criteria of Vanesse, which was an old case citation, was on
25  Symbolic.

1          Whether it's the debtors' burden or SEB's burden,
2  this is not a question of -- in particular with the way we got
3  here and the process where it's -- it's Regal Ware's burden to
4  prove it's reasonable.  And we have -- we have demonstrated
5  evidence that we had really the most important kind of
6  experience you could have with a potential licensee.  What
7  could be more important than an actual adverse experience.  Not
8  just a fight at a bar, but an experience dealing with trademark
9  licenses where it's clear, although counsel had quite a bit of
10 liberty with -- with objections, that that was a -- that was a
11 very bad experience for Regal, however you slice it.

12         And, by the way, I make the comment about the
13 objections and so forth because I must not have been paying
14 attention.  But when we had the proffer of other witnesses -- I
15 would note, for example, think of -- think of SEB's proffer and
16 think of the record, Your Honor.  They tried to dismiss the
17 Tefal litigation as just -- just run of the mill litigation.
18 The proffered witness didn't even have any personal knowledge
19 of it, he was looking at a file.  That was interesting.  Our
20 man was there and it was involved with this experience.

21         So, how is it unreasonable that -- to withhold
22 consent to that party who was in mortal -- you know, mortal
23 combat with us.  Not -- businesspeople don't think like
24 lawyers, Your Honor, we know that.  Lawyers can fight in a room
25 like this and be collegial afterwards, at least many of them.

1 Businesspeople don't quite think that way.  And that's not the
2 standard.

3           The standard has to be reasonableness in the position
4 of someone in Regal's shoes.  How could it be anything else?
5 Can it be reasonableness if some objective cookware
6 manufacturer?  Some hypothetical person?  They're cold, hard
7 standard seems to posit that.  That you put it into a computer,
8 if the company can make pots, if it can walk and chew gum and
9 if it's got money, it's unreasonable.  But that's not the
10 standard.

11          Why can't it be a fact that it's our name.  It's
12 Judge Gross's cookware, it's Kortanek cookware, it's Regal
13 cookware, I want to know who's going to have that stuff.  We
14 got critical input onto that, the record is uncontroverted as
15 to Newell and then as to Global Home.  We didn't like the deal
16 with Cerberus, frankly, and you know, the record is clear on
17 that.  But that was an exigent situation, it was another rush
18 deal, somewhat like this.  But at least, you know, we got a
19 chance to make the effort.  We took some information from them,
20 we cut a deal, there were economics involved.  And we got
21 benefits in terms of limiting the future downstream flow, which
22 is why we're here today.

23          Quality doesn't -- doesn't answer it.  The point --
24 and the last bit of testimony was really important, Your Honor.
25 And I emphasize that.  There's only a couple of times you get

1    to have input on who your ultimate licensee is. Of course, at

2    inception, that goes without saying. You decide who you're

3    Michelangelo's going to be. But you decide it at -- at

4    assignment time. And how -- one of these rhetorical devices,

5    but the exception can't swallow the rule.

6            If unreasonable just means ability to make pots that

7    way, this is not genetic sequencing. I mean a lot of people

8    can probably make pots like this. And financial wherewithal.

9    That -- hasn't that just deleted all that case law about the

10   personal services nature? It's personal. I think you're

11   allowed. And Your Honor should be comfortable. It is hard for

12   us. Bankruptcy lawyers and judges think, well, this is a

13   restriction, I want to maximize value.

14           (c)(1), Section 365(c)(1) is really important and

15   powerful section. So, notwithstanding everybody's expectations

16   that, you know, we should have been able to get this done, we

17   don't understand why they're not consenting, they haven't told

18   us. We have told you.

19           It's not we don't like them. That's a gross

20   oversimplification. We've had a bad experience with them. The

21   evidence is uncontroverted. We have, you know, direct

22   competition with them.

23           Think of their standard, Your Honor. If you grant

24   this -- I would submit to you that if you approve on this

25   record, this is a standard that IP lawyers will look at across

1  the country -- Delaware's a pretty influential place, and

2  they're going to say, geeze, I guess that means -- this is like

3  a suicide provision.  When my licensee files bankruptcy, even

4  if it means suicide, consenting to assignment to Microsoft in

5  my hypothetical, they meet the quality test, they meet the

6  financial wherewithal, hundreds or millions of times over.

7  That's it.  You know?  You open the barndoor when you entered

8  into that license agreement, but you have to keep consenting,

9  it doesn't matter who it is.  It's not the standard, Your

10  Honor.  And I respectfully submit that it shouldn't be.

11       And the debtors say that -- they've -- they mention

12  the case law.  Their case law doesn't say that.  Trademarks are

13  so such a quintessential form of a personal services agreement,

14  if we were afforded more time, I think Your Honor would find

15  just looking at Walker on patents that trademark -- I just

16  learned this -- trademarks weren't even assignable, licenses,

17  rather, until the '30's.  There's a so-called modern view that

18  is a fairly recent development.

19       And we've cited in our supplemental memoranda that

20  Your Honor asked us to file, I know that just like yesterday,

21  got under Your Honor's door early this morning.  We cited cases

22  that make clear that it's a red herring to say there's a

23  distinction between an exclusive and a nonexclusive.

24       Still personal services.  And you can't make it --

25  you can't wish it away.  You can't wish that fact away.

1    So, there's an economic impact to our objection, we
2  know that.  But that doesn't mean the Reigle family has to lie
3  down and let anybody come in.  That's what their standard is.

4    I'm not sure what would be reasonable under their
5  standard.  Is it someone has a criminal record or someone who
6  is about to file bankruptcy.  I just -- I don't really know.

7    So, maybe they'll answer that in their rebuttal, Your
8  Honor.  But -- if I may, I just want to look at my notes
9  because I want to make sure I haven't missed anything.

10                    (Pause)

11    MR. KORTANEK:  Well, Your Honor, I do have one small
12  point.  And that is I respectfully suggest to Your Honor that
13  on this record, it's really important to -- I understand that
14  sale processes move at light speed sometimes, as do plan
15  processes.  But I would think it's a very uncomfortable
16  decision to even think about saying someone is unreasonable,
17  that this entity is actually unreasonable given the timing
18  here.

19    I mean how could there be a reasonable and deliberate
20  decision, to state it another way, in two or three business
21  days since we were asked to consent?  And threatened with a
22  lawsuit for objecting.

23    Thank you, Your Honor.  I have no further -- nothing
24  further.

25    THE COURT:  Thank you, Mr. Kortanek.

1            MR. GALARDI:  I think I'll take my time now.

2            THE COURT:  Okay.

3            MR. GALARDI:  Your Honor, I think I'll first go to

4   Mr. Herman and what I believe he left out and what goes to the

5   good faith.

6            First of all, I agree, Your Honor, if Mr. Herman were

7   here for $40 million and there were no other issue, and he

8   agreed, as he stood here today, to waive any objection to the

9   process and let's open it up, I've already offered to Your

10  Honor we're prepared to do that.  We're still prepared to do

11  that.  Before Your Honor signs that order, as soon as he waives

12  the condition and doesn't have a free option to drive my client

13  up in price, we'll open up this auction and we'll get it done

14  right now.  So, that's really a red herring.

15           What I think Mr. Herman seems to have done -- I was

16  sitting there when he did this, and he's a very good lawyer, he

17  forgot to cross examine Mr. Lac.  Mr. Lac was the financial

18  person that testified.  Mr. Lac was the one who testified that

19  we did this analysis.  Sure the lawyer didn't do them, he was

20  there.  But there was very clear testimony.  Mr. Lac, Mr.

21  Sumeire were the two people primarily responsible.  Mr. Lac was

22  the financial person.  Mr. Lac was the one who did the models.

23  Mr. Lac is the one that had Citibank check the models.

24           He also left out something else.  Any affirmative

25  evidence.  Though he said his witness was available, the

1   Supreme Court is clear:  He did not bring him in.  He did not
2   call him.

3          He also left out the fact that Mr. Lowrey testified
4   that we've been in negotiations with the WearEver Debtors about
5   the agreement, how we can improve the agreement, what we can
6   do, what price.  As Mr. Lowrey said, and, again, it's
7   circumstantial evidence, but that's inconsistent with us
8   knowing a price.  And if Your Honor looks at that -- my client
9   pays me a lot of money to sit there, they really wouldn't have
10  wanted me to sit there for three and a half hours at $100,000
11  increments.  It would have been like a pole vault experience.
12  I would have said get the bar up there, give me your best
13  price, I'll beat you by 100,000.

14         That is not what happened.  The people that will tell
15  you -- and you can't see this in the record, is that at $30
16  million, they went out, they came back.  I don't know if it was
17  gamesmanship or whether it was a price, or whether it was a
18  higher price.  But we were prepared to go.  Not one person
19  cross examined my witness about how much higher we were
20  prepared to go.  It was an independent business decision.
21  There is no testimony

22         Mr. Herman simply did not leave -- put any evidence
23  on whatsoever.  And if Your Honor wants to open the auction, I
24  offer it again right here, right now.  I'm just not going to go
25  up on my price or ask me about the waiver of that condition,

1 but the debtors know what we'll do, everybody in this courtroom
2 knows what we do, but we don't do it for free and we don't do
3 it -- and as Mr. Herman says, I waive my 363(m) objection.

4      Because yesterday he said he wanted to get it for 21.
5 Today he said he wanted to get it to 21.  And until he waives
6 that objection, we have absolutely no reason to bid a single
7 penny more because the debtors believe ours is the highest and
8 best offer.

9      Now, Your Honor, I like the expression that Mr.
10 Kortanek put the rabbit in the hat.  He starts from the premise
11 that this is a personal services contract.  That is a legal
12 determination.  And it is -- it is not the classic case of
13 James Taylor goes out and tries to book an engagement, and all
14 of a sudden you have some other person who plays the guitar and
15 looks like James Taylor singing Sweet Baby James.  That's a
16 personal services contract.  We know what those are.

17      Judge McKelvie, by Mr. Kortanek's own admission,
18 knows copyright laws.  Know intellectual property law.
19 Concludes that an exclusive copyright, not a license, an
20 exclusive property right of a copyright can be freely assumed
21 and assigned in a bankruptcy context.

22      So, now he's got to tell me what's so different about
23 this?  Intellectual property, we use that phrase.  Trademarks
24 aren't even defined as intellectual property in the Bankruptcy
25 Code, but copyrights are.  And they didn't make a special

1 exception there.

2       Now, with respect to Ferraris.  Sure, it's very
3 different.  If Ferrari has a distributor who is going to sell a
4 Ferrari, that's different.  But they already gave away the
5 right to use this Regal name.  It's not that I'm selling
6 Ferrari.  It's not that Pepsi is selling Coke.  We're selling
7 something that they gave up, gave up for eternity and said
8 somebody can go ahead and sell it.

9       Now, with respect to the personal services argument,
10 it is simply inconsistent with the language of the agreement.
11 If it were truly personal services, and you really want James
12 Taylor to be there, you would have put restrictions on who it
13 could be subleased to.  The testimony is uncontroverted.  The
14 document is clear.  When they sold this, this could have been
15 sub-licensed to anybody, even that three-headed monster that we
16 all know and love who gives DIP loans, who stands at the gates,
17 Cerberus.

18       I can't believe that of Cerberus versus SEB, who's
19 not a three-headed monster, but we're French and we happen to
20 be competitive, that somehow we're somehow less -- more of a
21 threat than Cerberus.  That's what his -- his -- his argument
22 comes down to.

23       With respect to that, I think Your Honor has to rule
24 on to legal issues -- first a legal issue, then a factual
25 issue.  Is there any difference between an exclusive copyright,

1  because Judge McKelvie has ruled in the exclusive copyright,
2  it's freely assignable.

3          If there's no difference, then with respect to a
4  trademark, we don't even have to get to whether the consent is
5  reasonable or not.  You can do it.

6          Now, with respect to the factual issue, Mr. Kortanek
7  says, oh, it's been an expedited process, it's been two or
8  three days.  I could stand here today, and I asked the witness,
9  let's take three or four days, let me give you my marketing
10 plans.  No, I don't trust you.  Let me give you this.  No,
11 you'll breach the agreement.

12         Your Honor, we're prepared to live by the agreement.
13 We're prepared to enter into agreement to give him all of the
14 rights and terminations.

15         What I think I'm hearing is that because we
16 vigorously pursued our trademark rights and they sued us and we
17 sued them, exactly what you would want somebody to do, they
18 don't want us around, and they haven't -- you know, it's a
19 family business, eight nine years ago.  That is not an un --
20 that is unreasonable withholding of consent, and it makes this
21 license simply not assignable.

22         I understand that Reigles may not want my company
23 there.  But Lifetime -- let's look at the consent they got.
24 They got the consent that's the exact same provision that if
25 they didn't get this deal, they have to sell the goods for six

1  months.  So, you get that license.

2      So, Regal wants to get back.  And what we have is --

3  you know, we've heard of buyer's remorse.  We have seller's

4  remorse here.  They sold this thing.  They want to get back

5  into the retail business.  And the only reason that they're

6  here and why, on the eve of the bid deadline, they bought

7  rights back that they didn't even have under the license

8  agreement is because they don't want to have a competitor in

9  here.

10      And the competition exists whether we get this

11  license or not.  It's a competition on two different plains:

12  The Williams-Sonoma plain.  They don't intend to go door-to-

13  door to sell the pots that they sell at Wal-Mart.  That's --

14  so, it really comes down to, I believe, if Your Honor goes to

15  the factual issue, the testimony is insufficient to show that

16  this consent is reasonable.

17      Thank you.

18      THE COURT:  Thank you.  Ms. Levine?

19      MS. LEVINE:  Thank you, Your Honor.

20      THE COURT:  I think you're last.

21      MS. LEVINE:  And I'll be brief.

22      THE COURT:  Okay.

23      MS. LEVINE:  Your Honor, two basic points:  First, we

24  support the debtor.  We would like to see the sale approved.

25      I would note, Your Honor, that we're supporting the

1  debtor, including the finding that the SEB bid is the highest
2  and best offer on the assumption that the auction is not
3  opened.   If Your Honor were to find, based upon the evidence
4  before you, that the Lifetime Brands bid is higher and better,
5  based upon the colloquy here today, we would ask the Court then
6  at that point in time to, again, reconsider opening the auction
7  so that SEB could use that information and make any further
8  decisions it deemed appropriate.

9          And very briefly, these arguments have been
10  adequately -- more than adequately briefed and argued by
11  others.   But just with regard to the issue of reasonableness,
12  and we don't believe you even have to reach it because we do
13  believe that as an exclusive license, the issue -- the issue is
14  one of absolute right by the debtor to assume and assign.

15          But on the issue of reasonableness, I think it's
16  extremely telling, Your Honor, that the primary argument is
17  that they don't want to sell to SEB because they're a
18  competitor.   And there is only one other bidder here who is
19  also unacceptable because they're a competitor.

20          There is no position where we say to ourselves, okay,
21  we see that there is an exercise of reasonableness by the part
22  of Regal because they're going to pick one and not the other.
23  We just happened to pick the wrong one.

24          The only reason why Lifetime Brands is even in
25  consideration here is because they capitulated to what we

1   believe is an unreasonable position by Regal.  They have a

2   five-year noncompete.  That five-year noncompete is up.  They

3   want to be back in this business and they've taken this

4   opportunity not to try and renegotiate a license agreement with

5   an existing contract party, but to say we don't want this

6   license assigned because we don't want you doing what we want

7   to do ourselves for free.

8              Thank you, Your Honor.

9              THE COURT:  Thank you.  Ms. Jones, I have to turn to

10  you for just a minute because it has to do with really the

11  process, and it's this:  You need a decision this evening, I

12  believe, is that correct, on the sale motion?  Here's why I'm

13  thinking -- I would like to take a little bit of time, organize

14  my thoughts, and rule from the bench on this because if I go to

15  write an opinion, given the -- you know, the nature of this

16  case and the dispute and the seriousness of the issues and how

17  complex they all are, I'll be writing for a month on this

18  thing.

19                        (Laughter)

20             THE COURT:  And I know we don't have that kind of

21  time, practically speaking.  And this is one of those

22  occasions, however, and I would at least like to make a record

23  in case people want to appeal, or depending on who wants to

24  take the appeal.  So, I could use until, say, 7:30 just to go

25  out and organize thoughts and be able to come back here and

1  make some sense, hopefully to somebody, if not everybody, and

2  is that something that we can do?

3           MS. DAVIS JONES:  Your Honor, you have sat here for

4  nine hours listening to us.  Surely the least we can do is give

5  you until 7:30.  But I think, frankly, Your Honor, if you want

6  more time than that, the parties can just -- we can just remain

7  available for whenever Your Honor is ready.

8           Your Honor, I did have just a couple of points that I

9  wanted to make in response to Mr. Kortanek, and these are very

10 specific, and it's only three points.

11          THE COURT:  Okay.

12          MS. DAVIS JONES:  One, Your Honor, the NTB case that

13 he -- that he referenced.  Your Honor, that's a case with a

14 nonexclusive trademark --

15          THE COURT:  Right.

16          MS. DAVIS JONES:  -- and all different facts.

17          Two, Your Honor, the reference to the Ferrari case.

18 I guess what Mr. Kortanek is teaching us -- and -- or asking us

19 and it's probably not wrong, is that the Court there looks at

20 the facts and found that there was not an unreasonable

21 withholding a consent.  Your Honor, we're asking you to look at

22 the facts and to make a decision based on the facts.

23          Thirdly, Your Honor, there's this kind of complaint I

24 kind of hear from Mr. Kortanek that somehow he didn't get to

25 put his case on he would have liked to have put on today or he

 1   wasn't as ready as he would have liked to have been or what

 2   have you.

 3          Your Honor, we talked about this at yesterday's

 4   hearing.

 5          THE COURT:  Yes.

 6          MS. DAVIS JONES:  But let me reiterate it for this

 7   record.  Regal had specific knowledge that the Regal license

 8   would be adjudicated today.  One, it's in the sale motion, Page

 9   12, in the description of intangible property that was filed on

10   July 14th, served.  Also included in the first amendment

11   attached to the sale motion at Page 3.

12          And lastly, Your Honor, in the sale procedures order,

13   Page 30, specifically identifies and discusses this license

14   transfer issue for several pages because the issue came up at

15   the sale procedures hearing, and that sales procedure order was

16   served on -- was served, Your Honor.

17          The -- Your Honor, yesterday Mr. Kortanek -- and he

18   may be alluding a little bit to this -- complained that they

19   did not have enough notice that this contract was going to be

20   transferred.  And he complains today that he's only recently

21   that we made the demand for consent.

22          Your Honor, let's remember what the facts are.  This

23   license was with Newell.  Newell received the notice because

24   they were the party.  Regal wasn't the party.  Why Newell

25   didn't get this to Regal sooner or why Regal didn't work with

1 Newell sooner, I have no, Your Honor -- no idea, Your Honor.
2 And that surely cannot be at the debtors' doorstep. It may be
3 because they were busy doing this assignment of the license. I
4 don't know what they were doing.

5 But for whatever reason, Your Honor, that can't be
6 put at the debtors' doorstep, and it surely cannot be put at
7 the Court's doorstep.

8 Your Honor, Mr. Kortanek told us yesterday, and he
9 referenced it today, that there's no surprise that this
10 transfer would be an issue. So, Your Honor, it is disingenuous
11 to be standing here now and saying, well, I would have liked to
12 have had more time. Frankly, Your Honor, we all would like to
13 have more time in bankruptcy cases, but they do move quickly.

14 Your Honor, there is no discussion in their sale
15 objection of the lack of notice. And more importantly, they
16 are here today, they're here with competent counsel, they're
17 here with a witness. My best calculation is we spent the
18 better of the afternoon with Mr. Kortanek and having -- giving
19 him every opportunity, Your Honor was most patient, to have his
20 witness on the stand and to try to work through these issues.
21 And, frankly, he had every opportunity to cross examine all of
22 our witnesses, as well, as you gave us the opportunity to put
23 all our witnesses on today.

24 So, Your Honor, that last argument, I think, has no
25 basis at all. And, again, Your Honor, we would ask the Court

1  to approve the sale.

2         Thank you.

3         THE COURT:  Thank you.  Thank you, everyone.  I've

4  got a lot to digest in a short time.  I'm going to go do it.

5  Hopefully you'll find something to digest, as well.  Maybe at

6  the vending machines downstairs, or whatever.  And why don't we

7  come back at -- let's make it quarter to eight, if that's

8  acceptable to everyone.  And I'll have a ruling for you at that

9  point.

10         Thank you.

11         MULTIPLE SPEAKERS:  Thank you.

12         (Recess 6:50 P.M./Reconvene 8:08 P.M.)

13         THE COURT:  We've re-gathered.  Thank you.  I was a

14  lawyer recently enough to remember what it was like to sit as

15  the judge, you know, read what the judge thought was poetry

16  from the bench wondering what the result was going to be

17  through it all.  And this is not poetry at all because I really

18  haven't had time to write poetry.

19         But I am ruling that the sale to SEB will be approved

20  this evening.

21         Before the Court is the motion to approve the sale of

22  substantially all of the assets of the WearEver Debtors

23  operating assets free and clear of liens, et cetera.

24         The Court previously entered a bid procedures order

25  approving Lifetime Products as the stalking horse with a

1  breakup fee, scheduling an auction for yesterday, and setting

2  today as the hearing on the sale motion.

3          The Court has heard and considered substantial

4  testimony, written submissions, and exhibits.

5          Specifically before the Court are the objection of

6  Lifetime to the bona fides of the auction process, and the

7  objection of Regal Ware to any assignment of its trademark

8  license without its consent.

9          On the sale, no one questions the debtors' proper

10 exercise of its business judgment.  And the Court, based upon

11 the entire record in this case, finds that that exercise to

12 sell the WearEver assets is in the exercise of proper business

13 judgment, is necessary and proper.

14         The Court also finds notice of the sale procedures

15 was sufficient.  And, again, no one challenges the adequacy of

16 the notice.

17         Lifetime, the stalking horse, has contested the

18 auction process under Section 363 of the Code on the basis that

19 SEB's investment advisor, Citigroup, served in the recent past

20 as its financial advisor and had access to confidential

21 information.

22         Lifetime has made argument and made factual

23 representations which were not supported by any affirmative

24 evidence, despite a representation by counsel that it could

25 produce a witness.

 1          The testimony of Mr. Hadid, of Citigroup, refutes any

 2   claim that the auction process was tainted.  Mr. Hadid's

 3   testimony established that Citigroup advised Lifetime on

 4   unrelated financial matters and did not reveal any confidential

 5   information to SEB.

 6          The auction was spirited and produced approximately

 7   80 bids or counterbids.  And resulted in an increased price

 8   from the original asset purchase agreement price of $21 million

 9   to $35.1 million.

10          The fact that SEB topped the highest amount that

11   Lifetime was prepared to bid, based upon the representation of

12   Lifetime's counsel, particularly given testimony that SEB was

13   prepared to bid still a higher amount does not establish any

14   chicanery.  In fact, it refutes it.

15          In addition, the record shows that SEB was an

16   interested suitor for these assets before Citigroup was

17   retained and the unrefuted testimony was that SEB did not have

18   any information about Citigroup's involvement with Lifetime on

19   the unrelated financial matters until the day of the auction.

20   Accordingly, the 363(m) objection is overruled.

21          The Court next turns to the highest or best bid

22   issue.  That is is the $35.1 million bid the highest or best

23   bid.  It is significant to the Court that the lender who

24   received the sale proceeds in repayment of debt and the

25   Committee whose function is to maximize recovery for the

1  unsecured creditors have both argued that SEB's bid is highest
2  and best.

3        The highest and best issue inexorably turns on the
4  resolution of the objection of Regal Ware to any assignment of
5  its trademark license.  As the record shows, in 1999, Regal
6  Ware had licensed the use of its trademark to Newell Operating
7  Company in connection with a transaction for the sale of
8  assets.

9        And thereafter, Newell, under a sub-license
10 agreement, licensed the use of the Regal Ware trademark to
11 Mirro Operating Company, one of the debtors.  The initial
12 license to Newell was an exclusive worldwide royalty free
13 license, as was the subsequent sub-license from Newell to Mirro
14 in 2004.

15       Thereafter, effective August 1st on the eve of this
16 sale hearing, Regal Ware re-obtained the license from Newell.
17 And now objects that the license which is to be assigned to SEB
18 as the successful bidder is unassignable.

19       Regal Ware argues that the license is akin to a
20 personal services contract and is unassignable or, in the
21 alternative, that its consent is required and it's -- and that
22 its withholding of that consent is not unreasonable under the
23 circumstance -- under the circumstances that Lifetime and SEB
24 are competitors, that it has quality control concerns, and that
25 with respect to SEB, it has been subjected to bad faith

1  litigation its opinion and as it alleges.

2         The Court founds that the license is assignable.
3  First, the license to Newell and the sub-license to Mirro were
4  exclusive and did not restrict assignment to any particular
5  entity.

6         The cases cited by Regal Ware in support of its
7  objection involve nonexclusive licenses and/or special
8  circumstances not present here.

9         The Court relies in its conclusion the license is
10 assignable on the District Court's decision in In Re: Golden
11 Books, 269 Bankruptcy Reporter 311 in which, with respect to a
12 copyright license, the Court held that an exclusive licensee
13 does acquire property rights and may freely transfer its
14 rights.  And the license and sub-license agreements here do not
15 prohibit an assignment, Regal Ware having given up control of
16 the trademark license and has not regained that control.

17        The case of In Re: Rooster, Inc. also supports the
18 Court's conclusion wherein the Bankruptcy Court found that an
19 exclusive license for trademark is freely assignable in that it
20 does not constitute a personal services contract.

21        Having found the license is assignable, the Court
22 need not reach the issue of whether or not Regal Ware's refusal
23 to consent to the assignment was reasonable.  But notes that
24 the testimony that there were no circumstances under which
25 Regal Ware would consent to the assignment to SEB may be an

1 unreasonable withholding with consent.

2      Which, again, brings us to the issue of the highest
3 or best offer.  Because Lifetime has now negotiated with Regal
4 Ware for consent to Lifetime of the assignment of the license
5 with a six-month termination date.  And argues that the removal
6 of the threat of further litigation and with the consent to the
7 assignment, the elimination of a potential reduction of the
8 purchase price in the amount of $2 million vaults its final bid
9 into a winning bid.

10      First, in order to do fairness and right by all
11 parties, the Court would have to reopen the auction, which SEB
12 was, in fact, prepared to consider if Lifetime withdrew its
13 363(m) objection.

14      Lifetime refused to do so.  Hence, the reopening is
15 not a viable alternative.

16      Second, since the Court has found that the Regal Ware
17 license is assignable, the mere threat of appeal does not
18 support a finding that Lifetime's bid is improved by $2
19 million.

20      Accordingly, the Court is prepared to enter an order
21 approving the sale of the WearEver assets to SEB on the terms
22 of the asset purchase agreement as further modified by the bids
23 at the auction for a sale price of $31.5 (sic) million.

24      Ms. Jones, is there anything further?

25      MS. DAVIS JONES:  Your Honor, two things.  I think at

1  the very end of your decision, Your Honor, you said 31.1, I

2  believe, and it's 35.1.

3          THE COURT:  Thirty -- I'm sorry, I misspoke.  It is

4  35.1.  Mr. Galardi, I'm sorry, you didn't -- you didn't

5  suddenly get a performance fee.

6                          (Laughter)

7          MR. GALARDI:  I appreciate it, Your Honor.

8  (Indiscernible)

9          THE COURT:  Thank you.

10          MS. DAVIS JONES:  Secondly, Your Honor, we, as I

11  mentioned earlier -- much earlier in the hearing, we had a

12  proposed form of order that includes a lot of comments we had

13  received from various reclamation claimants and so forth --

14          THE COURT:  Yes.

15          MS. DAVIS JONES:  -- addressing their issues.  And

16  we'd be in a position to present that to the Court, but there

17  are some changes we had to make to the order -- or will have to

18  make to the order in light of the -- of this bid and so forth.

19          So, Your Honor, I'm hopeful that we'll be able to

20  present an order to the Court tomorrow.

21          THE COURT:  And I will be here all day and send it

22  over as soon as it's ready.

23          MS. DAVIS JONES:  Thank you.

24          THE COURT:  Anything further?

25          MR. KORTANEK:  Your Honor, Steve Kortanek from Klehr

1  Harrison for Regal Ware.

2          Your Honor, our client has authorized us to file a

3  motion for stay pending appeal, and we intend to file that with

4  Your Honor tomorrow morning.

5          Given that the order won't be tendered until tomorrow

6  morning, obviously we're concerned about mootness, Your Honor.

7          THE COURT:  Certainly.

8          MR. KORTANEK:  Now, it's not clear to me standing

9  here now, I haven't done the research, whether under any

10 circumstances an assumption and assignment over our objection,

11 in light of Your Honor's ruling, is subject even to a 363(m) or

12 any mootness risk, but we can't take the risk that we're going

13 to be faced with a mootness argument.

14          So, with that in mind, I recognize we need a written

15 motion.  We -- I think we have the right to go to District

16 Court, frankly, straightaway, or we could present it to Your

17 Honor.

18          But what we don't want to have happen, of course, is

19 for debtors' counsel to say, ah ha, I have an order entered and

20 you didn't get a stay, and we've closed.

21          So, the drop dead date on this closing is August

22 18th, I believe.

23          THE COURT:  That is my understanding.

24          MR. KORTANEK:  So, what -- what we'll be asking in

25 our written motion by tomorrow will be -- at least as a

1   temporary matter, I think we ought to have enough breathing

2   room to get it to District Court, at least, and we're going to

3   try the 3rd Circuit if that doesn't work.  But we'll -- we'll

4   demonstrate in that paper that we at least ought to have a

5   chance to present the appeal at a hearing on the merits.

6           THE COURT:  I understand and I will obviously

7   promptly review and schedule argument upon the receipt of the

8   stay motion.

9           MR. KORTANEK:  Thank you.

10          THE COURT:  Ms. Jones?

11          MS. DAVIS JONES:  Your Honor, just so that Mr.

12  Kortanek doesn't believe he has to get up at 6 A.M. and watch

13  the docket every minute, I expect, Your Honor, that it would

14  probably be at least the afternoon until we'd be able to submit

15  an order.  And if it would be helpful to the Court, I'd be glad

16  to tell Mr. Kortanek when we have submitted it.

17          THE COURT:  That would be helpful.  And I think he

18  would probably appreciate that.  And the Court would, as well.

19          Mr. Galardi?

20          MR. GALARDI:  Your Honor, I think I'll -- I'll wait

21  until he files his motion.

22          THE COURT:  Okay.  That's fine.  All right.  Well,

23  look, I thank everyone for your patience and your

24  participation.  And we'll stand in recess, I guess, until

25  something further develops.  Good evening.

1    MULTIPLE SPEAKERS:  Thank you, Your Honor.

2    (Proceedings Adjourn at 8:21 P.M.)

3

4

5    C E R T I F I C A T I O N

6

7    I, Karen Hartmann, certify that the foregoing is a

8    correct transcript to the best of my ability, from the

9    electronic sound recording of the proceedings in the above-

10   entitled matter.

11

12   _/s/_ _Karen Hartmann_____    Date:  August 12, 2006

13   TRANSCRIPTS PLUS

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| Global Home Products LLC, et al.,[1] | : | **Case No. 06-10340 (KG)** |
| | : | **(Jointly Administered)** |
| Debtors. | | **Related Docket No. 549, 604, 618, 631, 633, 641** |

**ORDER APPROVING MOTION OF DEBTORS FOR THE ENTRY OF AN ORDER (I)
APPROVING SALE BY THE WEAREVER DEBTORS OF SUBSTANTIALLY ALL OF
WEAREVER DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO SECTIONS 363(B),(F)
AND (M) OF THE BANKRUPTCY CODE, (II) ASSUMING AND ASSIGNING
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (III) GRANTING RELATED RELIEF**

Upon the motion, dated July 14, 2006 (the "Sale Motion")[2] of the above-

captioned debtors and debtors-in-possession (the "Debtors"), for entry of an order authorizing

and approving (i) the sale (the "Sale") of certain of the Debtors' assets free and clear of any and

all liens, claims, interests and encumbrances under Sections 363(b), (f) and (m) of the

Bankruptcy Code, pursuant to the terms of that certain Asset Purchase Agreement dated as of

July 7, 2006 (as amended, including as amended by that certain First Amendment dated as of

August 3, 2006, the "Agreement") between SEB S.A. and Groupe SEB USA (the "Buyer") and

Mirro Acquisition Inc., Mirro Operating Company, LLC, Mirro Puerto Rico, Inc. (collectively,

---

[1] The Debtors are the following entities: Global Home Products LLC; GHP Holding Company LLC; GHP
Operating Company LLC; Anchor Hocking Acquisition Inc.; Anchor Hocking Inc.; AH Acquisition Puerto Rico,
Inc.; Anchor Hocking Consumer Glass Corporation; Anchor Hocking CG Operating Company LLC; Anchor
Hocking Operating Company LLC; Burnes Acquisition Inc.; Intercraft Company; Burnes Puerto Rico, Inc.; Picture
LLC; Burnes Operating Company LLC; Mirro Acquisition Inc.; Mirro Puerto Rico, Inc.; Mirro Operating Company
LLC.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Sale
Motion or the Agreement, as the case may be; as to any conflicts with respect to such terms, the meanings contained
in the Agreement shall control over the meanings contained in the Sale Motion.

31504-001\DOCS_DE:119757.10

664
8-14-06

the "WearEver Debtors") and 690649 BC Ltd. (together with the WearEver Debtors, the "Sellers") (substantially in the form attached hereto as Exhibit A, exclusive of exhibits and schedules, except for those certain exhibits and/or schedules attached to the Agreement), (ii) the assumption and assignment of certain executory contracts and unexpired leases to the Buyer, as described in the Agreement and a list of which is attached hereto as Exhibit B, (the "Designated Contracts"), and (iii) the assumption by the Buyer of certain liabilities of the Sellers, as described in the Agreement; and the Court having previously entered an order on July 14, 2006 (the "Procedures Order") approving the Procedures Motion with respect to the use of bidding procedures in connection with, and conducting an auction for, the Sale of the Property; and an auction having been held on August 7, 2006 in accordance with the Procedures Order (the "Auction"); and a hearing on the Sale Motion having been held on August 8, 2006 (the "Sale Hearing"), at which time all interested parties were offered a fair and reasonable opportunity to be heard and object with respect to the Auction, Sale Motion and Sale; and the Court having reviewed and considered (i) the transcript of the Auction; (ii) the Sale Motion, (iii) the objections thereto, (iv) the arguments and evidence of Lifetime with respect to the "bona fides" of the Auction; (v) the arguments and the evidence regarding the WearEver Debtors ability to assume and assign the Sublicense Agreement (as defined below) to the Buyer; and (vi) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the WearEver Debtors, their estates and creditors and other parties in interest, and upon the record of the Auction and Sale Hearing and these cases and after due deliberation thereon and good cause appearing therefor,

## IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:

A.     The findings and conclusions on the record of the Sale Hearing including, without limitation, the findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.     This Court has jurisdiction to hear and determine the Sale Motion and the transactions contemplated by the Agreement in accordance with the Procedures Order pursuant to 28 U.S.C. §§157 and 1334.

C.     Venue of these cases and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). The statutory predicates for the relief requested herein are Sections 105, 363 and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code") and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014.

E.     The Debtors have demonstrated a sound business purpose for the Sale and have followed the terms of the Procedures Order and such additional procedures for notices of the Sale Motion, the Sale Hearing, the Sale, and the assumption and assignment of the Designated Contracts, which procedures were fair and reasonable, to provide notice of the Sale Motion, the Sale Hearing, the Sale, and the assumption and assignment of the Designated Contracts to all creditors and other parties in interest.

F.     Pursuant to the Procedures Order, proper, timely, adequate and sufficient notice of the Sale Motion, the Auction, the Sale Hearing, the Sale, and the assumption and assignment of

the Designated Contracts has been provided in accordance with all applicable law, including

without limitation, § 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, and

no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the Sale or the

assumption and assignment of the Designated Contracts was or is required.

      G.    A reasonable opportunity to object and to be heard regarding the relief requested

in the Sale Motion has been afforded to all creditors and parties in interest.

      H.    On or about July 7, 2006, the Sellers entered into an Asset Purchase Agreement,

as amended (the "Lifetime Agreement") with Lifetime Brands, Inc. ("Lifetime") for the sale of

the Property, subject to Competing Bids.

      I.    On August 3, 2006, the Buyer timely submitted a Competing Bid in accordance

with, and subject to the terms of, the Procedures Order (the "SEB Bid").

      J.    At the Auction, the Buyer presented the highest and best Competing Bid for the

Property in the amount of $35.75 million (thirty-five million seven-hundred-fifty thousand

dollars), inclusive of the Break Up Fee, plus satisfaction of any and all obligations of the Debtors

and the non-debtor Sellers with respect to Inventory Advances and certain other liabilities as set

forth in the Agreement. At the conclusion of the Auction, the Sellers determined that the Buyer

was the Successful Bidder.

      K.    At the Auction, Lifetime was approved as the back-up bidder as provided in the

Lifetime Agreement and the Procedures Order.

      L.    The Auction was duly noticed and conducted in a non-collusive, fair and good

faith manner in accordance with the procedures set forth in the Procedures Order, and the

Debtors, the Debtors' prepetition secured lenders, the Committee and Sellers reported to the

Court their recommendation of the Successful Bidder and any back-up bidder(s) and the amounts of their respective bids for approval by the Court at the Sale Hearing. A transcript of the record of the Auction has been submitted to the Court.

M.    At the Auction, the Buyer also offered to purchase from one of the Sellers' non-debtor affiliates all of the assets listed on Schedule 1.2 attached to the Agreement for the purchase price of $750,000 (the "Nuevo Laredo Assets") which Assets were Excluded Assets under the Lifetime Agreement. The Debtors attributed no value to the proposed purchase of the Nuevo Laredo Assets in connection with the Auction.

N.    Subject to the applicable provisions of bankruptcy law and other applicable law, upon entry of this Order, each of the Sellers will have the power and authority to execute, deliver and perform the Agreement and all writings related thereto.

O.    Each of the Sellers has all of the corporate power and authority necessary to consummate the transactions contemplated by the Agreement and has taken all corporate action necessary to authorize and approve the Agreement and the consummation by such WearEver Debtor of the transactions contemplated thereby.

P.    With respect to that certain *Trademark Sublicense Agreement* (the "Sublicense Agreement"), dated as of April 13, 2004, by and between Newell Operating Company ("Newell") and Mirro Operating Company, LLC ("Mirro"), in 1999 Regal Ware, Inc. ("Regal") had licensed the use of certain of its trademarks to Newell in connection with a transaction for the sale of assets, and thereafter Newell under the Sublicense Agreement licensed the use of the REGAL WARE trademarks to Mirro. The initial license to Newell was an exclusive worldwide royalty free trademark license as was the Sublicense Agreement from Newell to Mirro in 2004.

Thereafter, effective August 1, 2006, Regal took an assignment of the Sublicense Agreement and the Trademark License from Newell and thereafter objected to the assignment of the Sublicense Agreement. The Court determines as a matter of law that the Sublicense Agreement is assignable. First, the license to Newell and the Sublicense Agreement to Mitro were exclusive and did not restrict assignment to any particular entity. The cases cited by Regal in support of its objection involve non-exclusive licenses and/or special circumstances not present here. The Court relies in its conclusion that the license is assignable on the decision of the United States District Court for the District of Delaware in *In re Golden Books*, in which, with respect to a copyright license, the Court held that an exclusive licensee does acquire property rights and may freely transfer its rights. The Sublicense Agreement does not prohibit an assignment, Regal having given up control of the trademark license and has not regained that control. The case of *In re Rooster Inc.* also supports the Court's conclusion, wherein the Court held that an exclusive license for trademarks is freely assignable in that it does not constitute a personal services contract. Accordingly, the Sublicense Agreement is not subject to the limitations of Section 365(c)(1) of the Bankruptcy Code, and as such may be assumed and assigned to the Buyer pursuant to Section 365(b) and (f) of the Bankruptcy Code.

Q.    The Court does not need to decide the issue of whether Regal's consent to the assumption and assignment of the Sublicense Agreement (as defined below) was unreasonably withheld, but the testimony on the record of the Sale Hearing provides that Regal's refusal to consent to the assumption and assignment of the Sublicense Agreement, under the circumstances, may have been unreasonable.

31604-001\DOCS_DE:119757.10                    6

R.    No consents or approvals, other than those expressly provided for in the Agreement, are required for the Sellers to consummate the Sale or with respect to the Nuevo Laredo Assets.

S.    The Agreement and the transactions contemplated thereby were negotiated, proposed and entered into by the WearEver Debtors and the Buyer in good faith and without collusion. Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Agreement or the Sale to be avoided under Section 363(n) of the Bankruptcy Code.

T.    The Buyer is acting as a good faith purchaser, as that term is used in the Bankruptcy Code and is, accordingly, entitled to the protections set forth in Section 363(m) of the Bankruptcy Code. In that regard, the Court finds that:

1.    That bidding at the Auction was if not entirely, almost entirely, about the price to be paid for the Assets, which bidding continued for over 70 rounds and yielded a price in amount in excess of $14 million above the price provided in the Lifetime Agreement.

2.    Lifetime reserved its rights regarding the "bona fides" of the Auction as a result of Citigroup being Buyer's financial advisor and a client of Lifetime, and did so at both the beginning and end of the Auction. Nonetheless Lifetime participated in the Auction and concluded its bidding at the price of $35 million, which Lifetime asserted was the maximum Purchase Price it was prepared to pay for the Property. In addition, although the Court and SEB offered to reopen the Auction if Lifetime withdrew its objection to the bona fides of the Auction, Lifetime would not waive such objection.

3.    Although Citigroup has advised Lifetime on certain matters, no evidence was presented to show or otherwise indicate that Buyer was provided with confidential

nonpublic information regarding Lifetime, its interests in the Property or its preparedness to bid at the Auction.

      4.    The testimony of the Citigroup representative, the Buyer's witnesses, and the testimony of Mr. Lowrey presented at the Sale Hearing, demonstrated that SEB had not been provided with confidential nonpublic information, that Buyer independently determined its bidding strategy, that SEB was prepared to bid in excess of the amount it was actually required to bid at the Auction and that SEB's analysis of the potential purchase of the Property was based upon financial and other analysis performed by persons at SEB.

      U.    The transfer of the Property to the Buyer will be a legal, valid and effective transfer, authorized pursuant to the Bankruptcy Code, and other applicable law and will vest the Buyer with all right, title, and interest of the WearEver Debtors in and to the Property free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever which have arisen or accrued, or otherwise exist, as of the Closing Date (as such term is defined in the Agreement).

      V.    Except as expressly set forth in the Agreement, the Buyer shall have no liability for any interests, liens, claims and encumbrances of any kind or nature whatsoever, or other obligation of or against the Debtors, related to the Property by reason of the transfer of the Property to the Buyer. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the Agreement with respect to assumed liabilities.

      W.    The Debtors have adequately marketed the Property for sale, and the consideration committed to by the Buyer pursuant to the Agreement (i) is fair and reasonable, (ii)

is the highest and best offer for the Property; (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, or possession thereof, and the District of Columbia. The Sale is proper, necessary and serves the best interests of the WearEver Debtors, their estates, creditors and all parties in interest.

X.    The WearEver Debtors may sell the Property free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Those non-Debtor parties who assert interests in the Property who did not object, or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2). Those parties who assert interests in the Property who did object, fall within one or more of the other subsections of § 363(f) and either are not entitled to adequate protection or are adequately protected by having their asserted interests, if any, attach to the cash proceeds of the Sale ultimately attributable to that respective asset against or in which they claim an interest, to the extent, if any, and in the same priority as such interests attached to that asset prior to the closing of the Sale.

Y.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Designated Contracts to the Buyer in connection with the closing of the Sale, and the assumption and assignment of the Designated Contracts is in the best interests of the Debtors, their estates, and their creditors. The Designated Contracts being assigned to the Buyer as set forth in the Agreement (a list of which is attached hereto as Exhibit

31604-001\DOCS_DE:119797.10                          9

B) are an integral part of the Property and, accordingly, such assumption and assignment of Designated Contracts is reasonable and enhances the value of the Debtors' estates.

Z.    Pursuant to and in accordance with the Agreement, the WearEver Debtors and Buyer, as applicable, have (i) cured, or have provided adequate assurance of cure, of any default existing or occurring prior to the Closing Date under any of the Designated Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A) and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default existing or occurring prior to the Closing Date under any of the Designated Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B), and the Buyer has provided adequate assurance of their future performance of and under the Designated Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C).

AA.    The Sale does not constitute a de facto plan of reorganization or liquidation or an element of such a plan for any of the Debtors, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

BB.    Approval of the Agreement and assumption and assignment of the Designated Contracts and closing of the Sale of the Property at this time are in the best interests of the WearEver Debtors, their creditors, their estates and other parties in interest.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The Sale Motion is granted in its entirety.

2.     Except as provided on the record of the Sale Hearing, all objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits. The objections to the Sale Motion filed by Regal Ware, Inc. (the "Regal Objection") and Lifetime Brands, Inc. are hereby overruled for the reasons set forth on the record of the Sale Hearing.

3.     The Agreement and all of the terms and conditions thereof, substantially in the form attached hereto as Exhibit A, are approved.

4.     With respect to the SEB Bid, section 10.26 of the Agreement was reinstated on the record of the Auction and, for the avoidance of doubt, the representations and warranties set forth in sections 5.3 and 5.4 of the Agreement expired on July 20, 2006 and are of no further force or effect.

5.     Pursuant to Section 363(b) of the Bankruptcy Code and by the issuance of this Order, the WearEver Debtors are authorized to perform their obligations under and comply with the terms of the Agreement, and consummate the Sale, pursuant to and in accordance with the terms and conditions of the Agreement.

6.     The Buyer shall not be required to seek or obtain relief from the automatic stay under Section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other Sale-related document. The automatic stay imposed by Section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

7.      This Order and the Agreement shall be binding in all respects upon all creditors and other interested parties of any of the WearEver Debtors. Nothing contained in any chapter 11 plan confirmed in these bankruptcy cases or the confirmation order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Agreement or this Order, and the Agreement and this Order shall control to the extent of such conflict or derogation.

8.      Except as expressly permitted or otherwise specifically provided by the Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding interests of any kind or nature whatsoever against or in the WearEver Debtors or any of the Property (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the WearEver Debtors, the Property, the operation of the WearEver Debtors' business prior to the Closing, or the transfer of the Property to the Buyer are hereby forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns, its property, or the Property, such persons' or entities' interests.

9.      Except as expressly provided in the Agreement or this Order with respect to assumed liabilities, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the WearEver Debtors are authorized to transfer the Property to the Buyer, and upon closing of the Sale, the transfer of the Property to the Buyer shall constitute legal, valid and effective transfers of the Property, shall vest the Buyer with all right, title, and interest of the Sellers in and to the Property and shall be free and clear of all interests, liens, claims and encumbrances of any kind

or nature whatsoever with all such interests, liens, claims and encumbrances of any kind or nature whatsoever to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Property, subject to any claims and defenses the Debtors may possess with respect thereto provided that the net proceeds of Sale shall be remitted at closing to Wachovia Bank, N.A., ("Wachovia") on account of their liens and security interests for application to the Obligations owed to Wachovia in accordance with and subject to the Final DIP Financing Order entered by this Court on May 4, 2006 at Docket No. 184.

10.    Except as expressly provided in the Agreement or this Order, this Order (i) shall be effective as a determination that, on the Closing Date, all interests of any kind or nature whatsoever existing with respect to the Property prior to the day of the closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any part of the Property.

11.    If any person or entity that has filed financing statements, mortgages, mechanics; liens, lis pendens, or other documents or agreements evidencing interests with respect to the Property shall not have delivered to the Sellers prior to the Closing Date, in proper

form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Property, then the Buyer hereby is authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Property; provided, however, that regardless of whether such persons or entities or the Buyer execute and file any releases, the Buyer hereby is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all such interests of any kind or nature whatsoever in the specific property transferred under this Order.

12.    The transactions contemplated by the Agreement and the Auction pursuant to the Procedures Order are undertaken by the Buyer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code. Accordingly, the Buyer is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code, including but not limited to the provision that the reversal or modification on appeal of the authorization provided herein to consummate the transactions shall not affect the validity of the transactions to the Buyer, unless such authorization is duly stayed pending such appeal.

13.    The consideration committed to by the Buyer pursuant to the Agreement (i) constitutes, and shall be deemed to constitute, reasonably equivalent value and fair consideration, and (ii) is fair and reasonable and may not be avoided under Section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

14.     The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

15.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates, and the Debtors' representatives are hereby authorized to execute such modifications, amendments or supplements.

16.     Except as expressly set forth in the Agreement with respect to assumed liabilities and except as otherwise provided in the Agreement, the Buyer shall have no liability for any interests, liens, claims and encumbrances of any kind or nature whatsoever, or other obligation of or against the Debtors, related to the Property by reason of the transfer of the Property to the Buyer.

17.     Neither the Buyer nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Property, to: (i) be a successor (or other such similarly situated party) to any of the Debtors; (b) have, de facto or otherwise, merged with or into any of the Debtors; or (c) be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors.

18.     Pursuant to Sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the WearEver Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the Agreement, of

the Designated Contracts (including, but without limitation, the WearEver Debtors' interests in the Sublicense Agreement) is approved, and the requirements of Section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied. All objections, to the assumption and assignment of the Sublicense Agreement (and to the assignment of all other Designated Contracts) are hereby overruled with prejudice for the reasons set forth on the record of the Sale Hearing.

19.    The WearEver Debtors are authorized in accordance with Sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Buyer, effective upon the closing of the Sale, the Designated Contracts (including, but without limitation, the WearEver Debtors' interests in the Sublicense Agreement) free and clear of all claims and interests of any kind or nature whatsoever and (b) execute and deliver to the Buyer such documents or other instruments as may be reasonably necessary to assign and transfer the Designated Contracts to the Buyer.

20.    The Designated Contracts shall be transferred and assigned to, and following the closing of the Sale remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Designated Contract that prohibits, restricts, or conditions such assignment or transfer or purports to terminate or alter any term of such Designated Contracts as a result of an assignment. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Designated Contracts after such assignment to and assumption by the Buyer.

21.    Each Designated Contract is an executory contract of the WearEver Debtors, subject to the WearEver Debtors' right to assert, prior to the assumption by the

applicable WearEver Debtor and assignment to the Buyer thereof, that any such Designated

Contract is not an executory contract or lease and/or to recharacterize such Designated Contract.

22.    The WearEver Debtors may assume each Designated Contract in

accordance with Section 365 of the Bankruptcy Code and may assign each Designated Contract

in accordance with Sections 363 and 365 of the Bankruptcy Code. The Buyer may designate

contracts to be assumed and assigned through the ninetieth (90th) day following entry of this

Order, and such deadline may be extended by further Court Order.

23.    Upon the closing of the Sale, in accordance with Sections 363 and 365 of

the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and

interest of each Designated Contract (including, but without limitation, the WearEver Debtors'

interests in the Sublicense Agreement), and each non-Debtor party to a Designated Contract that

has not objected to the assumption and assignment of such Designated Contract to Buyer is

deemed to have consented to the assumption and assignment by the WearEver Debtors to the

Buyer of the Designated Contracts. As of the closing of the Sale, each Designated Contract will

be in full force and effect and not subject to termination or cancellation by the non-Debtor party

thereto based upon any act, omission or failure that may have occurred or arisen prior to thereto.

24.    In accordance with the Agreement, the WearEver Debtors shall be

responsible for and pay in the aggregate, up to the initial $150,000 of cure costs (the "Cure Cap")

in respect of Designated Contracts subject to assumption and assignment by the WearEver

Debtors, and Buyer shall bear and pay any excess over such amount.

25.    All defaults, breaches or other obligations of the WearEver Debtors under

any Designated Contract incurred, arising or accruing prior to the Closing Date (without giving

effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed and considered cured in full by the WearEver Debtors and the Buyer, as applicable and in accordance with the Agreement, by the payment of the cure amount associated with such Designated Contract (as to each Designated Contract, the "Cure Amount" and collectively, the "Cure Amounts") at the closing of the Sale or as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect to defaults, breaches or other obligations incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided herein or in the Agreement.

26.     Upon payment of the Cure Amounts under the terms of the Agreement, each non-Debtor party to a Designated Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, or the property of either of them, any default or breach existing as of the Closing Date of the Sale, or, as against the Buyer, any counterclaim, defense, setoff or any other claim asserted or which may be asserted against the Debtors. The Buyer has provided adequate assurance of future performance of the Designated Contracts, as required by Sections 365(b)(1) and (f)(2) of the Bankruptcy Code.

27.     Upon assignment of the Designated Contracts to the Buyer at or subsequent to the closing of the Sale, no default shall exist under any Designated Contract and no non-Debtor party to any Designated Contract shall be permitted to declare a default by or against the Buyer under such Designated Contract or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any obligation under the Designated Contract. Upon entry of this Order and assumption and assignment of the

Designated Contracts, the Buyer shall be deemed in compliance with all terms and provisions of the Designated Contracts.

28.    Subject to the Cure Cap, the Buyer may designate additional executory contracts and unexpired leases to be assumed and assigned by the WearEver Debtors to the Buyer after the Closing Date in accordance with the provisions of the Agreement. Upon receipt of such designation, the Debtors shall promptly take all reasonable actions in an effort to cause the assumption by the Debtors and assignment to and assumption by the Buyer pursuant to Section 365 of the Bankruptcy Code of each such executory contract or unexpired lease and otherwise cooperate in reasonable respects with the Buyer in respect of each assignment.

29.    Subject to Sellers' obligation with respect to air freight charges, the Buyer will be responsible for and shall pay all shipping, handling, freight and similar fees and charges related to the Designated Inventory (as defined in the Agreement) ordered by the Sellers pursuant to the terms and provision of Section 2.4 of the Agreement.

30.    The Court hereby approves, on a final basis pursuant to Bankruptcy Rule 4001(c)(2), the following:

a.    The Inventory Advance Provisions set forth in Section 2.4 of the Lifetime Agreement are hereby approved.

b.    Lifetime is granted (x) to the extent of Inventory Advances advanced by Lifetime utilized for the acquisition of Designated Finished Goods an allowed super-priority claim (junior to and only to the claims with respect to the DIP Agreement and the claims of Madeleine with respect to the obligations of the Sellers and various affiliates of the Sellers and to Carve-Out Expenses and related financing entered in the Debtors' chapter 11 cases on May 4,

2006) under 364(c)(1), 503(b)(1) and 507(a)(2) of the Bankruptcy Code (the "Superpriority Administrative Claim"), and which Superpriority Administrative Expense Claim shall, in all events, exclude any claim in or to any Avoidance Actions and shall be conditioned upon the Lifetime Agreement not being terminated by reason of Lifetime's default thereunder), (y) to the extent of Inventory Advances advanced by Lifetime utilized for the acquisition of Designated Finished Goods, a perfected first priority security interest in the Designated Finished Goods pursuant to section 364(c)(2) of the Bankruptcy Code, and the proceeds thereof (including all accounts receivable created upon the Sale or other disposition of any Designated Finished Goods), and (z) to the extent of Inventory Advances advanced by Lifetime utilized for the acquisition of Designated Raw Materials, a first priority security interest in the Designated Raw Materials pursuant to section 364(c)(2) of the Bankruptcy Code, and the proceeds thereof (including the products created therefrom) and a perfected security interest in the Designated Finished Goods (junior only to the lien in favor of Lifetime as referred to in the foregoing clause (y)) pursuant to section 364(c)(2) of the Bankruptcy Code, provided that Lifetime shall have used its best efforts to satisfy the obligations referred to in this clause (z) from the Designated Raw Materials and the proceeds thereof prior to seeking to satisfy such obligations from the Designated Finished Goods and the proceeds thereof as collateral security for the Inventory Advances advanced by Lifetime. The first priority security interests granted pursuant to this paragraph 30(b)(y) and (z) are collectively referred to as the "Lien".

       c.     The Sellers shall reimburse Lifetime for the Inventory Advances advanced by Lifetime promptly following receipt, and to the extent, of payment for the Inventory Collateral and, in any event, shall repay Lifetime in Good Funds an amount equal to all

Inventory Advances advanced by Lifetime less the undrawn amount of each Letter of Credit Sellers cause to be returned to Lifetime on the earlier to occur of (x) the closing of the Sale to the Buyer, and (y) the Outside Date if the Closing shall have not previously occurred and a transaction or transaction with parties other than Lifetime and involving substantially all of the Property shall have closed. Pursuant to section 2.2 of the Agreement, effective on the Closing Date, Buyer shall assume all liabilities and obligations for the Inventory Advances.

        d.      Subject to the Sellers' obligations with respect to air freight charges, upon the closing of the transaction with the Buyer, the Buyer shall assume the shipping, handling, freight and similar fees and charges related to the Designated Inventory ordered by the Sellers pursuant to the terms and provisions of section 2.4 of the Agreement and to the extent such inventory is included in the Property.

        e.      The Lien shall be effective and perfected upon the date of this Sale Order and without the necessity of the execution, recordation of filing of security agreements, financing statements or other similar documents.

        f.      The Inventory Advances advanced by Lifetime shall constitute valid and binding obligations of the WearEver Debtors, enforceable against each WearEver Debtor. No obligation, payment, transfer or grant of security shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law.

        g.      Lifetime is hereby authorized, but not required, to file or record financing statements, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to it hereunder. Whether or not Lifetime shall, in its sole discretion, choose to file such financing statements, notices of lien

or similar instruments or otherwise confirm perfection of the liens and security interests granted

to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed,

enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and

on the date of entry of this Sale Order.  Upon the request of Lifetime, without any further consent

of any party, Lifetime is authorized to take, execute and deliver such instruments (in each case

without representation or warranty of any kind) to enable Lifetime to further validate, perfect,

preserve and enforce its liens, in all instances subject to the terms of the Lifetime Agreement.

        h.     If any or all of the provisions of this Sale Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the

validity of any of the obligations incurred prior to the actual receipt of written notice by Lifetime

of the effective date of such reversal, stay, modification or vacation or (ii) the validity or

enforceability of any lien or priority authorized or created hereby or pursuant with respect to any

of the obligations.

        i.     Except as expressly provided in this Sale Order, the Lien and the

Superpriority Administrative Claim and all other rights and remedies of Lifetime granted by the

provisions of this Sale Order shall survive, and shall not be modified, impaired or discharged by

(i) the entry of an order converting any of the Debtors' chapter 11 cases to a case(s) under

chapter 7, dismissing any of the Debtors' chapter 11 cases, terminating the joint administration

of the Debtors' chapter 11 cases or by any other act or omission, or (ii) the entry of an order

confirming a plan of reorganization in any of the Debtors' chapter 11 cases.  The terms and

provisions of this Sale Order shall continue in these chapter 11 cases, in any successor cases if

these chapter 11 cases cease to be jointly administered, or in any superseding chapter 7 cases

under the Bankruptcy Code, and the Lien, the Superpriority Administrative Claim and all other rights and remedies of Lifetime granted by the provisions of this Sale Order shall continue in full force and effect until the Inventory Advances advanced by Lifetime are either paid in full or otherwise satisfied, and in all instances, subject to the terms and conditions of the Lifetime Agreement.

   j. Lifetime shall be deemed to have extended credit to the Sellers in good faith, as that term is used in Section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Sale Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

   k. Upon (i) the full repayment of all Inventory Advances advanced by Lifetime for any Designated Finished Goods or Designated Raw Materials described in section 2.4 of the Lifetime Agreement and this Sale Order, and (ii) the satisfaction of the Sellers' obligations with respect to the return to Lifetime of Letters of Credit issued by Lifetime to the extent undrawn, any all security interests granted to Lifetime pursuant to the Procedures Order and this Sale Order, including but not limited to the Lien, shall be deemed terminated and of no further force or effect without any further action required on the part of the Debtors. Upon repayment of all amounts owed to Lifetime used for the acquisition of Designated Finished Goods, or other satisfaction of the Inventory Advances as provided in section 2.4 of the Lifetime Agreement, the Procedures Order and this Sale Order, the Superpriority Administrative Claim shall be deemed fully satisfied.

31.    The non-debtor Sellers, and to the extent applicable, the WearEver Debtors, are authorized to sell the Neuvo Laredo Assets to the Buyer or one of its subsidiaries or affiliates for the amount of $750,000, subject to such additional terms and conditions as the Sellers and Buyer might agree and provided that all costs of removal and transport of such assets shall be the sole and exclusive responsibility of the Buyer. To the extent the automatic stay under section 362 of the Bankruptcy Code would preclude, prohibit or otherwise limit such sale, the automatic stay under section 362 is hereby modified to the extent necessary to permit Sellers and Buyer to consummate such sale and transfer and convey the Nuevo Laredo Assets.

32.    Subject to the occurrence of the closing of the Sale, Sellers shall pay Lifetime the Breakup Fee in accordance with the terms of the Lifetime Agreement, and the Procedures Order.

33.    Entry of this Sale Order shall not authorize the granting of any security interest in any property allegedly subject to the IMASA Reclamation Claim defined below. Prior to the Closing, the Debtors shall account for any purchased Designated Raw Materials and ensure that any property allegedly subject to the IMASA Reclamation Claim, if any, is not commingled with such Designated Raw Materials.

34.    Each of the Debtors' creditors is authorized, as of the Closing Date, to execute such documents and take all other actions as may be necessary to release and terminate its interests in the Property, if any, as such interests may have been recorded or may otherwise exist, with such interests to attach to the proceeds of the Sale.

35.    Each federal, state and local governmental agency or department is authorized to accept for filing and/or recording any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

36.    All entities which presently are, or on or after the Closing Date may be, in possession of some or all of the Property is authorized to provide access to, and surrender possession of, the Property to the Buyer on and after the Closing Date, with the interests of such entity to be satisfied solely from the proceeds of the Sale.

37.    This Court retains exclusive jurisdiction to enforce and implement the terms and provisions of the Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith, if any, in all respects.

38.    The terms and provisions of the Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer, and its respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties and any subsequent examiners or trustees appointed in the Debtors' chapter 11 cases or upon a conversion of any of the Debtors' chapter 11 cases to chapter 7 under the Bankruptcy Code.

39.    Any lien, claim or interest asserted by the PBGC in the Property shall attach with the same priority, amount, and validity (or invalidity) to the Sale Proceeds as existed prior to the Sale. All parties reserve their respective rights with respect to the allowance of any claims, lien or interest that may be asserted by the PBGC against either the Sale Proceeds, the Debtors or their estates. To the extent that (i) the Sale Proceeds are applied to repay amounts

owed to Wachovia under the Debtors' debtor in possession loan agreement and (ii) the PBGC is adjudicated to have a superior lien, claim or interest in Wachovia in the Sale Proceeds (an "Allowed PBGC Lien"), then Wachovia shall be obligated to disgorge such amounts required to satisfy any allowed claim secured by the Allowed PBGC Lien.

   40. Industria Mexicana Del Aluminio, S.A. de CV ("IMASA") has asserted a reclamation demand for goods allegedly delivered to the Debtors prior to the Petition Date (the "IMASA Reclamation Claim"). The IMASA Reclamation Claim shall attach with the same priority, amount, and validity (or invalidity) to the proceeds of the Sale of those goods and/or materials that are the subject of the IMASA Reclamation Claim as existed prior to the Sale with all parties reserving their respective rights with respect to the IMASA Reclamation Claim. Nothing herein shall be deemed an admission that the IMASA Reclamation Claim, to the extent allowed, is for goods or materials that are included in the Property. Nothing in this Sale Order shall prejudice the rights of IMASA with respect to its asserted reclamation rights, provided however, that such claim shall not entitle IMASA to reclaim goods sold to the Buyer pursuant to the Sale, the rights of the Debtors or other parties in interest to object to such reclamation rights on any grounds, including, but to limited to, the assertion of any defenses to any asserted reclamation claims, or the Debtors' right to assert that the Bankruptcy Court had the authority to authorize the sale of the Property and enter the Sale Order free and clear of any IMASA Reclamation Claim in such property, notwithstanding any objection IMASA could have filed or the right of IMASA to contend that the sale of any Property on such terms to the Buyer has no effect on IMASA's reclamation rights. Nothing herein shall be deemed to affect any

administrative expense claims under section 503(b) of the Bankruptcy Code asserted by IMASA, or the rights of the Debtors or other parties in interest to object thereto.

41.    Novelis Do Brasil LTDA ("Novelis") has asserted a reclamation demand for goods allegedly delivered to the Debtors prior to the Petition Date (the "Novelis Reclamation Claim"). The Novelis Reclamation Claim shall attach with the same priority, amount, and validity (or invalidity) to the proceeds of the Sale of those goods and/or materials that are the subject of the Novelis Reclamation Claim as existed prior to the Sale with all parties reserving their respective rights with respect to the Novelis Reclamation Claim. Nothing herein shall be deemed an admission that the Novelis Reclamation Claim, to the extent allowed, is for goods or materials that are included in the Property. Nothing herein shall be deemed to affect any administrative claims under section 503(b) of the Bankruptcy Code asserted by Novelis, or the rights of the Debtors or other parties in interest to object thereto.

42.    Perot Systems has withdrawn its objection to the Sale Motion.

a.    Perot Systems will continue to provide service to Global Home Products (GHP) under the terms of the MSA, for which GHP may use such service for the benefit of the Buyer of the Property.

b.    Perot Systems and GHP will negotiate in good faith to right size the charges under the MSA in conjunction with business plans of GHP as they evolve and to deal with other MSA related matters including Perot Systems' current balance sheet exposures and to execute an amended MSA by August 31, 2006. Upon the closing of the sale of substantially all of the operating assets of the Sellers, GHP shall pay Perot Systems, in three equal installments, due respectively 30, 60 and 90 days from the closing date of the Sale, an amount equal to the

unamortized license fees paid to Oracle Corporation for software used at GHP ($528,193.77 as of July 31, 2006).

     c.    Perot Systems will provide Transition Services to GHP for the benefit of the Buyer of the Property (without requiring termination of the MSA and without requiring payment of the Termination Fee or the payment required by § 10.10(c ), provided the Buyer of the Property must pay in advance for any such transition services as set forth in the MSA); provided, GHP and the Buyer are in compliance at all times with any requirements of third-parties from whom Perot Systems is a licensee for the benefit of GHP. The Buyer will make all its payments directly to Perot Systems; the Debtors remain responsible for timely payment to Perot Systems for all amounts due under the MSA that the Buyer fails to make.

     d.    Perot Systems and GHP reserve all other rights.

     e.    Perot Systems will continue to receive payments for services under the MSA at the rates set forth in the MSA (until the MSA is either renegotiated or rejected) and will retain all payments that have been or will be made.

     f.    Nothing in this Sale Order vacates or modifies the relief granted in the *Order (I) Approving Sale by the Burnes Group Debtors of Substantially All of the Burnes Group Debtors' Operating Assets Free and Clear of All Liens, Claims, Encumbrances And Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (II) Assuming and Assigning Certain Executory Contracts And Unexpired Leases; and (III) Granting Related Relief* [Docket No. 353] to Perot and the Debtors.

43.    As provided by Bankruptcy Rules 7062 and 9014, this Order shall be

effective and enforceable immediately upon signing and shall not be subject to the 10-day stay

provisions contained in Bankruptcy Rules 6004(g) and 6006(d).

Dated: August 11, 2006
       Wilmington, Delaware

                                THE HONORABLE KEVIN GROSS
                                UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

CONFORMED TO REFLECT MODIFICATIONS SET FORTH IN THAT CERTAIN
FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT DATED AS OF JULY 14, 2006

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this 7th day of August, 2006, by and between SEB S.A., a company incorporated under the laws of France, and Groupe SEB USA, a Delaware corporation (collectively, the "Buyer"), and Mirro Acquisition Inc., a Delaware corporation, Mirro Operating Company, LLC, a Delaware limited liability company and Mirro Puerto Rico, Inc., a corporation organized under the laws of the Commonwealth of Puerto Rico (collectively, the "Debtor Sellers") and 690649 BC Ltd., a British Columbia company (the "Non-Debtor Seller"; together with the Debtor Sellers, each a "Seller" and collectively, the "Sellers" and, together with Buyer, the "Parties"), each of the Debtor Sellers being a Debtor and Debtor in Possession under Case No. 06-10340 (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

## RECITALS

A.     Sellers are engaged in the business of manufacturing and distributing cookware and bake ware products and related accessories under the "Mirro", "Regal", "AirBake Ultra", "Cushion Air" and "WearEver" brand names (such business is referred to herein as the "Business").

B.     Sellers wish to sell to Buyer, pursuant to Sections 363 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), substantially all of the assets used in connection with and arising out of the operation of the Business at the price and on the other terms and conditions specified in detail below and Buyer wishes to so purchase and acquire such assets from Sellers.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.     <u>Transfer of Assets</u>.

1.1     <u>Purchase and Sale of Assets</u>.  On the Closing Date, as hereinafter defined, in consideration of the covenants, representations and obligations of Buyer hereunder, and subject to the conditions hereinafter set forth, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers the following assets, wherever located, whether or not identified or disclosed on Sellers' books and records (collectively, the "Property"):

1.1.1     <u>Contracts</u>.  Seller's right, title and interest in and to (i) those equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements described on Exhibit "A-1" to this Agreement and incorporated herein by this reference (collectively, the "Equipment Agreements"), and (ii) those other contracts, orders, purchase orders, licenses, contracts, agreements and similar arrangements

described on **Exhibit "A-2"** (collectively, the "**Other Contracts**" and together with the Equipment Agreements, the "**Contracts**").

        1.1.2  <u>Personal Property</u>. All of the equipment and tangible personal property owned by any Seller and all other equipment and tangible personal property now or hereafter owned by any Seller and used in connection with the Business, including, without limitation, all such furniture, vehicles, machinery, equipment, tools, dies, spare parts, computers, fixtures and furnishings wherever located other than such items listed in Exhibit "B" attached to this Agreement (collectively, the "**Personal Property**"). As used in this Agreement, the Personal Property shall not include the Inventory.  The Personal Property shall also expressly exclude any equipment or other tangible property held by any Seller pursuant to a Contract where Buyer does not assume the underlying Contract relating to such personal property at the Closing.

        1.1.3  <u>Intangible Property</u>. All patents, patent applications and manufacturing know-how owned or held by any Seller and used exclusively in connection with the Business, and all other intangible personal property owned or held by any Seller and used exclusively in connection with the Business, but in all cases only to the extent of such Seller's interest and only to the extent transferable, together with all books, records and like items pertaining to the Business, including, without limitation, the names, patents, and patent applications set forth on **Schedule 1.1.3** attached hereto and incorporated herein by this reference, the goodwill of the Business, processes, trademarks, trademark applications and registrations, trade names, copyrights, copyright applications, service marks, licenses to use or for the use of any intellectual property, catalogues, customer lists and other customer data bases, logos and registrations or applications therefor, domain names and registrations and applications therefor, correspondence with present or prospective customers and suppliers, advertising materials, software programs and source codes and object codes, data, databases, trade secrets, "know-how" and other confidential information and all other intellectual property (in whatever form or medium) and all intangible embodiments thereof, and telephone exchange numbers identified with the Business (collectively, the "**Intangible Property**"). As used in this Agreement, Intangible Property shall in all events exclude, (i) any materials containing privileged communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy and any other materials which are subject to attorney-client or any other privilege, and (ii) any software or other item of intangible property held by any Seller pursuant to a license or other Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing.

        1.1.4  <u>Receivables</u>. All instruments, receivables, accounts receivable and unbilled costs and fees attributable to the Business and, prepayments and prepaid expenses (subject to the proration provisions of Section 3.5) and security deposits and other deposits received from or held by third parties and subject to Section 1.2, all causes of action relating or pertaining to the foregoing, the right to bill and receive payment for product shipped and/or services rendered but unbilled or unpaid as of the Closing and all rights to receive and retain mail related to the foregoing (collectively, the "**Receivables**").

        1.1.5  <u>Claims</u>. Subject to Section 1.2, all of each Seller's interest in all rights, suits, claims, choses in action, causes of action, judgments, damages, rights to payment and

litigation rights of any kind or nature whatsoever (whether arising in contract, tort or otherwise, or any equitable remedy for breach of performance, whether or not such breach gives rise to a right to payment, but as to each of the foregoing, only to the extent the same relates directly to or arises under any property otherwise included in the Property (collectively, "**Claims**").

        1.1.6   Insurance Policies. Except as may be otherwise provided in Section 1.2(iv) of this Agreement, all Claims arising under insurance policies with respect to the Property and only to the extent the Purchase Price has not been adjusted pursuant to Section 10.1 of this Agreement on account of the damage(s) to which such Claim(s) relate.

        1.1.7   Inventory. All supplies, goods, materials, work in process, inventory and stock in trade owned and held by any Seller and at any location (including those assets located at the facility whose address is Avenue New York 202, Parque Industrial Park Oradel, Nuevo Laredo, Tam 88000 Mexico (the "**Nuevo Laredo Facility**")) for use in connection with the operation of the Business (collectively, the "**Inventory**").

        1.1.8   Nuevo Laredo Equipment   All of the equipment and tangible personal property located at the Nuevo Laredo Facility and described on Schedule 1.1.8 attached hereto and incorporated herein by this reference  (the "**Nuevo Laredo Equipment**")  [Note _ Relabel Schedule 1.2 and attach as Schedule 1.1.8.]

        1.2   Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Property shall be limited to the items identified or described in Section 1.1 above and shall in any event exclude all of the following (collectively, the "**Excluded Assets**"): (i) those items excluded pursuant to the provisions of Section 1.1 above; (ii) all cash or cash equivalents; (iii) Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to the Sellers pursuant to the terms and provisions hereof; (iv) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing;  (v) any fee, license, leasehold or other interests in any real property held or occupied by any Seller,  (vi) all securities, whether capital stock or debt, and equity of any Seller or any other entity; (vii) all rights and claims in or to any refunds or credits of or with respect to any taxes, assessments or similar charges paid by or on behalf of any Seller, in each case to the extent applicable to any period prior to the Closing; (viii) tax records, minute books, stock transfer books and corporate seals of any Seller; (ix) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of any Seller; (x) all deposits, security and collateral associated with the Property, including cash deposits, Seller L/Cs (as defined in Section 2.5 below) and any collateral therefor; (xi) all rights, claims and causes of action of any Seller against Perot Systems Corporation, former or current officers, directors, employees, members, interest holders, principals, agents, lenders, lienholders, representatives of such Seller and any party asserting rights, suits, claims, choses in action, causes of action, judgments, damages, rights to payment and litigation rights of any kind or nature whatsoever (whether arising in contract, tort or otherwise, or any equitable remedy for breach of performance), whether or not such breach gives rights to a right to payment, against any debtor or debtor estate in the Bankruptcy

Case; and  (xii) all preference or avoidance claims and actions of any Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions")

 1.3 <u>Instruments of Transfer.</u> The sale, assignment, transfer, conveyance and delivery of the Property to Buyer shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for in Section 3 below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Property to Buyer, but in all events only to the extent that the same do not impose any monetary obligations upon Sellers or in any other respect increase in any material way the burdens imposed by the other provisions of this Agreement upon Sellers.

2. <u>Consideration.</u>

 2.1 <u>Purchase Price and Other Consideration.</u>

 2.1.1 The cash consideration to be paid by Buyer to Sellers for the Property shall be $35,750,000 plus an amount equal to the Inventory Advances (as defined in Section 2.4 of that certain Asset Purchase Agreement dated July ___, 2006, among Sellers, as sellers, and Lifetime Brands, Inc., as buyer, as amended (the "Lifetime Purchase Agreement") (the "Purchase Price"), subject to Section 2.5 of this Agreement.

 2.1.2 The Purchase Price shall be paid as follows:

 (a) Concurrently with the execution and delivery of this Agreement by Buyer, Buyer has deposited into an escrow account directed by Sellers (the "Escrow") an amount equal to $2,000,000 in immediately available, good funds (funds delivered in this manner are referred to herein as "Good Funds") (the "Deposit"). The Deposit shall become nonrefundable upon the termination of the transaction contemplated by this Agreement by reason of Buyer's default of its material obligations hereunder (a "Buyer Default Termination"), it being agreed that Sellers shall not have the right to so terminate this Agreement and retain any portion of the Deposit unless Buyer has failed to cure the applicable default within five (5) days following its receipt of written notice thereof from Sellers, and, at such time, Sellers shall not be in material default of their obligations under this Agreement. At the Closing, the Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Purchase Price (with such portion of the Purchase Price deposited into Escrow in accordance with the Supply Agreement (as defined in Section 3.3.5 below). In the event the Deposit becomes nonrefundable by reason of a Buyer Default Termination, subject to the qualifications set forth above, Escrow Holder shall immediately disburse the Deposit and all interest accrued thereon to Sellers to be retained by Sellers for their own account. If the transactions contemplated herein terminate by reason of (A) Sellers' material default under this Agreement, it being agreed that Buyer shall not have the right to so terminate this Agreement unless Sellers have failed to cure the applicable default within five (5) days following their receipt of written notice thereof from Buyer, or (B) the failure of a condition to Buyer's obligations hereunder (including the condition set forth in Section 4.2.7, below), the Escrow Holder shall return to Buyer the Deposit (together with all interest accrued thereon) but less Buyer's one-half share of the Escrow Holder's escrow fees and

charges, and provided that, notwithstanding anything to the contrary herein, if Buyer is required to remain the "back-up bidder" pursuant to Section 8.1(a) below, Buyer shall not be entitled to the refund of the Deposit until the earlier of (i) the consummation in all material respects of the sale the Property to the Upset Purchaser (as defined in Section 8.1(a) hereof) or (ii) the Outside Date, if the Closing has not occurred on or prior thereto.

        (b)     On the Closing Date, Buyer shall (A) cause the Escrow Holder to deliver the Deposit (together with all accrued interest thereon) to Sellers, and (B) pay and deliver, in Good Funds, the balance of the Purchase Price to Sellers.

        2.2     <u>Assumed Liabilities</u>. Buyer shall, effective as of the Closing Date, be assigned the applicable Sellers' interests under the Designated Contracts (as defined in Section 8.1(c), below) to be assigned by Sellers under this Agreement and shall assume all liabilities and obligations (i) of Sellers accruing under the Designated Contracts on and after the Closing Date or, if assigned subsequently in accordance with the provisions of Section 8.1(c), below, from the effective date of such later assignment by the applicable Sellers, (ii) all obligations arising in connection with the use and operation of the Property from and after the Closing Date; (iii) all liability with respect only to accrued vacation benefits of those employees of Sellers employed by Buyer following the Closing, (iv) the Inventory Advances, and (v) any such additional liabilities and obligations as may be set forth or described on Schedule 2.2 hereto. Other than the liabilities and obligations of Sellers expressly assumed by Buyer hereunder, Buyer is not assuming and shall not be liable for any liabilities or obligations of Sellers including any such liabilities or obligations arising out of or related to (w) any breach by any Seller of any Contract, (x) the ownership, operation or control of the Property or the Business prior to the Closing (other than the obligations undertaken by Buyer pursuant to Section 2.4 of this Agreement and such other obligations as may be expressly assumed pursuant to this Agreement) or (y) other than as expressly assumed pursuant to clause (iii) of this Section 2.2, any liability or obligation or Claim of any employee including with respect to pension and severance obligation.

        2.3     <u>Purchase Price Allocation</u>. Not later than fifteen (15) days prior to the Closing Date, Buyer shall prepare and deliver to Sellers for their review and consideration a schedule (the "Allocation Schedule") allocating the Purchase Price among the various assets comprising the Property in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. If Sellers disagree with or raise objections to the Allocation Schedule, Buyer and Sellers will negotiate in good faith to resolve such objections. If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Sellers shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings). Buyer and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Buyer and Sellers shall be free to make their own respective allocations of the

Purchase Price for tax purposes. Notwithstanding any other provisions of this Agreement, in the event the Parties mutually agree upon the allocation of the Purchase Price, the provisions of this Section 2.3 shall survive the Closing.

2.4    Buyer's Obligation With Respect to "Inventory Advances"
Reference is made to the Lifetime Purchase Agreement. Concurrently with the Closing, Buyer shall satisfy and discharge in full Sellers' obligations to Lifetime Brands, Inc., pursuant to Section 2.4(ii) of the Lifetime Purchase Agreement.

2.5    Purchase Price Adjustment.

2.5.1    Sellers and Buyer acknowledge and agree that the Purchase Price has been based on (i) Eligible Accounts Receivable (defined below) being $5,400,000 (the "A/R Benchmark") and (ii) Eligible Inventory (defined below) being $11,930,000 (the "Inventory Benchmark"). The sum of the A/R Benchmark and Inventory Benchmark shall be referred to herein as the "Target Amount". Within 2 days prior to the Closing Date, Sellers shall deliver to Buyer a statement of Accounts Receivable and Inventory as of 11:59 p.m. on the day immediately prior to the Closing Date, prepared in accordance with generally accepted accounting principles, consistently applied, and which has been determined on a basis consistent with the methodology employed as of June 30, 2006 in the Borrowing Base Certificates prepared by Sellers and delivered to Wachovia Bank, National Association in its capacity as agent (the "DIP Agent") under the DIP Agreement (each, a "Borrowing Base Certificate") (it being agreed that notwithstanding anything to the contrary in the foregoing, in determining Eligible Accounts Receivable the Sellers shall deduct chargebacks and other credits reasonably expected to be taken by their customers and relating to events or conditions prior to the Closing (the "Chargebacks")), through the date when such statement is required to be delivered hereunder, certified by such officer(s) of the Sellers (or applicable Seller) as the DIP Agent shall accept (the "Closing Statement"). Buyer and its representatives shall be permitted to have reasonable access to the Sellers' offices and their books, records and work papers containing financial information of Sellers during the period through the Closing Date in order to, among other things, verify the accuracy and completeness of the Closing Statement (including the methodology used in calculating Eligible Accounts Receivable and Eligible Inventory). The Closing Statement shall be conclusive and binding upon Buyer and Sellers unless Buyer objects in writing to any item or items shown on the Closing Statement within 24 hours after the Buyer's receipt of the Closing Statement. Such writing shall assert that the Closing Statement is in error and specify in reasonable detail the amount in dispute and the basis for such dispute.

2.5.2    In the event that the sum of the A/R Benchmark and the Inventory Benchmark as reflected on the Closing Statement: (w) is less than the Target Amount (the amount by which such Eligible Accounts Receivable and Eligible Inventory is less than the Target Amount, the "Shortfall") by not more than $830,000, the Purchase Price shall not be adjusted; (x) is greater than the Target Amount (the amount by which such Accounts Receivable and Inventory is greater than the Target Amount, the "Excess") by not more than $830,000, the Purchase Price shall not be adjusted; (y) evidences a Shortfall of more than $830,000, then the Purchase Price shall be decreased on a dollar-for-dollar basis to the extent the Shortfall exceeds the Target Amount minus $830,000 and (z) evidences an Excess of more than $830,000, then the Purchase

Price shall be increased on a dollar-for-dollar basis to the extent the Target Amount plus $830,000 is exceeded.

2.5.3   For the purposes of the foregoing Sections 2.5.1 and 2.5.2, the term "Eligible Accounts Receivable" shall refer to the amounts reflected on printed Line Item 10 of Column A of a particular Borrowing Base Certificate and the term "Eligible Inventory" shall mean the aggregate of the amounts reflected on printed Line Items 16, 22, 28, 35 and 40 of Column A of a particular Borrowing Base Certificate prepared by Sellers and provided to the DIP Agent as required by the agreements evidencing and securing the debtor in possession financing provided to certain Sellers by the lenders on behalf of whom the DIP Agent is acting (collectively, the "DIP Agreement"), but shall not include any collateral (including inventory, accounts receivable and raw materials) on which the Lifetime has a lien in respect of the Inventory Advances.

2.5.4   Notwithstanding anything to the contrary herein, the Purchase Price (as adjusted, if at all, in accordance with the terms of this Agreement) shall be reduced by $2,000,000 at Closing if at such time the Sellers shall have failed to satisfy the condition set forth in Section 4.2.17 of this Agreement.

2.6   Replacement of Seller L/C's.   At or prior to the Closing, Buyer shall obtain, at Buyer's sole cost and expense, and deliver to the parties holding letters of credit or similar financial accommodations issued for any Seller's account (collectively, "Seller L/Cs"), replacement letters of credit or similar financial accommodations sufficient to cause such parties to release and return to the applicable Seller(s) at or prior to the Closing the undrawn originals of the Seller L/Cs and all cash and other collateral therefor.

3.   Closing Transactions.

3.1   Closing Conference.   The Closing of the transactions provided for herein (the "Closing") shall take place at the Wilmington, Delaware offices of the Sellers' attorneys.

3.2   Closing Date.   The Closing shall be held upon the earlier to occur of (i) the business day following the satisfaction of the last of the conditions set forth in Sections 4.1 and 4.2 below, and (ii) August 18, 2006 (the "Outside Date"). In the event the conditions to Closing have not been satisfied or waived by the Outside Date, then the Buyer or the Sellers (if they are not in material default hereunder) may terminate this Agreement. Alternatively, the Parties may mutually agree in writing to an extended Closing Date. Until this Agreement is either terminated or the Parties have agreed upon an extended Closing Date, the Parties shall diligently continue to work to satisfy all conditions to Closing and the transaction contemplated herein shall close as soon as such conditions are satisfied or waived.

3.3   Sellers' Deliveries to Buyer at Closing.   On the Closing Date, Sellers shall make the following deliveries to Buyer:

3.3.1   An Assignment and Assumption of Leases and Contracts substantially in the form and content attached as Exhibit "C" hereto, duly executed by Sellers pursuant to which each Seller shall assign to Buyer their respective interests, if any, in the Designated Contracts (the "Assignment of Contracts").

3.3.2   A bill of sale, duly executed by each Seller in the form and on the terms of the bill of sale attached hereto as Exhibit "D," pursuant to which each Seller transfers all of its rights, title and interests, if any, in and to the Personal Property, the Inventory and the Receivables to Buyer (the "Bill of Sale").

3.3.3   A counterpart assignment of intangible property, duly executed by each Seller, in the form and content of the assignment of intangible property attached as Exhibit "E" hereto, pursuant to which each Seller assigns to Buyer all of its rights, titles and interests, if any, in and to the Intangible Property (the "Assignment of Intangible Property").

3.3.4   A counterpart of a Transition Services Agreement in form and content satisfactory to Buyer and Sellers (the "Transition Agreement"), between Buyer, on the one hand, and appropriate affiliates of the Sellers (the "Seller Transition Parties"), on the other, providing, among other things, for (i) up to six (6) months of information technology, human resources, accounting, distribution and related services and support by the Sellers; (ii) the Buyer to pay a monthly flat fee for the services to be rendered to Buyer thereunder, and (iii) the Buyer and its employees, representatives and agents to have reasonable access to, and use of, the Sellers' distribution centers, warehouses and manufacturing facilities for the purposes described in such agreement for such period, which Transition Agreement shall have been executed by the Seller Transition Parties.

3.3.5   The Buyer and the Seller Supply Parties (as defined below) shall have executed a supply agreement in substantially the form attached hereto to Buyer and Sellers (the "Supply Agreement"), between Buyer, on the one hand, and appropriate affiliates of the Sellers (collectively, the "Seller Supply Parties"), on the other, providing that, among other things: (a) the Seller Supply Parties shall supply the Buyer with such number of units of cookware product determined by SKUs as the parties shall agree ("NL Cookware") and bake ware product determined by SKUs as the parties shall agree ("NL Bake Ware"), such amounts to be sufficient to satisfy demand for such product through November 30, 2006, in the case of NL Cookware, and December 31, 2006, in the case of NL Bake Ware, in each of the foregoing cases as set forth in projections to be mutually agreed upon in writing by Buyer and Sellers as part of the Supply Agreement (collectively, the "Minimum Supply Amount"); (b) the NL Cookware and the NL Bake Ware shall be supplied to the Buyer at such cost as the parties shall agree; (c) from the cash proceeds payable by the Buyer at Closing, the Buyer shall deposit into Escrow (the "Supply Agreement Escrow") with the Escrow Holder, or direct the Escrow Holder to retain a portion of the Deposit in an amount equal to, $1.9 million, subject to adjustment as set forth in clause (v), below (the "Supply Agreement Escrowed Amount") in Good Funds pursuant to joint escrow instructions to be delivered by the Sellers and the Buyer to the Escrow Holder on or before the Closing Date, which instructions shall provide that the Escrow Holder shall release (i) 25% of the Supply Agreement Escrowed Amount to the Sellers upon the Seller Supply Parties' having supplied the Buyer with more than 50% of the Minimum Supply Amount, (ii) a further 25% of the

Supply Agreement Escrowed Amount to the Sellers upon the Seller Supply Parties' having supplied the Buyer with more 75% of the Minimum Supply Amount, (iii) the balance of the Supply Agreement Escrowed Amount to the Sellers upon the Seller Supply Parties' having supplied the Buyer with the Minimum Supply Amount, (IV) the balance of the Supply Agreement Escrowed Amount to the Buyer on such date or dates to be agreed upon by the parties (it being understood that such dates and the return to the Buyer of the escrowed amounts shall be related to the Sellers' compliance with a production timetable to be determined by the parties to the Supply Agreement, subject to such "force majeure" exceptions as the parties shall agree, and upon the Buyer's timely providing liquidity sufficient to permit the Seller Supply Parties to acquire the raw materials reasonably necessary to reasonably manufacture, within the timeframes for such manufacture afforded by the Supply Agreement, the balance of the Minimum Supply Amount after taking into account the raw materials and "work in process" supplied by the Buyer) and (v) notwithstanding the foregoing, the Buyer shall be entitled to deduct from the Supply Agreement Escrowed Amount from time to time an amount equal to the Chargebacks taken or that will be taken (as the Buyer, acting in good faith, shall have been advised by customers, taking into account usual and customary methods for determining the appropriate scope and amount of chargebacks) to the extent (x) such Chargebacks were not deducted from the calculation of Eligible Accounts Receivable and reflected in the Closing Statement and (y) of such Chargebacks (on a dollar-for-dollar basis) which, had they been deducted from the calculation of Eligible Accounts Receivable and reflected in the Closing Statement would have resulted in a Shortfall greater than $830,000; (d) that the Seller Supply Parties agree that they will operate the Nuevo Laredo Facility as efficiently as is reasonably possible; (e) the Seller Supply Parties' obligations under the Supply Agreement shall be expressly conditioned upon the Buyer permitting the Seller Supply Parties to utilize the "work in process" and raw materials located at the Nuevo Laredo Facility to the extent such "work in process" and raw materials form part of the Property; (f) the Sellers shall agree to use their commercially reasonable efforts to assist the Buyer in removing the Property remaining at the Nuevo Laredo Facility at the end of the term of the Supply Agreement, such assistance to be at the Buyer's sole cost and expense; and (g) the parties thereto shall negotiate in good faith to grant to the Buyer a right to extend the Supply Agreement on mutually agreeable terms. For the avoidance of doubt, the Buyer's right to withdraw amounts in the Supply Agreement Escrow shall be limited to the circumstances expressly provided in this Agreement.

       3.3.6   Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Sellers to Buyer at the Closing.

       3.4   <u>Buyer's Deliveries to Sellers at Closing</u>.  On the Closing Date, Buyer shall make or cause the following deliveries to Sellers:

       3.4.1   That portion of the Purchase Price to be delivered by Buyer directly to Sellers at the Closing under Section 2.1, as adjusted (if at all) pursuant to Section 2.5 and reduced by the Supply Agreement Escrow Amount, and Buyer shall cause the Escrow Holder to deliver the Deposit to Sellers as contemplated in Section 2.1.2(b) hereof or re-deposit such amount of the Deposit equal to the Supply Agreement Escrow Amount into the Supply Agreement Deposit Escrow in lieu of payment thereof to the Sellers.

3.4.2  A counterpart of the Assignment of Contracts, duly executed by Buyer.

3.4.3  A counterpart of the Assignment of Intangible Property, duly executed by Buyer.

3.4.4  A counterpart of the Transition Agreement, duly executed by Buyer.

3.4.5  A counterpart of the Supply Agreement, duly executed by Buyer, together with the Supply Agreement Escrow Amount (or a direction to the Escrow Holder to establish the Supply Agreement Escrow Account with such amount on deposit therein).

3.4.6  Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Buyer to Sellers at the Closing.

3.5  Prorations.  Rent, current taxes and other items of expense (including, without limitation, any prepaid insurance, maintenance, tax or like payments under the Designated Contracts, or any of them) and income relating to or attributable to the Business and/or the Property shall be prorated between Sellers and Buyer as of the Closing Date. All liabilities and obligations due (or in respect of periods prior to or as of the Closing Date shall be paid in full or otherwise satisfied by Sellers and all liabilities and obligations due in respect of periods after the Closing Date shall be paid in full or otherwise satisfied by Buyer. Rent shall be prorated on the basis of a thirty (30) day month.  Buyer shall pay to Sellers in cash on the Closing Date the amount of any security or similar deposits with contracting parties under the Designated Contracts and the amount of any other deposits made by Sellers relating to the property to which the Designated Contracts relate.

3.6  Sales, Use and Other Taxes.  Any sales, purchases, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Property is located, or any subdivision of any such state, which may be payable by reason of the sale of the Property under this Agreement or the transactions contemplated herein shall be borne equally by the Sellers, on the one hand, and the Buyer on the other hand, and shall be timely paid by the Buyer.  At the time when the Closing Statement is delivered by Sellers, the Buyer shall deliver to the Sellers a reasonable estimate of taxes which are reasonably likely to be payable and, at Closing, the Sellers shall advance one-half of such estimated taxes to the Buyer (or reduce the Purchase Price payable at such time by the Buyer by such amount).  The Buyer agrees to seek and use commercially reasonable efforts to obtain all applicable exemptions from the imposition of sales, transfer and similar taxes (collectively, the "Transfer Taxes") on the transactions contemplated herein.  The Buyer agrees to return to the Sellers any excess of the amounts advanced and the Sellers agree to advance any shortfall in the amounts advanced (or deducted from the Purchase Price), in both cases based on the amount of taxes actually paid by the Buyer in connection with the consummation of the transactions contemplated hereby. Buyer shall pay, as and when due, all Transfer Taxes.

3.7     Possession.  Right to possession of the Property shall transfer to Buyer on the Closing Date.  Sellers shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain control of the Property, and shall also make available to Buyer at their then existing locations the originals of all documents in Sellers' possession that are required to be transferred to Buyer by this Agreement.

4.     Conditions Precedent to Closing.

4.1     Conditions to Sellers' Obligations.  Sellers' obligation to make the deliveries required of Sellers at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Sellers of each of the following conditions:

4.1.1   All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

4.1.2   Buyer shall have executed and delivered to Sellers the Assignment of Contracts and Assignment of Intangible Property.

4.1.3   Buyer shall have delivered, or shall be prepared to deliver to Sellers at the Closing, all cash and other documents required of Buyer to be delivered at the Closing.

4.1.4   Buyer shall have delivered to Sellers appropriate evidence of all necessary corporate action by Buyer in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions duly adopted by Buyer's directors approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by Buyer of this Agreement; and (ii) a k-bis excerpt as to the incumbency of the representative of SEB S.A. executing this Agreement, resolutions of the board of directors for Groupe SEB USA and a certificate of incumbency of the representative of Groupe SEB USA executing this Agreement.

4.1.5   [Reserved]

4.1.6   No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation of the transactions contemplated by this Agreement would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.1.7   Buyer shall have substantially performed or tendered performance of each and every material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.1.8   The Bankruptcy Court shall have entered the Approval Order in accordance with Section 8.1.1 below which order shall be satisfactory in form and substance to the Sellers and the order shall not have been stayed as of the Closing Date.

4.1.9   [Reserved]

4.1.10   [Reserved]

4.1.11   [Reserved]

4.1.12   The Closing Statement evidences that the sum of the Eligible Accounts Receivable and Eligible Inventory is not less than $15,000,000.

4.1.13   [Reserved]

4.2   <u>Conditions to Buyer's Obligations</u>.  Buyer's obligation to make the deliveries required of Buyer at the Closing, and to otherwise close the transaction contemplated herein, shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1   Sellers shall have substantially performed or tendered performance of each and every covenant on Sellers' part to be performed which, by its terms, is capable of performance before the Closing.

4.2.2   , Other than with respect to such representations and warranties of the Sellers that cease to be effective in accordance with Section 10.26 hereof, all representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects.

4.2.3   Sellers shall have executed and be prepared to deliver to Buyer the Assignment of Contracts; the Bill of Sale; and the Assignment of Intangible Property.

4.2.4   Sellers shall have delivered, or shall be prepared to deliver to Buyer at the Closing, all other documents required of Sellers to be delivered at the Closing.

4.2.5   No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation of the transactions contemplated by this Agreement would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.2.6   The Bankruptcy Court shall have entered the Approval Order in accordance with Section 8.1.1 below which order shall be satisfactory in form and substance to the Buyer and the order shall not have been stayed as of the Closing Date.

4.2.7   [Reserved]

4.2.8   [Reserved]

4.2.9   [Reserved]

4.2.10   From July 7, 2006 to the Closing Date, Sellers shall have operated the Business in the ordinary course consistent with the manner in which the Business has been operated since the filing of the Bankruptcy Case taking into account in all events the limitations imposed by bankruptcy law on the conduct and activities of those of the Debtor Sellers.

4.2.11   [Reserved]

4.2.12   There shall have not occurred since July 7, 2006 any event, change, condition or matter that individually or in the aggregate results in or could reasonably be expected to result in, and the Sellers shall have no actual knowledge of, a planned or actual decrease by either Wal-Mart or Target that would result in more than 10% of the combined number of SKUs purchased or ordered by such customers as set forth on Exhibit "4.2.12" attached hereto and incorporated by reference.

4.2.13   The Closing Statement is provided to Buyer in accordance with Section 2.5.1 above and evidences that the sum of the Eligible Accounts Receivable and Eligible Inventory is not less than $15,000,001.

4.2.14   The Sellers shall have incurred not less than $1.4 million to satisfy air freight charges for the shipment of product used in the Business and to be shipped to Wal-Mart and Target and Buyer shall have received evidence reasonably satisfactory to it of such incurrence.

4.2.15   Since July 7, 2006, the Sellers shall have not disposed of any excess and obsolete inventory, or a material amount of any other inventory, for below the Sellers' cost therefor.

4.2.16   [Reserved].

4.2.17   The Sellers shall have obtained one of the following prior to the Closing: (i) an order (as part of the Approval Order, which shall not be stayed as of the Closing) obtained after prior notice and an opportunity to be heard by Regal Ware, Inc. ("Regal Ware") and Newell Operating Co. ("Newell") either (xx) authorizing the assignment of Sellers' interest in such intellectual property licensed by Regal Ware to Newell as is sublicensed by Newell to Mirro Operating Company pursuant to that certain Trademark Sublicense Agreement (the "Sublicense Agreement"), (yy) stating that the consents of Regal Ware and Newell are not required for the assignment of Sellers' interest in the Sublicense Agreement (or, alternatively, if Sellers have obtained the consent of only one of Regal Ware and Newell, an order providing that the consent of the other is not required in order to assign the Sellers' interest in the Sublicense Agreement), (ii) the written consents (in a form reasonably satisfactory to the Buyer) of Regal Ware and Newell to the assignment of Sellers' interest in the Sublicense Agreement to Buyer, (iii) the written consent of Newell to the assignment of Sellers' interest in the Sublicense Agreement to Buyer and Buyer's written agreement acknowledging that Regal Ware's consent to the assignment of Sellers' interest

under the Sublicense Agreement is not required, or (iv) Buyer's written agreement acknowledging that Regal Ware's and Newell's consent to the assignment of Sellers interest under the Sublicense Agreement is not required. Only upon the failure of all of the events described in clauses (i) through (iv) above to occur, at the election of Buyer, Sellers shall reasonably cooperate with Buyer in any commercially reasonable arrangement providing for the disposition of all Designated Inventory (as defined in Section 2.4 of the Lifetime Purchase Agreement) (and, in the case of Designated Raw Materials (as defined in Section 2.4 of the Lifetime Purchase Agreement) which shall become upon the manufacture thereof Designated Inventory, such additional Designated Inventory), subject to the Sublicense Agreement, pursuant to one or more "secured creditor" sales or other processes mutually agreeable to the parties, and the proceeds of all such sales and other processes, net of the actual cash costs and expenses of Sellers (as provided in the immediately following sentence) shall be for the account of the Buyer. All cash costs and expenses actually incurred by the Sellers in connection with any "secured creditor" sales or other processes described in the preceding sentence shall be the sole responsibility and obligation of the Buyer and the Buyer agrees to indemnify and hold harmless each of the Sellers with respect to any and all losses, liabilities, damages, claims, demands, causes of action, actions, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Sellers (or any of them) may suffer or incur directly arising or resulting from cooperating with Buyer with respect to such "secured creditor" sales or other processes as contemplated herein

      4.3     _Termination._ If any of the above conditions is neither satisfied nor waived on or before the date by which the condition is required to be satisfied (but in any case, no later than the Outside Date), a Party who is not then in default hereunder may terminate this Agreement by delivering to the other written notice of termination. Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving party; provided, however, that the consent of a Party to the Closing shall constitute a waiver by such party of any conditions to Closing not satisfied as of the Closing Date.

    5.    _Sellers Representations and Warranties._ Sellers hereby make the following representations and warranties to Buyer:

      5.1     _Organization, Standing and Power._ Subject to the applicable provisions of bankruptcy law, each Seller has all requisite entity power and authority to own, lease and operate its properties, to carry on its business as now being conducted and, upon obtaining the Approval Order, will have the power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

      5.2     _Authorization of Sellers._ Subject to the Sellers' obtaining the Approval Order, the execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Sellers: (A) do not and will not: (i) conflict with or result in a breach of the articles of incorporation or the by-laws of any Seller; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (ii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which any Seller is a party or by which

any Seller or any of its assets or properties may be bound and (B) (i) have been, in the cases of the Non-Debtor Sellers, duly and validly authorized and approved by all necessary corporate or limited liability company action, as applicable, of each Non-Debtor Seller and (ii) is valid and binding on each Seller, and is enforceable against such Seller in accordance with the terms hereof.

5.3     Title to Assets.  Subject to Section 10.26 of this Agreement, no Seller has knowledge of a valid claim (asserted or otherwise) that title to any of the Property is owned by a third party.

5.4     Intellectual Property.  Subject in all events to the first sentence of Section 10.26 below and except as otherwise provided on Schedule 5.4 to this Agreement, (i) Schedule 1.1.3 lists in reasonable detail all registrations and applications for registration of all Intangible Property owned by the Sellers; (ii) the Sellers own or have the right to use all Intangible Property, and all Intangible Property is valid, subsisting and enforceable in all respects; (iii) the Intangible Property is sufficient to operate the Business as conducted as of the Execution Date, except as individually or in the aggregate have not had or would not reasonably be expected to have a material adverse effect; and (iv) except as individually or in the aggregate have not had or would not reasonably be expected to have a material adverse effect, (a) no action is pending or, to the Sellers' knowledge, threatened which challenges the validity or use of, or the ownership by, the Sellers of the Intangible Property; (b) the Sellers have no knowledge of any infringement or infringing use of any of the Intangible Property by any third party; and (c) to the Sellers' knowledge, no infringement, misappropriation or violation of any intellectual property right or other proprietary right of any third party has occurred or will result from the conduct of the Business.

5.4.1 Subject in all events to the first sentence of Section 10.26 below, upon a breach of the representations set forth in Section 5.4 of this Agreement, Buyer shall provide Sellers with written notice of same and (a) if such breach relates to a material portion or amount of SKUs (with reference to the volume of sales attributable to such SKUs, customer demands therefor, and the likelihood and extent of anticipated Chargebacks associated with the withdrawal from sale of such SKUs), Buyer may, as its sole and exclusive remedy, terminate this Agreement in accordance with its terms, and (b) to the extent such breach relates to an immaterial portion or amount of SKUs (with reference to the volume of sales attributable to such SKUs, customer demands therefor, and the likelihood and extent of anticipated Chargebacks associated with the withdrawal from sale of such SKUs), Sellers shall have the right to elect to either (x) remove all such SKUs (or a portion thereof) from sale to or by the Sellers' customers prior to the Closing, at the Sellers' sole cost and expense (it being understood that such cost and expense may include related Chargebacks, but only to the extent that such Chargebacks, together with an amount equal to the Chargebacks taken or that will be taken pursuant to Section 3.3.5(c)(v), would cause the sum of the Eligible Receivables and Eligible Inventory to fall below $16,500,000) or (y) not take any action, it being understood that in such event, Buyer's sole remedy would be to make a claim against the Supply Agreement Escrowed Amount for the costs and expenses of removal of such goods (it being understood that such costs and expenses may include related Chargebacks, but only to the extent that such Chargebacks, together with an amount equal to the Chargebacks taken or that will be taken pursuant to Section 3.3.5(c)(v),

would cause the sum of the Eligible Receivables and Eligible Inventory to fall below $16,500,000)

6. **Buyer's Warranties and Representations.** In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Sellers:

6.1 **Organization, Standing and Power.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all requisite entity power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

6.2 **Authorization of Buyer.** The execution, delivery and performance of this Agreement and all writings relating hereto by Buyer have been duly and validly authorized. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or any of its assets or properties may be bound.

7. **"AS IS" Transaction.** Buyer hereby acknowledges and agrees that Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Property (including, without limitation, income to be derived or expenses to be incurred in connection with the Property, the physical condition of any personal property comprising a part of the Property or which is the subject of any Contract to be assumed by Buyer at the Closing, the value of the Property (or any portion thereof), the transferability of the Property, the terms, amount, validity, collectibility or enforceability of any assumed liabilities or Contract, the title of the Property (or any portion thereof), the merchantability or fitness of the Personal Property or any other portion of the Property for any particular purpose, or any other matter or thing relating to the Property or any portion thereof). Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Property. Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of all portions of the Property and all such other matters relating to or affecting the Property as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Property, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, except only for such surviving representations, Buyer will accept the Property at the Closing **"AS IS," "WHERE IS,"** and **"WITH ALL FAULTS."**

8. **Bankruptcy Court Approvals.**

8.1 **Bankruptcy Court Approval of Sale Matters.**

(a)     Promptly following the execution of this Agreement by Buyer and Sellers (and in no event later than the second (2nd) business day), Sellers will seek approval by the Bankruptcy Court of an order in form and substance satisfactory to the Buyer and the Sellers (the "Approval Order) which, among other things, (i) approves the sale of the Property to Buyer on the terms and conditions set forth in this Agreement and authorizes the Sellers to proceed with this transaction, (ii) includes a specific finding that Buyer is a good faith purchaser (as determined under Section 363(m) of the Bankruptcy Code) of the Property, (iii) states that the sale of the Property to Buyer shall be free and clear of all liens, claims, interests and encumbrances whatsoever (other than those, if any, listed on Schedule 8.1(a)(iii) attached hereto and incorporated herein by this reference), and (iv) approves the Sellers' assumption and assignment of the Designated Contracts (collectively, the "Section 365 Contracts") pursuant to Section 365 of the Bankruptcy Code; provided that (xx) as to any cure amounts payable to the other parties to the Section 365 Contracts as a condition to such assumption and assignment, Sellers shall bear and pay, in the aggregate, up to $150,000 of such cure costs and Buyer shall bear and pay any excess over such amount, and (yy) Buyer shall be responsible for satisfying such "adequate assurance of future performance" requirements as the Bankruptcy Court may impose as a condition to approving Sellers' assumption or assignment of any Section 365 Contract.  Following the filing of the Sale Motion, Sellers shall use reasonable efforts to obtain the Approval Order.  Both Buyer's and Sellers' obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Approval Order other than such obligations of the Sellers arising under clause (b), below, and set forth in the Procedures Order.  If the Bankruptcy Court refuses to issue the Approval Order or to approve any third party purchaser at the hearing on the Sale Motion, then this transaction shall automatically terminate and the Sellers and the Buyer shall be relieved of any further liability or obligation hereunder.  In the event that a third party (an "Upset Purchaser" and the underlying agreement between the Upset Purchaser and one or more of the Sellers, the "Upset Agreement") is approved by the Bankruptcy Court as the purchaser of substantially all of the Property at the hearing on the Sale Motion, however, notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Sellers at the last purchase price and on the last terms offered by Buyer at the auction until the Outside Date, but subject and subordinate in all respects to the rights of the Upset Purchaser under the Upset Agreement; provided, however, this Agreement shall automatically terminate if the Approval Order is for any reason whatsoever not entered by the Bankruptcy Court on or before August 11, 2006, or the Closing does not occur by the Outside Date.  Upon entry of the Approval Order in accordance with the provisions of this Section 8.1(a) (such entry date being referred to herein as the "Sale Approval Date"), the condition set forth in this Section 8.1(a) shall conclusively be deemed satisfied.

(b)     (i) With respect to the Contracts included on Exhibit "8.1(c)" attached hereto and incorporated by reference (the "Scheduled Contracts"), the Buyer may designate such Scheduled Contracts (collectively, "Designated Contracts" and each a "Designated Contract") to be assumed by the Sellers (or the applicable Seller, as the case may be) and assigned to the Buyer pursuant to Section 365 of the Bankruptcy Code, (ii) as to those Scheduled Contracts which the Buyer shall have designated prior to ten (10) business days before the hearing on the Sale Motion, the Sellers shall seek the entry of an order approving such

assumption and assignment in connection with the entry of the Approval Order, with such approved assumption and assignment occurring at the Closing, (iii) as to those Scheduled Contracts which the Buyer shall have designated after ten (10) business days before the hearing on the Sale Motion, the Sellers shall promptly take all reasonable actions in an effort to cause the assumption by the Sellers (or applicable Seller, as the case may be) and assignment to and assumption by Buyer pursuant to Section 365 of the Bankruptcy Code of each such Designated Contract and otherwise cooperate in reasonable respects with the Buyer in respect of each assignment and (iv) during the 90 day period commencing on the Execution Date, the Sellers shall not reject any Scheduled Contracts unless with the prior written consent of the Buyer, it being agreed that after July 20, 2006 the contract costs actually incurred by the Sellers under each Designated Contract and each other Scheduled Contract as to which the Buyer has not provided consent for rejection, shall be reimbursed by the Buyer until the tenth (10th) business day after such time as the Buyer shall notify the Sellers in writing that the Buyer does not intend to designate such Scheduled Contract as a Designated Contract (at such time, the costs under such Scheduled Contracts shall no longer be the Buyer's obligation). The assignment to Buyer of the Designated Contracts made to Buyer post-Closing (and Buyer's assumption of the post-assignment obligations thereunder) shall be made pursuant to an assignment and assumption instrument identical in all material respects to the Assignment of Contracts. Buyer's and Sellers' respective cure obligations with respect to any Designated Contracts assumed and assigned post-Closing shall be subject to the aggregate limitations set forth in Section 8.1(a)(iv)(xx) above and Buyer shall be responsible for satisfying such "adequate assurance of future performance" requirements as the Bankruptcy Court may impose as a condition to approving Sellers' assumption or assignment thereof.

9.    Access to Records and Properties of Sellers. From and after the date of this Agreement until the Closing Date, Sellers shall afford to Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives, reasonable access for examination at all reasonable times to the Property and all records pertaining to the Property or the Business. Buyer, however, shall not be entitled to access to any materials containing privileged communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy. Buyer expressly acknowledges that nothing in this Section 9 is intended to give rise to any contingency to Buyer's obligations to proceed with the transactions contemplated herein.

10.    Miscellaneous.

10.1    Damage and Destruction. Sellers shall promptly notify Buyer of the occurrence of any material damage to or destruction of the Property that occurs prior to the Closing Date. In the event of any uninsured damage to or destruction of the Property prior to the Closing Date the cost of which to repair would total $315,000 or less, then such damage or destruction shall have no effect whatsoever on the Purchase Price or Buyer's or Seller's obligation to close. Should any uninsured damage or destruction to the Property occur prior to the Closing Date the cost of which to repair would total more than $315,000 but less than $550,000, then unless Sellers cause the same to be repaired and restored in all material respects prior to the Closing Date (in which case the Purchase Price shall be

unaffected and the parties shall proceed with the Closing as though such damage, destruction or proceedings had never occurred or been initiated), Buyer's sole remedy shall be to receive a dollar-for-dollar reduction in the Purchase Price in an amount equal to the sum of (i) the cost of such repairs, less (ii) the amount of any insurance proceeds with respect thereto assigned to Buyer at the Closing, and consummate the transaction contemplated herein. If any uninsured damage or destruction to the Property occurs prior to the Closing Date the cost of which to repair would total $850,000 or more, then irrespective of whether the same can be repaired and/or restored prior to the Closing Date, Buyer shall have the right and option to either (i) terminate this Agreement and the transaction contemplated herein, or (ii) elect to receive, as its sole and exclusive remedy by reason of such damage, destruction, a Purchase Price reduction in the amount of $740,000 and consummate the transaction contemplated herein as though the damage or destruction had never occurred or been initiated. In all other events or in the event that Buyer elects to consummate the purchase pursuant to clause (ii) above, (xx) all insurance proceeds, including business interruption and rental loss proceeds, collected by or paid to Sellers prior to the Closing Date, shall be credited against the Purchase Price on a dollar-for-dollar basis on Buyer's account or the Purchase Price shall be adjusted by an amount agreed between Buyer and Sellers, and (yy) all entitlement to all other insurance proceeds arising out of such damage or destruction or proceedings and not collected prior to the Closing Date shall be assigned to Buyer at the Closing. Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Property shall unconditionally shift to the Buyer on the Closing Date. For avoidance of doubt, Buyer and Sellers intend that the provisions of this Section 10.1 shall control over any right or remedy to which the Buyer may otherwise be entitled under this Agreement by reason of the occurrence of any event subject to this Section 10.1.

10.2    Attorneys' Fees. In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

10.3    Reasonable Access to Records and Certain Personnel. In order to facilitate Sellers' efforts to administer and close the Bankruptcy Case (including, without limitation, the preparation of filings in the Bankruptcy Case and state, local and federal tax returns and other filings), for a period of five (5) years following the Closing, (i) the Buyer shall permit Sellers' counsel and other professionals and counsel for any successors to Sellers and their respective professionals (collectively, "Permitted Access Parties") reasonable access to the financial and other books and records which comprised part of the Property acquired, which access shall include (xx) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (yy) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with

reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the reasonable costs and expenses thereof, and (ii) Buyer shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to finance, management and administrative personnel during regular business hours to assist Sellers and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not unreasonably interfere with the Buyer's business operations.

       10.4   Notices. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of the date of mailing. Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 10.5.

| | |
|---|---|
| To Sellers: | Global Home Products<br>550 Polaris Parkway, Suite 500<br>Westerville, OH 43082<br>Attn: Mark Eichhorn<br>Fax: 740-681-6078<br>e-mail: meichhorn@anchorhocking.com |
| With a copy to: | Pachulski Stang Ziehl Young Jones<br>& Weintraub LLP<br>150 California Street, 15th<br>San Francisco, CA 94111<br>Attn: David M. Bertenthal, Esq.<br>Fax: 415-263-7010<br>e-mail: dbertenthal@pszyjw.com |
| | and |
| | Pachulski Stang Ziehl Young Jones<br>& Weintraub LLP<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19801<br>Attn:  Laura Davis Jones, Esq.<br>Fax:   302-652-4400<br>e-mail: ljones@pszyjw.com |
| To Buyer: | SEB S.A.<br>Chemin du Petit Bois<br>Les 4M - BP 172 |

69134  Ecuily cedex
France
Attn:   Philippe Sumeire and Bruno Labrosse
Fax:
emails: psumeire@groupeseb.com and
        blabrosse@groupeseb.com

With a copy to:          Skadden, Arps, Slate, Meagher & Flom LLP
                         40 Bank Street
                         London E14 5DS
                         Attn:   Lynn Hiestand, Esq.
                         Fax:    (00) 44 207 072 7120
                         e-mail: lhiestan@skadden.com

                         and

                         Skadden, Arps, Slate, Meagher & Flom LLP
                         One Rodney Square
                         Wilmington, DE 19899-0636
                         Attn: Gregg M. Galardi
                         Fax: 888 329 3792
                         email:  ggalardi@skadden.com


10.5    Entire Agreement. This instrument, that certain Confidentiality
Agreement dated May 22, 2006, between Houlihan, Lokey, Howard & Zukin Capital (for
The WearEver Company) and the Buyer, and the documents to be executed pursuant hereto
contain the entire agreement between the parties relating to the sale of the Property. Any
oral representations or modifications concerning this Agreement or any such other
document shall be of no force and effect excepting a subsequent modification in writing,
signed by the Party to be charged.

10.6    Modification. This Agreement may be modified, amended or
supplemented only by a written instrument duly executed by all the parties hereto.

10.7    Closing Date. All actions to be taken on the Closing Date pursuant
to this Agreement shall be deemed to have occurred simultaneously, and no act, document
or transaction shall be deemed to have been taken, delivered or effected until all such
actions, documents and transactions have been taken, delivered or effected.

10.8    Severability. Should any term, provision or paragraph of this
Agreement be determined to be illegal or void or of no force and effect, the balance of the
Agreement shall survive.

1-NY/2064980.1                        21

10.9  Captions. All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

10.10  Further Assurances. Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement.

10.11  Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

10.12  Brokerage Obligations. Except for Houlihan, Lokey, Howard & Zukin (the "Broker"), which Broker Sellers have engaged in connection with this transaction, Sellers and the Buyer each represent and warrant to the other that such party has incurred no liability to any real estate broker or other broker or agent with respect to the payment of any commission regarding the consummation of the transaction contemplated hereby. It is agreed that other than the fee or commission payable to the Broker (which shall be paid to the Broker concurrently with, and out of the proceeds payable to the Sellers at, the Closing), if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions, are ever asserted against Buyer or the Sellers in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

10.13  Payment of Fees and Expenses. Except as provided in Section 10.12 above, each party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

10.14  Survival. The respective representations, warranties, covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.15  Assignments. This Agreement shall not be assigned by any Party hereto without the prior written consent of the other party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion, provided that Buyer may assign any or all of its rights and interests hereunder to one or more of its Affiliates and designate

one or more of its Affiliates to perform its obligations hereunder and provided further that, in the event that Buyer so assigns this Agreement, it shall nevertheless remain liable to perform its obligations hereunder if its assignee fails to fulfill such obligations. For the purposes of this Agreement, "Affiliate" means, with respect to any person, any other person, legal or otherwise, that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under the common control with, the first such person (control meaning the possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through ownership of voting securities, by contract or otherwise) and the directors, officers, employees and agents of such other person.

10.16  Binding Effect.  Subject to the provisions of Section 10.16, above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors (including, without limitation, and notwithstanding anything to the contrary in Section 10.16 above, any trustee hereafter appointed in the Bankruptcy Case), and assigns of the parties hereto.

10.17  Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of Delaware.

10.18  Good Faith.  All parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

10.19  Construction.  In the interpretation and construction of this Agreement, the parties acknowledge that the terms hereof reflect extensive negotiations between the parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either party hereto.

10.20  Counterparts.  This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile signature pages or pages in portable document format (.pdf) provided that by doing so the parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

10.21  Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

10.22  Bankruptcy Court Jurisdiction.  THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT. SUCH COURT SHALL HAVE SOLE JURISDICTION OVER

**SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND BUYER AND SELLERS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.**

10.23    Interpretation and Rules of Construction.  In this Agreement, except to the extent that the context otherwise requires:

10.23.1 when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

10.23.2 the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

10.23.3 whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

10.23.4 the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

10.23.5 all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

10.23.6 the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

10.23.7 any law or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

10.23.8 references to a person are also to its permitted successors and assigns; and

10.23.9 the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

10.24    Certain Limitations on Disclosure.  Except as may be required by applicable law and except for such disclosures as each Seller may make to its secured lender, the Broker and/or to the Official Committee of Unsecured Creditors in the Bankruptcy Case, prior to Sellers' filing of the Procedures Motion, neither Buyer nor Sellers shall make any public announcement of the transactions contemplated by this Agreement without first obtaining the other's prior written consent.

10.25    No Third Party Beneficiaries.  There are no third party beneficiaries to this Agreement or any of the agreements set forth herein.

**10.26** . Limitation on Representations and Warranties. Notwithstanding anything herein to the contrary, the representations set forth in Sections 5.3 and 5.4 of this Agreement (including, without limitation, Section 5.4.1) lapsed on July 20, 2006 (the "Lapse Date") and have since the Lapse Date been and continue to be of no force or effect whatsoever (including as a condition to the Buyer's obligation to consummate the transaction contemplated herein) after July 20, 2006. Further, but without in any way limiting the foregoing or in any way restoring any of the representations or provisions of Sections 5.3 and 5.4 (including, without limitation, Section 5.4.1), Buyer's sole recourse by reason of the inaccuracy of the representation or warranty set forth in Section 5.3 or (as set forth in Section 5.4.1 above) a material inaccuracy in the representations and warranties set forth in Section 5.4, shall be to terminate this Agreement and the transactions contemplated herein (which termination shall be in writing) prior to the Lapse Date and such occurrence shall cause the Sellers to cause the immediate return of the Deposit to the Buyer.

**10.27** Purchase of Nuevo Laredo Equipment.    Sellers (or the applicable Sellers, if fewer than all) shall transfer the Neuvo Laredo Equipment to the Buyer or one of its subsidiaries or affiliates for the additional amount of $750,000, subject to such additional terms and conditions as the Sellers and Buyer might agree and provided that all costs of removal and transport of such assets shall be the sole and exclusive responsibility of the Buyer. However, the transfer of the Nuevo Laredo Equipment is not a condition to the parties' obligation to close the transaction provided for in the other provisions of this Agreement.

**10.28** Joint and Several Liability.  Each entity comprising Buyer shall be jointly and severally liable for all obligations of the Buyer hereunder and under any other document, agreement and instruments executed and delivered by Buyer in connection with the transaction contemplated herein

CONFORMED TO REFLECT MODIFICATIONS SET FORTH IN THAT CERTAIN
FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT DATED AS OF JULY 14, 2006

In Witness Whereof, Buyer and Sellers have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

**SEB S.A.,**
a company incorporated under the laws of France

By:_____
Name:
Title:

**GROUPE SEB USA**
a Delaware corporation

By:_____
Name:
Title:

**SELLERS:**

**MIRRO ACQUISITION INC.,**
a Delaware corporation and
Chapter 11 Debtor and Debtor in Possession

By:_____
Name:
Title:

**MIRRO OPERATING COMPANY, LLC,**
a Delaware limited liability company and
Chapter 11 Debtor and Debtor in Possession

By:_____
Name:
Its:

**MIRRO PUERTO RICO, INC.,**
a corporation organized under the laws of the
Commonwealth of Puerto Rico and
Chapter 11 Debtor and Debtor in Possession

By:_____
Name:

Signature Page to Asset Purchase Agreement

Title:

**690649 BC, LTD.,**
a British Columbia company

By:
Name:
Title:

CONFORMED TO REFLECT MODIFICATIONS SET FORTH IN THAT CERTAIN
FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT DATED AS OF JULY 14, 2006

## Exhibits and Schedules

[TO BE ATTACHED]

[Please note that exhibits have not yet been reviewed]

Exhibit "C"

ASSIGNMENT AND ASSUMPTION OF CONTRACTS

This Assignment and Assumption of Contracts (this "Assignment") is entered into as of this ___ th day of August, 2006, between _____ _____ _____, and _____, each a Debtor and Debtor in Possession under Case No. 06-10340 in the Bankruptcy Court (collectively, the "Assignor"), on the one hand, and SEB S.A., a company incorporated under the laws of France, and Groupe SEB USA, a Delaware corporation (collectively, the "Assignee"), on the other hand, with respect to the following facts and circumstances:

A.    Assignor, as Seller, and Assignee, as Buyer, have heretofore entered into that certain Asset Purchase Agreement dated July ___, 2006 (the "Purchase Agreement"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.    Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement. Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.3.1 and 3.4.2 of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.    Assignment.  Effective as of the Closing Date, to the extent of their respective interests therein, the parties comprising Assignor hereby assign to Assignee all of their right, title and interest in and to the Contracts described on Exhibit "A" attached hereto and incorporated herein by this reference (collectively, the "Assigned Contracts").

2.    Assumption.  Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to faithfully perform all of Assignor's obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3.    Assignee's Indemnification.  Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignor) and hold Assignor free and harmless of, from and against any and all liabilities, obligations, claims, demands, actions, causes of action, losses and costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Assignor may suffer or incur by reason of or in connection with Assignee's breach or default or

1-NY/2064980.1                                   2

asserted or claimed breach or default of any obligation to the counter-party under the Assigned Contracts (or any of them) to be performed thereunder from and after the Closing Date.

4.    Attorneys' Fees.  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

5.    Amendments.  This Assignment may only be amended by a writing signed by both Assignor and Assignee.

6.    Execution in Counterparts.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

7.    Delivery Pursuant to Purchase Agreement.  Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement and the acknowledgement and disclaimer set forth in Section 7 thereof).

8.    Governing Law.  This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware

9.    Joint and Several Liability  Each entity comprising Assignee shall be jointly and severally liable for all obligations of the Assignee hereunder.

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Assignment as of the day and year first set forth above.

**ASSIGNOR:**

Mirro Operating Company, LLC, a
_____ limited liability company
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its: _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its: _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____.
Its: _____

**ASSIGNEE:**

**SEB S.A., a company incorporated under the laws of France**

By:_____
Name: _____.
Its: _____

**Groupe SEB USA, a Delaware corporation**

By:_____
Name: _____.
Its: _____

Exhibit "D"

## BILL OF SALE

Pursuant to Section 3.3.2 of that certain Asset Purchase Agreement dated as of August, 2006 (the "Agreement"), by and between SEB S.A., a company incorporated under the laws of France, and Groupe SEB USA, a Delaware corporation (collectively, the "Buyer"), on the one hand, and Mirro Operating Company, LLC, a _____ limited liability company, _____, and _____, each a Debtor and Debtor in Possession under Case No. 06-10340 in the Bankruptcy Court (collectively, the "Sellers"), on the other hand, and for good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, to the extent of their respective interests therein, each entity comprising Sellers hereby sells, transfers, assigns and delivers to Buyer all of its right, title and interest in and to (i) the Personal Property, (ii) the Receivables, and (iii) the Inventory.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Agreement.

Notwithstanding anything to the contrary herein, Sellers are executing and delivering this Bill of Sale in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Agreement and the acknowledgement and disclaimer set forth in Section 7 of the Agreement).

Each entity comprising Assignee shall be jointly and severally liable for all obligations of the Assignee hereunder

**IN WITNESS WHEREOF**, Sellers have caused this Bill of Sale to be executed as of the
_____ day of August, 2006.

**SELLERS:**

Mirro Operating Company, LLC, a
_____ limited liability company
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____


_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____


_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____


_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____

## Exhibit "E"

## ASSIGNMENT OF INTANGIBLE PROPERTY

Mirro Operating Company, LLC, a _____ limited liability company _____, and _____, each a Debtor and Debtor in Possession under Case No. 06-10340 in the Bankruptcy Court (collectively, the "Assignor") are executing this Assignment of Intangible Property (the "Assignment") in favor of _____, a _____ (the "Assignee"), with respect to the following facts and circumstances:

(A)     Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated August ___, 2006 (the "Agreement"). Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(B)     Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Agreement. Pursuant to Sections 3.3.3 and 3.4.3 of the Agreement, Assignor and Assignee are required to mutually execute and deliver this Assignment at the Closing.

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which Assignor hereby expressly acknowledges, to the extent of their respective interests therein, each entity comprising Assignor hereby assigns, conveys, transfers and sets over unto Assignee, all of its right, title and interest (including any and all goodwill), if any, in and to all Intangible Property, including, but not limited to, its right, title and interest, if any, in and to the Intangible Property identified on Schedule 1 attached hereto and incorporated herein by this reference. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignor and Assignee.

Notwithstanding anything to the contrary herein, the parties comprising Assignor are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Agreement and the acknowledgement and disclaimer set forth in Section 7 thereof).

In the event that Assignor or Assignee brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

1-NY/2064980.1                    7

This Assignment shall be governed by and construed and enforced in accordance with the laws of Delaware

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the ___ of _____, 2006.

**ASSIGNOR:**

Mirro Operating Company, LLC, a
_____ limited liability company
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____

_____, a
_____
and Debtor and Debtor in Possession

By:_____
Name: _____
Its: _____

## Schedule

**[TO BE ATTACHED]**